```
 1                  IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE EASTERN DISTRICT OF VIRGINIA
                           Newport News Division
 3      - - - - - - - - - - - - - - - - - - -
 4                                         )
        UNITED STATES OF AMERICA,          )
 5                                         )
                    Plaintiff,             )     CRIMINAL ACTION
 6                                         )     NO. 4:17cr45
        v.                                 )
 7                                         )
        JOSEPH JAMES CAIN BENSON, et       )
 8      al.,                               )
                                           )
 9                  Defendants.            )
        - - - - - - - - - - - - - - - - - - -
10
                         TRANSCRIPT OF PROCEEDINGS
11      (Jury Trial - Day 2 - TESTIMONY & EVIDENCE - Pages 1 - 225)
                             Norfolk, Virginia
12
                              April 11, 2018
13
        BEFORE:  THE HONORABLE RAYMOND A. JACKSON
14                United States District Judge

15      APPEARANCES:

16               OFFICE OF THE UNITED STATES ATTORNEY
                 By:  Howard J. Zlotnick, AUSA
17                    Lisa R. McKeel, AUSA
                 Counsel for the Plaintiff
18
                 RULOFF SWAIN HADDAD MORECOCK TALBERT & WOODWARD PC
19               By:  Lawrence H. Woodward, Jr., Esq.
                 Counsel for the Defendant Benson
20
                 SACKS & SACKS
21               By:  Andrew M. Sacks, Esq.
                 Counsel for Defendant Wallace
22
                 KELLETER LAW, PC
23               By:  Trey R. Kelleter, Esq.
                 Counsel for the Defendant Brown
24
                 RASBERRY LAW, PC
25               By:  Jamison P. Rasberry, Esq.
                 Counsel for the Defendant Kindell
```

```
1                          I N D E X

2     GOVERNMENT'S
3     WITNESSES                                          PAGE

4       SUSANNE MENDOLA
             Direct Examination By Ms. McKeel              5
5            Cross-Examination By Mr. Woodward            11
             Cross-Examination By Mr. Sacks               15
6            Examination By the Court                     18
             Redirect Examination By Ms. McKeel           18
7       OFFICER MARTIN SCOTT
             Direct Examination By Ms. McKeel             19
8            Cross-Examination By Mr. Woodward            35
             Cross-Examination By Mr. Sacks               39
9            Cross-Examination By Mr. Rasberry            42
             Redirect Examination By Ms. McKeel           43
10      SIDNEY LUCAS
             Direct Examination By Ms. McKeel             43
11           Cross-Examination By Mr. Woodward            46
             Cross-Examination By Mr. Sacks               47
12      JW
             Direct Examination By Ms. McKeel             48
13           Cross-Examination By Mr. Woodward            54
             Cross-Examination By Mr. Sacks               55
14           Cross-Examination By Mr. Kelleter            60
             Cross-Examination By Mr. Rasberry            62
15      TEQUILLA WALKER
             Direct Examination By Ms. McKeel             63
16           Cross-Examination By Mr. Woodward            76
             Cross-Examination By Mr. Sacks               79
17      LEKEISHA WYNNE
             Direct Examination By Ms. McKeel             85
18           Cross-Examination By Mr. Woodward            88
             Cross-Examination By Mr. Sacks               94
19           Cross-Examination By Mr. Kelleter           102
             Cross-Examination By Mr. Rasberry           103
20           Examination By the Court                    104
        STACEY SMITHLEY
21           Direct Examination By Mr. Zlotnick          105
             Cross-Examination By Mr. Woodward           185
22           Cross-Examination By Mr. Sacks              203
             Cont'd Cross-Examination By Mr. Woodward    213
23

24

25
```

Janet Collins, Official Court Reporter

```
 1

 2                          E X H I B I T S

 3    GOVERNMENT'S
      NO.                  DESCRIPTION                        PAGE
 4
      1, 2, 3              Documents                             7
 5    4                   Document                              22
      5                   Document                              23
 6    6                   Document                              24
      7                   Document                              25
 7    8                   Document                              27
      9                   Document                              28
 8    10                  Document                              31
      11                  Document                              32
 9    14                  Document                              64
      16                  Document                              73
10    15                  Document                              74
      76A                 Document                             113
11    18                  Document                             117
      20 and 21           Physical Evidence                    119
12    154                 Video                                120
      23 & 24             Documents                            125
13    25                  Document                             126
      26                  Document                             128
14    28                  Physical Evidence                    129
      27                  Document                             130
15    29                  Physical Evidence                    131
      30                  Document                             132
16    31                  Physical Evidence                    135
      32                  Document                             136
17    33                  Document                             137
      34                  Document                             139
18    35                  Document                             140
      58                  Document                             141
19    64                  Document                             142
      52-56               Physical Evidence                    147
20    50                  Document                             148
      59                  Document                             149
21    38                  Document                             150
      40                  Document                             151
22    41                  Document                             152
      42                  Document                             153
23    43                  Document                             153
      39                  Document                             154
24    45 & 46             Documents                            155
      47 & 48             Documents                            156
25    49                  Document                             158
      76B                 Document                             160
```

Janet Collins, Official Court Reporter

4

```
 1    13                    Document                  164
      72                    Document                  165
 2    73                    Document                  166
      74                    Document                  167
 3    65                    Document                  169
      66                    Document                  170
 4    67                    Document                  171
      80 & 81               Physical Evidence         173
 5    68                    Document                  176
      70                    Document                  177
 6    69                    Document                  178
      82                    Physical Evidence         180
 7    83                    Document                  181
      84                    Physical Evidence         182
 8    85 & 131              Physical Evidence         183

 9
      DEFENDANT'S
10    NO.              DESCRIPTION                    PAGE

11     200 Wallace           Document                  102

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Janet Collins, Official Court Reporter

S. MENDOLA - DIRECT                                                    5

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                         *  *  *  *  *
 3          THE COURT:  You may call your first witness.
 4          MS. MCKEEL:  Thank you, Your Honor, Susanne Mendola.
 5          SUSANNE MENDOLA, called by the Government, having
 6   been first duly sworn, was examined and testified as follows:
 7                     DIRECT EXAMINATION
 8   BY MS. MCKEEL:
 9   Q.  Would you state your name and spell it for our court
10   reporter?
11   A.  Susanne, S-U-S-A-N-N-E, Mendola, M-E-N-D-O-L-A.
12   Q.  Ms. Mendola, I'd like to take you back to March of 2009.
13   What city did you live in?
14   A.  Newport News.
15   Q.  And what was your street name?
16   A.  Sandpiper Street.
17   Q.  Is that near Clipper Drive?
18   A.  Yes.
19   Q.  Okay.  How long have -- do you still live there, ma'am?
20   A.  Yes.
21   Q.  How long have you lived in that house?
22   A.  Since January 1983.
23   Q.  Now, where was your house in relation to 217 Clipper
24   Drive?
25   A.  Catty-corner across the street from it.
```

S. MENDOLA - DIRECT                                                6

```
 1  Q.  I'm going to take you back specifically to March the
 2  13th, 2009.  Do you remember that day, ma'am?
 3  A.  Yes.
 4          THE COURT:  Can you speak up, ma'am?  Keep your
 5  voice up.
 6          THE WITNESS:  Yes.
 7  BY MS. MCKEEL:
 8  Q.  I'm going to show you, it's going to be on your screen,
 9  what has been marked as United States Exhibit Number 1.
10          Do you see that, ma'am?
11  A.  Yes, I do.
12  Q.  Do you recognize that photograph?
13  A.  Yes.
14  Q.  What is that?
15  A.  That's the front of the house at 217 Clipper.
16  Q.  Okay.  Let's look at Government's Exhibit Number 2,
17  please.  What is that, ma'am?
18  A.  That's the side and back angle of the same house.
19  Q.  Of the same house?
20  A.  Yes.
21  Q.  And let's look at Government's Exhibit Number 3, please.
22          Do you recognize that photo?
23  A.  Yes.  That's the angle looking at the back of the house.
24  Q.  That's what you can see from your house?
25  A.  Yes.
```

Janet Collins, Official Court Reporter

S. MENDOLA - DIRECT                                        7

```
 1   Q.  Okay.
 2          MS. MCKEEL:  Your Honor, United States would
 3   introduce Government's Exhibits, 1, 2, and 3, please.
 4          THE COURT:  Any objection?
 5          (No objection from defense.)
 6          THE COURT:  It may be released and published.
 7          (The documents were received in evidence as
 8   Government's Exhibit Nos. 1, 2, 3.)
 9   BY MS. MCKEEL:
10   Q.  Now, Ms. Mendola, I've already asked you did you remember
11   that day.  Can you tell us, please, what you did
12   that morning?
13          THE COURT:  Ms. McKeel, before we go forward, you
14   had her look at three exhibits.  We have three on the screen.
15   It might be easier if you do it so they can track one exhibit
16   at a time because right now --
17          MS. MCKEEL:  Yes, sir.
18          THE COURT:  -- they can't see 1 and 2, they just
19   have 3 here.  So next time, let's do one at a time.
20          MS. MCKEEL:  Yes, thank you, Judge.
21   BY MS. MCKEEL:
22   Q.  I asked you if you remembered that day.  Do you remember
23   what you did that morning?
24   A.  Yes.  We were going grocery shopping, and we left the
25   house about 10 in the morning.
```

S. MENDOLA - DIRECT                                              8

1    Q.   You are saying "we," who is we?

2    A.   My husband and I.

3    Q.   And you left about 10.  What time did you return,

4    approximately?

5    A.   Between 11 and 11:30.

6    Q.   When you returned, what exactly did you do?

7    A.   We gathered our groceries out of the car and we were

8    heading toward the front door of the house to take them in

9    the house.

10   Q.   If we can look at Government's Exhibit 3, please.

11        Ma'am, if you would take a look back at that.  You

12   previously stated this is the angle that you see; is that

13   correct?

14   A.   Yes.

15   Q.   When you were taking your groceries in, did you hear or

16   see something from the back of this home?

17   A.   It was a young boy who was outside on the sidewalk.  I

18   couldn't tell if he was laughing, screaming, crying, but he

19   was -- you know, it was loud, you know, loud utterances and

20   he had his jacket on because it was a little chilly, but that

21   was then.

22        As I said, our hands were full of the groceries, we

23   were going to take them into the house and then come back out

24   and try to see, you know, if he needed something.

25   Q.   So you were concerned?

S. MENDOLA - DIRECT                                                    9

1   A.  Yes.

2   Q.  Did you go inside your house and come back out?

3   A.  Yes, we did.

4   Q.  What did you see when you came back out?

5   A.  We saw the back door closing.  We assumed the young boy

6   had gone back in the house and closed the door.

7           MR. SACKS:  Object to assumption.

8           THE COURT:  Sustained.

9   BY MS. MCKEEL:

10  Q.  You no longer saw the little boy?

11  A.  No.

12  Q.  Prior to that occasion, did you know Louis Joseph, who

13  lived in that house?

14  A.  We knew there were people who lived in the house, but we

15  did not know them, we did not know their names.  There was

16  not much interaction.

17  Q.  Did you -- is that house a house that was sold or was it

18  a rental?

19  A.  It was being rented.

20  Q.  Okay.

21          Now, with Government's Exhibit Number 3, with this

22  particular photograph it's a little difficult to see.  But is

23  there a gate and a wall on the back of that house?

24  A.  Yes.

25  Q.  And when you recalled seeing the child outside, was that

S. MENDOLA - DIRECT                                          10

 1   gate opened or closed, or do you remember?

 2   A.  I don't recall, but the child was out on the sidewalk.

 3   Q.  He was on the sidewalk in front of the gate or along

 4   where the grass is?

 5   A.  In front of the gate.

 6   Q.  Now, from your view to 217 Clipper Drive where the child

 7   was standing, did you have anything blocking your view?

 8   A.  No.

 9   Q.  Now, while -- do you recall how long -- this being March,

10   2009, how long Mr. Joseph had lived there?

11   A.  I do not recall.

12   Q.  Okay.  Do you know how many people were inside that

13   house?

14   A.  I believe there were three.  We saw a man, we saw a

15   woman, we saw a child.

16   Q.  And was that the same child you saw crying?

17   A.  Yes.

18   Q.  Now, after you came back out and you found the child was

19   gone, what did you and your husband do?

20   A.  As I said, we weren't sure whether he was crying,

21   screaming, laughing.  I don't have children, so I don't

22   recognize a lot of those things.

23   Q.  Okay.

24   A.  And we saw him gone, you know, and so we just decided

25   that maybe there wasn't a problem, so we just went back in

1    the house.

2    Q.   Okay.  Did you go -- did you stay at your house all day

3    long --

4    A.   Yes.

5    Q.   -- or did you leave and go other places?

6    A.   I think we stayed at the house the rest of the day.

7    Q.   Did you notice any activity over at the house?

8    A.   No, because we spent the day in the sun room, or in the

9    back of the house.  Not in view of the front and the street.

10   Q.   But your view -- is your view the back of this house as

11   in Exhibit Number 3?

12   A.   Yes.

13   Q.   At some point, ma'am, did you all see police cars in the

14   neighborhood?

15   A.   Yes, we did.  It was late in the afternoon when we did

16   see emergency vehicles.

17          MS. MCKEEL:  That's all the questions I have, Your

18   Honor.

19          THE COURT:  Any cross?

20          MR. WOODWARD:  Yes.

21                      CROSS-EXAMINATION

22   BY MR. WOODWARD:

23   Q.   My name is Larry Woodward, I represent Mr. Joseph Benson.

24          You can see that on the viewer there in front of you,

25   ma'am?

S. MENDOLA - CROSS                                                              12

1    A.  Yes.

2    Q.  So I can get the lay of the land, what we're looking at

3    here is the back of 217 Clipper?

4    A.  Yes.

5    Q.  And it's not visible on this screen, but is there a

6    street between your house and there?

7    A.  Yes.

8    Q.  And what is that street?

9    A.  Sandpiper Street.

10   Q.  So that's Sandpiper that runs in front of your house and

11   behind 217 Clipper?

12   A.  Along the side of 217 Clipper.

13   Q.  And then so the front, if we could put it up.  I think

14   Exhibit 1 is the front.  Let's put up what's been admitted as

15   Exhibit 1.

16          This is the front of 217 Clipper?

17   A.  Yes.

18   Q.  Okay.  So, again, it's not visible here, but the bottom

19   of this picture, would the street that runs where the bottom

20   of that picture is be Clipper Drive?

21   A.  Yes.

22   Q.  And when you left to go to the grocery store at about

23   10:00 a.m., did the route you took to go wherever you buy

24   groceries, require you to go on Clipper Drive?

25   A.  No.

S. MENDOLA - CROSS                                                      13

```
1   Q.  So you didn't notice whether or not there were any kind
2   of vehicles parked in front of the house, because you didn't
3   go on Clipper Drive?
4   A.  We did not see vehicles in the front of the house, no.
5   Q.  Okay.  Well, you wouldn't've been able to if you didn't
6   drive on Clipper, correct?
7   A.  Correct.
8   Q.  Likewise, did you see, when you left about 10:00 a.m., on
9   Sandpiper Drive, which would be the back of the 217 Clipper,
10  any vehicles?
11  A.  I do not recall.
12  Q.  Okay.
13  A.  From that point in the morning.
14  Q.  Okay.
15          And you indicated you were gone about an hour to an
16  hour and a half, and you came back to your home?
17  A.  Yes.
18  Q.  And your house is not pictured in these pictures, but do
19  you have just like a pull -- you just pull in your driveway?
20  A.  Yes.
21  Q.  And you're unloading your groceries and you see this
22  child on the sidewalk.
23          Can we go back to 3?
24          Just so the ladies and gentlemen will know, of the
25  jury, how far would you estimate it is in distance to the
```

S. MENDOLA - CROSS                                              14

1    sidewalk you showed Ms. McKeel from where you were unloading

2    your groceries?  If you can point to something in the

3    courtroom, I can help you estimate.

4    A.  No more than from here to the back of the courtroom.

5    Q.  A hundred feet, give or take?

6    A.  That sounds about right.

7           THE COURT:  Let the record reflect it's

8    approximately a hundred feet.

9           MR. WOODWARD:  Yes, sir.

10   BY MR. WOODWARD:

11   Q.  And you indicated the child was making some sort of loud

12   noise and you couldn't tell whether it was laughter or

13   screaming, or what?

14   A.  That's correct.

15   Q.  Do you remember any words?

16   A.  No, I could not make out any words.

17   Q.  Did the child appear to be, to your knowledge, trying to

18   get your attention, or do you think he was just out there

19   making these noises, or do you know?

20   A.  I wasn't sure.

21   Q.  Okay.  And how long a period of time did you see that?

22   As I understood it, you were unloading your groceries; was it

23   a matter of seconds?

24   A.  Maybe a minute.  We went in the house and came back out.

25   Q.  And, of course, you have no way of knowing how long the

1   child had been out there when you pulled in your driveway?

2   A.  No.

3   Q.  Wasn't there when you left at 10:00 a.m.?

4   A.  No.

5   Q.  Okay.  And then, just so I've got it clear, you took some

6   groceries, a load of groceries into the house, and when you

7   came back out, the child wasn't there anymore?

8   A.  No.  That's correct, he was not.

9   Q.  That was a bad question.

10  A.  Yes, he wasn't there.

11  Q.  And about how long a period of time was that from when

12  you saw him and took your groceries in and came back out and

13  he was gone?

14  A.  A minute, maybe two, at the very most.

15  Q.  And I take it, from what you told Ms. McKeel, your

16  concern, if that's the right word, that there may be some

17  problem kind of was gone because the child was not out there

18  anymore and you didn't go over to Clipper Drive and try to

19  see if anything was wrong; you just went back into your

20  house?

21  A.  No, we didn't.  We didn't know the family, we didn't know

22  the people.

23  Q.  Okay.

24          MR. WOODWARD:  Thank you.  I think that's all the

25  questions I have, Your Honor.

```
 1                        CROSS-EXAMINATION
 2   BY MR. SACKS:
 3   Q.  Good morning, Ms. Mendola.  I'm Andrew Sacks, I represent
 4   Mark Wallace.
 5          First of all, could you tell me again, what was the
 6   date that we are referring to that you saw the child crying?
 7   What's the date?
 8   A.  March 13th.
 9   Q.  And what year was that?
10   A.  2009.
11   Q.  Now, the photographs that we saw, the three exhibits, you
12   didn't take those, obviously?
13   A.  No.
14   Q.  Do you know when they were taken?
15   A.  No.
16   Q.  You don't know whether they depict the scene of the home
17   at any particular time that day or not?
18   A.  I don't know what time of day they were taken.
19   Q.  You just know that they show a house that you're familiar
20   with?
21   A.  Yes.
22   Q.  All right.
23          You didn't recall how long the folks who lived in the
24   house had been there.  Without prying into your private
25   affairs, can you give us some idea of how long you had lived
```

S. MENDOLA - CROSS                                                            17

1    in the neighborhood where you were on that day?

2    A.   I had been in that home since 1983.

3    Q.   So you are very familiar, then, with the neighborhood

4    area?

5    A.   Yes.

6    Q.   And is there -- do you have any kind of an estimate as to

7    how long the folks -- the man, the woman and the child

8    occupied that rental house before that day?  Or if you

9    don't --

10   A.   I'm not sure.  A year or two, maybe.  I'm not sure.

11   Q.   All right.  Had you seen them around periodically?

12   A.   Yes.

13   Q.   All right.

14        Now, from the time that you saw the child, I think

15   between 11 and 11:30 when you returned from shopping --

16   A.   Yes.

17   Q.   -- until you saw the police cars, I think you said late

18   in the afternoon?

19   A.   Yes.

20   Q.   You didn't see any other activity around or in connection

21   with that house?

22   A.   No.  We were in the back of our home, so we did not see

23   the street or any activity there.

24   Q.   Didn't hear -- nothing directed your attention to it?

25   A.   Didn't see it, didn't hear anything, no.

S. MENDOLA - EXAM BY COURT/REDIRECT                    18

1  Q.  And I think you told us that you never saw any vehicles

2  at the house, one way or the other, around the house?

3  A.  I don't recall if there were vehicles there that day.

4  Q.  All right.

5        MR. SACKS:  I think that's all I have, Ms. Mendola.

6  Thank you very much for your time.

7        MR. KELLETER:  No questions.

8        MR. RASBERRY:  No questions, Your Honor.

9        THE COURT:  The Court has a question.

10                    EXAMINATION

11  BY THE COURT:

12  Q.  Do you know approximately what age the child was?

13  A.  I think he was probably around 4 or 5.

14        THE COURT:  You may redirect.

15                 REDIRECT EXAMINATION

16  BY MS. MCKEEL:

17  Q.  Ms. Mendola, you've been asked about the noise that you

18  heard.  Was it of a nature that it drew your attention to the

19  house?

20  A.  The fact that he was out in the yard.  Like I said, I

21  don't know if it was screaming, laughing or crying.  Just him

22  being out there by himself drew our attention.

23        MS. MCKEEL:  That's all I have, Your Honor.

24        THE COURT:  May the witness be permanently excused,

25  counsel?

M. SCOTT - DIRECT                                                 19

```
 1              (Defense responds in the affirmative.)
 2              THE COURT:  You may be permanently excused, ma'am.
 3              THE WITNESS:  Thank you.
 4              MS. MCKEEL:  United States' next witness is Officer
 5    Martin Scott.
 6              OFFICER MARTIN SCOTT, called by the Government,
 7    having been first duly sworn, was examined and testified as
 8    follows:
 9                          DIRECT EXAMINATION
10    BY MS. MCKEEL:
11    Q.  Good morning, sir.  Would you please tell us your name,
12    and spell it for our court reporter?
13    A.  Retired master police officer ME Scott, last name
14    S-C-O-T-T, Newport News Police.
15    Q.  Now, sir, you just said you were retired.  Where are you
16    retired from?
17    A.  Newport News.
18    Q.  Police department?
19    A.  Police department, yes, ma'am.
20    Q.  Are you employed now?
21    A.  I am not.
22    Q.  Okay.  You retired?
23    A.  Yeah.
24    Q.  Were you employed with the Newport News Police Department
25    back in March of 2009?
```

M. SCOTT - DIRECT                                                    20

1    A.   I was.

2    Q.   Okay.  And did you -- were you a patrol officer and you

3    worked a certain area?

4    A.   Yes.  I was a patrol officer in the North Precinct,

5    Denbigh area in the City of Newport News, yes.

6    Q.   How long, sir, have you worked with the Newport News

7    Police Department?

8    A.   At the time, I had been with the Newport News Police

9    Department for approximately eight years at that time.

10   Q.   Okay.  And what year did you retire?

11   A.   I just retired last May.

12   Q.   Now, were you working on Friday, March 13th of 2009?

13   A.   I was.

14   Q.   And did you receive a call, dispatch call?

15   A.   I did.

16   Q.   And where did you respond to?

17   A.   Refer to my notes, please?

18        On March 13th at approximately 4:42 p.m., I received

19   a dispatch to 217 Clipper Drive.

20   Q.   Okay.  And what did you receive a dispatch call for?

21   A.   It was in reference to a deceased person.

22   Q.   As a result of getting that call, what did you do?

23   A.   I proceeded to that area of 217 Clipper Drive.  I was

24   approximately three minutes away, I arrived at the residence

25   at 4:45 p.m.

M. SCOTT - DIRECT                                                         21

1    Q.   Okay.  Now, when you got there, was anybody else there
2    that you could see out front of this home?
3    A.   No, ma'am.
4    Q.   Okay.  I'd like to show you what's been marked as
5    Government's Exhibit Number 1.
6              It's been introduced, it will be on your screen, sir?
7    A.   Okay.
8    Q.   Would you take a look at that?
9    A.   Yes, ma'am.
10   Q.   Do you recall that photograph?
11   A.   That is 217 Clipper Drive.
12   Q.   Is that the front of the house or the back of the house?
13   A.   That is the front of the house.
14   Q.   And would that have been the entrance that you went into?
15   A.   Yes, ma'am.
16   Q.   Okay.  So the medics, had they arrived at that time?
17   A.   Not at that time, ma'am.  I was the only person that had
18   arrived on-scene.
19   Q.   So when you -- did you go in through the front door, sir?
20   A.   I did.  I approached the residence and the front door
21   that's shown in the photograph, I walked up to that door.
22   Q.   I'm going to show you what's been marked as Government's
23   Exhibit Number 4.  If you will take a look at your screen,
24   please.
25             Do you recognize this photograph, sir?

M. SCOTT - DIRECT                                                    22

 1   A.  That is the front door of the residence at 217 Clipper

 2   Drive.

 3          MS. MCKEEL:  Your Honor, the United States would

 4   like to introduce it and publish it to the jury.

 5          THE COURT:  Any objection?

 6          (No objection from defense.)

 7          THE COURT:  It will be admitted.

 8          (The document was received in evidence as

 9   Government's Exhibit No. 4.)

10   BY MS. MCKEEL:

11   Q.  And so this was the entrance that you walked into when

12   you first came in; is that right?

13   A.  That is correct, ma'am.

14   Q.  Do you recall if the door was opened or closed when you

15   came in?

16   A.  When I arrived, the outer door, the storm door, was

17   closed as shown in the photograph.  But as I opened that, I

18   noticed that the inner security door, the solid door,

19   appeared to have been kicked in.

20   Q.  Okay.  Let me show you, please, Government's Exhibit

21   Number 5.

22          And is that an accurate depiction of what you saw,

23   sir, in this photograph?

24   A.  Yes.  You can see that the deadbolt is still out and the

25   door is still open.

M. SCOTT - DIRECT                                                    23

```
 1          MS. MCKEEL:  Your Honor, we would like to introduce
 2   this photograph, please.
 3          THE COURT:  Any objection?
 4          MR. WOODWARD:  No, Your Honor.
 5          (No objection from defense.)
 6          MR. WOODWARD:  Your Honor, I've seen all of these
 7   crime scene photos, we don't have any objection to them.
 8          THE COURT:  But unfortunately for the record, we
 9   will have to admit them one by one.
10          It will be admitted.
11          MS. MCKEEL:  Thank you, Judge.
12          (The document was received in evidence as
13   Government's Exhibit No. 5.)
14   BY MS. MCKEEL:
15   Q.  So this accurately depicts what you saw when you came in
16   this door?
17   A.  That is correct.
18   Q.  Now, when you came through that front door, did you see
19   anybody?
20   A.  I did not see -- physically see anyone from the front
21   door, no.
22   Q.  Did you hear anything?
23   A.  I did.  I could hear a female inside who was upset,
24   hysterically crying, shaken, or whatever.
25   Q.  Okay.  What did you do -- you didn't see anything, but
```

M. SCOTT - DIRECT                                                    24

 1    what did you do then?  Did you look around the scene or what?
 2    A.  Yes.  Finding the front door in that condition, it arose
 3    my suspicion a little bit.  And I also could see a pool of
 4    coagulated blood on the floor.
 5    Q.  And I will show you Government's Exhibit Number 6.
 6            Does that show, from the different angle, the front
 7    door and a front room?
 8    A.  Yes.  That's the room where, as I entered, would have
 9    been immediately to my -- to my right.
10            MS. MCKEEL:  Your Honor, we'd like to introduce
11    Government's Exhibit Number 6, please.
12            (No objection from defense.)
13            THE COURT:  It will be admitted.
14            MS. MCKEEL:  Thank you.
15            (The document was received in evidence as
16    Government's Exhibit No. 6.)
17    BY MS. MCKEEL:
18    Q.  Officer Scott, if you could, look at that photograph.
19    This is the front room, where you said you saw blood.  Can
20    you tell us approximately where you thought you saw it?
21    A.  It was on the floor and there was a trail that led toward
22    the back of the house where I could hear someone in the back
23    of the house.
24            This was not -- I immediately assessed the situation
25    and determined this was not a routine or normal deceased

M. SCOTT - DIRECT                                                    25

1    person.  So I was very careful when I entered the home not to

2    disturb anything.  I immediately began treating it as a crime

3    scene.

4    Q.  You did not step in any blood?

5    A.  I did not step in any blood, I was very careful where I

6    stepped.

7    Q.  As you went back to the back of the house where you said

8    you heard this noise, let us take a look at Government's

9    Exhibit Number 7.

10          Do you recognize this photograph, sir?

11   A.  This is as I came out that room into the kitchen area,

12   which was on the back side of the house.

13          MS. MCKEEL:  Your Honor, we would introduce this

14   exhibit, please.

15          (No objection from defense.)

16          THE COURT:  It will be admitted.

17          (The document was received in evidence as

18   Government's Exhibit No. 7.)

19   BY MS. MCKEEL:

20   Q.  If you could, please show Exhibit Number 8 to the

21   witness.

22          Do you recognize this photograph, sir?

23   A.  Yes.  This is the family room/den area of the house.  And

24   as you can see from the photographs, something else that

25   caught my attention was it appeared to have been ransacked

M. SCOTT - DIRECT                                              26

 1   because all the cushions were tossed about and things.

 2          MR. SACKS:  Objection to the speculation to what

 3   happened, not to the physical description.

 4   BY MS. MCKEEL:

 5   Q.  As a police officer, when you are called, especially the

 6   person on the scene, do you have to make some assessments of

 7   what's going on?

 8   A.  I do.

 9   Q.  Do you need to call anybody or call it in?

10   A.  No.

11   Q.  Okay.  So as -- when we're in this particular area of the

12   house, where is it that you heard or saw anybody at this

13   point?

14   A.  I saw a black female later identified as -- if I can

15   refer to my notes -- Tequilla Walker.  She was standing

16   somewhere in the area of the back door, which is shown in the

17   photograph.

18   Q.  Okay.

19          If you could, please, sir, look at Government's

20   Exhibit Number 9.

21          Do you recognize that photograph?

22   A.  This is the blood trail that led out the back door of the

23   residence.

24          MS. MCKEEL:  Your Honor, I think -- I'm not sure if

25   I introduced Exhibit 8 and 9.

M. SCOTT - DIRECT                                               27

1          THE COURT:  I think the Exhibit 8 was admitted --
2     no, it wasn't.
3          MS. MCKEEL:  It was not.  I'm sorry, Judge, I would
4     do that at this point.
5          (No objection from defense.)
6          THE COURT:  Government's Exhibit 8 will be admitted.
7          (The document was received in evidence as
8     Government's Exhibit No. 8.)
9     BY MS. MCKEEL:
10    Q.  Let's look at Government's Exhibit 8 first.
11         And Number 8, is this another doorway in this
12    photograph?
13    A.  Yes.  I came in -- if you are looking at this photograph,
14    it's looking out the rear of the house that leads out to the
15    patio area, a covered patio to the rear of the house.
16         This is the doorway I would have had to walk through
17    the house and around to get to this doorway here.
18    Q.  And if we could look at Government's Exhibit Number 9.
19         And, sir, does that depict the same doorway we just
20    saw in Government's Exhibit 8?
21    A.  It does, and the blood that I observed on the floor.
22    Q.  So what, sir, did you notice -- this is a -- is this a
23    double area, open area, that you're in at this point?
24    A.  Yes.  When you come into the house from the front door, I
25    came to the front door, I observed the condition of the front

M. SCOTT - DIRECT                                                    28

```
 1   door, I observed the blood.
 2           The one room there in that photograph, I think it
 3   was Number 4, that showed the white chair that was looking
 4   back towards the front door.  I would have been looking and I
 5   could see through to the back door area.  It kind of --
 6   it's -- I guess it's like a formal dining room area.  And it
 7   was pretty much empty except for the white chair, fish
 8   aquarium, and there was an empty flat screen TV box in there.
 9           I could look through that to the kitchen area where
10   I walked to, and Ms. Walker and a young black male juvenile
11   was in that area of the house when I arrived.
12           MS. MCKEEL:  Your Honor, we would offer Government's
13   Exhibit Number 9.
14           THE COURT:  Any objection?
15           (No objection from defense.)
16           THE COURT:  It may be admitted.
17           (The document was received in evidence as
18   Government's Exhibit No. 9.)
19   BY MS. MCKEEL:
20   Q.  This area that you were in, the kitchen area you are
21   calling it, if you looked back at Government's Exhibit
22   Number 8, does it also enclose a living room area?
23   A.  That is a view looking out toward the back.  I would have
24   been standing to the left looking this way instead of this
25   way.
```

M. SCOTT - DIRECT                                                      29

1           And the wall from that room that I would've looked

2    through, that had the white chair and stuff in it, that wall

3    way in that photo so is to my left, so I could not see in

4    that area --

5    Q.   Okay.

6    A.   -- from the front door.

7    Q.   Now, when you made it to this area where the kitchen and

8    the living-type of room is in, do you recall where Tequilla

9    Walker and the child were standing?

10   A.   Ms. Walker was standing somewhere in the area of the back

11   door, kind of looking out the back door.  And the child, he

12   was standing next to the wall there.

13   Q.   Did she notice you come in, did she face you?

14   A.   She did not immediately notice me.  I kind of startled

15   her.  When I made it back to the kitchen area, I kind of

16   startled her a little bit.

17   Q.   Now, at some point, at this point where we are, do the

18   medics arrive?

19   A.   Not at this point.  Treating it as a crime scene, I had

20   Ms. Walker and the young juvenile walk toward me.  I told her

21   to be very careful where she stepped, not to step in any

22   blood or anything.  And we went back to the other side of the

23   house, which was behind us.

24           I took them into the master bedroom area which did

25   not appear to have any disturbance to it.  I went back there

M. SCOTT - DIRECT                                                    30

 1    to remove them from the immediate area.

 2          Once I got them back there, other officers had

 3    started to arrive.  A supervisor -- I'm not sure if he -- he

 4    or she had shown up yet, but other officers, they started to

 5    arrive.  The medics did come into the house.  I briefed them

 6    on what I had.  I did not want them to walk through, so I

 7    escorted them back out the front door, we walked around and

 8    into the backyard to the patio area where we could observe

 9    the victim --

10    Q.  Okay.

11    A.  -- who was laying on the patio.

12    Q.  Why didn't you want the medics coming through the house

13    or anybody coming through that area?

14    A.  I didn't want them to contaminate the crime scene.

15    Q.  And did you see blood throughout the house?

16    A.  I did.

17    Q.  And you just told us that you noticed the victim on the

18    back patio.  Could you see the victim when you were standing

19    in the den/living room/kitchen area?

20    A.  When I walked toward the back door area where I was

21    standing in that kitchen area and stuff, I could see out the

22    back door and I saw him lying on the ground.

23    Q.  Did you go back through that back door or did you go back

24    around the house?

25    A.  I went back around the house.

M. SCOTT - DIRECT                                                    31

1   Q.  I'd like to show you what's been marked as Government's

2   Exhibit Number 10, sir.

3           Do you recognize this photograph?

4   A.  I do.

5   Q.  And what is this?

6   A.  That's a photograph of the victim, how he was observed

7   lying on the back patio when I arrived.

8           MS. MCKEEL:  Your Honor, we'd like to introduce

9   Government's Exhibit Number 10 and publish it to the jury,

10  please.

11          THE COURT:  Any objection?

12          (No objection from defense.)

13          THE COURT:  Hearing no objection, it will be

14  admitted.

15          (The document was received in evidence as

16  Government's Exhibit No. 10.)

17  BY MS. MCKEEL:

18  Q.  Officer Scott, the last photographs that I showed you,

19  the back of the house, is this the patio that leads to the

20  back of the house?

21  A.  That is the patio area of the house.  The steps there

22  that you see going up to, that leads to that back door, which

23  you have previously shown a photograph of.

24  Q.  Okay.

25          And if you take a look, finally, at Government's

M. SCOTT - DIRECT                                                32

1   Exhibit Number 11.  Do you recognize that photograph?

2   A.  That's the victim that was found lying on the back patio

3   area.

4   Q.  And in this photograph, is that gate open or closed?

5   A.  The gate is open, and that's the way we found it upon our

6   arrival.

7          When I escorted the medics around, we did not enter

8   the patio area.  We walked around and kind of looked over the

9   wall, and the medic pronounced him deceased based on a visual

10  observation of him.

11  Q.  Okay.

12         MS. MCKEEL:  Your Honor, we would like to introduce

13  and publish to the jury Government's Exhibit Number 11.

14         THE COURT:  Any objection?

15         (No objection from defense.)

16         THE COURT:  Hearing no objection, it may be

17  admitted.

18         (The document was received in evidence as

19  Government's Exhibit No. 11.)

20  BY MS. MCKEEL:

21  Q.  After finding the victim on the back patio and escorting

22  the medics, what did you do next?

23  A.  I then returned -- I turned back around and went back

24  into the front door of the house and into the bedroom where

25  I -- another officer had taken the juvenile out to her car so

M. SCOTT - DIRECT                                                      33

1    I could speak with Ms. Walker and gather some information.
2    Q.   Okay.  And at that point, sir, did -- did the detectives
3    start arriving that would be investigators of the scene?
4    A.   Other officers had arrived.  What happened -- back up a
5    little bit.
6         Whenever I determined this was not a normal deceased
7    person, I immediately requested a supervisor and additional
8    officers respond on-scene.  And while the medics, I think
9    they were right behind me, responded to the deceased person.
10   While they are arriving, other officers had shown up and
11   began establishing a perimeter, setting up a crime scene,
12   began canvassing door-to-door, and we started a crime scene
13   log.
14        My supervisor showed up sometime during that
15   timeframe.  Officer Cupp had shown up, she was the female
16   officer who I had her take the juvenile outside.  So we had
17   established the crime scene at that time.
18   Q.   And when you talk about "establishing a crime scene,"
19   does crime scene tape go up around the area?
20   A.   Crime scene tape immediately goes up around the area to
21   set up a perimeter that we could control access to.
22   Q.   I would like you to take a look at, please, Government's
23   Exhibit 1.  And is that photograph -- do you recognize that
24   photograph?
25   A.   Yes.  As you can see in the photograph, going across the

M. SCOTT - DIRECT                                                    34

 1   photograph, that's police crime scene tape.  And, if you
 2   notice to the left, there is crime scene tape running along
 3   the left side of this house also.  We totally took crime
 4   scene tape went all the way around the perimeter.
 5   Q.  Now, was it your responsibility to speak with Tequilla
 6   Walker and the child, or someone else's?
 7   A.  I initially spoke with Ms. Walker.  Don't recall speaking
 8   to the child; he was very young at the time.
 9            Spoke with Ms. Walker and gathered initial
10   information, the identity of the victim, things like that.
11   Q.  Okay.  And did she give you the name of the victim?
12   A.  She did.
13   Q.  What was his name?
14   A.  She identified him as a Mr. Louis Edward Joseph, Jr.
15   Q.  Now, during your observations inside the house when you
16   were the first person in there, particularly where you say
17   the blood trail was, did you see any firearms openly?
18   A.  I did not.
19   Q.  Okay.  When you got back to the back area near the living
20   room and the den area, did you see cartridge casings and
21   evidence of a shooting?
22   A.  I did not observe those.
23   Q.  Okay.
24            MS. MCKEEL:  Judge, if I may, just a moment.
25            (Government counsel confer.)

Janet Collins, Official Court Reporter

M. SCOTT - CROSS                                                    35

```
 1             MS. MCKEEL:  That's all the questions I have for
 2   Officer Scott.
 3             THE COURT:  Ladies and gentlemen, we're going to
 4   take a 15-minute break, then we are going to come back and
 5   start with the cross-examination.
 6             You may step down, sir.
 7             May this witness be permanently excused, counsel?
 8             MR. WOODWARD:  No, sir, we need to do cross.
 9             THE COURT:  Oh, that's right.
10             (Off the record, 10:58 a.m., jury out.)
11             (On the record, 11:18 a.m., jury in.)
12             THE COURT:  You may be seated.
13             Record reflect that all jurors are present in the
14   courtroom.  Does counsel agree?
15             (All present counsel agree.)
16             THE COURT:  You may commence.
17             MR. WOODWARD:  Thank you, Your Honor.
18                        CROSS-EXAMINATION
19   BY MR. WOODWARD:
20   Q.  Good morning, Officer Scott.  My name is Larry Woodward,
21   I represent Mr. Benson.  I got just a few things I want to
22   cover with you.
23             Let me, just to -- in general terms, it was not your
24   responsibility to collect any evidence?
25   A.  I did not collect any evidence, no.
```

M. SCOTT - CROSS                                                        36

1    Q.  And that would include dusting for fingerprints, or
2    swabbing blood, or picking up -- you didn't collect anything?
3    A.  That's correct, sir, I did not process the scene.
4    Q.  And you indicated a couple of times to Ms. McKeel that
5    you had contacted your supervisor who arrived on the scene.
6    Who was that?
7    A.  I don't recall who that was, and I don't have it in my
8    notes.
9    Q.  And you indicated, if I got it correctly, when you came
10   in contact with who you later learned to be Ms. Walker and
11   the child, you put them into the master bedroom first; is
12   that correct?
13   A.  Yes, sir.
14   Q.  And did you do what we would call "clear the house?"  In
15   other words, go through and make sure there wasn't any other
16   person in the house that might be a threat to either you or
17   Ms. Walker or the child?
18   A.  Yes, sir.
19   Q.  And you didn't -- there was nobody else there?
20   A.  There was no one present, no, sir.
21   Q.  And how long would you estimate it was that Ms. Walker
22   and this child were in the bedroom before the child was taken
23   out and put in a car?
24   A.  May I refer to my notes?
25   Q.  Sure, absolutely.

M. SCOTT - CROSS                                                    37

1    A.   I do not have a time frame listed in my notes, but it
2    wasn't that long a period of time.
3    Q.   And, then am I given to understand, based on your
4    testimony, that Ms. Walker remained in the house after the
5    child was taken out?
6    A.   Initially she remained in to speak with me so I could
7    gather preliminary information from her.
8    Q.   I understand.  And then at some point, I guess, you
9    turned her over or someone else took over questioning her, a
10   detective or somebody?
11   A.   If I may refer back to my notes to make sure?
12   Q.   Sure.
13   A.   Yes, Ms. Walker was eventually escorted and put in the
14   officer's custody with the child.
15   Q.   And do you know approximately what time that was?
16   A.   I do not, sir.
17   Q.   Can we pull up what has been admitted Government's
18   Exhibit 3.  I think that's the right one.
19          Can you see that in front of you there, officer?
20   A.   I do.
21   Q.   Okay.  Now, this picture was taken prior to any crime
22   scene tape being put up.  Did you take any pictures?
23   A.   I did not take any photographs, sir.
24   Q.   Okay.  Can we go back to, I think it's -- I think it's
25   the back of the house with the crime scene tape up -- don't

M. SCOTT - CROSS                                                          38

1    worry about it.

2            So did you put up the crime scene tape?

3    A.  I did not put up the crime scene tape.

4    Q.  Do you know who closed or opened the gate?  I mean, it

5    appears to me in this picture that the gate is closed.  It's

6    hard to see, but can you tell from looking at the picture?

7    A.  I can't tell, sir.

8    Q.  Okay.  But the area where you can see there below the

9    gate, those steps lead up into the kitchen, correct?

10   A.  That is correct, sir.

11   Q.  And the inner door appears to be closed there, as well as

12   what I would call the storm door; is that correct?

13   A.  It appears so, sir.

14   Q.  Now, when you came into the residence that, the inner

15   door was open, correct?

16   A.  I don't recall, sir.

17   Q.  You don't recall, okay.

18           And, again, not knowing when this picture was taken

19   but just to orient the jury, the pictures you showed us of

20   the deceased body, as we look at this picture, would have

21   been to the left of the steps that head down; is that

22   correct?

23   A.  Looking at this --

24   Q.  Looking at this --

25   A.  -- the victim would have been laying to the left of the

1    gate.

2    Q.  Right, it would be to -- right, it would be to the right

3    as you come down the steps, but to the left as you look at

4    this picture?

5    A.  That is correct, sir.

6    Q.  And you were asked if you noticed any firearms or shell

7    casings.  You said no.

8            I presume you also didn't notice any, what you

9    thought to be drugs or cash in the house during your time?

10   A.  That is correct, sir, I didn't notice any of that.

11   Q.  All right.  Without telling me specifically what anyone

12   said, did you determine, when Ms. Walker entered the house,

13   whether she came in through the front door like you did or

14   entered the house from the back door?

15   A.  I did not determine.

16   Q.  I'm sorry?

17   A.  I did not.

18   Q.  You don't know.  All right.

19           MR. WOODWARD:  Thank you, Your Honor.  That's all I

20   have for this witness.

21           THE COURT:  Any further cross?

22           MR. SACKS:  Just briefly, Your Honor.

23                       CROSS-EXAMINATION

24   BY MR. SACKS:

25   Q.  Andrew Sacks here for Mark Wallace.

1          How are you?

2          Just a few.  Officer, with respect to -- well,

3    actually, could we put up those three photographs in a row,

4    Exhibits 1, 2, and 3?

5            MR. SACKS:  Is that possible, Your Honor, just to

6    put it in a series?

7            THE COURT:  I don't know if you can do a series

8    together or not.

9    BY MR. SACKS:

10   Q.  Just -- just look, if you would, officer, look at these.

11         That's Exhibit 1, 2, and, again, 3 you have seen, I

12   think.  Do you know who took those photographs?

13   A.  I do not.

14   Q.  Do you know when they were taken, the time?

15   A.  I do not.

16   Q.  You don't know whether they depict the scene as it was at

17   the time you arrived or not, do you?

18   A.  I cannot.

19   Q.  All right, sir.

20         Now, you do not -- you were dispatched, I think you

21   said, about 4:42 in the afternoon?

22   A.  That is correct.

23   Q.  And got there about 4:45?

24   A.  That's correct.

25   Q.  So I take it -- you have no personal knowledge of what

M. SCOTT - CROSS                                                    41

1   happened in that house before you got there or how all of

2   this came about?

3   A.  I do not.

4   Q.  All you did, you got there and made these observations,

5   which you recorded?

6   A.  That's correct.

7   Q.  I think you did prepare a report of notes to refresh your

8   recollection, if necessary?

9   A.  I did.

10  Q.  And one of the things I think you pointed out is that

11  when you went in the house, the blood smears that you saw on

12  the living room floor --

13  A.  Yes, sir.

14  Q.  -- actually appeared to be leading back towards the rear

15  of the house?

16  A.  Correct.

17  Q.  That was something you noticed?

18  A.  That is something I observed, yes.

19  Q.  All right, sir.

20        Now, you interviewed several -- you interviewed

21  Ms. Walker, I think you told us, as part of your --

22  A.  I spoke with Ms. Walker.

23  Q.  Spoke with her as part of your initial assessment?

24  A.  Yes, sir.

25  Q.  And, again, without getting into specifics of what she

M. SCOTT - CROSS                                                    42

 1    said, I don't want to ask hearsay but, generally speaking, in

 2    terms of going forward with the investigation, did you

 3    determine that whatever had happened, she was not present

 4    when it occurred?

 5    A.   I did.

 6    Q.   All right.  She was somewhere -- she was somewhere else?

 7    A.   Correct.

 8    Q.   And, as well, I know you said you did not recall talking

 9    to the child.  He was extremely young?

10    A.   He was, I think he was about 5.

11    Q.   All right.  But from your initial assessment at the

12    scene, did you also determine that he had been at the house

13    earlier?

14    A.   He had.

15    Q.   So he was there but the mother was not -- or the lady?

16    A.   From my understanding.

17    Q.   All right, sir.

18             MR. SACKS:  Officer, I think that's all that I have.

19             Thank you very much for your time.

20             THE WITNESS:  Yes.

21             MR. WOODWARD:  No questions, Your Honor.

22             MR. RASBERRY:  I have one, Your Honor.

23                          CROSS-EXAMINATION

24    BY MR. RASBERRY:

25    Q.   Good morning.  I'm Jameson Raspberry.

M. SCOTT - REDIRECT                                                    43

1    A.  Good morning, sir.

2    Q.  Did you have any previous contacts with Louis Joseph?

3    A.  No, sir.

4         MR. RASBERRY:  No more questions, thank you, Your

5    Honor.

6         THE COURT:  May the witness -- redirect?

7                    REDIRECT EXAMINATION

8    BY MS. MCKEEL:

9    Q.  Can we show Officer Scott Exhibit 3?  And if you can zoom

10   on to the right side of the photograph.  We are going to try

11   to zoom in so you can see, officer.

12   A.  The crime scene tape?

13   Q.  Yeah, is that what you see?

14   A.  I see it.  I observed it earlier.

15   Q.  So that, in fact, was crime scene tape put up?

16   A.  Crime scene had established before that photograph was

17   taken.

18        MS. MCKEEL:  That's all I have, Your Honor.

19        THE COURT:  May the witness be permanently excused?

20        (All defense respond in the affirmative.)

21        MS. MCKEEL:  United States calls Sid Lucas.

22        SIDNEY LUCAS, called by the Government, having been

23   first duly sworn, was examined and testified as follows:

24                    DIRECT EXAMINATION

25   BY MS. MCKEEL:

S. LUCAS - DIRECT                                                           44

1    Q.  Good morning, sir.  Would you please tell us your name

2    and spell it for our court reporter?

3    A.  Sidney Lucas.  S-I-D-N-E-Y, L-U-C-A-S.

4    Q.  And, sir, are you employed?

5    A.  Yes, ma'am.

6    Q.  Where are you employed?

7    A.  City of Newport News Fire Department.

8    Q.  And how long have you been employed?  What are your job

9    responsibilities?

10   A.  I am currently assigned to Fire Station 2 as a company

11   lieutenant.  I supervise the men and women assigned

12   underneath me and respond to calls for a response.

13   Q.  I'm going to take you back to Friday, March the 13th of

14   2009.  Were you working, sir?

15   A.  Yes, ma'am.

16   Q.  And what was your job back then?

17   A.  I was a firefighter medic and my job that day was

18   assigned to Medic 9, it's in Denbigh, and I was an advanced

19   life support medic.

20   Q.  Did you respond to 217 Clipper Drive, sir?

21   A.  Yes.

22   Q.  And when did you respond there?

23   A.  As the report states for the dispatch.

24   Q.  The dispatch.  What time did you get a dispatch?

25   A.  I can't recall.

1   Q.  Was that roughly somewhere around 1648 or 1642 when you

2   arrived?

3   A.  Yes, ma'am.

4   Q.  Okay.  Now, when you came on the scene, did you -- did

5   you come -- have other people that accompanied you?

6   A.  Yes, ma'am.  We had an engine response and a medic

7   response.

8   Q.  And when you came to the residence, did you enter through

9   the front of the house?

10  A.  No, ma'am.  The engine crew went in through the front of

11  the house and they were instructed by the police that was

12  already on-scene that it was a potential crime scene and not

13  to disturb anything.  So they exited the house, informed us,

14  and we went around the side of the house to the rear of the

15  house.

16  Q.  Okay.  And when you went around to the side of the house,

17  did you see something?

18  A.  Yes, ma'am.  We saw the victim, or the patient, that we

19  were called to assess.

20  Q.  I'd like to show you what's been admitted as Government's

21  Exhibit Number 11.  If you will look at your screen, sir.

22       Do you recognize this photo?

23  A.  Yes, ma'am.

24  Q.  Okay, is this the man that you saw.

25  A.  Yes, ma'am.

S. LUCAS - CROSS                                                    46

1   Q.  Okay.  And with this photo, if you can describe that area

2   that you saw?

3   A.  I believe it was the back porch, back patio area of the

4   house.

5   Q.  Now, what did you do when you -- once you saw his body?

6   A.  We checked for signs compatible with life and then we

7   pronounced the patient.

8   Q.  When you say you "pronounced," what does that mean?

9   A.  We pronounced the patient dead on arrival.

10  Q.  And was that roughly 1648?

11  A.  Yes, ma'am.

12  Q.  And in layman's terms, is that 4:48 in the afternoon?

13  A.  Yes, ma'am.

14        MS. MCKEEL:  That's all the questions I have, Your

15  Honor.

16        THE COURT:  Cross?

17                     CROSS-EXAMINATION

18  BY MR. WOODWARD:

19  Q.  How are you doing, sir?  My name is Larry Woodward.

20        Just a quick question.  So you never went inside the

21  house?

22  A.  No, sir.

23  Q.  You pronounced the victim deceased and then did whatever,

24  and never went in?

25  A.  Correct.

```
 1   Q.  And you indicated that the engine crew from the fire
 2   department had gone in the house and then were turned back.
 3          How many people from the engine crew entered the
 4   house?
 5   A.  Three.
 6   Q.  Three, okay.  And how long were they in there and where
 7   did they go, if you know?
 8   A.  I'm unable to advise that.
 9   Q.  You don't know, okay.  They got there before you?
10   A.  Yes, sir.
11   Q.  But when you got there, they had already been sent out of
12   the house and told you to go around the back or the side?
13   A.  Correct.
14   Q.  Okay.
15          MR. WOODWARD:  All right.  Thank you, Your Honor,
16   that's all I have.
17          THE COURT:  Any cross?
18          MR. SACKS:  Yes, Your Honor.
19                        CROSS-EXAMINATION
20   BY MR. SACKS:
21   Q.  I'm Andrew Sacks for Mark Wallace.
22          You don't have a specific independent recollection of
23   how the scene looked, other than just finding the victim
24   there and treating him?
25   A.  Are you speaking to the inside of the house?
```

JW - DIRECT                                                                48

1    Q.  No, the outside.

2    A.  The outside of the house, no, sir.

3    Q.  Your recollection is of the victim that you were going to

4    treat?

5    A.  My only recollection of that is correct.

6              MR. SACKS:  All right, thank you.

7              MR. KELLETER:  No questions, Your Honor.

8              MR. RASBERRY:  No questions, Your Honor.

9              THE COURT:  First, redirect?

10             MS. MCKEEL:  I'm sorry, there's no redirect.

11             THE COURT:  Oh, okay.  May the witness be

12   permanently excused?

13             (All defense respond in the affirmative.)

14             THE COURT:  Your next witness.

15             MS. MCKEEL:  United States calls JW.

16             JW, called by the Government, having been first duly

17   sworn, was examined and testified as follows:

18                         DIRECT EXAMINATION

19   BY MS. MCKEEL:

20   Q.  Are your initials JW?

21   A.  Yes.

22   Q.  Would you please tell us how old you are.

23   A.  14.

24   Q.  What is the month of your birthday?

25   A.  March.

JW - DIRECT                                                                          49

1    Q.   And what is the year of your birthday?

2    A.   2004.

3    Q.   JW, I'd like to take you back to Friday, March the 13th,

4    2009.  Do you remember that day?

5    A.   Yes.

6    Q.   Okay.  Did you know someone by the name of -- that you

7    called Lou?

8    A.   Yes.

9    Q.   And who was that?

10   A.   My mother's boyfriend at the time.

11           THE COURT:  Now, you will need to keep your voice up

12   so that we can hear you.

13           THE WITNESS:  Okay.

14   BY MS. MCKEEL:

15   Q.   And did you sometimes stay at Lou's house?

16   A.   Yes.

17   Q.   Do you remember, on Friday the 13th in the morning, 2009,

18   being with Lou?

19   A.   Yes.

20   Q.   Tell us what -- what you heard.

21   A.   I heard a noise at the door.

22   Q.   And were you with Lou?

23   A.   Yes.

24   Q.   What did you and Lou do?

25   A.   We were playing the video game.

1   Q.   When you got there, what did you see?

2   A.   Two men came in the house.

3   Q.   Did they have anything in their hands?

4   A.   Yes.

5   Q.   What did they have?

6   A.   Guns.

7   Q.   Okay.  Did you know these men?

8   A.   No.

9   Q.   Do you remember if they said anything to you or Lou?

10  A.   They told me to go in the room.

11  Q.   Okay.

12          MR. KELLETER:  Your Honor, I didn't hear that.

13          THE COURT:  Once again, you are going to have to

14  give us the loudest voice possible.  I don't think we have a

15  handheld microphone in here anywhere.

16          Let's see can we get the microphone straightened out

17  first.  First, we're going to give him the water and then we

18  are going to give him a handheld.

19          THE COURT:  Speak into that microphone.

20          THE WITNESS:  Hello.

21          THE COURT:  Okay.

22  BY MS. MCKEEL:

23  Q.   Do you remember if the men said anything when you first

24  saw them?

25  A.   Yes.  They told me to go in the room.

JW - DIRECT                                                        51

1    Q.  I'm sorry?

2    A.  They told me to go in the bedroom.

3    Q.  Okay.  Did you see them touch Lou, either one of the men?

4    A.  Yes.

5    Q.  What did you see?

6    A.  They pushed him to the ground.

7    Q.  Okay.  Did Lou say something to you?

8    A.  No.

9    Q.  What did you do?

10   A.  I went in the bedroom like they told me.

11   Q.  When you were in the bedroom, could you hear what was

12   happening?

13   A.  Yes.

14   Q.  What did you hear?

15   A.  Gunshot.

16   Q.  Did you come out of your bedroom at some point?

17   A.  Yes.

18   Q.  Your back room, where your kitchen is and your back

19   living room area, is there a couch in there?

20   A.  Yes.

21   Q.  And did you notice anything about the couch or see the

22   men by the couch?

23   A.  The pillows were gone.

24   Q.  Okay.  Was there a man looking through the couch?

25   A.  Yes.

JW - DIRECT                                                          52

```
1    Q.   When you saw that, do you remember anything anybody was

2    saying?

3    A.   No.

4    Q.   Okay.  Do you remember seeing Lou when you were there?

5    A.   Yes.

6    Q.   Tell us -- describe what Lou was doing.

7    A.   Bleeding.

8    Q.   Okay.  Did you see the men leave?

9    A.   Yes.

10   Q.   Okay.  Do you -- what did you do after the men left?

11   A.   I went to go check on Lou.

12   Q.   Okay.  What did you see when you went to check on Lou?

13   A.   That he was still bleeding.

14   Q.   And where was he bleeding from?

15   A.   His leg and stomach.

16   Q.   Do you recall how many gunshots you think you heard?

17   A.   Two.

18   Q.   During the times when you were back in your bedroom when

19   this happened, did you ever hear the men say anything to Lou?

20   A.   No.

21   Q.   Did you hear Lou say anything to the men?

22   A.   No.

23   Q.   When you went to check on Lou, did you talk to Lou?

24   A.   Yes.

25   Q.   What did you say to him?
```

JW - DIRECT                                                        53

```
 1    A.  I asked him if he was okay.

 2    Q.  Did Lou talk back to you?

 3    A.  He said "Go get peoples."

 4           MR. SACKS:  Objection to hearsay.

 5           THE COURT:  Counsel?

 6           MS. MCKEEL:  Judge, it's not offered for the truth

 7    of the matter, it's to see what the child did afterwards.

 8           THE COURT:  Well, you can ask him after he spoke to

 9    Lou what did he do afterwards.

10           MS. MCKEEL:  Judge, also, we can show at that point

11    when the child talked with him that he was alive.

12           THE COURT:  Objection overruled.  Continue.

13    BY MS. MCKEEL:

14    Q.  What did Lou say to you?

15    A.  He told me to "go get people."

16    Q.  Now, JW, you were 5 at that time?

17    A.  Yes.

18    Q.  Did you understand what that meant?

19    A.  No.

20    Q.  Do you remember what you did after Lou told you to go get

21    the people?

22    A.  I went back in the room.

23    Q.  What's the next thing you remember?

24    A.  That I went to go check on him one more time and then --

25           THE COURT:  Speak up, please.
```

1           THE WITNESS:  I went to go check on him one more

2    time.

3    BY MS. MCKEEL:

4    Q.  Did you talk to Lou?

5    A.  Yes.

6    Q.  Did he talk back to you at that point?

7    A.  No.

8    Q.  Did Lou ever, after that point, talk back to you?

9    A.  No.

10   Q.  What's the next thing you remember?

11   A.  The police came.

12   Q.  Okay.  Do you remember your mom coming home?

13   A.  Yes.

14           MS. MCKEEL:  That's all the questions we have, Your

15   Honor.

16                       CROSS-EXAMINATION

17   BY MR. WOODWARD:

18   Q.  Hi, JW.

19           I just want to ask you, during the time from when the

20   men came into the house until you remember your mom coming

21   home, do you remember if you ever went outside?

22   A.  No.

23   Q.  That was not a very good question.

24           Do you not remember if you went outside or do you

25   remember that you didn't go outside?

1  A.  I don't understand what you're saying.

2  Q.  Did you ever go outside of the house before your mom came

3  home?

4  A.  No.

5  Q.  Okay, and you say you saw the men leave.  Where were you

6  when you saw them leave?

7  A.  In the hallway.

8  Q.  Okay.  And how -- which door did they leave through?

9  A.  The door they came in.

10  Q.  The front door?

11  A.  (Nods head.)

12       MR. WOODWARD:  Thank you, Judge, that's all I have.

13       MR. SACKS:  A few, Your Honor.

14                      CROSS-EXAMINATION

15  BY MR. SACKS:

16  Q.  Good morning, young man.

17       I know you said you are 14 now?

18  A.  Yes.

19  Q.  And when you were 5, at the time of these events, I think

20  it was March 13.  So you had just turned 5 about nine days

21  ago -- or nine days before this.

22       In other words, when these things happened, if they

23  happened on March 13th, your birthday was about nine days

24  before that?

25  A.  It was about five.

JW - CROSS                                                                56

1   Q.  March 4th is your birthday?

2   A.  No, March 8th.

3           MS. MCKEEL:  Your Honor, I'm going to object to the

4   birth date.

5   BY MR. SACKS:

6   Q.  I just wanted to know how -- you had only been five for a

7   few days, basically?

8   A.  Yes.

9   Q.  That's all I wanted to know.  Thank you.

10          You said that Lou was your mother's boyfriend at the

11  time?

12  A.  Yes.

13  Q.  Do you know about how long they had been together that

14  way?

15  A.  For about a couple of months.

16  Q.  All right.  And during that couple of months, had Lou

17  been living at that same house where you were that day?

18  A.  Yes.

19  Q.  And had your mother been living with him there?

20  A.  Yes.

21  Q.  And you were living with the two of them?

22  A.  Yes.

23  Q.  So it was kind of like a unit of three of you there for a

24  couple of months?

25  A.  Yes.

JW - CROSS                                                          57

1    Q.  All right.  Leading up to these events?

2    A.  Yes.

3    Q.  Now, the prosecutor asked you did you sometimes stay at

4    Lou's house.  You said "yes."

5          Were there other houses you stayed at, or was that

6    where you stayed for those months they were together?

7    A.  Me -- my mother had an apartment somewhere else and I

8    stayed there sometimes.

9    Q.  But most of the time it was at Lou's house with her and

10   him?

11   A.  Yes.

12   Q.  Did you have your own room or sleep somewhere --

13   A.  I had my own room.

14   Q.  Your mother wasn't home then these things happened?

15   A.  No.

16   Q.  Do you remember about how long before these things

17   happened that your mother had left home, if you do?  If you

18   don't, it's --

19   A.  No.

20   Q.  She just had been gone sometime before that?

21   A.  Yes.

22   Q.  And then she didn't come back for quite some time

23   afterwards, right?

24   A.  Yes.

25   Q.  Did you call her at any time during that period?

JW - CROSS                                                              58

```
 1   A.   No.

 2   Q.   All right.  You just stayed at home?

 3   A.   Yes.

 4   Q.   Did you call the police?

 5   A.   No.

 6   Q.   You just waited there?

 7   A.   Yes.

 8   Q.   All right.

 9        Now, when Lou told you to go -- I wasn't sure exactly

10   what you said.  He said something about "the people."

11        Could you repeat that?  I just wasn't sure exactly

12   what you said.

13   A.   He told me to go get people.

14   Q.   Go get people.  And you didn't know what he was talking

15   about?

16   A.   Yes.

17   Q.   All right.  I guess there had been people at that house

18   before that day that you had seen come and go?

19   A.   Yes.

20   Q.   A lot of people come and go there, right?

21   A.   No.  Only his family.

22   Q.   All right.  But some people that you don't know sometimes

23   would come and go?

24   A.   No.

25   Q.   Were you there all the time or did you sometimes go out
```

JW - CROSS                                                              59

1   to other places?

2   A.  I used to go out.

3   Q.  So there were times when he was there --

4          MS. MCKEEL:  Your Honor, I'm going to object.  This

5   is beyond the scope.

6          THE COURT:  Objection sustained.

7          MR. SACKS:  All right, sir.

8   BY MR. SACKS:

9   Q.  When you were asked about what did you hear in the

10  bedroom, again, I thought you said you heard a -- a gunshot.

11  Did you say that?

12  A.  No, I heard a noise at the door.

13  Q.  Okay.  And then when you were in the bedroom, what did

14  you hear?

15  A.  A noise at the door.

16  Q.  Okay.  What did you hear later, another sound?

17  A.  Later then I heard a gunshot.

18  Q.  A gunshot?

19  A.  Yes.

20  Q.  All right.  So one shot?

21  A.  It was more than one, but it happened repeatedly.

22  Q.  All right, so when you said "a gunshot," you really meant

23  more than one?

24  A.  Yes.

25  Q.  These men who left, you had never seen them before?

JW - CROSS                                                         60

1   A.  No.

2   Q.  All right.  And they went out the front door?

3   A.  Yes.

4   Q.  All right.  After they went out the front door, where did

5   you go?

6   A.  Back in the room.

7   Q.  All right.  You didn't see where they went, did you?

8   A.  No.

9   Q.  All right.  You have no idea?

10  A.  No.

11  Q.  All right, sir.

12          And just a couple more.  Thank you for your patience.

13          When you were asked about where did you go when the

14  two unknown men came and they told you to go in, I thought

15  you said in the room?

16  A.  Yes, in the bedroom.

17  Q.  Okay.  Now, at first you said "the room," and I just --

18  is that how you referred to it, "the room?"

19  A.  Yes.

20  Q.  That's how you called it in the house?

21  A.  The bedroom, yes.

22  Q.  Okay, all right, sir.

23          MR. SACKS:  I think that's all I have.  Thank you,

24  young man.  Appreciate it.

25                          CROSS-EXAMINATION

Janet Collins, Official Court Reporter

1    BY MR. KELLETER:

2    Q.   You said you heard a noise at the door?

3    A.   Yes.

4    Q.   And then you saw two men?

5    A.   Yes.

6    Q.   Where were they in relation to the door?

7    A.   They were coming inside the door.

8    Q.   They were coming through the door?  When you came out of

9    the back room, you actually saw these two men coming from the

10   door?

11   A.   No, they came in that way.

12   Q.   How did you know they came in that way?

13   A.   Because the door was open.

14   Q.   Okay.  Where were they?

15   A.   Coming through the door.

16   Q.   I'm sorry, I'm just trying to figure out how close to the

17   door were they when you actually first saw them.

18        I know it's been a long time, but you obviously have

19   a memory that it was by a door.  So I'm just trying to get

20   you to try to remember what makes you say that.

21   A.   Because I heard the door open.

22   Q.   You heard it open.  Okay, and then at this point were

23   they very close to the door, do you think?

24   A.   Yes.

25   Q.   But beyond that, can you remember how close?

JW - CROSS                                                                62

1    A.  Right next to the couch.

2    Q.  Right next to the couch.  Is there a couch by the front

3    door?

4    A.  Yes.

5             MR. KELLETER:  I have no more questions.

6                          CROSS-EXAMINATION

7    BY MR. RASBERRY:

8    Q.  Good morning, JW.

9    A.  Good morning.

10   Q.  When you say "the front door," are you referring to the

11   door that faced Clipper Drive, or the back door where the

12   patio is?

13   A.  I don't really know.

14   Q.  You don't know which door?

15   A.  No.

16   Q.  Okay.  Do you recall the layout of that house?

17   A.  Yes.

18   Q.  Okay.  But you don't recall which door the men entered

19   from?

20   A.  No.

21            MR. RASBERRY:  No more questions, thank you.

22            THE COURT:  Answer yes or no.  I think you shook

23   your head.

24            THE WITNESS:  I said no.

25            THE COURT:  You have to say it loud enough for the

T. WALKER - DIRECT                                                   63

 1    record.
 2              MS. MCKEEL:  We have no redirect.
 3              THE COURT:  May the witness be excused?
 4              (All counsel respond in the affirmative.)
 5              THE COURT:  You may be permanently excused.  Thank
 6    you for coming.
 7              TEQUILLA WALKER, called by the Government, having
 8    been first duly sworn, was examined and testified as follows:
 9                          DIRECT EXAMINATION
10    BY MS. MCKEEL:
11    Q.  Would you state your full name, please, and spell it for
12    our court reporter?
13    A.  Tequilla Walker.  T-E-Q-U-I-L-L-A.  Walker, W-A-L-K-E-R.
14    Q.  Ma'am, are you employed?
15    A.  No.
16    Q.  Were you --
17    A.  Yes.
18    Q.  Were you employed previously?
19    A.  Yes, yes.
20    Q.  Did you just get laid off from work?
21    A.  Yes.
22    Q.  Do you have a child with the initials of JW?
23    A.  Yes.
24    Q.  And how old is he today?
25    A.  He is 14.

T. WALKER - DIRECT                                                64

1    Q.   I'm going to take you back to a time of March of 2009.
2         Did you know someone by the name of Louis Joseph?
3    A.   Yes.
4    Q.   I'm going to show you what's been marked, if you will
5    look at your screen, Government's Exhibit 14, please.
6         Do you see him, ma'am?
7    A.   Yes.
8    Q.   Who is that?
9    A.   That's Lou.
10   Q.   That's Lou?
11   A.   Uh-huh.
12        MS. MCKEEL:  Your Honor, the United States would
13   like to introduce Government's Exhibit 14.
14        THE COURT:  Any objection?
15        (No objection from defense.)
16        THE COURT:  It will be admitted.
17        MS. MCKEEL:  Thank you.
18        (The document was received in evidence as
19   Government's Exhibit No. 14.)
20   BY MS. MCKEEL:
21   Q.   Now, how long, by March of 2009, had you known Lou
22   Joseph?
23   A.   It hadn't been a whole year yet, so a couple of months.
24   Q.   Okay.
25        MS. MCKEEL:  You are going to have to speak up,

T. WALKER - DIRECT                                          65

1   okay?

2           THE COURT:  Ma'am, you have to speak loudly so they

3   can hear you.

4           THE WITNESS:  Okay.

5           It was only a couple of months.

6   BY MS. MCKEEL:

7   Q.  Okay.  When did you meet Mr. Joseph?

8   A.  It was in July, August.

9   Q.  Okay.  Of 2008, 2007?

10  A.  That was two --

11  Q.  We're talking about March of 2009 I asked you about.

12  A.  2009, uh-huh.  2008, I'm sorry.

13  Q.  On -- let's go right to it.

14          On March the 13th of 2009.  The previous night,

15  March the 12th, had you spent the night at Mr. Joseph's

16  house?

17  A.  Yes.

18  Q.  And who was at the house when you woke up that morning,

19  on Friday, March the 13th?

20  A.  It was just myself, Mr. Joseph, and my son.

21  Q.  Is that JW?

22  A.  JW, yes.

23  Q.  And at the time, how old was JW?

24  A.  He had just turned 5.

25  Q.  Do you recall when you moved into the home on Clipper

T. WALKER - DIRECT                                          66

1    Drive with Mr. Joseph?

2    A.   Yes.

3    Q.   When was that?

4    A.   That was September.

5    Q.   Of 2008?

6    A.   Yes, yes, 2008, yes, ma'am.

7    Q.   And did you have another house that you lived in or

8    another apartment?

9    A.   Yes.

10   Q.   Okay.  From, then, September of 2008 to March of 2009,

11   did you continuously stay with Mr. Joseph?

12   A.   Yes, I did.

13   Q.   And JW is not Mr. Joseph's child; is that correct?

14   A.   Ma'am?

15   Q.   He has another father; is that correct?

16   A.   Yes.

17   Q.   And would JW go and see his father and stay

18   there sometimes?

19   A.   You said what did JW go --

20   Q.   Did JW go see his own father?

21   A.   Yes, he did.

22   Q.   And would he stay with him sometimes?

23   A.   Yes.

24   Q.   When you first met Louis Joseph, did he have anyone else

25   staying at his house?

1    A.  Yes.

2    Q.  And who was that?

3    A.  His cousin.

4    Q.  And what was her name?

5    A.  Keisha.

6    Q.  Now, in March of 2009, did Mr. Joseph have a job?

7    A.  No.

8    Q.  Do you know how he made his living?

9    A.  No.

10   Q.  Did you have suspicions?

11   A.  Yes.

12   Q.  And what were your suspicions?

13   A.  I couldn't really pinpoint it, but I had suspicions that

14   he was doing something, I just couldn't really say.

15   Q.  Criminal activity?

16   A.  Right, yes.

17          THE COURT:  Ms. Matthews, ma'am, your voice is

18   coming off jumbled here.  I don't know if you give her a

19   handheld or what, but you need to keep your voice up so we

20   can hear.  They can't hear the end of your statements over

21   here.

22          THE WITNESS:  Okay.

23          THE COURT:  Leave the handheld mic over there.

24          And please speak into that handheld mic.

25   BY MS. MCKEEL:

T. WALKER - DIRECT                                              68

1   Q.   Ma'am, did Mr. Joseph have a car?

2   A.   Yes.

3   Q.   Do you recall what kind of car it was?

4   A.   I don't remember the make and model, I just remember it's

5   a gold car.

6   Q.   A gold car?

7   A.   Yes, ma'am.

8   Q.   And on the morning of Friday, March the 13th, was his car

9   at home?

10  A.   Yes.

11  Q.   Okay.  And had he used the car?

12  A.   That morning, yes, ma'am.

13          MR. SACKS:  Objection.  Regarding the timeframe.

14          THE COURT:  Objection sustained unless she has a

15  basis to know.

16  BY MS. MCKEEL:

17  Q.   Did you stay at the house all day on Friday, March the

18  13th?

19  A.   I left to go somewhere.

20  Q.   And about what time did you leave to go somewhere?

21  A.   I left about 9:00 a.m.

22  Q.   Okay.  So prior to your leaving, did Mr. Joseph use his

23  car?

24  A.   Yes, he did.

25  Q.   Do you know where he went?

Janet Collins, Official Court Reporter

T. WALKER - DIRECT                                                    69

1    A.  He went to the 7-11.

2    Q.  Did you see him return?

3    A.  Yes, I did.

4    Q.  You left at 9:00 a.m.  When did you return home?

5    A.  It was about 4:00 that evening.

6    Q.  Okay.  Now, during the time period that you were gone,

7    where was JW?

8    A.  He was at the house with Lou.

9    Q.  Was Mr. Joseph supposed to be watching him during this

10   time period?

11   A.  Yes, he was.

12   Q.  When you were gone during that day, did you try to

13   contact Mr. Joseph?

14   A.  Yes.

15   Q.  What did you do?

16   A.  I started off by texting him.  After a few of them went

17   unanswered, I started calling.

18   Q.  Did you ever, from after 9:00 in the morning until 4 --

19   whatever after 4, did you ever talk to Mr. Joseph?

20   A.  No, ma'am.

21   Q.  Did he ever text you back?

22   A.  No.

23   Q.  Did you find that that was odd?

24   A.  Yes.

25   Q.  When you returned home that day, where did you park?

1    A.   On the side of the street, which is basically on the side

2    of the house where we would normally park.

3    Q.   I'd like to show you Government's Exhibit, I believe it's

4    Number 2.

5         Would you take a look at that, ma'am.  Tell us -- can

6    you tell us what that is?

7    A.   It's Lou's car, and my car is parked behind him.

8    Q.   What color is your car?

9    A.   My color is the green car.  Green Malibu.

10   Q.   So when you got out of your car at this location, where

11   did you go?

12   A.   I went into the house, which was right up the sidewalk

13   here, which would have been to the right of my car.

14   Q.   There's a sidewalk right there, so you are going into the

15   back entrance?

16   A.   Yes.

17   Q.   What did you notice when you got to the back entrance?

18   A.   I saw Lou's -- he was laying there.  I saw his socks

19   first.  That was the first thing that caught my attention,

20   was his white socks.

21   Q.   And did you see at that location anything else on that

22   back patio?

23   A.   No.  Not besides him, no.

24   Q.   When you saw Lou, was he dead or alive?

25   A.   He was dead.

T. WALKER - DIRECT                                              71

```
 1   Q.   Okay.  Did you go over and touch him or just look at him?
 2   A.   Just look at him.
 3   Q.   And when you saw him, what did you do?
 4   A.   I -- I went in the house.
 5             THE COURT:  Hold up the microphone.
 6             THE WITNESS:  I went into the house.
 7   BY MS. MCKEEL:
 8   Q.   And when you went into the house, why were you going into
 9   the house?
10   A.   Before I left, I left my -- I left JW at the house, so
11   naturally the first thing with me seeing Lou laying there,
12   that was the first thing that, you know, came to mind, was me
13   trying to find where my child was.
14   Q.   Okay, when you went inside the house, did you find JW?
15   A.   Yes, I did.
16   Q.   Where did you find him?
17   A.   He was in the back bedroom watching television.
18   Q.   Okay.  Did you notice anything about his clothing?
19   A.   Yes.
20   Q.   What did you notice?
21   A.   He had blood on his T-shirt.
22   Q.   Did he appear to be hurt?
23   A.   No, he wasn't hurt.
24   Q.   After you found your son and he was unhurt, did you --
25   did you do anything?  Did you make any phone calls?
```

T. WALKER - DIRECT                                              72

1   A.   Yes.   That's when I initially made the 9-1-1 call.

2   Q.   And as a result of making that 9-1-1 call, who came to

3   your house?

4   A.   I'm sorry?

5   Q.   As a result of making the 9-1-1 call, who came to your

6   house?

7   A.   The police came.

8   Q.   Okay.   Did medics appear also?

9   A.   I'm sorry, can you repeat?

10  Q.   The medics?

11  A.   Yes, ma'am.

12  Q.   The fire department?

13  A.   Yes.

14  Q.   I'm going to show you what's been previously marked as

15  Government's Exhibit Number 11.

16          Who is this, ma'am?

17  A.   That's Lou.

18  Q.   Ms. Walker, I'd like to show you, if you will look at the

19  screen, Government's Exhibit Number 16.

20          Do you recognize this photo, ma'am?

21  A.   Yes.

22  Q.   What is that?

23  A.   That's a lawn chair.

24          MS. MCKEEL:   Your Honor, I'd like to introduce

25  Government's Exhibit Number 16.

Janet Collins, Official Court Reporter

1              THE COURT:  Any objection?

2              (No objection from defense.)

3              THE COURT:  Hearing no objection, it will be

4    admitted.

5              (The document was received in evidence as

6    Government's Exhibit No. 16.)

7    BY MS. MCKEEL:

8    Q.  This lawn chair, do you remember where it was when you

9    left that morning?

10   A.  No.

11   Q.  When you enter the front of Lou's house that you shared

12   with him, was there, to the right -- when you walked through

13   the front door, was there any furniture that you could recall

14   in that room?

15   A.  You said through the front door?  Not the back entrance,

16   but through the front?

17   Q.  Yes, ma'am, the front door.

18   A.  Nothing that I can recall.

19   Q.  Okay.  Did you, when you went inside the house and you

20   secured JW, did you look throughout the house?

21   A.  As I was on the phone when I made the 9-1-1 call, I

22   remember, you know, just pacing back and forth.

23   Q.  Did you notice where that chair was?

24   A.  I didn't notice where the chair was, no.

25   Q.  Do you know, before you left, if that chair was in the

1    front room?

2           MR. SACKS:  Objection.  Asked and answered.

3           THE COURT:  Sustained.  She said she didn't know

4    where the chair was.

5    BY MS. MCKEEL:

6    Q.  Do you recall that, ma'am?

7    A.  Where?  No, ma'am.

8    Q.  Now, ma'am, to the best of your knowledge when you left

9    that morning, had you ever seen drugs in Lou Joseph's house?

10   A.  No.

11   Q.  On occasion prior to the murder of Lou Joseph, did

12   Mr. Joseph ask you sometimes to leave a room or go in the

13   garage when people -- certain people would come over?

14   A.  It happened once or twice, yes.

15   Q.  I'd like to show you Government's Exhibit Number 15.

16          Do you know what this is, ma'am?

17   A.  Yes, that's JW's backpack.

18          MS. MCKEEL:  Your Honor, we would like to introduce

19   Government's Exhibit Number 15.

20          (No objection from defense.)

21          THE COURT:  Hearing no objection, it is admitted.

22          (The document was received in evidence as

23   Government's Exhibit No. 15.)

24          MR. SACKS:  I object on the relevance.  I just don't

25   know what the relevance is to this.

T. WALKER - DIRECT                                                    75

1              We withdraw the objection.

2              THE COURT:  The exhibit is admitted.

3              MS. MCKEEL:  Thank you, Judge.

4    BY MS. MCKEEL:

5    Q.  This backpack, in Government's Exhibit Number 15, did --

6    did you see the backpack before you left that morning on

7    Friday, March the 13th?

8    A.  You said did I see the backpack?

9    Q.  Yes, ma'am.

10   A.  Yes.  I --

11   Q.  Do you remember where it was?

12   A.  Yes.  We usually -- we will leave it hanging on the -- on

13   the bedroom door.

14   Q.  Okay.  And this backpack, does anybody else use it

15   besides JW?

16   A.  No.

17   Q.  Now, I would like to go back to Government's Exhibit

18   Number 16 regarding the chair.

19             THE COURT:  Now, counsel, I take it at some point --

20             MS. MCKEEL:  I've got one question, Judge.

21             THE COURT:  Wait a minute, hold on.

22             MS. MCKEEL:  Okay.

23             THE COURT:  With respect to that exhibit, I take it

24   at some point you are going to connect that exhibit to this

25   case?

Janet Collins, Official Court Reporter

1              MS. MCKEEL:  Have I not moved it into evidence?

2              THE COURT:  The backpack, no.  My question was

3    whether you are going to connect it to the case.  At first

4    there was an irrelevance objection that was withdrawn.  But

5    the Court is asking --

6              MS. MCKEEL:  It will be connected to the case, Your

7    Honor.

8              THE COURT:  All right, it's admitted.

9              MS. MCKEEL:  It will be.  Thank you, Judge.

10   BY MS. MCKEEL:

11   Q.  If you look at Government's Exhibit 16, the chair, was it

12   broken before you left?

13   A.  No.

14   Q.  Okay.

15             MS. MCKEEL:  That's all the questions I have for

16   Ms. Walker, Your Honor.

17             THE COURT:  Cross.

18                         CROSS-EXAMINATION

19   BY MR. WOODWARD:

20   Q.  Hi, Ms. Walker, my name is Larry Woodward.  I have a few

21   questions for you.

22             The backpack that Ms. McKeel showed you that you

23   indicated was your son's, did you ever tell or authorize

24   Mr. Joseph to store drugs in that backpack?

25   A.  No.

T. WALKER - CROSS                                                  77

1   Q.   Okay.  So if there were, in fact, drugs found in that

2   backpack, he would've been doing that without your knowledge?

3   A.   Yes.

4   Q.   Okay.

5        All right.  And you indicated -- on direct,

6   Ms. McKeel asked you some questions about how Mr. Joseph made

7   a living.

8        He always had a lot of cash?

9   A.   I'm sorry, you're asking me did he always have a lot of

10  cash?

11  Q.   (Nods head.)

12  A.   I can't really say.  I mean --

13  Q.   Okay.

14       Do you recall being interviewed by the authorities in

15  this case, I know it's been a while back, in June of 2011?

16  A.   Uh-huh.

17  Q.   Do you recall that?

18  A.   I talked to a lot of people.  I don't really remember.

19  Q.   Fair enough.

20       Do you recall -- to lay a foundation, do you recall

21  telling the authorities that he had cash on him all the time

22  and gave you cash for bills and occasionally gave you --

23  A.   Right, yes, he did.  But I mean -- I never seen, like,

24  you know, large amounts at one time a day.

25  Q.   He gave you cash?

T. WALKER - CROSS                                        78

1    A.  Yes.

2    Q.  Okay.  And these people that would come over when he

3    would ask you to leave the house, do you know who they were?

4    A.  It would be people that I would see on the normal.  I

5    mean, like, friends of his.

6    Q.  Okay.  And do you recall telling the authorities back in

7    that same interview that you were suspicious he was a drug

8    dealer?

9    A.  Yes, I do.

10   Q.  Okay.  Let me make sure -- shifting gears to something

11   else now.  When you came home, you went in through the back

12   door?

13   A.  Yes.

14   Q.  Where the -- where the -- where Mr. Joseph's body was, up

15   through the kitchen?

16   A.  Yes.

17   Q.  Did you ever see policemen -- excuse me, firemen come

18   into your house, three firemen while you were there?

19   A.  I don't recall.  Because after the police came in, as I

20   was on the phone still making the 9-1-1 call, it was still

21   officers that came in with the guns drawn.

22        Immediately after that, we were escorted on the

23   outside of the house.  So I was in front of the house in the

24   car with the detective --

25   Q.  Okay.

T. WALKER - CROSS                                                    79

1    A.   -- for quite some time.

2    Q.   So if they came in, you didn't see them?

3    A.   I did not.

4    Q.   All right.

5         And do you know whether or not Mr. Joseph had a gun

6    in your house?

7    A.   No, I did not.

8    Q.   I mean in "the" house; it was y'all's house together?

9    A.   I never seen a gun in the house.

10        THE COURT:  The Court believes that your examination

11   is beyond the scope of the direct.

12        MR. WOODWARD:  That's fine, Your Honor, I will make

13   her subject to recall.  Well just make -- okay, that's fine.

14        THE COURT:  Well, you may have to do that.

15        MR. WOODWARD:  Okay.  That's fine.  I just ask that

16   she remain subject to recall.

17        THE COURT:  Any further examination?

18                        CROSS-EXAMINATION

19   BY MR. SACKS:

20   Q.   Good afternoon, Andrew Sacks here for Mr. Wallace.

21        Ms. Walker, during the time that you and Mr. Joseph

22   were together those couple of months, you indicated that you

23   stayed in that apartment together, correct?

24   A.   In the house?

25   Q.   Yes, ma'am.  I said apartment.  I'm sorry, house.

T. WALKER - CROSS                                                80

1   A.  Yes.

2   Q.  So you kept your other apartment but that was empty

3   during the time that you were living with Mr. Joseph?

4   A.  Yes.  I had a friend and, like, a family member staying

5   over at my apartment.

6   Q.  And if your son JW were to spend the night out, he would

7   spend it with his father somewhere?

8   A.  Yes.

9   Q.  He wouldn't spend it at your apartment?

10  A.  No, no.

11  Q.  Now, you spoke to the police that day when they came to

12  the residence; did you not?

13  A.  Yes, I did.

14  Q.  And do you remember approximately how many times you

15  spoke to them?

16  A.  To the police?

17  Q.  Yes, ma'am.

18  A.  I spoke with them that day, that night.

19  Q.  All right.

20  A.  And, you know, a few times after that.

21  Q.  All right.  And then -- did you tell them at that time on

22  that day or that night shortly after this happened that you

23  had suspicions that Joseph was a drug dealer?

24  A.  I don't recall if I said it then or if it was later.  It

25  may -- I don't recall if it was then or not.

1   Q.  But that would be something important to tell them,

2   wouldn't it?

3   A.  I'm sorry?

4   Q.  It would be important to tell them if that was something

5   you suspected, wouldn't it?

6   A.  Yes.

7   Q.  But you don't remember whether you told them or not?

8   A.  I don't remember when exactly.  I did say that I

9   suspected that, but I just -- I don't know exactly when I

10  told them.

11  Q.  Now, at least, according to, as Mr. Woodward pointed out

12  in his cross-examination, on June 2011, a couple of years

13  later you spoke to some law enforcement officers in more

14  detail about things, correct?

15  A.  Uh-huh.

16  Q.  And you went into Mr. -- excuse me, Mr. Joseph's

17  background some; did you not?

18  A.  Yes.

19  Q.  And you did tell them then for sure that you suspected he

20  was a dug dealer?

21  A.  Oh, yes, uh-huh.

22  Q.  And that he didn't have a job but he always gave you

23  money to pay your bills?

24          THE COURT:  That's been and answered.

25          MR. SACKS:  All right, sir.

T. WALKER - CROSS                                                      82

1   BY MR. SACKS:

2   Q.  The rent -- excuse me, the home that you all lived in,

3   the street that the cars were parked on, do you know what

4   street that is --

5   A.  I don't.

6   Q.  -- that we looked at in the photograph -- in the exhibit?

7   A.  No.

8   Q.  Where your car was parked in front of his?

9   A.  I don't know that street.

10  Q.  You don't know the name of that?

11  A.  No.

12  Q.  Do you know what the street address is of the house?

13  A.  I don't remember the number.  I remember the name of the

14  street, yes.

15  Q.  And it's a different street than the one that the cars

16  were on?

17  A.  I can't say for sure.  I don't know because of how the

18  house sits on the corner, so it's that one street -- I don't

19  know which one.

20  Q.  I understand.  All right.

21          And when these people that came over -- you were

22  asked about people who would come over sometimes and

23  Mr. Joseph would ask you to go in another room?

24  A.  Uh-huh.

25  Q.  So you weren't present when whatever was going on was

T. WALKER - CROSS                                                    83

1    happening?

2    A.   Right, I was not there.

3    Q.   Where did JW go?

4    A.   Most of the time JW would be in the bedroom because he

5    would play the video game or be watching TV.

6    Q.   And would you agree that the people that you saw -- the

7    way that, when they came over, the activities appeared

8    suspicious to you as well?

9    A.   I never knew what was going on at the time.  I would

10   just, you know, "Can I excuse myself?"  So I just got up and

11   left out the room, so I couldn't really say.

12   Q.   Maybe this will refresh your memory.

13        Did you tell the agents on June 21, 2011, that when

14   these people came, "she saw certain people who came over the

15   house were acting in a slightly suspicious manner when

16   dealing with him."

17        THE COURT:  It calls for opinion.

18        And nobody's objected, but the Court is telling you

19   it's calling for an opinion and speculation.

20        MR. SACKS:  All right, Your Honor.

21   BY MR. SACKS:

22   Q.   In any event, would you agree that these types of

23   activities helped support your view that you believe he was a

24   drug dealer?

25   A.   Yeah.

L. WYNNE - DIRECT                                                84

1   Q.  All right.

2           And, let me see if I have anything else.

3           And finally this.  As part of your testimony that

4   you -- and the statement you made that you were suspicious

5   that he was a drug dealer, did he not tell you on one

6   occasion, just out of the blue, that if anything ever

7   happened to him and he got locked up, he didn't want you to

8   forget about him?

9   A.  Yes, he did tell me.

10  Q.  All right.  And putting that together with other things

11  you saw caused you to suspect he was dealing drugs?

12  A.  Yes.

13          MR. SACKS:  All right.

14          I think that's all I have.  Thank you very much for

15  your time.

16          THE COURT:  Cross?

17          MR. KELLETER:  No questions, Your Honor.

18          MR. RASBERRY:  No questions, Your Honor.

19          THE COURT:  Any redirect?

20          MS. MCKEEL:  No redirect, Your Honor.

21          THE COURT:  May this witness be held subject to

22  recall?

23          MR. WOODWARD:  Yes, sir.

24          THE COURT:  You are being held subject to recall.

25  You may not discuss your testimony.

L. WYNNE - DIRECT                                                85

```
 1          MS. MCKEEL:  Government's next witness is LeKeisha
 2   Wynne.
 3          LEKEISHA WYNNE, called by the Government, having
 4   been first duly sworn, was examined and testified as follows:
 5                       DIRECT EXAMINATION
 6   BY MS. MCKEEL:
 7   Q.  Good morning, ma'am -- good afternoon, I guess, at this
 8   point.
 9          Could you tell us your name and please spell it for
10   our Court Reporter.
11   A.  Lakeisha, L-A-K-E-I-S-H-A, W-Y-N-N-E.
12   Q.  Ma'am, do you know about someone by the name of Louis
13   Joseph?
14   A.  Yes.
15   Q.  And I'm going to show you what's previously been admitted
16   Government's Exhibit 14.  It's going to be on your screen in
17   front of you.
18          Do you recognize this photograph?
19   A.  Yes.
20   Q.  Who is that?
21   A.  Louis Joseph.
22   Q.  Okay.  And how is it that you know him?
23   A.  My cousin.
24   Q.  Okay.  At some point, ma'am, did you live with
25   Mr. Joseph?
```

L. WYNNE - DIRECT                                                    86

1    A.   Yes.

2    Q.   And do you recall where you lived together?

3    A.   217 Clipper Drive, Newport News, Virginia.

4    Q.   And is that in the Denbigh section of Newport News?

5    A.   Yes, ma'am.

6    Q.   Now, while you lived with Louis Joseph, do you recall

7    when you started living with him?

8    A.   It was about September of '98.

9    Q.   Of '98, 1998?

10   A.   I'm sorry, 2008, I'm sorry.

11   Q.   That's all right, that's all right.

12        And do you recall when Louis Joseph was murdered?

13   A.   Yes.

14   Q.   Did you live with him during that time period, or did you

15   stop living with him?

16   A.   I was still living with him at that time.

17   Q.   Now, did Louis Joseph have a job?

18   A.   No.

19   Q.   Do you know what he did to earn a living?

20   A.   He sold drugs.

21   Q.   And how is it that you knew he sold drugs?

22   A.   I seen him.

23   Q.   You saw him?

24   A.   Uh-huh.

25   Q.   And would you see drugs in 217 Clipper Drive?

L. WYNNE - DIRECT                                                        87

1    A.   Yes.

2    Q.   Were they out in the opening while Ms. Walker and JW were

3    there?

4    A.   No.

5    Q.   Do you know if Mr. Joseph -- do you know where he kept

6    the drugs?

7    A.   Not per se, but it was never out in the open.

8    Q.   Okay.  And what kind of drugs did Mr. Joseph sell?

9    A.   Crack cocaine.

10   Q.   And did you ever see him cooking or packaging the crack

11   cocaine?

12   A.   Yes, ma'am.

13   Q.   Describe what you saw.

14   A.   I've seen him cook it powder form on the stove, and then

15   it became a solid form, I guess.

16   Q.   Did you ever see drug dealers coming over to buy drugs?

17   A.   He never had anybody in his home like that, not around

18   me.

19   Q.   Okay.  Did he ever have meetings in his garage?

20   A.   Yes.

21   Q.   Tell us about that.

22   A.   Well, I've overheard phone conversations of him going to

23   meet somebody to buy drugs and they would always come in

24   through the garage from the outside of the house, and he

25   would go in through the inside of the house.  Never saw who

L. WYNNE - CROSS                                                        88

1    it was or -- but I knew that's what was going on.

2    Q.  Did he have people who worked for him to distribute

3    drugs?

4    A.  Yes, ma'am.

5    Q.  Who were they?

6    A.  A few people, a couple people.

7    Q.  Do you remember their names?

8    A.  One guy was considered -- called by the name of Unc.  I

9    don't know his real name.

10          It was a PC.  I believe his first name was actually

11   Preston, if I'm not mistaken.  A guy named Lee.

12   Q.  Okay.  Did you ever see Mr. Joseph with cash?

13   A.  Of course.

14   Q.  Okay.  What denominations of cash would he have?

15   A.  Nothing less than 20.

16   Q.  Okay.  Would that be a large amount of cash or

17   not-so-large amount of cash?

18   A.  Large amounts of cash.

19          MS. MCKEEL:  That's all I have.

20          THE COURT:  Mr. Woodward, in view of this witness's

21   testimony, the previous question the Court told you was

22   beyond the scope, the Court finds that, in view of the

23   government's examination, is now reasonably within the scope.

24          MR. WOODWARD:  I understand, Your Honor.

25                        CROSS-EXAMINATION

L. WYNNE - CROSS                                                          89

1    BY MR. WOODWARD:

2    Q.  Hi, Ms. Wynne, my name is Larry Woodward.

3            So I want to make sure, I couldn't hear what you

4    said.  You were still living at 217 Clipper when Mr. Joseph

5    was killed?

6    A.  Yes.

7    Q.  You had a separate bedroom there?

8    A.  Yes.

9    Q.  Just so it's clear, Mr. Joseph and Ms. Walker would stay

10   in a room?

11   A.  Yes.

12   Q.  The child, JW, had a room, and you had the third bedroom?

13   A.  Yes.

14   Q.  Was anybody else living there with you, or was it just

15   the four of you?

16   A.  Just us.

17   Q.  Okay.  Did you work during that time frame?

18   A.  Absolutely not.

19   Q.  Okay.

20           And let me clarify a few things.

21           Large amounts of cash.  Could you give us an estimate

22   based on what you saw as determined what amounts you're

23   talking about?

24   A.  I could see up to a couple thousand dollars at a time.

25   Q.  Okay.

L. WYNNE - CROSS                                                    90

1          Did you ever know Mr. Joseph to keep drugs in a
2    backpack?
3    A.  Not that I'm aware of.
4          MR. WOODWARD:  Could we put up, I think it's
5    Government's Exhibit 15.  Is it Government's Exhibit 15?
6          MS. MCKEEL:  Yes.
7    BY MR. WOODWARD:
8    Q.  Let me show you on the screen there before you, there's
9    a -- it's been admitted, that photograph, as Exhibit 15.
10         Do you recall, during the time frame right around
11   when Mr. Joseph passed, seeing that backpack at Clipper
12   Drive?
13   A.  Yes.
14   Q.  Okay.  What did you understand that backpack to be?
15   A.  Just a backpack.
16   Q.  Okay.  Wasn't yours?
17   A.  No.
18   Q.  Okay.  All right.  Did you ever know Mr. Joseph to sell
19   marijuana?
20   A.  No.
21   Q.  All right.  So if he did, you didn't know about it?
22   A.  Exactly.
23   Q.  And you said you saw him cook up crack powder into crack
24   cocaine.  You saw him do that at Clipper Drive?
25   A.  Yes, sir.

L. WYNNE - CROSS                                                        91

1   Q.  And in the kitchen?

2   A.  Yes, sir.

3   Q.  And he would do that when Mrs. Walker was not around?

4   A.  Exactly.

5   Q.  But he -- but you were around?

6   A.  Yes.

7   Q.  Okay.

8            Did you know Mr. Joseph to have a firearm?

9   A.  Not that I know of.

10  Q.  Okay.  So if he had a firearm -- let me ask.  If he had a

11  firearm, you didn't know about it?

12  A.  Exactly.

13  Q.  Did you have a firearm?

14  A.  No.

15  Q.  Okay.  Were you aware whether or not there were any

16  firearms in that house?

17  A.  No.

18  Q.  So if there were, it was -- you didn't know about it?

19  A.  Exactly.

20  Q.  Okay.

21           And Unc, PC, and Lee, let's take them one at a time.

22           Unc.  Was Unc a black male?

23  A.  Yes.

24  Q.  Okay, you've seen him before?

25  A.  Yes.

L. WYNNE - CROSS                                                      92

1    Q.  He knew Mr. Joseph was a drug dealer?

2    A.  Yes.

3    Q.  He distributed drugs for Mr. Joseph?

4    A.  Yes.

5    Q.  And he knew, or presumed -- or do you know if he knew

6    that Mr. Joseph had cash?

7    A.  Yes.

8    Q.  All right.

9            PC.  Was PC also a black male?

10   A.  Yes.

11   Q.  He helped Mr. Joseph distribute drugs?

12   A.  Yes.

13   Q.  And do you know if he knew that he had cash?

14   A.  Yes.

15   Q.  Okay.

16           And then Lee.  Same question; a black male?

17   A.  Yes.

18   Q.  And helped Mr. Joseph with his drug business?

19   A.  Yes.

20   Q.  Do you know the names of any other people that he dealt

21   drugs with?

22   A.  Yes.

23   Q.  Okay, give me the other ones.

24   A.  Darnell.  I just thought about him when you called those

25   names.  Darnell.

L. WYNNE - CROSS                                                        93

```
 1   Q.   Okay.  And Darnell was also a black male?

 2   A.   Yes.

 3   Q.   Who helped Mr. Joseph with drugs?

 4   A.   Yes.

 5   Q.   What about Damon Burress?

 6   A.   That was a friend.

 7   Q.   All right.  That was not a great question.

 8        Was it your friend or Mr. Joseph's friend?

 9   A.   It was his first and then I met him through him.

10   Q.   And did Mr. Burress also help Mr. Joseph with the drugs?

11   A.   Not that I'm aware of.

12   Q.   If he did, you weren't aware of it?

13   A.   Exactly.

14   Q.   What about an individual named Kelly?  Do you recall an

15   individual named Kelly?

16   A.   I remember that name, yes.

17   Q.   Did Kelly help Mr. Joseph?

18   A.   I've never seen Kelly before, but I know that name.

19   Q.   You know that name through Mr. Joseph as being someone

20   involved in drugs?

21   A.   Yes -- well, not being someone involved in drugs.  I know

22   of someone that was his friend.

23   Q.   Okay.  And since you've never seen him, you wouldn't know

24   if he was a black male or not?

25   A.   Exactly.
```

Janet Collins, Official Court Reporter

L. WYNNE - CROSS                                                        94

1  Q.  Okay.  But Damon Burress, you do know is a black male?
2  A.  Yes.
3  Q.  Damon Burress come to Clipper Drive occasionally?
4  A.  Yes.
5  Q.  Did Mr. Joseph ever give you cash?
6  A.  Yes.
7  Q.  Okay.
8        What kind of amounts of cash would he give you?
9  A.  Hmm, he's paid to get my nails done.  He actually gave me
10 my 30th birthday party.
11 Q.  Whenever you needed something, you could go to him?
12 A.  Exactly, yes.
13 Q.  And why was that; y'all were related?
14 A.  Yes.
15 Q.  You are his cousin?
16 A.  Yes.
17        MR. WOODWARD:  I think that's all I have for this
18 witness, Your Honor.
19        THE COURT:  Cross-examination?
20                    CROSS-EXAMINATION
21 BY MR. SACKS:
22 Q.  Good afternoon, ma'am.  Andrew Sacks here for Mark
23 Wallace.
24        You had been with Mr. Joseph since -- I think you
25 said '98 then you corrected.  2008?

L. WYNNE - CROSS                                                    95

1   A.  2008, yes.

2   Q.  All right.  So September 2008 is when you moved into the

3   Clipper Street address?

4   A.  Yes, sir.

5   Q.  And at that time, according to your testimony, if we

6   accept it, Mrs. Walker and JW were already there?

7   A.  No.

8   Q.  They were not?

9   A.  No.

10  Q.  So if Ms. Walker testified that she --

11          MS. MCKEEL:  I object to the form of the question.

12          THE COURT:  Don't -- just rephrase the question, not

13  with respect to what she said, just with respect to what she

14  knows.

15          MR. SACKS:  Yes, sir.

16  BY MR. SACKS:

17  Q.  I'll ask it this way.  As far as you know, prior to

18  September -- well, in July or August of 2008, Ms. Walker

19  wasn't living there?

20  A.  Not that I know of.

21  Q.  All right.  Because when you moved in, it was just you

22  and him?

23  A.  And she was just -- she had her own place, but she was

24  there a lot.

25  Q.  I understand.  But not living there with her son?

L. WYNNE - CROSS                                                      96

 1    A.   No.
 2    Q.   All right.  In fact, they never -- the two of them never
 3    lived there together, mother and son?
 4    A.   They stayed there plenty of nights and she still had her
 5    own place, so --
 6    Q.   But she didn't stay there every night?
 7    A.   No.
 8    Q.   She would stay at her apartment with her son sometimes?
 9    A.   Exactly.
10    Q.   Now, with respect to his activities.
11         I know you said that he was a drug dealer, sold
12    drugs, sold crack cocaine, and that he tried -- he sort of
13    kept it away from you?
14    A.   I've seen some stuff.
15    Q.   All right.  For example, you knew that he hid scales
16    under the couch, right?
17    A.   Uh-huh.
18    Q.   Is that a "yes?"
19    A.   Yes.  I'm sorry.
20    Q.   Scales to weigh drugs?
21    A.   Uh-huh, yes.
22    Q.   And you have talked to the police about -- where were you
23    on March 13th during the day when apparently things happened
24    on Clipper Street?
25    A.   I was in Williamsburg at my mother's house.

L. WYNNE - CROSS                                                    97

1   Q.  And how long had you been there, since that time?

2   A.  I actually had been there for a couple of weeks at that

3   time.

4   Q.  And you talked to the police at different times about

5   what happened, didn't you?

6   A.  Yes, sir.

7   Q.  And you told them that from what you understood, or

8   believed, that Mr. Joseph was getting a cocaine delivery

9   either the night before or the day of his shooting.  You told

10  the police that?

11  A.  I don't recall that.  I wouldn't have known that, I

12  wasn't there.

13  Q.  All right.  If there are notes of an interview of you on

14  March 19th -- actually, it's an earlier interview transcribed

15  on March 19th, 2009, by a Newport News Police Criminal

16  Investigations Division.

17         It says, "Detective LP Riley," and it just notes that

18  you indicated you believed victim was getting --

19         MS. MCKEEL:  Your Honor, I'm going to object.

20         THE COURT:  Sustained.

21         MS. MCKEEL:  This is from a detective, not this

22  witness.  If you want to see the transcript from a witness, I

23  would ask to show the witness.

24         THE COURT:  That's improper impeachment.

25         MR. SACKS:  I'm not trying to impeach her, I'm

L. WYNNE - CROSS                                                98

1    trying to refresh her memory.

2              THE COURT:  Well, no, but you're reading his

3    statement.

4              Now, you can ask her a question, I think she

5    answered it.  She said she was not there.

6              MR. SACKS:  May I show her the document to see if it

7    refreshes her memory?  That's the only --

8              THE COURT:  Well, you can mark it as a document for

9    refreshing recollection.  Anything can refresh her

10   recollection, you can mark anything like that.

11             MR. SACKS:  That's all I want to do.

12             THE COURT:  Pass it up and see if it refreshes her

13   memory.

14             THE CLERK:  Exhibit 200.

15             THE COURT:  It's Exhibit 200, Defense Exhibit 200,

16   for identification.

17             Thank you.

18   BY MR. SACKS:

19   Q.  And, Ms. Wynne, I'm just trying to see if this helps

20   refresh your memory of what you told the police.

21             At the top right-hand page of that typed summary,

22   what is the date?  It says "transcription date."

23   A.  March 19th, 2009.

24   Q.  And these events happened on March 13th, 2009, correct?

25   A.  Yes.

L. WYNNE - CROSS                                              99

1   Q.  And would that mean that you had spoken to the police

2   within some days of when this happened?

3   A.  Yes.

4   Q.  And as you read through it now, does it bring back some

5   of the things you told them at that time?

6            THE COURT:  No, the specific -- you have to ask her

7   a specific question.

8            MR. SACKS:  I will do that, Your Honor.

9            (Pause.)

10           THE COURT:  You got a specific question that he

11  asked you.

12           Does that refresh your recollection whether he was

13  expecting drugs the night before?

14           THE WITNESS:  No, sir.

15           THE COURT:  All right, then, let's move on.

16  BY MR. SACKS:

17  Q.  Now, did -- when you said you saw him cooking and

18  packaging crack at the house?

19  A.  Yes.

20  Q.  He would buy it in ounce quantities and then break it

21  down, right?

22  A.  Well, I couldn't tell you how much it was, but I seen it.

23           I don't -- I'm not -- I never did it, I never sold

24  it.  I couldn't tell you how much it was.

25  Q.  If you look at the top line of the second page of that

L. WYNNE - CROSS                                                    100

```
 1    document that I gave you, does that refresh your memory as to
 2    that question, about what quantity he would get?
 3    A.  I --
 4    Q.  Excuse me, I'm sorry.
 5    A.  It says "ounces" here, but I couldn't tell you then if it
 6    was ounces or now if it was ounces.
 7    Q.  All right.
 8         Now, you were also -- there was an interview of you,
 9    a transcript made by the police, this looks like March 19th,
10    2009, a statement.
11         You remember giving a statement they typed up?
12    A.  Uh-huh, yes, sir.
13    Q.  All right.  And in that statement, you were asked
14    about what kind of weight was he running, the --  Joseph, you
15    remember that?
16    A.  Yes.
17    Q.  And you said "big weight," right?
18    A.  Yes.
19    Q.  So that's the best -- you said it was a big weight but
20    you don't know --
21    A.  That's the best I could come up with.
22    Q.  Yes, ma'am, I understand.
23         Just a couple more.  I know that Mr. Woodward asked
24    you if he also dealt marijuana.
25         And let me just ask you.  Did you -- do you know that
```

L. WYNNE - CROSS                                                    101

1    he was dealing some marijuana at times?

2    A.  Not that I know of at all.

3    Q.  You said there were some meetings you overheard, some

4    conversations about meeting in the garage?

5    A.  I overheard his conversation, yes, sir.

6    Q.  These were conversations where he was setting up meetings

7    to sell drugs to his people?

8    A.  Or even to buy.

9    Q.  So he was buying and selling?

10   A.  Uh-huh.  I mean, he had --

11   Q.  Is that a "yes?"

12   A.  Yes.

13   Q.  So he would buy from them so he could sell to other

14   people?

15   A.  Yes.

16   Q.  In other words, his suppliers?

17   A.  Yes.

18   Q.  And then he had his distributors on the other end?

19   A.  Yes.

20   Q.  Some of whose names you've given us?

21   A.  Yes.

22   Q.  And was he -- you've known him how long, approximately?

23   A.  '98.  Since 1998.

24   Q.  Was it '98 or '08?

25   A.  1998.

L. WYNNE - CROSS                                                102

1    Q.  You've known him since '98?

2    A.  Yes.

3    Q.  And moved in in '08?

4    A.  Yes.

5    Q.  And how long has he been dealing drugs, as far as you

6    know?

7    A.  I couldn't tell you that.

8    Q.  As far as you can remember?

9    A.  I couldn't tell you that.

10         MR. SACKS:  Ms. Wynne, I want to thank you for your

11   time.  I think that's all I have.

12         Your Honor, there's an exhibit up there, I don't

13   know what you want to do with it.  It's to refresh the

14   recollection.

15         THE COURT:  That's not admitted, but if you will

16   return it to the clerk.  We can get you a copy, but we need

17   to give it to the clerk.

18         MR. WOODWARD:  Your Honor, just so I'm clear, is

19   that Defense 1 for identification purposes?

20         THE COURT:  That was 200 for identification.

21         (The document was marked as Wallace Exhibit No. 200

22   for identification.)

23         MR. WOODWARD:  200 for identification purposes.

24         THE COURT:  Mr. Kelleter.

25                    CROSS-EXAMINATION

L. WYNNE - CROSS                                                          103

1    BY MR. KELLETER:

2    Q.  There have been a couple of questions to you about

3    marijuana dealing.  But you were aware that he smoked

4    marijuana?

5    A.  Yes.

6    Q.  Okay.  And he didn't grow his own marijuana, right?

7    A.  No.

8    Q.  So somebody was coming and bringing him marijuana?

9    A.  Yes.

10   Q.  Okay.  And he didn't go out a whole lot, did he?

11   A.  No.

12   Q.  You indicated before, I think, that he didn't have a

13   driver's license?

14   A.  No.

15   Q.  And that he relied upon others to come to him oftentimes?

16   A.  Yes.

17   Q.  Including the person who would sell him marijuana?

18   A.  Yes.

19   Q.  And he smoked there at 217 Clipper?

20   A.  Yes.

21            MR. KELLETER:  No more questions.

22            MR. RASBERRY:  Briefly, Your Honor.

23                       CROSS-EXAMINATION

24   BY MR. RASBERRY:

25   Q.  Good afternoon.

L. WYNNE - CROSS/BY THE COURT                                    104

1    A.  Good afternoon.

2    Q.  Going back to 2009 -- 2008 through 2009 when you lived

3    with him.  You recall that time?

4    A.  Yes.

5    Q.  What kind of foot traffic was going through that house?

6    I mean, how many people were there at any given time on a

7    normal day?

8    A.  Us, most of the time.  We didn't have a lot of company.

9    Q.  Okay.  But there were people coming and going,

10   purchasing?

11   A.  Yes, yes.

12   Q.  Go ahead.

13   A.  Well, Lou never had anybody come to his house to buy

14   drugs from him, he always had somebody running for him.

15   Nobody came to that house to buy drugs.

16   Q.  So the people that you've named?

17   A.  Were his runners, yes.

18   Q.  And were coming frequently?

19   A.  Yes.

20          MR. RASBERRY:  Okay, thank you.

21          THE COURT:  The Court has a question.

22                          EXAMINATION

23   BY THE COURT:

24   Q.  You indicated, I think it was indicated, he did not have

25   a driver's license?

S. SMITHLEY - DIRECT                                                        105

```
 1   A.  No.
 2   Q.  Did he have a car?
 3   A.  Yes.
 4   Q.  Did he drive that car?
 5   A.  He had others drive it for him.  He would drive it every
 6   once in a while, that's if we were going on family something.
 7   But as far as drug dealing?  No.  He always had somebody
 8   drive for him.
 9            MS. MCKEEL:  We have no redirect, Your Honor.
10            THE COURT:  May the witness be permanently excused?
11            (Defense respond in the affirmative.)
12            THE COURT:  All right, ma'am, you are permanently
13   excused.
14            Next witness.
15            MR. ZLOTNICK:  The United States calls Stacey
16   Smithley.
17            May I begin, Your Honor?
18            STACEY SMITHLEY, called by the Government, having
19   been first duly sworn, was examined and testified as follows:
20                         DIRECT EXAMINATION
21   BY MR. ZLOTNICK:
22   Q.  Please state your name and spell it for the court
23   reporter.
24   A.  Stacey Smithley.  S-T-A-C-E-Y, S-M-I-T-H-L-E-Y.
25   Q.  Can you please tell us how you're presently employed?
```

S. SMITHLEY - DIRECT                                    106

1   A.   I'm a fifth grade teacher.

2   Q.   And is that -- what public school system is that?

3   A.   The City of Newport News.

4   Q.   Are you also employed in another job on a part-time

5   basis?

6   A.   Yes.  I do contract work for the City of Poquoson as a

7   crime scene investigator.

8   Q.   Before your employment with the City of Newport News as a

9   teacher and your part-time employment with Poquoson, were you

10  employed by the Newport News Police Department?

11  A.   Yes, sir.

12  Q.   Can you tell us what was the time frame that you worked

13  for the Newport News Police Department?

14  A.   2006 'til about 2012, I believe.

15  Q.   And during that time, what was your job?

16  A.   I was a senior crime scene investigator.

17  Q.   Now, what does a senior crime scene investigator do?

18  A.   We respond to crime scenes, homicides, robberies,

19  anything involving businesses, death investigations.  We

20  photograph, document and collect the evidence.

21  Q.   Now, at that time, and going back to 2009, was your name

22  Smithley or was it a different name?

23  A.   It was Stacey Rush.

24  Q.   Before becoming a crime scene investigator, did you have

25  to undergo training in that area?

S. SMITHLEY - DIRECT                                              107

1    A.   Yes.

2    Q.   Can you tell us what some of the training is that you've

3    had?

4    A.   I have my undergraduate degree in Biomedical Engineering,

5    and then I have my Master's Degree from George Washington in

6    Forensic Science.

7    Q.   Did you do an internship as well at an ME's office?

8    A.   Yes, I worked at the medical examiner's office.

9    Q.   Have you also worked for the National Academy of Science?

10   A.   Yes.

11   Q.   And what were you doing there?

12   A.   I was a program associate.  And so we received funding

13   from various organizations to -- we were commissioned to do

14   studies.  One of the studies was on forensic science.

15   Q.   And have you also had training in forensic science while

16   you were part of the Newport News Police Department?

17   A.   Yes, sir.

18   Q.   Did that include on-the-job training when you first began

19   with the senior investigator?

20   A.   Yes, sir.

21        MR. WOODWARD:  Your Honor, I would just say I've had

22   dozen of cases with Ms. Smithley, and I'm fine for him to go

23   through.  But I have no objection to her being qualified to

24   process a crime scene.

25        THE COURT:  Are you calling her as an expert or one

S. SMITHLEY - DIRECT                                            108

1    who just a processed the crime scene?

2              MR. ZLOTNICK:  I'm calling her as one who processes

3    a crime scene.

4              THE COURT:  All right, you may continue.

5    BY MR. ZLOTNICK:

6    Q.  Now, you've also given -- you've also acted as a senior

7    person supervising newer crime scene investigators?

8    A.  Yes, sir.

9    Q.  Now, I want to bring your attention to March the 13th of

10   2009, and ask you if you went to a crime scene related to a

11   homicide?

12   A.  Yes, sir.

13   Q.  Where was that?

14   A.  217 Clipper Drive in Newport News, Virginia.

15   Q.  Do you recall when you were notified to go to that

16   location?

17   A.  Around 5:00 in the afternoon.

18   Q.  And so we all know, when you say "217 Clipper Drive in

19   Newport News," what part of Newport News is that in?

20   A.  The northern part of Newport News.

21   Q.  So if you were going down Interstate 64 across the

22   tunnel, would it be on -- would that be on Jefferson going

23   towards downtown or going towards Williamsburg?

24   A.  Going towards Williamsburg, like Denbigh.

25   Q.  And do you know who the victim -- the person was that had

S. SMITHLEY - DIRECT                                              109

1    been deceased?

2    A.   Louis Edward Joseph, Jr.

3    Q.   This incident that you are going to be testifying about

4    happened over nine years ago.   What have you used to help

5    refresh your memory of these events?

6    A.   Crime scene notes, photographs, my evidence sheets.

7    Q.   And these were your crime scene report and your evidence

8    sheets.   When were they made in relation to when you took

9    actions in this case?

10   A.   As I was progressing through the case.

11   Q.   Now, can you tell us approximately when you got to the

12   crime scene?

13   A.   Arrived at 1743, so 5:43 p.m.

14   Q.   How were the weather conditions?

15   A.   It had been raining, and it was raining off and on that

16   day.

17   Q.   Were you the first law enforcement official there or was

18   already law enforcement there to brief you?

19   A.   There were other law enforcement officers there.

20   Q.   Can you tell us, what was the name of the law enforcement

21   person that briefed you?

22   A.   I believe it was Detective Schraudt.

23   Q.   Can you spell his name for our court reporter, please?

24   A.   S-C-H-R-A-U-D-T.

25   Q.   Now, what did this crime scene consist of?   Was it one

1   room of a house, the inside and the outside, or all of those?
2   A.  It was all of those.  It was on a corner lot with a house
3   that had a garage and three bedrooms.
4   Q.  And did you actually walk the area of the crime scene?
5   A.  Yes.
6   Q.  Did you photograph and collect evidence?
7   A.  Yes, sir.
8   Q.  Now, let me start, as we go through this.
9        When you first arrived at this crime scene, where did
10  you arrive from?  Did you go through the front door or
11  another door?
12  A.  I actually entered from the back door where the porch
13  was.
14  Q.  And when you got to the porch, what did you see there?
15  A.  The victim's body.
16  Q.  All right.
17       Now, at that point, had the victim -- had there been
18  any declaration about the condition of the victim, to your
19  knowledge?
20  A.  He had been declared deceased.
21  Q.  Now, at that point did you -- what did you do after going
22  through that door and seeing the victim's body?  What did you
23  do next?
24  A.  I made -- as I walked through, I made observations about
25  the house and I made my way to the front of the house, like

S. SMITHLEY - DIRECT                                                        111

1   the front door.

2   Q.  So from then, you started to gather information and walk

3   through the location, correct?

4   A.  Yes.

5   Q.  Did you also photograph evidence as well as collect it?

6   A.  Yes, sir.

7   Q.  When you got there, had anything actually been done to

8   the crime scene itself?

9   A.  Crime scene tape had been put up to secure the house and

10  the front yard.

11  Q.  I would like to show you what's marked as Exhibit 1.  I

12  believe Exhibit 1 is in evidence.

13        Can you tell us, what does that picture show?

14  A.  This is the front of the house showing that there was

15  crime scene tape that was put up.

16  Q.  I'd next like to have the witness shown what's been

17  marked as Exhibit 2.  What is this?

18  A.  This is the picture of the crime scene.  You can see the

19  side of the house as well as the back porch, which has those

20  bushes surrounding it.

21  Q.  And is that back porch area, is that the area you first

22  came into and saw the body?

23  A.  Yes, sir.

24  Q.  Now, I'd like to next have the witness shown Exhibit 3.

25        What is that?

S. SMITHLEY - DIRECT                                          112

1    A.   That's the very back of the house.

2    Q.   Now, in that picture we cannot see, other than on the

3    right corner, crime scene tape.  Was there crime scene tape

4    there or were you positioned so it was to your back?

5    A.   Yeah, I was inside of the crime scene tape.

6    Q.   So the crime tape was to what part of your body?

7    A.   Behind me.

8    Q.   And that's why it's not in the picture?

9    A.   Correct.

10   Q.   And then I think, showing you what's been marked as

11   Exhibit 4, can you tell us what that is?

12   A.   That's going to be the front door.

13   Q.   And who took that picture?

14   A.   I did.

15   Q.   In fact, who took all of these pictures we're going to go

16   through?

17   A.   I did.

18   Q.   And what was your purpose in taking Exhibit 4?

19   A.   This is the front entranceway and I had made some

20   observations about the status of the door.

21   Q.   Now, I'd next like to show the witness what's been

22   previously marked as Exhibit 76A.

23        Do you recognize what Exhibit 76A is?

24   A.   Yes.  This is a crime scene diagram that I did of the

25   house.

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                          113

1    Q.  And this crime scene diagram would help illustrate your

2    testimony as to where different things were?

3    A.  Yes.

4    Q.  And where pictures were taken?

5    A.  Yes.

6    Q.  Does this crime scene diagram truly and accurately depict

7    the interior of the house of 217 Clipper Drive?

8    A.  Yes.

9         MR. ZLOTNICK:  I'd offer Exhibit 76A into evidence,

10   Your Honor.

11        (No objection from defense.)

12        THE COURT:  It will be admitted.

13        (The document was received in evidence as

14   Government's Exhibit No. 76A.)

15        MR. ZLOTNICK:  I would like to publish Exhibit 76A.

16   BY MR. ZLOTNICK:

17   Q.  Showing you Exhibit 76A, can you show us on 76A where the

18   body was found?

19   A.  Do I touch it?

20   Q.  I think you can touch it.  It should make a mark.  Let me

21   see if I'm right.  So that's the area?

22   A.  Yes, that's the area.

23   Q.  And that's where you first entered?

24   A.  Yes, sir.

25   Q.  And we're going to -- we're able, through your

S. SMITHLEY - DIRECT                                              114

1   photographs and your memory, to go through all the different

2   rooms of the house where you went, correct?

3   A.  Correct.

4   Q.  And first, does -- this exhibit, does it show the

5   residence with or without the furniture, or the evidence?

6   A.  This is without the furniture and without the evidence.

7   It's just the walls.

8   Q.  We can take that down for now.

9        Ms. Smithley, the photographs the jury will see, do

10  they contain both numbers and letters?

11  A.  Yes, they do.

12  Q.  Can you tell us when in these photographs we are going to

13  see what the numbers represent?

14  A.  The numbers are going to represent more what I call

15  physical evidence that is not bodily fluids.  So if I didn't

16  have to swab it and just collected the item as a whole, then

17  I gave it a number.

18        If I had to take a swab of the sample, it could have

19  been suspected blood or any kind of bodily fluid, it's going

20  to have a letter next to it.

21  Q.  And when you collected items that have a number, would

22  those match a number that would be on your property sheet or

23  property report?

24  A.  Correct.

25  Q.  And would it be fair to call those hard evidence with

S. SMITHLEY - DIRECT                                                    115

1    numbers?

2    A.   Correct.

3    Q.   And letters in your photographs would show, in this

4    particular case, what?

5    A.   Suspected blood.

6    Q.   And they would also -- would they stay with a letter or

7    would they be given a number later?

8    A.   They would start with 100, so it would be like 100A,

9    100B, 100C.

10   Q.   Where would the number be given?

11   A.   The number would be given at the -- you are talking about

12   the 100?

13   Q.   Yes.

14   A.   That would be given whenever I went back to the office.

15   In order for us to catalog it into our computer database, it

16   has to actually be assigned a number.

17   Q.   But in the photographs that we're going to see, they have

18   letters?

19   A.   They just have letters.

20   Q.   And those would be bodily fluids, suspected blood?

21   A.   Correct.

22   Q.   Let's go to, next, 76A first.

23        Showing you 76A, is there a time that you entered the

24   front living room area of Clipper Drive?

25   A.   Yes, sir.

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                          116

1    Q.  Can you show us how you got in there?

2    A.  I initially came through the back door and walked through

3    the crime scene.  But then after I walked through the crime

4    scene, I came in through the front door and started

5    documenting the evidence.  So the front door would be right

6    there (indicating).

7    Q.  All right.  Let the record reflect she's circled an area

8    near the foyer; is that correct?

9    A.  Yes.

10          THE COURT:  Record will so reflect.

11   BY MR. ZLOTNICK:

12   Q.  Regarding that foyer, did you notice anything about the

13   door frame?

14   A.  The door frame had been broken.

15   Q.  And I'd like to show you Exhibit, I believe it's 18, if I

16   could.

17          Showing you Exhibit 18.  Do you recognize that?

18   A.  Yes.

19   Q.  Can you tell us what area that is?

20   A.  I'm standing in the hallway of where the bedrooms are

21   located, and to the left you can see the front living room,

22   and then to the right you see part of the front door with the

23   door frame broken.

24   Q.  And I want to next show you Exhibit -- before I go there,

25   does Exhibit 18 truly and accurately depict how the area of

S. SMITHLEY - DIRECT                                            117

1   the door frame looked when you were there?
2   A.  Yes.
3           MR. ZLOTNICK:  I'd offer Exhibit 18 into evidence.
4           (No objection from defense.)
5           THE COURT:  Document will be admitted.
6           (The document was received in evidence as
7   Government's Exhibit No. 18.)
8
9   BY MR. ZLOTNICK:
10  Q.  I next want to show you Exhibit Number 19.
11          Showing you Exhibit 19.  Can you tell us what that
12  is?
13  A.  That's going to be a closeup of the door frame.
14  Q.  Does that show a picture to truly and accurately depict
15  what the door frame looked like on March the 13th of 2009
16  when you were there?
17  A.  Yes.
18          MR. ZLOTNICK:  I offer it into evidence.
19          THE COURT:  Any objection?
20          (No objection from defense.)
21          THE COURT:  First, the exhibit will be admitted.
22          MR. ZLOTNICK:  I'm trying to -- we will publish this
23  exhibit and then we will take a break for lunch.
24          THE COURT:  Go on, it's about 3 of 1.
25          Go ahead.

S. SMITHLEY - DIRECT                                                118

1              MR. ZLOTNICK:  Very good.

2    BY MR. ZLOTNICK:

3    Q.  Okay, showing you Exhibits 18 and 19.  Can you tell us

4    how they relate to each other?

5    A.  So if you look at -- 19 is located (indicating), and I

6    have the circle on 18, right there.  That's a close-up.  19's

7    a close-up of that.

8    Q.  And was there also anything on the floor that would be --

9    that caught your attention?

10   A.  Yes.

11   Q.  What was on the floor?

12   A.  It was parts of the door frame, and I believe part of the

13   lock.

14   Q.  And I'd like to have Exhibit 20 and 21 next provided to

15   the witness.

16              Showing you Exhibits 20 and 21, can you tell us what

17   they are?

18   A.  Exhibit 20 is going to be my Number 8.  It's the piece of

19   the front door frame from hallway floor.

20              And then Exhibit 21 is my Number 9, and it's going

21   to be the piece of front door from foyer floor.

22   Q.  And they were collected by who?

23   A.  They were both collected by me.

24   Q.  What was the reason that you collected those?

25   A.  For the fact that they came from the front door and they

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                        119

1    were still not attached to the front door.

2    Q.  And they -- can you -- are they -- are you able to tell

3    us from any of those photographs where they were found in

4    relation to the door?

5    A.  One of them was found -- well, they were -- I did not

6    match them, but one of them had appeared to come from 19, the

7    piece that's missing.

8              MR. ZLOTNICK:  All right.  I'd offer those exhibits

9    into evidence, 20 and 21.

10             THE COURT:  Any objection?

11             (No objection from defense.)

12             THE COURT:  The documents will be admitted.

13             (The physical evidence was received in evidence as

14   Government's Exhibit Nos. 20 and 21.)

15             THE COURT:  Ladies and gentlemen of the jury, we are

16   going to take up at 2:30 with your direct examination of your

17   witness, with these exhibits.

18             (Off the record, 12:59 p.m., jury out.)

19             (On the record, 2:31 p.m., jury in.)

20             THE COURT:  You may be seated.

21             The record will reflect that all jurors are present

22   in the courtroom, does counsel agree?

23             (All counsel reply in the affirmative.)

24             THE COURT:  You may resume.

25   BY MR. ZLOTNICK:

S. SMITHLEY - DIRECT                                          120

1    Q.  Mrs. Smithley, before the lunch break, we had spoken

2    about the evidence that you found in the foyer with the

3    broken door; is that correct?

4    A.  Yes, sir.

5    Q.  All right.  During your time at this particular crime

6    scene, is it the practice -- or is it your practice to do a

7    videotape of the entirety of the crime scene?

8    A.  Yes, sir.

9    Q.  Was that done in this case?

10   A.  Yes.

11   Q.  And that's on Exhibit 154, which is loaded.

12          MR. ZLOTNICK:  I would like to offer Exhibit 154

13   into evidence.

14          THE COURT:  Any objection?

15          (No objection from defense.)

16          THE COURT:  Exhibit 154 will be admitted.

17          (The physical evidence was received in evidence as

18   Government's Exhibit No. 154.)

19          MR. ZLOTNICK:  I'd like permission to play Exhibit

20   154, if I may?

21          THE COURT:  You may.

22          (Video plays.)

23          MR. ZLOTNICK:  Can we stop it there?  Can we stop it

24   at that point?

25   BY MR. ZLOTNICK:

S. SMITHLEY - DIRECT                                            121

1    Q.  Can you tell us what area that covers that we're looking

2    at right now on the scene?

3    A.  This is going to be the back porch.

4    Q.  All right.  And that's where -- what's under the cover?

5    A.  The victim.

6    Q.  All right.  We can continue to play.

7            (Video plays.)

8            THE COURT:  Mr. Zlotnick, has this video covered the

9    relevant crime scene?

10           MR. ZLOTNICK:  It is, I believe, except for one more

11   place, Your Honor.

12           (Video plays.)

13           MR. ZLOTNICK:  I think that's fine now, Your Honor.

14           One more second, I'm sorry.

15           (Video plays.)

16           THE COURT:  Okay, Mr. Zlotnick.

17           MR. ZLOTNICK:  Your Honor, the part I want to show

18   is outside.

19           THE COURT:  Okay, let's go outside.  We've been in

20   the house moving around for a while.

21           MR. ZLOTNICK:  We can fast-forward to the outside

22   section.

23           (Video plays.)

24           MR. ZLOTNICK:  Did that show the outside?  Can we

25   stop that right there?

S. SMITHLEY - DIRECT                                                    122

1    BY MR. ZLOTNICK:

2    Q.   That's the -- what part of the house is that?

3    A.   That's the front door and the front steps.

4    Q.   And that's the area that it appeared to you -- what had

5    happened there?

6    A.   The door had been forced open.

7    Q.   All right.

8              MR. ZLOTNICK:   Thank you, Your Honor.

9              MR. SACKS:   Objection to the conclusion of what she

10   is describing.

11             THE COURT:   Objection overruled.

12   BY MR. ZLOTNICK:

13   Q.   Did there come a time that you entered the front living

14   room of the Clipper Drive residence?

15   A.   Yes.

16   Q.   Now, when you were processing evidence, was there anyone

17   besides you that was allowed to collect evidence before you'd

18   arrived?

19   A.   Nobody else collected evidence.

20   Q.   Is that a procedure?

21   A.   Yes.  As a lead crime scene technician, you might have

22   other people present, but you try to manage all the evidence

23   yourself.

24   Q.   Now, you entered the front living room area.

25             So could we pull up Exhibit 76A so we can show where

S. SMITHLEY - DIRECT                                                123

```
 1    the front living room area is?
 2            Can you show us where the front living room area is?
 3    A.  This room right there (indicating).
 4    Q.  And you would have gone there from the foyer?
 5    A.  That's correct.
 6    Q.  We can take that down.
 7            What were the conditions of the lights when you
 8    entered the front living room?
 9    A.  It was dark.
10    Q.  Were the lights on or off?
11    A.  They were off.
12    Q.  Can you tell -- was -- what, if anything, covered --
13    describe the condition of the window?
14    A.  It was covered with like a blanket or a sheet.
15    Q.  What attracted your attention to the front living room
16    area?
17    A.  There was a white chair with a broken right arm.
18    Q.  In addition to that, did you see anything else that
19    attracted your attention?
20    A.  Suspected blood on the floor.
21    Q.  Can you tell us, was there -- was the blood the same or
22    was there a location that was different, as far as other
23    locations?
24    A.  As soon as you walked in the front living room from the
25    foyer, there was a larger pool of blood versus what you saw
```

S. SMITHLEY - DIRECT                                                   124

1    through the rest of the house.

2    Q.  Where was the larger pool of blood in relation to the

3    white chair?

4    A.  The white chair would be closer to the dining room door.

5    The pool of blood would be closer to the front door.

6    Q.  I want to ask you about the location of this chair, as

7    you described, in relation to the large pool of blood.

8           I would like to show the witness Exhibit 23, if I

9    could?

10          Do you recognize Exhibit 23?

11   A.  Yes.

12   Q.  Does 23 -- does Exhibit 23 truly and accurately depict

13   the location of the blood in the front living room and where

14   it's located?

15   A.  Yes.

16   Q.  Now, I would next like to have the witness shown, before

17   we are off of that, Exhibit 24, if I could.

18          Showing you Exhibit 24.  Is that a -- is that also to

19   show a picture of that same blood in a closeup?

20   A.  That's correct.

21   Q.  Does it truly and accurately depict what it looked like?

22   A.  Yes.

23          MR. ZLOTNICK:  I would offer now into evidence

24   Exhibit 23 and Exhibit 24.

25          (No objection from defense.)

S. SMITHLEY - DIRECT                                              125

```
 1              THE COURT:  Hold on, wait a minute.  Hearing no
 2    objection, the exhibits are admitted.
 3              MR. ZLOTNICK:  Thank you.  I didn't mean to get
 4    ahead of myself.
 5              (The document was received in evidence as
 6    Government's Exhibit Nos. 23 & 24.)
 7    BY MR. ZLOTNICK:
 8    Q.  Showing you Exhibit 23.
 9              Can you describe again where -- where is it in
10    relation to that picture, how can we know where that blood
11    puddle is?
12    A.  It's going to be where you see the yellow placards, it's
13    between A and B.
14    Q.  And I'd like to have the witness next shown Exhibit 24.
15    And what is 24?
16    A.  It's going to be a closeup of the same pool of suspected
17    blood with the placards A and B.
18    Q.  Can you tell us, was there anywhere else that had more
19    blood than that in the house?
20    A.  No, not in that collected quantity.
21    Q.  So now let's talk next about the plastic chair which you
22    described.  I'd like to have the witness shown Exhibit 25.
23              Showing you Exhibit 25, do you recognize that?
24    A.  Yes.
25    Q.  What is that?
```

S. SMITHLEY - DIRECT                                          126

1    A.   That is going to be the plastic chair I was referring to.

2    Q.   Does Exhibit 25 truly and accurately show what the

3    plastic chair -- how it appeared when you found it?

4    A.   Yes.

5         MR. ZLOTNICK:  I would offer Exhibit 25 into

6    evidence.

7         THE COURT:  Any objection?

8         (No objection from defense.)

9         THE COURT:  All right, then Exhibit 25 will be

10   admitted.

11        (The document was received in evidence as

12   Government's Exhibit No. 25.)

13        MR. ZLOTNICK:  I would like to publish it.

14        THE COURT:  And the exemplar is coming forward.

15   BY MR. ZLOTNICK:

16   Q.   I would like to show you the next exhibit, Exhibit 25.

17   Is that Exhibit 25?

18   A.   That's correct.

19        THE COURT:  I did indicate that you could publish

20   it.  Did you publish it?

21        MR. ZLOTNICK:  Yes.  I wanted to publish the

22   picture.

23        MR. WOODWARD:  Just so I am clear, is the picture 25

24   or the chair 25?

25        MR. ZLOTNICK:  The picture is 25 and I'm going to

S. SMITHLEY - DIRECT                                              127

1    get to the chair in a minute.

2    BY MR. ZLOTNICK:

3    Q.   So we will start off with the chair itself.   What's the

4    Number 7 indicate that's on that picture?

5    A.   Number 7 indicates the actual chair.

6    Q.   Can you describe the location where you found the chair?

7    A.   It's going to be in the front living room.

8    Q.   Can you tell us what was its position when you found it?

9    A.   As it was indicated, with it upright facing that wall.

10   Q.   And I want to next ask you if you saw anything next to

11   the chair itself?

12   A.   There's a couple of drops of blood which is indicated by

13   the letters, but there is also plastic white pieces located

14   around the chair that indicate came from the broken part of

15   the right arm.

16   Q.   What if any type of suspected strand did you find of

17   something?

18   A.   I did find a suspected strand of hair in, I believe,

19   blood droplet H.

20   Q.   And is H located in that picture?

21   A.   Yes.

22   Q.   And what did you find there, what's on H?

23   A.   Suspected blood with a strand of hair there.

24   Q.   Did you also photograph that to document it?

25   A.   Yes, sir, I did.

S. SMITHLEY - DIRECT                                              128

1    Q.   I'd next like to show the witness what's been marked as

2    Exhibit 26.

3           Showing you what's been marked as Exhibit 26.  You

4    recognize what that is?

5    A.   Yes.

6    Q.   What is it?

7    A.   That's going to be H with the suspected blood and the

8    hair that's been stuck inside it.

9    Q.   Does that photograph truly and accurately depict it as

10   appeared when you found it?

11   A.   Yes.

12          MR. ZLOTNICK:  I would offer Exhibit 26 into

13   evidence.

14          (No objection from defense.)

15          THE COURT:  Exhibit 26 will be admitted.

16          MR. ZLOTNICK:  Permission to publish it.

17          THE COURT:  Okay.

18          (The document was received in evidence as

19   Government's Exhibit No. 26.)

20          THE COURT:  Now let's go back and clear the record

21   on Exhibit 7, the chair.  You obviously have a picture of

22   that chair.

23          MR. ZLOTNICK:  Yup, now I'm going to put that in

24   next.

25          THE COURT:  Okay.

S. SMITHLEY - DIRECT                                              129

BY MR. ZLOTNICK:

Q.  I'd like to have the witness shown Exhibit 26, which I
think is right in front of us.  That's 28, I'm sorry.  28.

        Is 28 the chair?  I think that should --

        THE COURT:  Wait a minute, I thought you said that
was 7.

        MR. ZLOTNICK:  Item 7 is the chair, her number, but
we marked it as Exhibit 28.

        THE COURT:  Okay.  For the Court's record, it's
Exhibit 28.  All right.

BY MR. ZLOTNICK:

Q.  So can we bring the chair to the witness if we could?

        And is that Exhibit 28, the white chair?

A.  Yes, it is.

        MR. ZLOTNICK:  I'd like to offer Exhibit 28 into
evidence.

        THE COURT:  Any objection?

        (No objection from defense.)

        THE COURT:  Exhibit 28 will be admitted.

        (The physical evidence was received in evidence as
Government's Exhibit No. 28.)

BY MR. ZLOTNICK:

Q.  When we're looking at the pictures of the white chair,
what does the Item Number 7 denote or mean?

A.  Item 7 indicates the chair matches my item number.

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                                    130

1    Q.  Now, when you saw the white chair, was it in one piece or

2    broken?

3    A.  It was broken, as indicated.

4    Q.  Now, I'd like to next have the witness shown Exhibit 27.

5          And Exhibit 27, is that a photograph of the chair

6    showing the broken piece?

7    A.  Yes, sir.

8              MR. ZLOTNICK:  I'd offer 27 into evidence.

9              THE COURT:  Any objection?

10             (No objection from defense.)

11             THE COURT:  Exhibit 27 will be admitted.

12             (The physical evidence was received in evidence as

13   Government's Exhibit No. 27.)

14             MR. ZLOTNICK:  Request permission to publish it.

15             THE COURT:  You may.

16   BY MR. ZLOTNICK:

17   Q.  And what part of the chair was broken, just so the

18   record's clear on that?

19   A.  The right arm.

20   Q.  Did you also find pieces of what appear to come from the

21   chair?

22   A.  Yes, I did.

23   Q.  I'd like to have the witness shown what's been marked

24   Exhibit 29.  Do you recognize Exhibit 29?

25   A.  Yes.

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                                    131

1    Q.   What is Exhibit 29?

2    A.   Pieces of white chair from front living room floor.

3    Q.   How do you know that's what's in that package?

4    A.   I indicate it on the front of the package.

5             MR. ZLOTNICK:  I'd offer Exhibit 29 into evidence.

6             THE COURT:  Any objection?

7             (No objection from defense.)

8             THE COURT:  Exhibit 29 will be admitted.

9             (The physical evidence was received in evidence as

10   Government's Exhibit No. 29.)

11   BY MR. ZLOTNICK:

12   Q.   When you collected that piece of evidence, the pieces of

13   the white plastic chair, how did you label it for your own

14   record keeping purposes?

15   A.   I labeled them as 7A, since they were connected to

16   Item 7, my Item 7, the chair.

17   Q.   Now, besides the chair being broken, did something else

18   about this chair attract your attention?

19   A.   Yes.

20   Q.   Tell us what that was.

21   A.   Suspected blood.

22   Q.   And can you tell us where you saw the suspected blood?

23   A.   If you look on the back of the chair, on the top rim, as

24   if you put your hand underneath, that part, there was a small

25   amount of suspected blood on the back.

S. SMITHLEY - DIRECT                                              132

 1   Q.  And did you photograph what it looked like with the blood

 2   under the lip of the chair?

 3   A.  Yes.

 4   Q.  I would like to have the witness shown Exhibit 30.

 5          Showing you Exhibit 30, what is that?

 6   A.  That is the suspected blood from the back of the chair.

 7   Q.  And does that picture truly and accurately depict what it

 8   looked like?

 9   A.  Yes.

10          MR. ZLOTNICK:  I would offer Exhibit 30 into

11   evidence.

12          THE COURT:  Any objection?

13          (No objection from defense.)

14          THE COURT:  Hearing no objection, it is admitted.

15          (The document was received in evidence as

16   Government's Exhibit No. 30.)

17          MR. ZLOTNICK:  I request permission to so show

18   Exhibit 30.

19   BY MR. ZLOTNICK:

20   Q.  So you took that photograph, and could you show us on the

21   chair, if the Court will allow it, lifting the chair up,

22   where that was on the actual, physical item, if you can

23   recall?

24   A.  It's going to be on this side underneath with just a

25   little bit coming to the hop.

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                                    133

1              THE COURT:  Record will reflect the witness has

2    pointed to the top back of the chair.

3    BY MR. ZLOTNICK:

4    Q.  Did you see blood anywhere else on the chair?

5    A.  No, sir.

6    Q.  Why did the fact that there was blood on the lip of the

7    chair where you've shown us attract or draw your attention?

8    A.  It wasn't really the fact that there was blood on the lip

9    of the chair, it was the lack of presence of blood on the

10   rest of the chair with that only being the only location.

11   There wasn't blood on the arms, on the seat front, where

12   someone would normally sit.

13             MR. ZLOTNICK:  Permission to Publish the exhibit.

14             THE COURT:  Okay.

15   BY MR. ZLOTNICK:

16   Q.  If someone were to sit -- if you were sitting in the

17   chair, would you be able to touch the place where the blood

18   was found?

19             MR. WOODWARD:  Objection, Your Honor.  Calls for

20   speculation.

21             THE COURT:  Sustained.

22   BY MR. ZLOTNICK:

23   Q.  Where was the largest amount of blood in the room?

24   A.  A and B.

25   Q.  And where was that in relation to the chair?

S. SMITHLEY - DIRECT                                                    134

1    A.   The -- if you walk in from the front door, as soon as you

2    turn into the living room, the blood was right there.  And

3    then as you passed through the front living room, like you

4    are headed to the back of the house, the chair was closer

5    to -- if we were almost in the dining room.

6    Q.   As a result of the blood on the lip of the chair

7    attracting your attention, what did you do to collect

8    evidence?

9    A.   I took a swab of the blood.

10   Q.   I'd like to have Exhibit 31, if I could?

11           MR. ZLOTNICK:  I'd like to have the witness shown

12   Exhibit marked 31.

13   BY MR. ZLOTNICK:

14   Q.   Do you recognize Exhibit 31?

15   A.   Yes, sir.

16   Q.   What do you recognize it as?

17   A.   It's the swab of suspected blood from the white plastic

18   chair.

19   Q.   How do you know that's the swab that you took at that

20   time and place?

21   A.   It's indicated on the front of my packaging.

22           MR. ZLOTNICK:  I'd offer that into evidence, Your

23   Honor.

24           THE COURT:  Any objection?

25           (No objection from defense.)

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                              135

1          THE COURT:  Document will be admitted.

2          (The document was received in evidence as

3    Government's Exhibit No. 31.)

4    BY MR. ZLOTNICK:

5    Q.  When you obtained the swab from Exhibit 31 from the white

6    plastic chair, did you give it a number?

7    A.  7B.

8    Q.  And why 7B?

9    A.  7A was going to be the white plastic pieces and 7B is

10   going to still be attached to the white chair.  So I kept it

11   with the Item 7 and then assigned it B so it would stay

12   connected.

13   Q.  What is the next room that you went to?

14   A.  The dining room.

15   Q.  What led you to the dining room?

16   A.  A trail of suspected blood.

17   Q.  Showing you the next Exhibit, 76A.

18          Can you show us on 76A where the next room is, where

19   the dining room is in relation to the front living room?

20   A.  Here is going to be the dining room, so I went from the

21   front living room and I'm heading in that direction.

22          MR. ZLOTNICK:  Record reflect she's made those

23   notations on the exhibit.

24          THE COURT:  The record will so reflect.

25   BY MR. ZLOTNICK:

S. SMITHLEY - DIRECT                                                136

1   Q.   I next have the witness shown Exhibit 32.

2         Showing you Exhibit 32, can you tell us if that is

3   a -- that's a photograph that you took facing the -- from the

4   dining room facing the front living room?

5   A.   That's correct.

6   Q.   Does the picture truly and accurately depict that scene

7   as you saw it?

8   A.   Yes, sir.

9         MR. ZLOTNICK:  I'd offer Exhibit 32 into evidence.

10        THE COURT:  Any objection?

11        (No objection from defense.)

12        THE COURT:  Exhibit 32 will be admitted.

13        (The document was received in evidence as

14   Government's Exhibit No. 32.)

15        MR. ZLOTNICK:  Request permission to publish

16   Exhibit 32.

17        THE COURT:  You may.

18   BY MR. ZLOTNICK:

19   Q.   Could you describe for us what we see in Exhibit 32?

20   A.   Again, the letters are going to indicate spots of

21   suspected blood, and so you can kind of see.  And then you

22   see the white chair a little bit off to the left in the

23   living room.

24   Q.   So where were you standing when you took that picture?

25   A.   I'm stand in the dining room facing the front living

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                           137

 1   room.

 2   Q.  Now, as you entered the dining room, what was the

 3   condition of the lights?

 4   A.  I believe the lights were off in this room as well.

 5   Q.  What did you see on the floor along the common wall

 6   between the front living room and the dining room?

 7   A.  Expected blood.

 8   Q.  I would like the witness shown next Exhibit 33.

 9         Showing you Exhibit 33.  Does Exhibit 33 truly and

10   accurately show what the room looked like along the common

11   wall between the front living room and the dining room?

12   A.  Yes.

13            MR. ZLOTNICK:  I'd offer Exhibit 33 into evidence.

14            THE COURT:  Any objection?

15            (No objection from defense.)

16            THE COURT:  Exhibit 33 will be admitted.

17            (The document was received in evidence as

18   Government's Exhibit No. 33.)

19            MR. ZLOTNICK:  Request permission to publish

20   Exhibit 33.

21            THE COURT:  You may.

22   BY MR. ZLOTNICK:

23   Q.  Tell us what we see in Exhibit 33.

24   A.  Again, suspected blood.  And I've marked it with my

25   letters.

S. SMITHLEY - DIRECT                                              138

1   Q.   Where are you -- as far as standing, where's your back

2   when this picture is being taken?

3   A.   To the back of the house, like the back dining room wall.

4   Q.   Did there come a time that you actually entered the

5   kitchen?

6   A.   Yes.

7   Q.   And when you got to the kitchen, what was the condition

8   of lights?

9   A.   They were off as well.

10  Q.   Did you see if there was a pantry door?

11  A.   Yes.

12  Q.   What was the -- what was the position of the door?

13  A.   The pantry door was open.

14  Q.   Did you look on the floor?

15  A.   Yes.

16  Q.   What if anything did you see on the floor?

17  A.   Suspected blood.

18  Q.   Was there any appliance in the room?

19  A.   Yes.

20  Q.   What appliance?

21  A.   Refrigerator, and there was a stove.

22  Q.   I'd have the witness next shown Exhibit 34.

23       Does 34 -- is that a photograph of the kitchen area?

24  A.   Yes.

25  Q.   Does it truly and accurately depict the kitchen as you

S. SMITHLEY - DIRECT                                                    139

1   saw it?

2   A.  Yes.

3          MR. ZLOTNICK:  So I would offer Exhibit 34 into

4   evidence.

5          THE COURT:  Any objection?

6          (No objection from defense.)

7          THE COURT:  It will be admitted.

8          (The document was received in evidence as

9   Government's Exhibit No. 34.)

10         MR. ZLOTNICK:  Request permission to publish

11  Exhibit 34.

12         THE COURT:  You may.

13  BY MR. ZLOTNICK:

14  Q.  What does this 34 show us?

15  A.  It's showing us the kitchen.

16         Also if you look to the left of the refrigerator,

17  you will see that's the dining room.  My back is to the rear

18  living room, and you will see, again, the letters indicating

19  the suspected blood.

20  Q.  Where was there blood in relation to the refrigerator?

21  A.  There was blood on the refrigerator.

22  Q.  What letter would that be shown by?

23  A.  I believe it's U.

24  Q.  All right.  Did you do a closeup of that as well?

25  A.  Yes.

S. SMITHLEY - DIRECT                                             140

1    Q.   I would like to have the witness shown Exhibit 35.

2         Does Exhibit 35 truly and accurately depict where the

3    blood was around the refrigerator?

4    A.   Yes, sir.

5    Q.   I would offer 35 into evidence.

6         THE COURT:  Any objection?

7         (No objection from defense.)

8         THE COURT:  Exhibit 35 will be admitted and

9    published.

10        (The document was received in evidence as

11   Government's Exhibit No. 35.)

12   BY MR. ZLOTNICK:

13   Q.   Tell us what 35 is.

14   A.   35 is going to be the refrigerator, the side that you

15   would walk by if you are going from the kitchen into the

16   dining room.  And it's going to be on the lower side of the

17   part of the refrigerator, and it's suspected blood.

18   Q.   Now, was there a counter in the kitchen?

19   A.   Yes.

20   Q.   Showing you Exhibit 34, please, again.

21        Does Exhibit 34 show the counter?

22   A.   Yes.

23   Q.   And can you show us where that is on the -- point that

24   out to us.

25   A.   You have it right here (indicating).

S. SMITHLEY - DIRECT                                              141

```
1              MR. ZLOTNICK:  Let the record reflect witness has

2    circled where the counter is.

3              THE COURT:  Record will so reflect.

4    BY MR. ZLOTNICK:

5    Q.  I want to show you Exhibit 58 for identification.

6         Is that a larger picture of the counter?

7    A.  Yes.  We are standing inside the kitchen, and you can see

8    the back door in the background.

9    Q.  Now, does that picture truly and accurately depict how

10   the counter appeared on the day that you went there?

11   A.  Yes.

12             MR. ZLOTNICK:  I'd offer 58 into evidence.

13             THE COURT:  Any objection?

14             (No objection from defense.)

15             THE COURT:  It may be published, and it is admitted.

16             (The document was received in evidence as

17   Government's Exhibit No. 58.)

18   BY MR. ZLOTNICK:

19   Q.  What if anything did you collect from the counter?

20   A.  I collected Item Number 6, which is going to be a

21   cartridge case.

22   Q.  I'd like to have the witness next shown Exhibit 6 -- I'm

23   sorry, Exhibit 64.

24        Does 64 truly and accurately depict what the

25   cartridge case looked like when you found it?
```

S. SMITHLEY - DIRECT                                        142

1   A.   That's correct.

2            MR. ZLOTNICK:  I'd offer 64.

3            THE COURT:  Any objections?

4            (No objection from defense.)

5            THE COURT:  64 is admitted and may be publish.

6            (The document was received in evidence as

7   Government's Exhibit No. 64.)

8   BY MR. ZLOTNICK:

9   Q.   I would like to show the witness next 57.

10           Do you recognize Exhibit 57?

11  A.   Yes.

12  Q.   What is Exhibit 57?

13  A.   It's a .40 S&W CBC cartridge case recovered from the

14  kitchen counter.

15  Q.   And how do you know that's the same one you recovered?

16  A.   I indicated it on my packaging.

17  Q.   And the location you recovered it from?

18  A.   On the kitchen counter.

19           MR. ZLOTNICK:  I would ask for 57.

20           THE COURT:  It's not on the monitor.

21           Any objection to it?

22           (No objection from defense.)

23           THE COURT:  It's admitted.

24           MR. ZLOTNICK:  I'd offer 58 into evidence as well.

25           THE CLERK:  It's already in.

S. SMITHLEY - DIRECT                                                    143

 1              THE COURT:  All right.

 2     BY MR. ZLOTNICK:

 3     Q.  Now, did you see a -- any type of a case for electronics?

 4     A.  Yes, I did.

 5     Q.  What did you see?

 6     A.  I believe it was a cell phone holder.

 7     Q.  Did it have a cell phone, or was it empty?

 8     A.  It was empty.

 9     Q.  Was a cell phone ever recovered?

10     A.  No, not in the house.

11     Q.  And let me publish 58 again.

12              Does Exhibit 58 show where both the shell casing and

13     the empty cell phone case were?

14     A.  Yes.  The phone case is going to be over here

15     (indicating).

16              MR. WOODWARD:  Did she say that's the phone case?

17              THE WITNESS:  The phone case, I'm sorry.

18     BY MR. ZLOTNICK:

19     Q.  That's where the phone case was?

20     A.  Yes, sir.

21     Q.  And where were you -- where were you standing when you

22     took that picture?

23     A.  Inside the kitchen.

24     Q.  Now, what number did you give the shell casing?

25     A.  Item 6.

S. SMITHLEY - DIRECT                                            144

```
 1   Q.  Where is the kitchen in relation to the back living room
 2   area?
 3            Let's pull up 76A to show that.
 4            Where is the kitchen in relation to the back living
 5   room area?
 6   A.  The kitchen's going to be to the left.  And it doesn't
 7   show in this picture, but the island was jetting out like
 8   that, and so I was standing in the kitchen looking into the
 9   back living room.
10   Q.  And then the part -- so if you're -- from the kitchen,
11   can you see into the area where the body was found?
12   A.  You could --
13   Q.  To the door?
14   A.  I could see to the back door.
15   Q.  And show where is the back door.
16   A.  I'm going to circle the back door and it's right there
17   (indicating).
18   Q.  That's the door with the steps that we've seen pictures
19   of?
20   A.  That's correct.
21   Q.  So where do you go after the kitchen?
22   A.  Down to the back living room.
23   Q.  Which is shown on the diagram?
24   A.  Yes.
25   Q.  Can you describe for us what you saw in the back living
```

S. SMITHLEY - DIRECT                                              145

1    room area?

2    A.   There were couches, and the couch cushions had been

3    removed.   There was also suspected blood on the couches and

4    on the floor, along with additional cartridge cases and a

5    bullet.

6    Q.   What about the rear door?

7    A.   The rear door had suspected blood on it as well.

8    Q.   Did you find -- we can take that down now.

9         Did you find any components of what appeared to you

10   to be ammunition in the back living room area?

11   A.   Yes.

12   Q.   What did you find and where did you find it?

13   A.   Cartridge cases.

14   Q.   How many?

15   A.   I believe four, and one copper jacketed bullet.

16   Q.   And where did you find the four cartridge cases and the

17   copper jacketed bullets?

18   A.   They were on the floor of the back living room heading

19   out of the back door.

20   Q.   Next, I'd like to show the witness Exhibits 52, 53, 54,

21   55, and 56, which I believe are physical items.

22        Could you tell us what Exhibit 52 is?

23   A.   It's going to be a .40 S&W CBC cartridge case recovered

24   on the floor in the back living room.

25   Q.   How do you know that exhibit was recovered by you at that

S. SMITHLEY - DIRECT                                          146

1    location and time?

2    A.   It's indicated on the front of my packaging.

3    Q.   Can you tell us what Exhibit 53 is?

4    A.   It's going to be a Winchester .40 S&W cartridge case,

5    recovered on floor in back living room.

6    Q.   Now, did you give an item number for Exhibit 52?

7    A.   Yes.  I gave it Item Number 1.

8    Q.   Did you give an item number for Exhibit 53?

9    A.   Yes.  I gave it Item Number 2.

10   Q.   Did you also look at Exhibit 54?

11   A.   Yes.

12   Q.   What is Exhibit 54?

13   A.   A Winchester .40 S&W cartridge case recovered on floor in

14   back living room near the door.

15   Q.   What item number did you give that?

16   A.   Item 3.

17   Q.   And how do you know you recovered that?

18   A.   It's indicated on my packaging.

19   Q.   Take a look at Exhibit 55.

20   A.   Okay.

21   Q.   What is Exhibit 55?

22   A.   It's a copper jacketed bullet recovered on floor in back

23   living room next to the door.

24   Q.   What number did you give that?

25   A.   Item Number 4.

S. SMITHLEY - DIRECT                                              147

```
 1    Q.  And what is Exhibit 56?
 2    A.  It's a Winchester .40 S&W cartridge case, recovered on
 3    floor near door in back living room.
 4    Q.  What number did you give that?
 5    A.  Item Number 5.
 6            MR. ZLOTNICK:  I'd offer into evidence Exhibits 52,
 7    53, 54, 55 and 56.
 8            THE COURT:  Are there any objections to these
 9    exhibits?
10            (No objection from defense.)
11            THE COURT:  Hearing no objection, the Exhibits 52,
12    53, 54, 55 and 56 are admitted.
13            (The physical evidence was received in evidence as
14    Government's Exhibit Nos. 52-56.)
15            THE COURT:  And to the extent you want to publish
16    them, you may.
17            MR. ZLOTNICK:  Thank you, Your Honor.
18    BY MR. ZLOTNICK:
19    Q.  Let me next show the witness Exhibit 50.
20            Does Exhibit 50 show, in a photograph, the locations
21    where you found Exhibits 52, 53, 54, 55 and 56?
22    A.  Yes.
23    Q.  Does it truly and accurately depict their locations?
24    A.  Yes.
25    Q.  I'd offer Exhibit 50 into evidence.
```

S. SMITHLEY - DIRECT                                             148

```
 1              (No objection from defense.)
 2              THE COURT:  Hearing no objections, Exhibit 50's
 3    admitted.
 4              (The document was received in evidence as
 5    Government's Exhibit No. 50.)
 6              MR. ZLOTNICK:  I would like to publish it, Your
 7    Honor, with your permission.
 8              THE COURT:  You may.
 9    BY MR. ZLOTNICK:
10    Q.  Can you describe what we see in Exhibit 50?
11    A.  Items 1, 2, 3, 4, 5 are going to be on the floor.  Four
12    of those are going to be cartridge cases, one of them, I
13    believe, Item 4, is a copper jacketed bullet.  You also can
14    see Item Number 6 up on the counter, which is going to be the
15    cartridge case.
16    Q.  And do we have Exhibit 59?
17              Showing you Exhibit 59.  Is that a photograph of one
18    of the cartridge cases?
19    A.  Yes, Item Number 1.
20    Q.  All right.  Does it truly and accurately depict what it
21    looked like on the floor?
22    A.  Yes.
23    Q.  I would offer Exhibit 59 into evidence.
24              THE COURT:  Any objection?
25              (No objection from defense.)
```

S. SMITHLEY - DIRECT                                             149

1            THE COURT:  Exhibit 59 will be admitted and may be

2    published.

3            (The document was received in evidence as

4    Government's Exhibit No. 59.)

5    BY MR. ZLOTNICK:

6    Q.  And what's the measurement that you have there?

7    A.  It's approximately one inch.

8    Q.  Now, let's go to Exhibit 58, if we could.

9            Looking at Exhibit 58 where you found the shell

10   casing on the counter.  Can you tell us how that's located in

11   proximity to the location of the shell casings you found on

12   the floor in the back living room?

13   A.  The other cartridge cases are going directly on the

14   opposite side of the counter on the floor, so you can't see

15   them in the picture.  They're on the exact opposite side of

16   that counter.

17   Q.  And that shows the same porch door where you saw blood?

18   A.  Correct.

19   Q.  Leading down the steps?

20   A.  Yes.

21   Q.  All right, we can take that down.

22           Ms. Smithley, did you pick up any spent -- other

23   spent casings or bullets or ammunition components during your

24   time at that crime scene?

25   A.  No.

S. SMITHLEY - DIRECT                                            150

1    Q.  Did you find any evidence of a holster or anything -- any

2    components of weapons that appeared to have been associated

3    with the location, other than these?

4    A.  No.

5    Q.  No holsters?

6    A.  No.

7    Q.  No ammunition?

8    A.  No.

9    Q.  No other weapons?

10   A.  No.

11   Q.  I want to ask you some questions next about what else you

12   saw in the back living room.  I'm going to show you next

13   Exhibit 38.

14        So showing you Exhibit 38.  Does that show what the

15   back living room looked like?

16   A.  Yes.

17   Q.  Does it truly and accurately depict it?

18   A.  Yes.

19   Q.  I'd offer 38 into evidence.

20        THE COURT:  Any objection?

21        (No objection from defense.)

22        THE COURT:  It will be admitted.

23        (The document was received in evidence as

24   Government's Exhibit No. 38.)

25        MR. ZLOTNICK:  Request permission to publish 38.

S. SMITHLEY - DIRECT                                                151

```
 1            THE COURT:  You may.
 2   BY MR. ZLOTNICK:
 3   Q.  Can you tell us what we're looking at there?
 4   A.  This is going to be with my back to the back door.  The
 5   kitchen will be to your right.  And I have my letters.
 6            If you will notice, there's a yellow letter and a
 7   white letter, so now we're giving them double A's, B's, and I
 8   put the letters where there was the suspected blood that I
 9   was going to swab.
10   Q.  I next have the witness shown Exhibit 40.
11            Showing you Exhibit 40.  Can you tell us, does that
12   also show the back living room leading to the door?
13   A.  Yes.
14   Q.  Does it truly and accurately depict what that looked
15   like?
16   A.  Yes.
17   Q.  I would offer that into evidence, Exhibit 40.
18            THE COURT:  Any objection?
19            (No objection from defense.)
20            THE COURT:  Exhibit 40 will be admitted.
21            (The document was received in evidence as
22   Government's Exhibit No. 40.)
23            MR. ZLOTNICK:  Request permission to publish.
24            THE COURT:  If the Court admits them, what we're
25   going to do going forward, you may automatically publish
```

S. SMITHLEY - DIRECT                                              152

1    them.

2              MR. ZLOTNICK:  All right, thank you, Your Honor.

3    BY MR. ZLOTNICK:

4    Q.  What does Exhibit 40 show us?

5    A.  It shows the back door, two couches, and the suspected

6    blood, along with you can see the numbers that indicate where

7    the cartridge cases and bullets were located as well.

8    Q.  I next have the witness shown Exhibit 41.

9              And does Exhibit 41 truly and accurately show what

10   the carpet looked like in that room?

11   A.  Yes.

12             MR. ZLOTNICK:  I'd offer 41.

13             THE COURT:  Any objection?

14             (No objection from defense.)

15             THE COURT:  It will be admitted.

16             (The document was received in evidence as

17   Government's Exhibit No. 41.)

18   BY MR. ZLOTNICK:

19   Q.  Showing you Exhibit 41 and publishing it, can you tell us

20   what that shows as far as the carpet?

21   A.  Suspected blood on the carpet.

22   Q.  I next have the witness shown Exhibit 42.

23             Does 42 truly and accurately depict the couch or sofa

24   in that area?

25   A.  Yes.

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                             153

```
 1              MR. ZLOTNICK:  I'd offer 42 into evidence.
 2              THE COURT:  Any objections?
 3              (No objection from defense.)
 4              THE COURT:  42 is admitted.
 5              (The document was received in evidence as
 6    Government's Exhibit No. 42.)
 7    BY MR. ZLOTNICK:
 8    Q.  What does that show us?
 9    A.  That shows us the arm chair and the back of the couch and
10    the back door is in the back part of the picture, indicated
11    the suspected blood on the couch.
12    Q.  And how's that labeled, the suspected blood?
13    A.  Double C.
14    Q.  Now, how about Exhibit 43?  Let's show her 43.
15              Is that the other side of the couch?
16    A.  Yes.
17    Q.  Does it truly and accurately depict it?
18    A.  Yes.
19              MR. ZLOTNICK:  I offer 43 into evidence.
20              THE COURT:  Any objections?
21              (No objection from defense.)
22              THE COURT:  43 will be admitted.
23              (The document was received in evidence as
24    Government's Exhibit No. 43.)
25    BY MR. ZLOTNICK:
```

S. SMITHLEY - DIRECT                                                    154

1    Q.   Looking at 43, can you tell us what portion of the couch

2    that is?

3    A.   It's going to be the side of the same couch that we were

4    just looking at.

5    Q.   And what is the ruler going up showing us?

6    A.   Indicating the height of the couch and indicating where

7    the blood splatter is located on the side of the couch.

8    Q.   I next want to ask you, did you find any, what appeared

9    to you to be, impressions of shoes?

10   A.   Yes.

11   Q.   Where did you find the shoe impressions?

12   A.   On the floor.

13   Q.   In that same room?

14   A.   Yes.

15           MR. ZLOTNICK:  I'd have the witness shown

16   Exhibit 39.

17           Is that a photograph showing the shoe impressions

18   you saw?

19   A.   Yes.

20           MR. ZLOTNICK:  I'd offer 39 into evidence.

21           THE COURT:  Any objection.

22           (No objection from defense.)

23           THE COURT:  Exhibit 39 will be admitted.

24           (The document was received in evidence as

25   Government's Exhibit No. 39.)

S. SMITHLEY - DIRECT                                                    155

1    BY MR. ZLOTNICK:

2    Q.  I'd next have the witness shown Exhibit 45.

3            And if we put 46 next to it?  Are 45 and 46 also

4    pictures of shoe impressions?

5    A.  Yes.

6    Q.  From which room?

7    A.  The back living room.

8    Q.  Do they truly and accurately depict what they look like?

9    A.  Yes.

10           MR. ZLOTNICK:  I'd offer 45 and 46 into evidence.

11           THE COURT:  Any objection?

12           (No objection from defense.)

13           THE COURT:  These exhibits will also be admitted.

14           (The documents were received in evidence as

15   Government's Exhibit Nos. 45 & 46.)

16           MR. ZLOTNICK:  I would next have the witness shown

17   Exhibits 47 and 48.  Same way, if we could.

18   BY MR. ZLOTNICK:

19   Q.  Showing you 47 and 48.  Do those also show shoe

20   impressions?

21   A.  That's correct.

22   Q.  And they are all in the same -- which room?

23   A.  Back living room.

24   Q.  Would -- and they truly and accurately depict what the

25   shoe impressions look like?

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                        156

```
 1           Do they truly and accurately show the shoe
 2   impressions?
 3   A.   Yes.
 4           MR. ZLOTNICK:  I offer those into evidence.
 5           (No objection from defense.)
 6           THE COURT:  Hearing no objection, these exhibits are
 7   also admitted.
 8           (The documents were received in evidence as
 9   Government's Exhibit Nos. 47 & 48.)
10   BY MR. ZLOTNICK:
11   Q.   I next show the witness what's been marked as
12   Exhibit 76A.
13           Can you tell us, again --
14           MR. SACKS:  It's admitted?
15           THE COURT:  Yes, previously admitted.
16   BY MR. ZLOTNICK:
17   Q.   So can you tell us, on 76A, the location where the sofa
18   was?
19   A.   So you had two sofas.  You are going to have one that is
20   located here, and one that was located here (indicating).
21           MR. ZLOTNICK:  Let the record reflect that's been
22   drawn in by the witness.
23   BY MR. ZLOTNICK:
24   Q.   And can you tell us, where were the areas that you saw
25   what appear to be footprints, shoe impressions?
```

S. SMITHLEY - DIRECT                                              157

```
 1              THE COURT:  The record will so reflect.
 2              MR. ZLOTNICK:  I'm sorry, Your Honor.
 3              THE COURT:  You asked to have the record reflect,
 4    but you asked the other question before I ruled.
 5              MR. ZLOTNICK:  I'm sorry.
 6              THE COURT:  The record will so reflect that she's
 7    marked the exhibit.
 8              MR. WOODWARD:  Your Honor, can I just understand, is
 9    the exhibit going to be -- are the marks going to be on the
10    exhibit or is this just for demonstrative purposes?
11              THE COURT:  The exhibit is already admitted.
12              MR. WOODWARD:  Yes, sir.
13              THE COURT:  But for demonstrative purposes, she is
14    marking it.  But the record will show that she's marking that
15    exhibit.
16              MR. SACKS:  Is it being marked with something other
17    than this electronic representation?  Is there something else
18    I should --
19              THE REPORTER:  You need to stand up, please.
20              MR. SACKS:  It will not be any mark-up on the
21    exhibit itself?
22              THE COURT:  Not with what we're doing.  She is doing
23    this electronically.
24              MR. SACKS:  Okay.  Thank you.
25    BY MR. ZLOTNICK:
```

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                              158

1    Q.  Can you show us where you saw the shoe impressions?

2    A.  The shoe impressions are going to be in this area right

3    here where it's indicated in green.

4    Q.  And those are the photographs we saw.

5            Let the record reflect, she's put that in green.

6            THE COURT:  Record reflect that she's marking the

7    Exhibit in green.

8    BY MR. ZLOTNICK:

9    Q.  All right.  I next have the witness shown Exhibit 49.

10   Does Exhibit 49 show the back door leading to the porch?

11   A.  Yes, it does.

12   Q.  Does it truly and accurately depict what it looked like?

13   A.  Yes.

14           MR. ZLOTNICK:  I'd offer Exhibit 49 into evidence.

15           THE COURT:  Any objection to 49?

16           (No objection from defense.)

17           THE COURT:  49 will be admitted.

18           (The document was received in evidence as

19   Government's Exhibit No. 49.)

20           MR. ZLOTNICK:  I'd next have the witness shown

21   Exhibit 50.

22           And does Exhibit 50 show the back door going into

23   the porch?

24   A.  Yes, it does.

25   Q.  I offer 50 into evidence.

S. SMITHLEY - DIRECT                                        159

1          MR. ZLOTNICK:  It's already in, I'm sorry.

2    BY MR. ZLOTNICK:

3    Q.  And let me have witness shown Exhibit 76A.  I should say,

4    is there a 76B -- or 76B?

5          Is Exhibit 76B a diagram you prepared?

6    A.  Yes, that's correct.

7    Q.  And can you tell us, does it truly and accurately depict

8    the trail of blood as you saw it at the scene?

9    A.  Yes.

10   Q.  And does it also show where you found the cartridge cases

11   that you collected and where the -- you collected other

12   items, including the chair.  All the items you described,

13   you've collected?

14   A.  Yes.

15   Q.  And it truly and accurately depicts those locations?

16   A.  Yes.

17          MR. ZLOTNICK:  I'd offer Exhibit 76B into evidence.

18          THE COURT:  Are there any objections to 76B?

19          MR. WOODWARD:  Don't have any objection.

20          I would just like to understand, if we could, what

21   some of the little symbols that indicate blood or different

22   sizes, but I can cover that on cross.  I don't have any

23   objection.

24          MR. ZLOTNICK:  I thought I would do that once I get

25   it into evidence.

S. SMITHLEY - DIRECT                                                160

1             MR. WOODWARD:  Then no objection.

2             THE COURT:  Then 76B will be in evidence.

3             (The document was received in evidence as

4    Government's Exhibit No. 76B.)

5             MR. ZLOTNICK:  We have a blowup of this.  Can we use

6    the easel to bring that over?

7             THE COURT:  If counsel wants to see what she is

8    pointing to, you will have to walk around behind the -- over

9    in the first row someplace.

10            (Witness approaches the easel.)

11   BY MR. ZLOTNICK:

12   Q.  Ms. Smithley, can you tell us, what are the symbols that

13   we see on there?

14   A.  So on here you -- the blue is going to be indicative of

15   suspected blood, and then we have Items Number 1 through 9

16   which are going to show the, what I call, like, the hard

17   evidence that I collected.

18   Q.  And can you walk us through the trail of the blood that

19   you saw from which room to which room, to where it ultimately

20   ended?

21   A.  So when I started documenting it, I started in the front

22   foyer.  So here we have -- I turned right into the front

23   living room.  This is going to indicate where A and B were,

24   that larger pool of blood.

25            As I walk through the living room into the dining

S. SMITHLEY - DIRECT                                              161

 1   room, I turn right into the kitchen, indicating the blood

 2   right there on the refrigerator.  Going all the way through,

 3   this indicates the blood that was on the sofa, the arm chair,

 4   and the side.

 5          This larger X just indicates the fact that that was

 6   just a large area of suspected blood, not necessarily

 7   connected as a pool of blood.

 8          And then we have the suspected blood that goes down

 9   the stairs to where we get to the victim's body.

10   BY MR. ZLOTNICK:

11   Q.  And then you saw what the stairs look like?

12   A.  Yes.

13   Q.  What did the stairs look like?

14   A.  The stairs had suspected blood on them as well.

15   Q.  Now, does the chart also show where you found the plastic

16   white chair, Number 7?

17   A.  Yes, it does.

18   Q.  And can you show us where that is on the chart?

19   A.  It's in the front living room right here (indicating).

20   Q.  Does the chart show where you found the shell casing on

21   the counter?

22   A.  Yes.  The cartridge case was located right here where the

23   Number 6 is (indicating).

24   Q.  And does the chart also show where you found the other

25   components in the back living room?

S. SMITHLEY - DIRECT                                              162

1    A.   Yes.   Item Numbers 1, 2, 3, 4, and 5 are the other

2    cartridge cases and the bullet.

3    Q.   And then does the chart also show indications of what you

4    saw on the front -- the front door as you entered the foyer?

5    A.   Yes.   It indicates Items 8 and 9, which are the pieces of

6    the front door frame that were on the floor.

7    Q.   All right.   And that's a summary of what you found?

8    A.   That's correct.

9    Q.   All right.   Thank you.

10           (Witness resumes the stand.)

11           MR. ZLOTNICK:   I'm done with it for now with that

12   part of the examination.

13           And we can remove the easel, Your Honor.

14           THE COURT:   Do you have a copy of that particular

15   chart?

16           MR. ZLOTNICK:   We do, and it's electronic as well.

17           THE COURT:   Okay if it's electronic, or you have a

18   smaller copy, we can just substitute it in the record.

19           MR. ZLOTNICK:   That's fine, thank you.

20           THE COURT:   I tell you what, though, give it to the

21   clerk for the time being.

22           MR. ZLOTNICK:   We can take the chart down now.

23   BY MR. ZLOTNICK:

24   Q.   Ms. Smithley, there came a point, as a part of your job,

25   you would document information about the location of injuries

S. SMITHLEY - DIRECT                                      163

1   on the victim?

2   A.   Yes.

3   Q.   Can you tell us, first, when you -- saw the victim, at

4   what point did you document the injuries on the victim?

5   A.   I documented it after the medical examiner -- the on-call

6   medical examiner released the body for me to have contact

7   with it.  So that was about probably, I think, around 6:30.

8   Q.   That evening?

9   A.   That evening.

10  Q.   Did you document what clothing was on the victim?

11  A.   Yes.

12  Q.   What kind of clothing did you see that he had on?

13  A.   He had on jean shorts and a white tank top, white socks

14  and a belt.

15  Q.   What if anything did he have on his feet?

16  A.   Just the white shoes -- I mean the white socks, no shoes.

17  Q.   When you got there -- I'm sorry.

18        Now, there came a point, though, did you become aware

19  of when the body was released from the scene?

20  A.   The body was released to the body removal at 2144 hours.

21  Q.   Did you take photographs of where you saw injuries on the

22  victim?

23  A.   Yes.

24  Q.   Where did you take those photographs?

25  A.   I took those photographs at the scene.  I also took

S. SMITHLEY - DIRECT                                              164

1   photographs at the autopsy.

2   Q.  I want to show you what's been marked as Exhibit 13.

3        Let me put that on the screen, if I could.

4        Does Exhibit 13 indicate where you documented a wound

5   on the victim?

6   A.  That's correct.

7   Q.  And can you tell us, does that photograph truly and

8   accurately depict where that location was?

9   A.  Yes.

10       MR. ZLOTNICK:  I'd offer 13.

11       THE COURT:  Any objection?

12       (No objection from defense.)

13       THE COURT:  13 will be admitted.

14       (The document was received in evidence as

15   Government's Exhibit No. 13.)

16  BY MR. ZLOTNICK:

17  Q.  Showing you Exhibit 13.  Where was the injury?

18  A.  It's going to be above his right eye.

19  Q.  What kind of injury did you see?

20  A.  It appeared to be a gash.

21  Q.  Now, did you also document any injury to his lower left

22  ribs?

23  A.  Yes.

24  Q.  I'd like to have you shown the witness Exhibit 72.

25       Does 72 truly and accurately depict the injury to his

S. SMITHLEY - DIRECT                                                165

```
 1   lower left ribs?
 2   A.   Yes.
 3             MR. ZLOTNICK:  I'd offer 72 into evidence.
 4             THE COURT:  Any objection to 72?
 5             (No objection from defense.)
 6             THE COURT:  Hearing no objections, 72 is admitted.
 7             (The document was received in evidence as
 8   Government's Exhibit No. 72.)
 9   BY MR. ZLOTNICK:
10   Q.   Did you see a part of Mr. Joseph's body that had the
11   biggest concentration of blood?
12   A.   Yes.
13   Q.   And where was that?
14   A.   In the genital areas.
15   Q.   Did you also see whether or not there was any injury to
16   his upper left thigh?
17   A.   Yes.
18   Q.   And did you see what if any injury that there was near
19   his knee?
20   A.   Yes.
21   Q.   What did you see there?
22   A.   Behind his right knee, there appeared to be a hole.
23             MR. ZLOTNICK:  I'd like to have --
24   BY MR. ZLOTNICK:
25   Q.   What about -- let me have you look at Exhibit 73, if we
```

S. SMITHLEY - DIRECT                                            166

 1  could.

 2        What is Exhibit 73?  Does that truly and accurately

 3  depict another injury by his right rear buttocks and thigh?

 4  A.  Yes, like behind his right knee on his right upper thigh.

 5  Q.  And that truly and accurately depicts the injury?

 6  A.  Yes.

 7        MR. ZLOTNICK:  I'd offer Exhibit 73 into evidence.

 8        THE COURT:  Any objection?

 9        (No objection from defense.)

10        THE COURT:  73 will be admitted.

11        (The document was received in evidence as

12  Government's Exhibit No. 73.)

13  BY MR. ZLOTNICK:

14  Q.  And another final injury.

15        Did you see an injury near his right shoulder blade?

16  A.  Yes.

17  Q.  I'd like the witness shown Exhibit 74.

18        Showing you Exhibit 74, does that show the injury

19  under his right shoulder blade?

20  A.  Yes.

21        MR. ZLOTNICK:  I'd offer 74 into evidence.

22        THE COURT:  Any objection to Exhibit 74?

23        (No objection from defense.)

24        THE COURT:  74's admitted.

25        (The document was received in evidence as

S. SMITHLEY - DIRECT                                                167

1    Government's Exhibit No. 74.)

2    BY MR. ZLOTNICK:

3    Q.  Now, did you have to move the body to -- at all?

4    A.  Yes, I did.

5    Q.  What did you notice when you -- underneath the body when

6    you moved it?

7    A.  His -- the back of his shirt, the white tank top was just

8    saturated with blood, and then that's when I observed the

9    injuries to his back.

10   Q.  What did you put under him?

11   A.  I put a white sheet, a sterile white sheet, to collect

12   any evidence that might fall out.

13   Q.  Now, as a matter of procedure, did you do anything

14   regarding his hands?

15   A.  Yes.

16   Q.  What did you do?

17   A.  According to our policy at Newport News, we have to do a

18   gunshot residue kit for any victim.

19   Q.  And can you tell us, was the gunshot residue kit

20   submitted?

21   A.  No, it was not.

22   Q.  Why was it not submitted?

23   A.  When you submit a gunshot residue kit, the lab can tell

24   you that one of three things happened, but they can't tell

25   you which one actually happened.  It can be that the person

S. SMITHLEY - DIRECT                                                168

 1  handled a firearm, that they were present during the shooting
 2  of a firearm, or they shot a firearm.
 3          So it's like the handle of the gun that has been
 4  recently shot, they actually shot the firearm or they were in
 5  the presence of somebody shooting.  And since she was in the
 6  presence because he had the gunshot wounds, that he could
 7  test positive for that.  But they wouldn't be able to tell me
 8  which of the three was accurate.
 9  Q.  So what, if any, point would there be, in your judgment,
10  to have submitted it?
11  A.  There wouldn't be.  He should have residue on him.
12  Q.  Now, how many bedrooms were there in the Clipper
13  residence?
14  A.  Three bedrooms.
15  Q.  And did you look in those three bedrooms?
16  A.  Yes, sir.
17  Q.  What if any disturbance did you see in the bedrooms?
18          MR. SACKS:  Objection, Your Honor, unless there's
19  some time that she saw it before.
20          THE COURT:  Objection sustained.
21          MR. ZLOTNICK:  Let me reframe it.
22  BY MR. ZLOTNICK:
23  Q.  Did you enter the bedrooms?
24  A.  Yes.
25  Q.  What if anything did you see in the bedrooms indicating

S. SMITHLEY - DIRECT                                            169

```
 1    anything?

 2    A.   Nothing.  The TV was on in the front master bedroom.  The

 3    mattresses were in location, they hadn't been tossed or moved

 4    about like the living room had been.

 5    Q.   I'd like to have the witness shown Exhibit 65.

 6         Does Exhibit 65 show one of the bedrooms, the master

 7    bedroom?

 8    A.   Yes.

 9    Q.   Does it truly and accurately show what it looked like

10    when it got there?

11    A.   Yes.

12         THE COURT:  Any objection to 65?

13         (No objection from defense.)

14         THE COURT:  Exhibit 65 will be admitted.

15         (The document was received in evidence as

16    Government's Exhibit No. 65.)

17    BY MR. ZLOTNICK:

18    Q.   Tell us what 65 shows us.

19    A.   The front bedroom, the master bedroom.

20    Q.   And what did you notice, what's that show that was on?

21    A.   The TV's on and it was on Nickelodeon.

22    Q.   I next have the witness shown Exhibit 66.

23         Does that also show the master bedroom, Exhibit 66?

24    A.   Yes.

25         MR. ZLOTNICK:  I'd offer 66.
```

S. SMITHLEY - DIRECT                                                    170

```
 1              THE COURT:  Any objection?

 2              (No objection from defense.)

 3              THE COURT:  66 will be admitted.

 4              (The document was received in evidence as

 5    Government's Exhibit No. 66.)

 6    BY MR. ZLOTNICK:

 7    Q.  And does 66 also show the master bedroom without -- as

 8    you found it?

 9    A.  Yes, as I found it.

10    Q.  Now, did there come a time that you saw anything on the

11    closet door in the master bedroom?

12    A.  Yes.

13    Q.  What did you see on the floor in the master bedroom?

14    A.  A pair of black pants.

15    Q.  And what if anything was in those black pants?

16    A.  Money.

17    Q.  Did you count how much money was in there?

18    A.  Yes, but I don't recall how much.

19    Q.  Would your report refresh your memory?

20    A.  Yes.

21              It was $1,640.

22    Q.  Can I next have the witness shown Exhibit 67?

23              Did you collect -- you recognize 67?

24    A.  Yes.

25    Q.  What is 67?
```

S. SMITHLEY - DIRECT                                        171

1    A.  It's going to be Item 11, and it's -- my writing is

2    covered, but it's the money that was recovered from the black

3    pants hanging on the door in the front bedroom.

4    Q.  And you gave it Number 11 because it's physical evidence?

5    A.  That's correct.

6    Q.  And I'd like to have the witness -- can we tell -- it was

7    in the master bedroom?

8    A.  Yes.

9    Q.  Now, did you then stay at the scene or did you go to

10   another location?

11   A.  I went to another location.

12   Q.  What location did you go to?

13   A.  I went to the medical examiner's office.

14   Q.  Now let me offer into evidence Exhibit 67.

15   A.  I'm sorry, I misspoke.  I actually went back to the

16   forensics unit to secure my evidence, and then I went to the

17   medical examiner's office.

18            MR. ZLOTNICK:  Let me offer Exhibit 67, Your Honor.

19            THE COURT:  Any objection, counsel?

20            (No objection from defense.)

21            THE COURT:  Exhibit 67 is admitted.

22            (The physical evidence was received in evidence as

23   Government's Exhibit No. 67.)

24   BY MR. ZLOTNICK:

25   Q.  So you went next to your office?

S. SMITHLEY - DIRECT                                                    172

1    A.   Yes.

2    Q.   Approximately what time did you leave the scene, having

3    been there?

4    A.   I left the scene at 4:00 in the morning.

5    Q.   Where'd you go next after your office?

6    A.   I went to the medical examiner's office.

7    Q.   So what date are we on now?

8    A.   We're on March 14th.

9    Q.   So on March 14th, 2013, where do you go to, what

10   medical -- where's the medical examiner's office?

11   A.   In Norfolk.

12   Q.   What was your purpose in going there?

13   A.   For the autopsy of the victim.

14   Q.   Who conducted the autopsy, if you know from your personal

15   knowledge?

16   A.   Dr. Kinnison.

17   Q.   What if anything did you collect from Dr. Kinnison?

18   A.   She gave me two copper jacketed bullets, fingernail

19   clippings, the pair of white socks, a black do rag, a white

20   tank top, gray boxers, and the blue jean shorts.

21   Q.   I'd have the witness shown Exhibit 80 and 81, if I could.

22        Do you recognize Exhibits 80 and 81?

23   A.   Yes.

24   Q.   What are 80 and 81?

25   A.   80 is going to be a copper jacketed bullet recovered from

S. SMITHLEY - DIRECT                                              173

1   the victim's underwear.

2   Q.   Who gave it to you?

3   A.   Dr. Kinnison.

4   Q.   What is -- and what is Exhibit 81?

5   A.   Exhibit 81 is going to be a copper jacketed bullet from

6   victim's right thigh.

7   Q.   And how do you know that Exhibit 80 and 81 were the same

8   items that you obtained from Dr. Kinnison on March 14th of

9   2013?

10  A.   They're indicated on the front, the chain of custody.

11  Q.   I'd offer Exhibits 80 and 81 into evidence.

12          THE COURT:   Any objection?

13          (No objection from defense.)

14          THE COURT:   Exhibits 80 and 81 will come into

15  evidence.

16          (The physical evidence was received in evidence as

17  Government's Exhibit Nos. 80 & 81.)

18  BY MR. ZLOTNICK:

19  Q.   What item numbers did you assign 80 and 81?

20  A.   I need them back.

21          Exhibit 80 is going to be Item Number 17, and

22  Exhibit 81 is going to be item number -- sorry, Exhibit 80 is

23  Item 16, Exhibit 81 is 17.

24  Q.   Now, did there come a time after going to the medical

25  examiner's office and collecting those copper jacketed

S. SMITHLEY - DIRECT                                                      174

1   bullets that you went back to another location connected to

2   this case?

3   A.   Yes.

4   Q.   Where did you go?

5   A.   I returned back to my office to secure the items of

6   evidence that Dr. Kinnison gave me, and then I returned to

7   Clipper Drive.

8   Q.   So you get back to Clipper Drive.  What part of the day

9   was this on March the 14th?

10  A.   I'm now back at the crime scene at 1:28 in the afternoon.

11  Q.   And what do you do when you get back to the crime scene

12  at that time?

13  A.   I process for prints.

14  Q.   What areas did you process for fingerprints?

15  A.   The front door cabinet and front living room, dining room

16  table, kitchen counter, refrigerator, rear glass door, rear

17  back door, door to the garage, glass door to the garage.

18  Living room coffee table, and white cabinet in the garage.

19  Q.   And what was the result of your attempt to obtain

20  fingerprints?

21  A.   No prints of value were recovered.

22  Q.   Now, why were you doing your fingerprinting at this stage

23  when you are coming back, and why -- why had you not done it

24  earlier?

25  A.   You have to collect the evidence first, especially if you

S. SMITHLEY - DIRECT                                                175

1    are going to be submitting it for DNA, because you do not

2    want to do a cross-contamination.  So once you have collected

3    your evidence, you are going to proceed forward with the

4    fingerprints.

5            I had to leave the scene but I did seal it and

6    photograph the seal in order to go to the autopsy to

7    determine what exactly happened to the victim, which would

8    drive my further search when I returned to the house.

9    Q.  Now, after attempting to obtain fingerprints, did there

10   come a time that you entered into the rear bedroom of the

11   house?

12   A.  Yes.  I conducted a secondary search of the home looking

13   for any additional evidence.

14   Q.  Did there come a time that you saw a backpack?

15   A.  Yes.

16   Q.  I would like to have the witness shown Exhibit 68.

17           Does Exhibit 68 show us where you found the backpack?

18   A.  Yes.  It's going to be on that back bedroom door.  You

19   can kind of see the red part of it.

20   Q.  First, does the picture show the location, truly and

21   accurately?

22   A.  Yes.

23   Q.  I'd offer 68 into evidence.

24           THE COURT:  Any objection?

25           (No objection from defense.)

S. SMITHLEY - DIRECT                                        176

1          THE COURT:  Exhibit 68 will be admitted.

2          (The document was received in evidence as

3   Government's Exhibit No. 68.)

4   BY MR. ZLOTNICK:

5   Q.  And I also like to offer Exhibit -- did you look in the

6   backpack?

7   A.  Yes, I did.

8   Q.  What if anything did you see in the backpack?

9   A.  Suspected marijuana.

10  Q.  Where was it in the backpack?

11  A.  It was in the, like, main pouch.  It wasn't a big

12  backpack, it was a small, like, little-kid backpack.

13          MR. SACKS:  I'm sorry?

14          THE WITNESS:  A little-kid backpack, like a

15  Spider-Man backpack.

16  BY MR. ZLOTNICK:

17  Q.  I would like to show the witness Exhibit 70.

18          Do you recognize that exhibit?

19  A.  Yes.  It's the suspected marijuana recovered from the

20  Spider-Man backpack.

21          MR. ZLOTNICK:  I'd offer Exhibit -- that exhibit

22  into evidence.

23          MR. SACKS:  What number is that?

24          MR. ZLOTNICK:  It's Exhibit 70.

25          (No objection from defense.)

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                                    177

```
 1              THE COURT:  All right, it may be released and
 2    published.
 3    BY MR. ZLOTNICK:
 4    Q.  Did you give it an item --
 5              THE COURT:  Exhibit 70 will be admitted.
 6              (The physical evidence was received in evidence as
 7    Government's Exhibit No. 70.)
 8              MR. ZLOTNICK:  I'd next have the witness shown
 9    Exhibit 15.
10    BY MR. ZLOTNICK:
11    Q.  Does Exhibit 15 truly and accurately represent what the
12    backpack looked like?
13    A.  Yes.
14              MR. ZLOTNICK:  I offer it in evidence -- oh, it's
15    apparently in evidence.
16    BY MR. ZLOTNICK:
17    Q.  And if I could have the witness shown now Exhibit 69.
18              Does Exhibit 69 show the marijuana in relation to the
19    backpack?
20    A.  Yes, it does.
21    Q.  Does it truly and accurately depict it?
22    A.  Yes.
23              MR. ZLOTNICK:  I'd offer Exhibit 69 into evidence.
24              THE COURT:  Any objections?
25              (No objection from defense.)
```

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                                178

```
 1              THE COURT:  Exhibit 69 is admitted.
 2              (The document was received in evidence as
 3    Government's Exhibit No. 69.)
 4    BY MR. ZLOTNICK:
 5    Q.  Now, Ms. Smithley, moving you forward in time to January
 6    the 12th, 2010.  Did there come a time that you traveled to
 7    another city?
 8    A.  Yes.
 9    Q.  Where did you travel?
10    A.  Boston, Massachusetts.
11    Q.  Were you accompanied there by any other law enforcement
12    agents?
13    A.  Detective Espinoza, and now Lieutenant Andy Matthews.
14    Q.  Can you tell us, was there a contact made with a police
15    department there?
16    A.  Yes.
17    Q.  What police department?
18    A.  The Boston Police Department.
19    Q.  With these detectives and the Boston Police Department,
20    did you go to a location?
21    A.  Yes, I did.
22    Q.  What was the location?
23    A.  We went to 19 Reynolds Way, Apartment 257.
24    Q.  And did you see anyone at that location?
25    A.  Mr. Joseph Benson and his, I guess, girlfriend at the
```

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                             179

1    time, Ms. Nation.

2    Q.  Did anyone give permission to search?

3    A.  Ms. Nation gave permission to search the apartment.

4    Q.  And when you got in there, did you recover shoes?

5    A.  Yes, I did.

6    Q.  And when you recovered the shoes, what was your purpose

7    in recovering the shoes?

8    A.  To see if they were similar to the shoe impressions that

9    were at the original crime scene.

10   Q.  Did you make that comparison?

11   A.  Yes.

12   Q.  And what was your result?

13   A.  Um --

14           MR. SACKS:  Objection, foundation.

15           MR. ZLOTNICK:  We stipulated to it.

16           MR. WOODWARD:  Your Honor, we stipulated to this.

17           THE COURT:  Continue.

18   BY MR. ZLOTNICK:

19   Q.  What was the result?

20   A.  They were not similar.

21   Q.  And did there come a time that you also recovered a cell

22   phone?

23   A.  Yes.

24   Q.  I'd have the witness shown Exhibit 82.

25           Showing you Exhibit 82, can you look inside the

S. SMITHLEY - DIRECT                                              180

1    package to see what's in there?

2    A.  You want me to open it?

3    Q.  I think it's open.

4    A.  Oh.  It's a BlackBerry cell phone.

5    Q.  And you recognize that phone?

6    A.  Yes.

7    Q.  And what is that phone; where was that phone taken from?

8    A.  It was collected from the bedroom at the apartment in

9    Boston.

10   Q.  Where Benson was present?

11   A.  Yes.

12          MR. ZLOTNICK:  And I would like the witness shown --

13   let me offer Exhibit 82 into evidence.

14          THE COURT:  Any objection?

15          (No objection from defense.)

16          THE COURT:  82 will be admitted.

17          (The physical evidence was received in evidence as

18   Government's Exhibit No. 82.)

19          MR. ZLOTNICK:  I next have the witness shown

20   Exhibit 83.

21   BY MR. ZLOTNICK

22   Q.  You recognize Exhibit 83?

23   A.  That's the cell phone that was Exhibit 82.

24   Q.  And that's a photograph of it?

25   A.  Yup.

S. SMITHLEY - DIRECT                                          181

1    Q.  And it truly and accurately shows what it looked like?

2    A.  Yes.

3              MR. ZLOTNICK:  I'd offer 83 into evidence.

4              THE COURT:  Any objections?

5              (No objection from defense.)

6              THE COURT:  83 will be admitted.

7              (The document was marked as Government's Exhibit No.

8    83.)

9    BY MR. ZLOTNICK:

10   Q.  Did you give the cell phone a number?

11   A.  Yes, I did.

12   Q.  I should have asked you before.

13   A.  Assigned it Item Number 32.

14   Q.  All right.

15             Did you -- did there come a time that you also took

16   possession of certain buccal swabs in this case?

17   A.  Yes.

18   Q.  And who did you get those from?

19   A.  Let me look here.

20             I received a pair of buccal swabs from Detective

21   Espinoza.

22   Q.  I'd like to have the witness shown Exhibit 84.

23   Do you recognize Exhibit 84.

24   A.  Yes.

25   Q.  What is it?

S. SMITHLEY - DIRECT                                                  182

1    A.   Joseph Benson buccal swab sample.

2    Q.   Did you give it a number?

3    A.   Item 34.

4    Q.   All right.

5              MR. ZLOTNICK:  I offer that into evidence.

6              THE COURT:  Any objections?

7              (No objection from defense.)

8              THE COURT:  It will be admitted.

9              (The physical evidence was received in evidence as

10   Government's Exhibit No. 84.)

11             (Government counsel confer.)

12             MR. ZLOTNICK:  That's all of my questions.  Thank

13   you, Your Honor.

14             THE COURT:  Okay, ladies and gentlemen of the jury,

15   before we start the cross-examination, what we're going to do

16   is we're going to simply take the break now.  15 minutes,

17   then we will come back for cross.

18             (Jury out, 3:57 p.m.)

19             THE COURT:  Yes, sir?

20             MR. ZLOTNICK:  Your Honor, I'd like --

21             THE COURT:  Everyone have a seat.

22             You may step down.

23             MR. ZLOTNICK:  There were two minor items that I

24   forgot to get in, I'm sorry.  A DNA card and a swab of blood

25   from the left seat.  I would like to be able to reopen just

S. SMITHLEY - DIRECT                                                183

1    to ask her those two questions to get those pieces in.  I

2    missed it on my checklist.

3            One from Louis Joseph, the DNA blood card, and the

4    swab from the back of the left love seat.

5            THE COURT:  Has defendant's counsel stipulated to

6    the those two exhibits?

7            MR. WOODWARD:  Your Honor, I think we have.  If we

8    haven't, we will.  They are not in controversy, so I would

9    simply -- I mean, if he wants to explain them to the jury, I

10   understand, but we're not going to have any objections to

11   Mr. Joseph's blood card.

12           THE COURT:  You need to question her to put them in?

13           MR. ZLOTNICK:  I'm just going to put them in, that's

14   it.

15           THE COURT:  Does anyone object to the admission of

16   these two exhibits?

17           (No objection from defense.)

18           (The physical evidence was received in evidence as

19   Government's Exhibit Nos. 85 & 131.)

20           (On the record, 4:23 p.m.)

21           THE COURT:  You can read some of those stipulations

22   for the documents you put in with this witness.

23           (Jury in, 4:24 p.m.)

24           THE COURT:  You may be seated.

25           The record reflects that all jurors have returned to

S. SMITHLEY - CROSS                                                      184

 1    the courtroom.  Does counsel agree?

 2            MR. ZLOTNICK:  Yes, Your Honor.

 3            (All counsel agree.)

 4            THE COURT:  All right, you may resume for a moment.

 5    BY MR. ZLOTNICK:

 6    Q.  Ms. Smithley, I neglected to ask you about Exhibit 131,

 7    which is in evidence now, which was a swab from the sofa.

 8            Do you remember taking that, the blood swab from the

 9    sofa in the house?

10    A.  Yes.

11    Q.  And Exhibit 85 was a blood card.

12            Are you familiar with that, with Louis Joseph?

13    A.  Yes.

14    Q.  Where did that come from?

15    A.  The blood card came from -- Technician Wells turned it

16    over to me.

17    Q.  All right.

18    A.  Belonging to the victim from the autopsy.

19    Q.  Thank you.

20    A.  Yeah.

21            MR. ZLOTNICK:  Now, Your Honor, at this time I would

22    like to read some stipulations.

23            THE COURT:  Ladies and gentlemen, stipulations are

24    nothing more than agreements that counsel have reached

25    regarding certain evidence.  Means they agree that these

S. SMITHLEY - CROSS                                                        185

1    documents, these matters are proven and may be admitted and

2    accepted by you.

3              Stipulation Number 1.

4              It is hereby stipulated and agreed among the parties

5    that:

6              1. United States Exhibits 52-54, 56-57 are cartridge

7    casings placed in the Newport News Police Department Property

8    and Evidence Section by Newport News Police Department Crime

9    Scene Technician Stacey Smithley, where they were properly

10   stored and maintained as evidence by the Newport News Police

11   Department.  On March 24, 2009, the cartridge casings were

12   transported by Smithley to the Commonwealth of Virginia,

13   Department of Forensic Science for analysis.  Leland Kennedy

14   of the Department of Forensic Science examined the cartridge

15   casings and determined that no fingerprints for

16   identification could be obtained.  His conclusions were

17   memorialized in a Certificate of Analysis dated April 13,

18   2009.  After the completion of the forensic examination, the

19   cartridge casings were returned to the Newport News Police

20   Department Property and Evidence Section and properly stored

21   and maintained as evidence by the Newport News Police

22   Department.

23             THE COURT:  All right, cross-examination.

24             MR. WOODWARD:  Thank you, Your Honor.

25                       CROSS-EXAMINATION

S. SMITHLEY - CROSS                                                      186

1    BY MR. WOODWARD:

2    Q.  Hi, Ms. Smithley.

3    A.  Hi.

4    Q.  Try to roll through this as quickly as possible.

5         Could you put up what has been admitted as

6    Government's Exhibit 2?  This is a picture the jury's going

7    to have, I just want to clarify.

8         The two vehicles that are shown in this picture

9    inside of the crime scene tape, to your knowledge were they

10   processed, do they have anything to do with the crime scene,

11   or were they just parked there?

12   A.  One of the vehicles I believe was Ms. Walker's.

13   Q.  Okay.

14   A.  Then the other one was going to be the victim's car,

15   which, when I returned, I processed one of them for prints on

16   the outside --

17            THE COURT:  What did you say, ma'am?

18            THE WITNESS:  I'm sorry.  I processed one of them

19   for prints on the outside.

20   BY MR. WOODWARD:

21   Q.  You did?

22   A.  Yes.

23   Q.  Okay.

24   A.  Yes.

25   Q.  But that's what they were?

S. SMITHLEY - CROSS                                                    187

1    A.  Yes.

2    Q.  All right.  You can take that down.

3         Let me now just ask you...the backpack, we will start

4    with that, was where you went last.

5         Explain to the jury, where in the bedroom was that

6    found?

7    A.  If you're in the back bedroom of the house, hanging on

8    the door handle of the -- the door that goes into the

9    bedroom.

10   Q.  So it was kind of in plain view, it wasn't hidden up in a

11   closet or --

12   A.  Nope.

13   Q.  -- or hard to find, anything like that?

14        Okay.  I'm not going to put back up all the pictures,

15   but in terms of the letters, the swabs that you took.

16   A.  Yes.

17   Q.  I think you went from A through 100A, I guess it was,

18   through triple -- LLL; is that right?  I got your P&E sheets.

19   A.  Triple O.

20   Q.  Triple O.  You're right, there's one more page.

21   A.  Yep, there's one more page.

22   Q.  So A through triple O.

23        Now, did you keep any records of which of those swabs

24   or how many were sent to the lab for testing?

25   A.  I don't have that record with me.

S. SMITHLEY - CROSS                                                        188

1    Q.  Okay.  And you had mentioned in your direct examination
2    about bodily fluids.  But you would agree that everything you
3    saw was suspected blood?
4    A.  That's correct.
5    Q.  Obviously you don't know if it's blood 'til it gets to
6    the lab, but it wasn't any saliva or any other sort of bodily
7    fluids that you collected?
8    A.  That's correct.
9    Q.  Okay.  Would you agree with me, even though you don't
10   have the number in front of you or the record in front of
11   you, not all of those swabs were sent to the lab?
12   A.  That's correct.
13   Q.  Because, if my math and alphabet is right, it would be 26
14   plus 26 plus 20?
15   A.  Uh-huh.
16   Q.  So that's 52 -- 72 total swabs that you took?
17   A.  That's correct.
18   Q.  Okay.  Did you make the decision about which ones to send
19   and which ones not to send?
20   A.  I counseled with the DNA.  I can't remember the guy's
21   name that was in charge of the lab during that time.
22          And also our bloodstain expert, Angela Moore with
23   the Newport News Police Department, as to which ones that we
24   should send.
25   Q.  And would I be correct, and perhaps that evidence will

S. SMITHLEY - CROSS                                              189

```
 1   come in later, which ones went to the lab, but, in doing that
 2   counseling and making that determination as a professional,
 3   you sent some of the swabs from each area of the house?
 4   A.  That's correct, yes.
 5   Q.  That represented --
 6   A.  Yes.
 7   Q.  -- each area of the house?
 8   A.  Yes.
 9   Q.  Okay.
10        And then the next thing, the money that was found.  I
11   don't remember the exhibit, but that was -- you remember
12   $1,600 and change, I think it was?
13   A.  Yes, sir.
14   Q.  That was inside a pair of black pants?
15   A.  Correct.
16   Q.  And, again, I think you said they were hanging on a
17   doorknob?
18   A.  In the master bedroom on the inside of the door.
19   Q.  And that money was just bundled up and stuck in the
20   pocket?
21   A.  Yes, sir.
22   Q.  Okay.
23        Okay, I am now going to put on the document camera --
24   I'm doing it this way because I think it will actually be
25   easier for the jury to see, because I can point to it.
```

S. SMITHLEY - CROSS                                                      190

1          So you recognize this to be a copy of what's been
2     admitted as Exhibit 76B?
3     A.  Yes, sir.
4     Q.  And this, can you see my pen on the screen?
5     A.  Yes.
6     Q.  This is the spot of suspected blood that you had the A
7     and B markers by?
8     A.  That's correct.
9     Q.  The one that you said was bigger -- okay.
10         And the smaller ones are smaller blood?
11    A.  Uh-huh.
12    Q.  Okay.  And 7 is the chair?
13    A.  Yes, sir.
14    Q.  Now, what is the distance, as you recall it, from this
15    spot of blood to the chair?
16    A.  I would say -- I don't have my measurements with me but,
17    as you can see, if you look at my key, that space is two
18    feet.  Do you see that, where it says "prepared by Stacey
19    Smithley"?
20    Q.  Yes.
21    A.  So I would have to -- this would be an estimate, I would
22    probably say maybe 8 to 10 feet.
23    Q.  And of course you had no way of knowing what part of
24    somebody's body that blood came from, it's just blood?
25    A.  Just blood, uh-huh.

S. SMITHLEY - CROSS                                            191

```
 1    Q.  Okay.  So 8 to 10 feet.

 2         And then am I given to understand this room -- I'm

 3    not writing on the Court's exhibit, Your Honor, so I wanted

 4    to let you know that.  This is my copy.

 5         You called this -- what was this room called?

 6    A.  The front living room.

 7    Q.  The front living room.

 8         And in the front living room, there were no shell

 9    casings or bullets or anything like that found?

10    A.  No, there wasn't.

11    Q.  And over here, and we don't need to look at all the

12    pictures again, but 1 through 6 are five shell casings and

13    one bullet, correct?

14    A.  That's correct.

15    Q.  And if I understand the way the house kind of flows --

16    let me ask you a better question.

17         What is the approximate distance if you walk, like,

18    the closest route either way from this area where the

19    physical evidence and the shell casings were found, to where

20    the chair is?

21         Down the hallway you have, I guess, take a left if

22    you are going one way, and a right if you are going the other

23    way?

24    A.  This would, again, be an estimate without my exact

25    measurements.  I would have to say maybe 30 feet, if you were
```

S. SMITHLEY - CROSS                                        192

1    talking about from the chair to the back door.

2    Q.   Okay.

3    A.   Probably more than that, a little more.

4    Q.   And there's -- as we saw in the pictures, there's walls

5    and, you know, there's no direct line of sight from this area

6    to where --

7    A.   Right.

8    Q.   -- this -- so if somebody were sitting in a chair right

9    here at Number 7 --

10   A.   Yes.

11   Q.   -- you couldn't see over here where the shell casings

12   were found?

13   A.   That's correct.

14   Q.   Okay.  And you, of course, had no way of knowing in what

15   order the shell casings were put, wherever they were put?

16   A.   Uh-uh.  The numbers just indicate the order I found them.

17   Q.   Right.  Or if they were all put there at the same time?

18   A.   That's correct.

19   Q.   And if I understood your testimony on direct, including

20   the autopsy, you recovered -- or if you didn't recover them,

21   then given possession of three bullets; is that right?

22   A.   Yes.

23   Q.   And there were five shell casings?

24   A.   That's correct.

25   Q.   Okay.  Did you make any sort of inspection or review of

S. SMITHLEY - CROSS                                                193

1   the premises to see if there were holes in the wall or holes

2   in the floor, or in the couch, anything like that?

3   A.   Yes.   I did my initial search, I did a search when I did

4   the evidence, and then I did a third search when I came back

5   when I recovered the backpack.

6   Q.   And if I understand it, the one bullet that you found in

7   the premises was found on the floor?

8   A.   That's correct.

9   Q.   And then, per what Dr. Kinnison told you or you saw at

10  the autopsy, one other bullet was removed from the underwear

11  of the deceased, and then one was in his thigh, I think you

12  said; is that correct?

13  A.   I believe so.

14  Q.   Okay.

15         And, again, I know you went through it in a certain

16  order with Mr. Zlotnick, but you have no way of knowing what

17  order any of the blood was placed there?

18  A.   No.

19  Q.   What -- okay.

20         And let me make sure before I draw on my exhibit, is

21  right about here where you said the footprints were?

22  A.   No, the footprints are going to be where that big X is,

23  they were within that area.

24  Q.   So up here?

25  A.   Move down closer to the couch.

S. SMITHLEY - CROSS                                                    194

1    Q.   Here?

2    A.   Yeah, like more in there.

3    Q.   Somewhere in here?

4    A.   Yeah.

5    Q.   Okay.  And this big X encompasses the area that you

6    showed of the couch with a number of evidence markers on the

7    floor and around there?

8    A.   Yes, sir.

9    Q.   All right.

10        And then, am I correct that right here where Number 6

11   is the counter?

12   A.   Yes.

13   Q.   Okay.  And one of the shell casings was found on top of

14   the counter?

15   A.   Yes, sir.

16   Q.   Now, we talked about some shoe impressions in your

17   testimony that were in this area, and you indicated that when

18   you, pursuant to the consent search where my client lived in

19   Boston, you seized some shoes and you compared them to those

20   shoe impressions?

21   A.   Yes.

22   Q.   And they didn't match?

23   A.   They were not a match.

24   Q.   And there was a stipulation read about shoe impressions

25   found at the front door.

S. SMITHLEY - CROSS                                                        195

1   A.   Yes.

2   Q.   Just so I make sure, is this --

3   A.   That's the front door.

4   Q.   Is this the front door area?

5   A.   Yes, sir.

6   Q.   And you compared those shoe impressions and we stipulated

7   they didn't match any shoes of Mr. Benson either?

8   A.   That's correct.  And that would be more of a shoe print

9   because of the substance.

10  Q.   Okay, well, why don't you -- so it's clear to the jury,

11  in your use of the language, what's the difference between a

12  shoe print and a shoe impression?

13  A.   A shoe impression is like you have something of thicker

14  substance, like suspected blood.  While a shoe print, where

15  it is something that is already on your shoe and you are

16  placing your shoe up against a surface leaving that

17  impression, or leaving that print.

18  Q.   Got you.  And did you do any comparison?  I know you

19  excluded my client's shoes, but did you do any comparison

20  between the ones that were found in this area where my pen is

21  and the ones at the front door to see if they matched?

22  A.   If I recall, I don't have it in my notes, but all the

23  prints were dissimilar.

24  Q.   So let me ask you, then.  How many different shoe prints

25  do you think you found in the house?

S. SMITHLEY - CROSS                                                          196

1    A.    I believe it was three.

2    Q.    So three different shoe prints?

3    A.    Yes.

4    Q.    Okay.  All dissimilar, and none matching the shoes that

5    were seized from Mr. Benson?

6    A.    That's correct.

7    Q.    Okay.  Did you, in going through here, and the jury's

8    seen the pictures; I know it's late in the day.  There were a

9    number of pairs of shoes shown in your video and in --

10   A.    Uh-huh.

11   Q.    -- all over the house.  Did you seize any of those shoes

12   to try to compare them?

13   A.    No, I examined those at the scene.

14   Q.    Were you able -- and I'll start, I guess, with -- at the

15   front door, the shoe print?

16   A.    Uh-huh.

17   Q.    Was that one print?

18   A.    That would be a print.

19   Q.    A print?

20   A.    Yeah.

21   Q.    Were you able, even though you couldn't match it to

22   anything, to make any determination about the size or type of

23   shoe?

24   A.    No.  All of the prints were going to be partial prints,

25   they weren't full -- like, a full shoe.

S. SMITHLEY - CROSS                                          197

1   Q.  And the same thing for over here?

2   A.  Yes, sir.

3   Q.  So there were two different ones, where my pen is here?

4   A.  Two in the blood, and then one --

5   Q.  One here?

6   A.  -- on the door.

7   Q.  And you would agree with me, at least when you came in

8   contact with Mr. Joseph's body, he had on socks, he didn't

9   have on any shoes?

10  A.  That's correct.

11  Q.  The pictures show that -- so you -- did you conclude, as

12  a professional, that he didn't leave any of those prints, at

13  least not while he was wearing his socks?

14  A.  Yes, sir.

15  Q.  And you also talked about the areas that you dusted for

16  prints.  And you found no prints of value.

17          And just so the jury will understand, what is -- in

18  forensic examination, what is a print of value?

19  A.  A print of value is a print that we are able to then take

20  somebody else's print and do a comparison, where there is

21  enough detail, or what we call minutia, in the print.

22          So it doesn't mean that there aren't prints there,

23  it just wasn't anything available for me to make a comparison

24  to.

25  Q.  And do I understand that there has to be a certain amount

S. SMITHLEY - CROSS                                                    198

1    of ridge detail in order for it to be forensically useful?

2    A.  That's correct.

3    Q.  And I think you already told us this.

4         The same thing is true of the -- of the car that you

5    processed?

6    A.  Yes.

7    Q.  Is that right?

8    A.  Yes.  I didn't receive any prints of value.

9    Q.  And if I understand with regard to the cell phone that

10   Mr. Benson turned over when he was up in Boston, you simply

11   took that into custody and you didn't do an analysis; that

12   was for someone else to do?

13   A.  That's correct.

14   Q.  Okay.  And with regard to the chair, you of course don't

15   know when it was broken or when it was placed there?  The

16   item -- I forget the exhibit -- that chair right there, I

17   forget what number it is.

18   A.  I was -- Tequilla Walker said it was located outside.

19   She did not put it inside the house.

20   Q.  So she told you -- when you talked to her, she didn't say

21   she didn't know where it was, she told you it was located

22   outside the house?

23   A.  Yes.  When asked if that was inside the house as a normal

24   chair, she said, no, it was located outside the house.

25   Q.  And that was what she told you eight or nine years ago?

S. SMITHLEY - CROSS                                                      199

1    A.   Uh-huh.

2    Q.   And you don't know that, you just know that's what

3    Ms. Walker's story about the chair was at that time?

4    A.   Yes, sir.

5    Q.   Okay.

6         And likewise, again, without necessarily telling me

7    what anybody else said, it appeared to you that the chair had

8    been broken in the area that it was in because you found the

9    pieces, whatever exhibit they are, close to the chair?

10   A.   Yes, sir.

11   Q.   Okay.

12        Did you go through the kitchen?  That's a bad

13   question.

14        Did you process the kitchen as part of the crime

15   scene?

16   A.   Yes, I processed the countertops.

17   Q.   You, as a crime scene examiner, of course, are familiar

18   with drug paraphernalia?

19   A.   Yes, sir.

20   Q.   Had plenty of occasions in your career to find?

21        When you looked through the kitchen, did you see

22   anything that looked like to you had been used to cook

23   cocaine?

24   A.   No, sir.

25   Q.   Okay.  Were you focused on anything like that?

S. SMITHLEY - CROSS                                                    200

```
1   A.  No, sir.  I actually wasn't.

2   Q.  So you didn't seize any pots or pans or anything like

3   that?

4   A.  No.

5   Q.  And the only -- the only drugs that you found in the

6   house were the marijuana, which has previously been admitted

7   here?

8   A.  Yes.

9   Q.  Okay.

10          Did you find any plastic bags or several boxes of

11  plastic bags in this case, anything like that?

12  A.  An abnormal amount of plastic bags?

13  Q.  An abnormal amount that would raise your suspicion as a

14  professional?

15  A.  I don't recall any.

16  Q.  Okay.  And Mr. Zlotnick asked you some questions about

17  finding a cell phone holder?

18  A.  Yes.

19  Q.  Just laying on the counter, and you don't know whether it

20  ever had a cell phone in it or when it had a cell phone in

21  it?

22  A.  No, sir, I didn't.

23  Q.  You just know when you saw it, it didn't have a cell

24  phone in it?

25  A.  That's correct.
```

S. SMITHLEY - CROSS                                                201

```
1   Q.  Was it your testimony -- if I understood it, during the

2   search of the entire house, you found no cell phones?

3   A.  No cell phones.

4          MR. WOODWARD:  Just one minute, Your Honor, I want

5   to make sure before I --

6          (Pause.)

7   BY MR. WOODWARD:

8   Q.  The jury will have the picture but, again, this

9   circumference you see is my pen.  The circumference here, if

10  that's the right word, where the various pieces of physical

11  evidence, what's the approximate size of that area?  It's one

12  of the pictures that's in evidence right there by the door.

13         Do you know what --

14         THE COURT:  Well, what area are you talking about?

15  Are you talking about the area that includes the little boxes

16  to the right or what?

17         MR. WOODWARD:  I'll clarify.

18  BY MR. WOODWARD:

19  Q.  I'm in the area, if you take -- if you take Number 1,

20  which I understand these are approximate, this is a chart.

21  A.  Uh-huh.

22  Q.  Number 1 is over here sort of on the ground -- on the

23  floor in the middle of the counter?

24  A.  Right.

25  Q.  And that's sort of the one that was farthest that way.
```

S. SMITHLEY - CROSS                                                 202

1         And Number 5 is over here, looks like, approximate, a

2    little bit right to the edge of the door that leads down to

3    where the body was found.

4         So what I'm asking you, is this area approximately --

5    what I mean?

6         Let me ask a -- what is the approximate distance from

7    Number 1 to Number 5?

8    A.   I would say that would be within a 4 to 5-foot area.

9    Q.   Okay.  And that would be the two that were the farthest

10   apart?

11   A.   One -- yeah, 1 and 5.

12   Q.   And 6 is actually -- one -- if this is the counter, 6 is

13   here on the counter and one is down on the ground like kind

14   of right down beside it?

15   A.   That's correct.

16   Q.   The distance is not on the floor but it's right near it?

17   A.   It's on the vertical.

18   Q.   And then you were asked by Mr. Zlotnick some questions

19   about some injuries that you saw on the body.  And of course

20   you don't know what order those injuries were inflicted in or

21   who inflicted them, or anything like that?

22   A.   No, sir.

23   Q.   Okay.

24        All right.

25        MR. WOODWARD:  Thank you, Judge, I think that's all

S. SMITHLEY - CROSS                                              203

1    I have for this witness.

2         THE COURT:  Cross-examination?

3                   CROSS-EXAMINATION

4    BY MR. SACKS:

5    Q.  Good afternoon.

6    A.  Hi.

7    Q.  Andrew Sacks here for Mark Wallace.

8    A.  Uh-huh.

9    Q.  First of all, if we could look at Exhibit 2, please.

10        You recognize that scene from your visit, both on the

11   13th and the 14th, correct?

12   A.  That's correct.

13   Q.  Of March 2009?

14   A.  Yes.

15   Q.  Now, the street that those vehicles are on, do you happen

16   to know the name of that?

17   A.  I don't know if I have it in my notes.

18   Q.  Don't -- if you don't have them readily available --

19   A.  No, it's not readily.

20   Q.  But that's not Clipper?

21   A.  Uh-uh.  The front of the house is on Clipper.

22   Q.  So this is the exact opposite from the front of the

23   house.

24   A.  This is the corner of the house.  The house is on a

25   corner street.

S. SMITHLEY - CROSS                                                    204

1    Q.  All right, maybe if we could look at Exhibit 1.  Put that

2    up.

3            Where in relation -- that's the front of the house,

4    right?

5    A.  Yes.

6    Q.  And where, in relation to the front, was the street that

7    we just saw with those two vehicles?

8    A.  I'm going to write on here to indicate.  Is that okay?

9    Q.  It's up to His Honor.

10            THE COURT:  Just tell us --

11   A.  It's on the right-hand side of the --

12   BY MR. SACKS:

13   Q.  As we look at this house, it would be to your right?

14   A.  On the right-hand side, right.

15   Q.  So it's not in front of the house?

16   A.  Uh-uh.

17   Q.  And when you went there that day, I think you responded

18   that you told us about 6 something -- 5 --

19   A.  5:43.

20   Q.  5:43.  Did you even look at that side street at that

21   time?

22   A.  That's actually where I parked, was on the side street.

23   Q.  Okay.  And those cars were there at that time?

24   A.  Yes.

25   Q.  Now, you don't know how long they had been there?

S. SMITHLEY - CROSS                                                    205

1    A.   No.

2    Q.   All right.

3         The next day when you went back, on the 14th?

4    A.   Uh-huh.

5    Q.   You went to do some things, including you processed one

6    of the vehicles for fingerprints?

7    A.   Yes.

8    Q.   Do you remember which one it was?

9    A.   I do not remember which one.  One of them was gone.

10   Q.   That's what I was going to ask you.

11        If you go back to Exhibit 2, one of these -- you

12   don't remember which one, but one of those two cars wasn't

13   there anymore?

14   A.   Correct.

15   Q.   And you don't know which one or who drove it away or why?

16   A.   That's correct.

17   Q.   And you don't have any other information about any other

18   processing of a second vehicle, other than your own notes

19   about the one vehicle you did process?

20   A.   That's correct.

21   Q.   So you don't know whether the police drove it away or

22   what the purpose was, but it was gone?

23   A.   I could tell you who told me was the owner of the car.

24   Q.   I don't want any hearsay.

25   A.   Then, no, I can't.

S. SMITHLEY - CROSS                                                206

1  Q.  All right.  Thank you.  Now, just a few more.

2        You talked about a gun -- gunshot -- I think you said

3  gunshot residue --

4  A.  Yes.

5  Q.  -- kit.  And you told us, I think, that anytime someone

6  is the victim of a shooting or there may be other witnesses

7  and so forth, but certainly when there is a gun involved,

8  people who are at the scene are victims.  This gunshot

9  residue test is a pretty standard test?

10  A.  Yes.

11  Q.  And it's a test that allows an investigator to put a

12  strip on somebody's hand and pull off and see if there are

13  certain particles that come out of a barrel of a gun when

14  it's fired?

15  A.  Yeah --

16  Q.  It's close enough?

17  A.  Yeah, it's a little thing you tap on the hands, one for

18  left, one for right, and it would collect any barium and

19  ammonium lead, that's indicative of a gunshot residue powder.

20  Q.  And you told us there are three ways if somebody handled

21  a weapon they could get it on there?

22  A.  That's correct.

23  Q.  If they fired it, it could get on there, or if they were

24  in the presence of the weapon being fired?

25  A.  Yes.

S. SMITHLEY - CROSS                                                    207

1    Q.  And in this case, you did the gunshot residue on

2    Mr. Joseph?

3    A.  Yes.

4    Q.  But didn't submit it because there would be no way to

5    know which of those three was the case, since there was

6    obviously a gun fired at some point in that area?

7    A.  Yes.

8    Q.  It doesn't mean that he didn't fire a gun either,

9    correct, does it?

10   A.  That's correct.

11   Q.  And if he fired a gun, it would test positive, wouldn't

12   it?  Ordinarily you would expect it to.

13   A.  It should test positive, yes.

14   Q.  Now, I learned this the hard way.  But Nickelodeon is a

15   pretty much kid's channel?

16   A.  Yes.

17   Q.  And that was on in the bedroom?

18   A.  Yes, the front master bedroom.

19   Q.  Is that the same master bedroom where the black pants

20   were hanging?

21   A.  Yes.

22   Q.  With the $1,640?

23   A.  Yes.

24   Q.  And also where the backpack, the Spider-Man -- or am I

25   getting that confused?

S. SMITHLEY - CROSS                                            208

1    A.   The Spider-Man backpack was going to be in the far back

2    left-hand corner bedroom.

3    Q.   All right.

4         Now, if I could look at the exhibit -- I'm sorry.

5    No, the exhibit -- the money.

6         Exhibit 67, may I see that, please?

7         Your Honor, it's a physical exhibit?

8         THE COURT:   You may.

9    BY MR. SACKS:

10   Q.   Thank you.  And just if we could go -- just the master

11   bedroom -- well, this is -- I guess you would -- yeah, there

12   we go, amazing.  That's the master bedroom, right?

13   A.   Yes, sir.

14   Q.   That's where the pants were hanging with the money?

15   A.   Yes.

16   Q.   We can take that down.

17        Now, I'm just looking at this.  Did you -- did you

18   count the money before you vouchered it?

19   A.   Yes.

20   Q.   And did you happen to make a note of the denominations of

21   the $1,640?

22   A.   Sometimes I do in my evidence.  I don't know if I did on

23   that.  I would not in my notes.

24   Q.   This looks like a whole bunch of 20-dollar bills.

25   A.   That's what it appears to be, yes.

S. SMITHLEY - CROSS                                                209

1    Q.   From your recollection?

2    A.   Yes, sir.

3    Q.   And that master bedroom is -- we can go back to 76.  That

4    master bedroom is -- well, here's the front living room,

5    right?

6    A.   Yes, sir.

7    Q.   Master bedroom here?

8    A.   Yes.

9    Q.   So there's not much distance between those two areas if

10   somebody wanted to walk in there and take the money out of

11   the pant's pocket?

12   A.   Uh-huh.

13   Q.   All right.

14        Take that down.

15        Regarding the fingerprints.  If I touch this right

16   now like I'm going to the podium, I might leave prints and I

17   might not, right?

18   A.   Correct.

19   Q.   It depends on temperature and my skin and a lot of

20   factors.

21        The fact that there were prints of no value -- no

22   prints of value were recovered, it doesn't mean that somebody

23   didn't touch something?

24   A.   Correct.

25   Q.   And if I could look at Exhibit 70, please.  That's the

S. SMITHLEY - CROSS                                              210

1    marijuana in the backpack.

2          I'm looking at Exhibit 70, and I'm not going to

3    reopen it.  But it appears there's a fairly sizable plastic

4    bag inside of marijuana.

5    A.  That's correct.

6    Q.  And this was inside a Spider-Man backpack?

7    A.  Yes.

8    Q.  And you told us the backpack wasn't very large.

9    A.  Uh-uh.

10   Q.  And this marijuana, pretty much, took up most of the

11   pouch inside?

12   A.  Probably, like, a fourth of the backpack.

13         MR. SACKS:  Now, Your Honor, I'd like to -- the

14   government's agreed that Government's Exhibit 71 is a DEA

15   certificate of analysis that was mentioned in the

16   stipulation.

17         I'd like to move the -- this in.  It's got a

18   Government's Exhibit number on it.

19         THE COURT:  Well, usually what happens is we don't

20   move the stipulations in, we read the stipulations to the

21   jury.  We haven't admitted any stipulations.

22         MR. SACKS:  Yes, sir.

23         This is the underlying certificate of analysis --

24         THE COURT:  I know that.

25         MR. SACKS:  -- that we said was authentic.  But I'd

S. SMITHLEY - CROSS                                                    211

1  like to get the exhibit -- the document itself in that shows

2  the analysis.  That's what I --

3          THE COURT:  We will take that up after the fact.

4  But what usually happens is if we have a stipulation, you

5  don't put in the exhibit.

6          MR. SACKS:  All right, sir.

7          May I show her this and ask her?

8          THE COURT:  Sure.

9  BY MR. SACKS:

10 Q.  Ms. Smithley, that's Government's Exhibit 71, I believe;

11 is it not?

12 A.  Yes, sir.

13 Q.  And it is a certificate of analysis that was referenced

14 in a stipulation.  That appears to relate to marijuana; does

15 it not?

16 A.  Yes.

17 Q.  And as far as you know, this is the only marijuana that

18 I'm holding that was found in your processing?

19 A.  That's correct.

20 Q.  And what is the weight -- the net weight of the marijuana

21 on that certificate?

22 A.  46.84 grams.

23 Q.  Now, I'm not an expert at this, but 28 grams to an ounce?

24 A.  Yes.

25 Q.  All right.  And so we've got about 49 grams of marijuana?

S. SMITHLEY - CROSS                                                    212

1    A.   Approximately, yes.

2    Q.   So about an ounce and three quarters?

3    A.   Yes.

4    Q.   All right.  Thank you.

5              MR. SACKS:  Thank you, Your Honor.  I'll return

6    this.

7    BY MR. SACKS:

8    Q.   And finally this.

9              You're confident that Ms. Walker told you that that

10   white chair was located outside of the house?

11   A.   Yes.  She was at the residence and I was present during

12   part of the conversation.

13   Q.   Got you.  So you actually heard her say that?

14   A.   Yes, yes.

15             MR. SACKS:  All right.

16             I think that's all I have, Ms. Smithley.  Thank you

17   very much for your time.  Thank you, Your Honor.

18             THE WITNESS:  Thank you.

19             MR. KELLETER:  I have no questions.

20             THE COURT:  Mr. Rasberry?

21             MR. RASBERRY:  No further questions, Your Honor.

22             MR. WOODWARD:  Your Honor, I neglected to ask one

23   question.  I have one more question.  Just one question.

24             THE COURT:  Well, this is imperfect cross,

25   Mr. Woodward.  I'm going to allow you one question.

S. SMITHLEY - CROSS                                                  213

1                       CROSS-EXAMINATION

2    BY MR. WOODWARD:

3    Q.  Was there anything besides the marijuana found in the

4    backpack?

5    A.  There was a note that indicated there was no school

6    March 13th, 2009.

7              MR. WOODWARD:  Thank you.

8              THE COURT:  Gentlemen, ladies, may this witness be

9    excused, permanently?

10             MR. ZLOTNICK:  No redirect, Your Honor.

11             THE COURT:  My question was, may the witness be

12   excused permanently?

13             MR. WOODWARD:  Yes, Your Honor.

14             MR. SACKS:  No objection, Your Honor.

15             THE COURT:  You may be excused.

16             THE WITNESS:  Thank you.

17             THE COURT:  Thank you.

18             Ladies and gentlemen, the Court's decided we're not

19   going to start another witness today.  If the trial goes on,

20   depending upon our speed, we may go a little longer than we

21   did today.  But today we are going to terminate right here.

22             Turn in your notebooks, remember all the precaution,

23   do not discuss the case, have anyone discuss it with you.

24             We will see you tomorrow morning.  We are going to

25   start promptly at 9:30.

```
 1              All rise.

 2              (Jury out, 5:05 p.m.)

 3              MR. SACKS:  Your Honor, may I take up one additional

 4    matter?

 5              THE COURT:  All right, you may have a seat.

 6              MR. WOODWARD:  And, Your Honor, I have one that --

 7              Based upon what -- I had made Ms. Tequilla Walker

 8    subject to recall and then the Court allowed me to ask the

 9    question I needed to ask of the other resident in the house,

10    so I don't have contact with Ms. Walker, but if the

11    government wants to notify her based upon the fact that I was

12    able to inquire about that, I will not need her subject to

13    recall or to call her.  They can -- I just wanted to let the

14    Court know that.

15              THE COURT:  All right.

16              Can you contact her and let her know that she is not

17    requested to return?

18              MR. ZLOTNICK:  Yes, sir, we will be pleased to do

19    that.

20              THE COURT:  All right, Mr. Sacks.

21              MR. SACKS:  Your Honor, I just need your guidance

22    and assistance.  On Friday morning I have a sentencing at

23    9:00 in Newport News Circuit Court that has been, for a

24    number of reasons, had been difficult to set.

25              Now, I'm very close to the client, his mother and
```

```
 1    his aunt, and I would expect that if they call -- they will
 2    call us first and I'll be back here, I'll be here by 0:30.
 3         Now, if the Court is not willing to release me, I
 4    understand and respect that.  I have to make this request,
 5    then I will represent to the Court that I'm in a carryover
 6    that does not allow me to be free, and I will make
 7    arrangements instead of continuing it, to have my partner and
 8    an associate handle it.  But I want to be able to at least
 9    ask you for your permission.
10         THE COURT:  Well, I would strongly advise you to
11    have your associate or partner handle it because I don't see
12    that we are going to be finished Friday and we will start
13    again Friday at 9:30 a.m.
14         MR. SACKS:  Thank you, I just wanted to get the
15    Court's guidance.
16         MR. KELLETER:  I think tomorrow's the day that the
17    government might call two cooperators, and it's with those
18    two witnesses that there are going to be some issues as to
19    the scope of their testimony and whether or not -- if certain
20    parts of it are not admissible, whether certain things would
21    be redacted.
22         I'll file a motion -- a quick motion this evening
23    for it to be with Your Honor in the morning.  But I just want
24    to make you aware that this is the one issue that may take.
25    A little time to argue.
```

1          THE COURT:  The Court hasn't seen any pretrial

2    motions requesting that the Court -- I haven't seen a motion

3    in limine with respect to any of these.

4          MR. KELLETER:  Your Honor, in fact, I mean, part of

5    it is that I think the defense and the government did a very

6    good job of narrowing the issues.  We had a number of issues

7    to raise and we agreed on ways to save time.  So I would just

8    note that, Your Honor, we haven't made these motions

9    precisely because we streamlined things.  But I think

10   tomorrow on these only two witnesses will be the one time

11   where there's going to be some issues.

12         THE COURT:  The Court certainly would like to have

13   some notes of what the issue is, or what the problem is, in

14   order to save some time.  Because we're not going to spend

15   any time here arguing over matters while the jury is sitting

16   there, if it's something we can resolve.

17         As a matter of fact, are you calling in two

18   informant witnesses tomorrow, Mr. Zlotnick?

19         MR. ZLOTNICK:  Yes, Your Honor.  I can tell you what

20   I think the issue is, if you would like to hear it.

21         THE COURT:  Because we can get right on in here at

22   9:00 tomorrow morning and resolve the issues.  But we're not

23   going to be having them sitting back there while we argue.

24         MR. KELLETER:  Well, Your Honor, and that's

25   precisely -- if we need to show up earlier, that's fine, then

1    I will submit something tonight that raises what the

2    issues -- there is more than one issue, but it is all dealing

3    with these two witnesses.

4            THE COURT:  All right.  Well, I'll hear what he has

5    to say.

6            MS. MCKEEL:  Before we start, may I be excused to

7    let the witnesses go from that room?

8            THE COURT:  Yes, ma'am.

9            MS. MCKEEL:  Thank you.

10           MR. ZLOTNICK:  Your Honor, I think that there are

11   two -- actually, I think this can even come up on a third

12   witness potentially.

13           But basically we have a situation where the one

14   that's most, I think, applicable is a witness named Brandon

15   Douglas.  I anticipate that Brandon Douglas will testify that

16   he had a conversation with Defendant Brown, and during that

17   conversation, he made statement -- Brown made statements to

18   Brandon Douglas that indicated that he, Brown, had been

19   involved in this home invasion, and that he had been brought

20   into it by Wallace.

21           He names Wallace, and he indicates that, in the

22   course of this incident, Wallace had brought some other

23   individuals down here from out of town from Boston, and they

24   had gone in too aggressively.  I think he may have used the

25   term "like commandos" and they had screwed up, or he used a

1    stronger term than that, what they call the jam, and that he

2    indicated that he himself went to a position in there to the

3    door.

4           He indicated that Mr. Wallace stayed in the car,

5    that Wallace had driven his car.  So you have him making

6    statements, opposing party statements that implicate him, as

7    well as implicate Wallace.

8           And I think the counsel and I talked about the issue

9    of whether or not that raises a *Bruton* problem.

10          And I can site to the Court a couple of cases that

11   says because of the law of confrontation, *Bruton* statements

12   only apply to testimonial statements.

13          There's a case called *Dargan*, at 738 Fed.3d. 643.

14          A case called *Alvarado,* at 816 Fed.3d. 242.  And I

15   gave to counsel, it addressed this issue.  And these were

16   statements made, what I call real-world statements; they

17   weren't made to law enforcement, therefore *Bruton* doesn't

18   apply.  And whenever it's clear to me that these were not

19   coconspirators statements, therefore these are not statements

20   in furtherance of a conspiracy, they are only admissible

21   against one defendant, and there has to be a limiting

22   instruction that they can only be used against the defendant

23   who made the statement.

24          And certainly I would never try to argue during a

25   closing that the statement that, say, Brown made to Douglas,

1    should be used against another defendant.  We would certainly

2    argue it in the terms of the limiting instruction, but it

3    does come in, I think, and there's not a *Bruton* problem.

4            That's the essence of the issue, and I think the

5    issue comes up with testimony of a witness named Turner, who

6    was in a jail cell with Defendant Benson and he made

7    statements -- Benson made statements to Turner, where he

8    indicated that Wallace had got him into this thing.

9            So that's where the issue arises, just to give you

10   kind of a heads up on the issue.

11           THE COURT:  It's not what they said, what they

12   necessarily did.

13           MR. ZLOTNICK:  I'm sorry?

14           THE COURT:  It's not what the co-defendant said,

15   it's what they did, is what you are telling me.

16           In other words, he is saying that something Wallace

17   said is not testimonial, per se.

18           MR. ZLOTNICK:  Right.  In other words, I'm

19   soliciting the conversation between Wallace and Brown -- I'm

20   sorry, the conversation between Brown and Brandon Douglas is

21   not a testimonial statement, it's not a type of statement

22   covered by *Crawford* or its progeny of cases because it's not

23   made, like, to a law enforcement officer as in *Bruton,* where

24   you're trying -- it's going to be used in court later.

25           This is a confidential statement to a trusted

1    friend, so you don't have the -- and I think the *Dargan* case

2    talks about that, that kind of analysis.  That's the issue.

3            THE COURT:  But it implicates a couple of

4    defendants.

5            MR. ZLOTNICK:  It does, absolutely.

6            THE COURT:  And that's the problem here.

7            MR. KELLETER:  Your Honor --

8            THE COURT:  Wait a minute, wait a minute, wait a

9    minute.  That's the problem that Mr. Kelleter has.

10            MR. ZLOTNICK:  I agree.

11            THE COURT:  We will see where we are.

12            Come up, Mr. Kelleter.

13            MR. KELLETER:  Your Honor, if I could just clarify

14    something.  With all due respect, that's not precisely the

15    issue at this point.

16            THE COURT:  Wait 'til you get to the podium to

17    start.

18            MR. KELLETER:  Okay.  I'm way at the end.  I never

19    know --

20            No, that is part of the issue.  But we also and,

21    again, I'll put an argument in writing so Your Honor will

22    have it in the morning, but I think the government

23    acknowledges that it's inadmissible and that we would submit

24    that the only remedy isn't that you simply give a limiting

25    instruction, you can also redact statements if they are

1    easily redactable, and we think they will be.

2          So it's not simply ringing the bell in front of the

3    front of the jury, and then saying forget you heard that.  I

4    think there are other remedies, because we all agree it's

5    going to be inadmissible against co-defendants.

6          The other issue, and it may be something that we

7    work out pretty quickly, is that Mr. Douglas made all sorts

8    of statements and debriefs that go well beyond this alleged

9    confession.

10          And we've been told now by the government that they

11    are not going to all Mr. Alliers, who was one of the other

12    cooperators who was on the witness list.  So that will save

13    time.

14          But it's unclear to me if they are going to try to

15    get some of that supposed testimony in through Mr. Douglas.

16          THE COURT:  Well, the Court draws -- this Judge

17    draws a very tight circle around admission of evidence.  We

18    chew very closely to the rules, exactly to the Rules of

19    Evidence.

20          So what I'm telling you and Mr. Zlotnick, you can

21    send that memo to me tonight if you want to but, you know,

22    both of you know the Rules of Evidence and you clearly know

23    the case law, so y'all talk about it.  And you can send it to

24    me, but the Court's going to take the -- is going to rule

25    very closely to the Rules of Evidence.  Draws a very tight

```
 1   circle on it.  We're not going to sneak in anything.  I know
 2   that's not the way that Mr. Zlotnick and Ms. McKeel work, so
 3   we don't have that problem, so y'all just read the law and
 4   work on it.
 5              MR. KELLETER:  Very good.
 6              THE COURT:  Meanwhile, you send it to me, of course,
 7   and I will take a very close look at it.
 8              Now, I don't know if the government is going to get
 9   a chance to respond if you send that around midnight, I will
10   be sleep.
11              MR. WOODWARD:  And, Your Honor, two minutes on
12   behalf Mr. Benson.
13              I agree with Mr. Kelleter.  This has come up many
14   times, even including in front of Your Honor and some other
15   cases I've tried.  I think it's as simple as Mr. Zlotnick can
16   ask his witness if Mr. Brown made a statement against
17   admission, he can say what did Mr. Brown tell you he did, or
18   what did Mr. Benson tell you he did.  That's clearly
19   admissible if it's a statement against interest and they
20   don't need to ask them what they might've said that anybody
21   else did.
22              And that, I know, was the way we handled a similar
23   issue in the *Pridgen* case.  I'm not saying, as you said in
24   the jury room earlier, maybe that wasn't precedential but
25   it's an easy fix.
```

```
1              If I said I robbed a place with two other people and

2     it's a confrontation issue, the government can say, what did

3     Woodward said he did.  He said he robbed a place.  That's

4     what's admissible, because they admit it's not admissible

5     against the other people.  It seems to me that's a better fix

6     than having them say it and then telling the jury to ignore

7     it.

8              THE COURT:  Well, the Court prefers the cautious

9     approach to it, to be candid with you, Mr. Zlotnick.  So you

10    can think about it.  I don't know what other proof you have

11    here, but the Court clearly believes that you can certainly,

12    as Mr. Woodward as has put it, he can certainly put in

13    testimony that a defendant has given against his own

14    interest, but maybe it's a question of how far he is going

15    and saying that Brown said that Benson did this, and this one

16    did that, and whatever.

17             The Court has some issues.

18             MR. SACKS:  Just my 30 seconds' worth, then I'll sit

19    down.

20             Mr. Wallace has been -- has been mentioned by --

21    both of those people are going to say things that he

22    supposedly said, that is obviously rank hearsay.  And if it

23    wasn't for the fact that we had a joint trial, the jury in

24    the separate trial would never hear it.

25             We have a joint trial, we understand the reasons for
```

1   that, but somehow -- and I know His Honor will find a way, I
2   think redaction is the only way to go because the jury hears
3   that and you tell them to disregard it, and even though we
4   presume they follow instructions, sometimes there are things
5   that are so hard to put out of your head that even cautionary
6   instructions aren't enough, and the courts have held that.
7           So they should not hear from those men that hearsay
8   that they say about Mr. Wallace.  That's just totally
9   inadmissible and highly prejudicial.  I think it's a 403
10  issue as well.
11          THE COURT:  Okay, I will see what you file and see
12  what the response is, but I'm telling you --
13          MR. SACKS:  Yes, sir, thank you.
14          THE COURT:  We don't know what the future holds, but
15  we are not going to be getting into any issues that
16  potentially cause us, depending upon what happens where we
17  have to retry this.  So think about it very cautiously.
18          All right, and you may respond tonight if you wish,
19  Mr. Zlotnick, if you know what he's going to file.  I don't
20  know when it's going to get to me.
21          MR. KELLETER:  Well, so to save you time, we may not
22  file anything.  I think we've already had a good discussion.
23          MR. ZLOTNICK:  What I can say, Judge, is if the
24  Court will take a look at the *Dargan* case that I've cited,
25  and I think that -- and I understands the Court's view on the

```
 1   thing, but I think that it used to be -- I could remember a

 2   long time ago I take the issues with the *Bruton* issue, but

 3   it's different than an a *Bruton* issue, and I think the issue

 4   of the definition of what is testimonial -- if it's not

 5   testimonial, a limiting instruction is enough.  But I think

 6   the Court can take a look at that and I will do whatever the

 7   Court tells me to do, obviously.

 8            THE COURT:  Well, you know the Court takes the most

 9   cautious approach on these things, and I'm sure you've

10   thought about it and I don't know what the scope of your case

11   is, but the Court will take a look at it.

12            MR. ZLOTNICK:  I appreciate that, sir.  Thank you.

13            (Whereupon, the proceedings conclude, 5:22 p.m.)

14               *****     *****     *****

15   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
16
          /S/                              9/20/2018
17   -------------------------------     ------------
     Janet A. Collins, RMR, CRR, CRI          DATE
18

19

20

21

22

23

24

25
```