```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Newport News Division

 3   - - - - - - - - - - - - - - - - - -
                                        )
 4     UNITED STATES OF AMERICA,        )
                                        )
 5            Plaintiff,                )    CRIMINAL ACTION
                                        )    NO. 4:17cr45
 6     v.                               )
                                        )
 7     JOSEPH JAMES CAIN BENSON, et     )
       al.,                             )
 8                                      )
              Defendants.               )
 9   - - - - - - - - - - - - - - - - - -

10                     TRANSCRIPT OF PROCEEDINGS
     (Jury Trial - Day 3 - TESTIMONY & EVIDENCE - Pages 226 - 453)
11                        Norfolk, Virginia

12                         April 12, 2018

13   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge
14
     APPEARANCES:
15
                 OFFICE OF THE UNITED STATES ATTORNEY
16               By:  Howard J. Zlotnick, AUSA
                      Lisa R. McKeel, AUSA
17               Counsel for the Plaintiff

18               RULOFF SWAIN HADDAD MORECOCK TALBERT & WOODWARD PC
                 By:  Lawrence H. Woodward, Jr., Esq.
19               Counsel for the Defendant Benson

20               SACKS & SACKS
                 By:  Andrew M. Sacks, Esq.
21               Counsel for Defendant Wallace

22               KELLETER LAW, PC
                 By:  Trey R. Kelleter, Esq.
23               Counsel for the Defendant Brown

24               RASBERRY LAW, PC
                 By:  Jamison P. Rasberry, Esq.
25               Counsel for the Defendant Kindell
```

```
1                              I N D E X

2
     GOVERNMENT'S
3    WITNESSES                                              PAGE

4     ELIZABETH KINNISON
          Direct Examination By Ms. McKeel              241
5         Cross-Examination By Mr. Woodward             259
          Cross-Examination By Mr. Sacks                261
6         Redirect Examination By Ms. McKeel            267
     JAVIER ESPINOZA
7         Direct Examination By Ms. McKeel              268
          Cross-Examination By Mr. Woodward             274
8         Redirect Examination By Ms. McKeel            275
     STEVEN SMITHLEY
9         Direct Examination By Mr. Zlotnick            276
          Cross-Examination By Mr. Woodward             286
10        Cross-Examination By Mr. Sacks                291
     GLORIA HILL
11        Direct Examination By Ms. McKeel              293
          Cross-Examination By Mr. Woodward             311
12        Cross-Examination By Mr. Sacks                324
          Cross-Examination By Mr. Rasberry             328
13        Redirect Examination By Ms. McKeel            329
     CHARLES LENNON
14        Direct Examination By Mr. Zlotnick            330
          Cross-Examination By Mr. Woodward             345
15        Cross-Examination By Mr. Sacks                346
          Cross-Examination By Mr. Kelleter             347
16        Cross-Examination By Mr. Rasberry             349
     JAMES VALENTI
17        Direct Examination By Mr. Zlotnick            350
          Cross-Examination By Mr. Woodward             375
18        Cross-Examination By Mr. Kelleter             376
          Redirect Examination By Mr. Zlotnick          378
19   PURCELL PIGGOTT
          Direct Examination By Ms. McKeel              380
20        Cross-Examination By Mr. Sacks                384
          Cross-Examination By Mr. Rasberry             388
21   PAUL SWARTZ
          Direct Examination By Mr. Zlotnick            391
22

23

24

25
```

```
1                          E X H I B I T S

2   GOVERNMENT'S
    NO.              DESCRIPTION                        PAGE
3
    86                      Document                    245
4   156                     Document                    281
    91                      Document                    284
5   92                      Document                    284
    90                      Document                    286
6   87A                     Document                    299
    87B                     Document                    303
7   87C                     Document                    305
    117                     Document                    334
8   117                     Document                    336
    96, 96A, 97, 97A,       Documents & Audios          338
9   98, 98A
    94A & 95B               Physical Evidence           367
10  99A                     Document                    370
    99B                     Document                    373
11  94 & 95                 Documents                   373
    102-108                 Documents                   399
12  124 & 124A              Documents                   400
    125 & 125A              Documents                   401
13  127, 127A, 127B,        Documents                   402
    and 127C
14  128                     Document                    402
    135 & 135A              Documents                   403
15  138                     Document                    403
    139                     Document                    404
16  140                     Document                    404
    127 - Replaced 127B     Document                    427
17  141                     Document                    439
    142                     Document                    445
18  144                     Document                    453

19

20

21

22

23

24

25
```

Janet Collins, Official Court Reporter

229

1              P-R-O-C-E-E-D-I-N-G-S

2              (Whereupon, the proceedings commence, 9:26 a.m.)

3              THE COURT:  Good morning.

4              (All counsel respond, good morning, Your Honor.)

5              THE COURT:  Couple of things.

6              Number one, I said to counsel if there are some

7      issues I want you to get in here early.

8              Yesterday an issue was raised before the Court and

9      the Court wanted to address that issue.  It's now about 9:28.

10     The Court's been here since 8:50 this morning.

11             Now, Mr. Kelleter, you raised this issue yesterday.

12     The Court fully expected you to be in here, if no other

13     counsel was here this morning, so we could get on with the

14     issue.

15             Now, I've been sitting back there waiting so that I

16     could get all of you in here so I would have an opportunity

17     to address the issue before 9:30.  I don't want to have this

18     problem again.  If I say show up at 9:15, I expect everybody

19     to be here.  I'm not waiting.

20             Now, back to the issue.

21             Yesterday you raised a potential problem you believe

22     would be raised by having an informant come in here and

23     testify about what was your -- what was said about your

24     client by another co-defendant.

25             Now, I don't know how you resolved this issue, but

1    there is no *Bruton* issue, this is non-testimonial, but there

2    is another problem here.   To admit this evidence under

3    804(b)(3), there's two things that are necessary here,

4    sufficient and culpability by the speaker, that is by

5    Mr. Brown, and that's here.

6         But the other thing the both cases you gave me,

7    Mr. Zlotnick, talks about is the fact you have to have

8    sufficient reliability and trustworthiness, and both of those

9    courts looked at the evidence and put it in context.   There

10   has to be some corroboration.

11        Court doesn't know -- there is not sufficient

12   corroborative evidence in the record about Mr. Wallace doing

13   anything, at this juncture, for the Court to put -- let that

14   informant come in and point the finger at Mr. Wallace about

15   saying what Mr. Brown said about Mr. Wallace.

16        And so that is problem that the Court has.  I don't

17   know how you all resolved it.  I'm not saying that it's not

18   eventually admissible, but at this point the record doesn't

19   have lot a corroborative evidence about any of these

20   defendants in the record for the Court to bring in the

21   informants' statements.

22        I'm just simply saying that I think something else

23   has to go in the record before the Court can admit the

24   statements of the informant.  Are you tracking what I'm

25   saying?

```
 1          MR. ZLOTNICK:  I understand.  If I -- may I comment
 2    on the Court's observation?
 3          Your Honor, we are going to have -- I can almost do
 4    it to me like subject to connection with a co-conspirator
 5    statement.
 6          I can represent to the Court that Mr. Swartz is
 7    going to testify that we can put the Defendant Wallace's GPS,
 8    his phone in the vicinity of the crime in the same place that
 9    the victim's phone was hitting, at the same tower.
10          In addition to that, we're going to have testimony
11    of another law enforcement agent where Mark Wallace actually
12    made a statement to that agent that he was at the scene of
13    the crime itself.  So that would be sufficiently
14    corroborative.
15          And we are also going to have testimony that the
16    ways in which Wallace was involved in all of this -- or that
17    Kindell was involved in all of this, is that Kindell knew
18    Wallace and that Wallace had asked him to come down here.
19    That's a statement that Kindell made, I believe, to a witness
20    called Berry.
21          I can give you -- if it will be helpful to the
22    Court, I think it might be, I can provide you the Grand Jury
23    transcripts that you have of those witnesses, you can look at
24    them.
25          THE COURT:  Mr. Zlotnick, what you are saying, the
```

1    Court would find that that would be sufficiently

2    corroborative to satisfy that requirement under 804(b)(3).

3    But what you have to understand, the Court did not have any

4    of that when this issue was raised in terms of where you were

5    going with your proof.

6            And ordinarily, the information that you, things you

7    are going to put in the record after the informant hopefully

8    would have been in the record before you put the informant

9    on.  And it would have been in the record.  But as long as it

10   gets in the record, I think the Court can survive any

11   appellate challenge to admitting the evidence.

12           So I think that responds to what the Court was

13   concerned about, with respect to Mr. Wallace.

14           Mr. Sacks?

15           MR. SACKS:  Yes, Your Honor, if I could briefly

16   respond.  The government -- the other problem is that it's

17   hearsay against Mr. Wallace.

18           THE COURT:  Of course it's hearsay.

19           MR. SACKS:  And so it's not admissible against him.

20   It's a joint trial for judicial economy.  In a separate

21   trial, it couldn't never come in.  The government admits --

22   they've admitted, in, I believe, pleadings, they've admitted

23   orally it's not admissible against Mr. Wallace, they admit

24   that.

25           Now, I respect His Honor -- the issues you raised, I

1    looked at the cases and I saw them talk about that, too.  But

2    there were other -- the *Bruton* issue they swept aside because

3    it was testimonial, but the problem in this case, in addition

4    to what His Honor has pointed out is that even if those

5    conditions are met and they are found to be reliable, that's

6    whether they can be admitted against the person who made the

7    statements.

8           As far as him implicating other people, that is

9    hearsay.  That is -- that is not *Bruton,* it's just rank

10   hearsay and there is no exception, and the government admits

11   that.

12          That's why we had the discussion yesterday about

13   whether you redact it by instructing the government to

14   instruct the witness not to testify about what Wallace

15   supposedly said or did, but -- or whether you just give a

16   cautionary instruction to the jury that says even though it's

17   a joint trial, you can only consider this evidence against

18   whoever the declarant is.  That's the other big problem.

19          Your Honor, I'm not trying to invite error, I'm

20   trying to avoid it, and I'm not suggesting that the Court is

21   wrong, I'm trying to help the Court reach an appropriate

22   decision.  This would be a, a huge, I submit, prejudicial

23   error if that statement that the penal interest exception,

24   it's hearsay, too, except that it's penal interest exception,

25   so it can come against that guy that said it, admission

234

1  against interest by the man who said it.  But if he goes off
2  and says yeah, Wallace did this, and that, and so forth,
3  that's just hearsay.
4          THE COURT:  All right, I got your point.
5          MR. SACKS:  Got it.  Thank you very much, Your
6  Honor.
7          THE COURT:  Respond to the exact point that he made
8  and then I will have him pick up.
9          MR. SACKS:  Thank you very much, Your Honor, I
10  appreciate it.
11          MR. ZLOTNICK:  One other point if I could make it,
12  it would be the Court's analyzed this as an 804 statement,
13  but it's also non-hearsay under 801(d), the exemption from
14  hearsay.  In other words, it's both an opposing party
15  statement, it's the statements of an opposing party as well
16  as the exception under 804 that the Court relied on.
17          So I would submit that our position is that it's
18  non-testimonial under either, but it would be admissible and
19  Mr. Sacks is correct, I did say to these lawyers that I
20  thought it would come in against the person making it only
21  with a limiting instruction.  Because I saw it as also
22  admissible under 801(d), which is the opposing party
23  statement, 801(d), a statement is offered against an opposing
24  party.
25          So I see it as admissible, as the Court points out,

1    under 804 as well as non-exempt hearsay as an opposing party

2    statement.

3          THE COURT:  Mr. Kelleter.

4          MR. KELLETER:  Your Honor, two things, Your Honor.

5          First on that specific point, the opposing party has

6    to be the person who said, not the other defendants.  That's

7    just wrong.

8          Secondly, the only other issue I wish to bring to

9    Your Honor's attention is the statement of Wayne Turner.

10   Basically, this whole discussion about the statement by

11   Mr. Brown and how it relates to Mr. Wallace is the same issue

12   that Mr. Turner is going to say that Mr. Benson said

13   something that both implicates Mr. Wallace and Mr. Brown, my

14   client.  And some of the exact same issues are there, but

15   there's one additional issue.

16         As Your Honor noted under 894(b)(3), first there has

17   so be sufficient culpability.  You know, Wayne Turner is

18   going to be a jailhouse snitch who says I was playing chess

19   one day with Mr. Benson and Mr. Benson made some comments.

20         The comment -- I think we will see the comment that

21   he makes that involves Mr. Wallace and Mr. Brown isn't really

22   culpable for Mr. Benson.  It's going to be a comment where he

23   basically says, they're talking about Newport News,

24   Mr. Turner mentions that he's from the Denbigh area.  And

25   Mr. Benson says, oh, in essence, do you know Mark Wallace,

1  not using those names, but yeah.  And he goes, yeah, I know

2  Mark Wallace.

3          Oh, do you know Bryan Brown.  He says yes.

4          At which point Mr. Turner claims Mr. Benson said,

5  man, that I'm in jail because of something they did.

6          Then Mr. Turner's testimony may be that he links

7  that comment to other comments that Mr. Benson made in which

8  Mr. Turner then surmises what they're talking about.

9          So I have real concern that it's even sufficiently

10  culpable.  It's essentially, I didn't rob the bank, he robbed

11  the bank, you know, it's rank hearsay and incredibly

12  prejudicial.

13          THE COURT:  The Court's not going to exclude this

14  evidence.  I guess I hand you an appellate issue that you say

15  you want, that you think it is, if the Court does it.  But

16  the Court's not of the view that it's an error for the Court

17  to admit this testimony.

18          What the Court would suggest to the government is to

19  switch its order of proof, that's what the Court would

20  suggest.

21          MR. SACKS:  Brief reply to Mr. Zlotnick on that 801?

22          THE COURT:  Yes, and then we are going to put an end

23  to it.  This is why you need to be here when I tell you to be

24  here in the morning.

25          MR. SACKS:  I understand.

1        Your Honor, 804 -- excuse me, 801 -- the government

2    acknowledged that it was inadmissible before and said a

3    limiting instruction should be given.

4        THE COURT:  We can do that.

5        MR. SACKS:  The debate if it's a limiting or a

6    redaction.  Mr. Zlotnick says now, and I don't criticize, but

7    he says he has a new theory.  801(d)(2), an opposing party's

8    statement, the statement is offered against an opposing party

9    and was made by the party in an individual or representative

10   capacity.

11       So they are not talking about Wallace who is not the

12   one making the statement, it's the people who made the

13   statements who are the opposing party, and whether it's --

14   he's just offering alternative theory to offer the statement,

15   it sounds like, against the person that made it.  This is

16   basically vicarious statements.  They talk about (d), for

17   example, made by the party's agent or employee on a matter

18   within the scope of that relationship while it existed.

19       Or (e), was made by the party's coconspirator during

20   and in furtherance of the conspiracy.

21       There is no conspiracy charge here, it's not before

22   the Court.  So all I'm saying, and I respect Mr. Zlotnick

23   greatly, but I believe, Your Honor, with all of my heart it's

24   inadmissible.  And not only, that, it's hearsay within

25   hearsay because you've got hearsay from these other guys

1    talking about Wallace and some of what they say about

2    Wallace, they heard from other people.

3              So you got two layers of hearsay, some of it is

4    speculation, some of it isn't attributable to everybody, it's

5    rumor in the neighborhood, you get all of those kinds of

6    problems.  My only goal is to keep the jury from hearing

7    testimony that is not competent against Mark Wallace, that's

8    my only goal.

9              THE COURT:  And the Court's only concern is only

10   admissible evidence that goes in the record.

11             MR. SACKS:  And I know that.

12             THE COURT:  We are of the same concern but going in

13   different directions.  And the Court believes, having read

14   this latest case, which one is it, it's *Alvarado*, U.S. 816

15   Fed.3d. 242, that it is permissible if there's sufficient

16   corroborative evidence in the record with respect to what he

17   says about Wallace.  And so the Court's going to allow the

18   evidence, your objection is noted for the record.

19             MR. SACKS:  Yes, sir.  I would ask for the strongest

20   or limiting or cautionary instruction because we know it's

21   not admissible, technically, against him in this trial.

22             THE COURT:  Well, Mr. Sacks, I just ruled.  Thank

23   you very much.

24             MR. SACKS:  Yes, sir, Your Honor, thank you.

25             MR. WOODWARD:  Your Honor, just so the record is

```
 1    clear, I join in that everybody's objection is preserved on
 2    behalf of --
 3              THE COURT:  Every defendant objects.
 4              MR. WOODWARD:  Yes, sir.
 5              THE COURT:  Mr. Rasberry, you object.
 6              MR. RASBERRY:  Yes, sir, thank you.
 7              THE COURT:  Mr. Kelleter objects, Mr. Sacks objects,
 8    Mr. Woodward objects, and the United States, in face of those
 9    objections, the Court will allow it, but you decide just
10    where you want to go.  But the Court would tell you that --
11              MR. WOODWARD:  Your Honor, just for flow of the
12    trial, then, do we have -- we don't have to jump up and
13    object when the testimony comes in?
14              THE COURT:  No, sir.  The record will reflect that
15    counsel has already objected to the testimony.
16              MR. SACKS:  Your Honor, may I just inquire?  I just
17    want to make sure I understand the state of court.
18              I thought you said that you would still consider a
19    limiting instruction.  Maybe I misunderstood.
20              THE COURT:  Well, I will preserve that, too, I may
21    or may not.  I will be checking the law as we go along.
22              MR. SACKS:  All right, Your honor, thank you very
23    much, sir.
24              THE COURT:  All right.
25              Mr. Zlotnick, in terms of the witness order, what
```

1    are we doing?  Who are we calling here?  You say you have

2    other evidence connecting Mr. Wallace to this robbery.

3          MR. ZLOTNICK:  I thought -- what I thought I'd be

4    able -- we've got, unfortunately, a couple of people coming

5    in tomorrow but we can put some of the evidence connecting

6    Mr. Wallace to this thing today before those people testify.

7          I will have one of them at least testify, and we

8    will see what the Court's view is, but I can represent that

9    the other ones will be here.

10         THE COURT:  Okay.

11         MR. ZLOTNICK:  We're going to Dr. Kinnison,

12   Detective Espinoza, another one on the phone which is going

13   to connect it with a witness, and then the DNA, and we are

14   going to get into the guns.  And then I think we should be

15   able to get into two witnesses that show the connection

16   between why Kindell was down here, at least, before we do it.

17   And if the Court wants more, if I had to, I could bring

18   Mr. Swartz out of order.

19         THE COURT:  It's out of order, but, you know, the

20   other thing is the Court was sitting here thinking if you

21   didn't do it connected sufficiently for the Court, then the

22   Court will have to go back and order that we strike all the

23   testimony of that informant.  So I'm just telling you.

24         MR. ZLOTNICK:  No, I understand the problem, and I

25   see it similar to, in a conspiracy case, sometimes all this

E. KINNISON, M.D. - DIRECT                                        241

 1   evidence, you decide whether or not it comes in or not.  We

 2   will do the best we can.

 3            THE COURT:  Okay.

 4            MR. ZLOTNICK:  And I understand the Court's issue.

 5            THE COURT:  Okay.

 6            MR. SACKS:  Your Honor, thank you very much.

 7            (Whereupon, the proceedings commence, 9:41 a.m.)

 8            THE COURT:  Let's bring the jury in and get started

 9   here.

10            (Jury in, 9:42 a.m.)

11            THE COURT:  Good morning.

12            (All jurors respond, "Good morning.")

13            THE COURT's:  Let the record reflect that all jurors

14   are present this morning.  Does counsel agree?

15            MR. ZLOTNICK:  Yes, Your Honor.

16            (All counsel respond in the affirmative.)

17            THE COURT:  All right, ladies and gentlemen, we are

18   ready to continue with the United States' case?

19            MS. MCKEEL:  United States calls Dr. Kinnison.

20   Dr. Kinnison.

21   ELIZABETH KINNISON, MD, called by the Government, having been

22     first duly sworn, was examined and testified as follows:

23                      DIRECT EXAMINATION

24   BY MS. MCKEEL:

25   Q.  Good morning, ma'am.  Would you please tell us your name,

E. KINNISON, M.D. - DIRECT                                    242

1   and spell it for our court reporter?

2   A.   My name's Elizabeth Kinnison, K-I-N-N-I-S-O-N.

3   Q.   And, ma'am, where are you employed?

4   A.   At the Tidewater District Office of the Chief Medical

5   Examiner.

6   Q.   And how long have you been employed there?

7   A.   Since 1996.

8   Q.   And what are your responsibilities and duties at the

9   medical examiner's office?

10  A.   Well, I'm a forensic pathologist, so I perform

11  examinations on dead people.  I testify in court and teach

12  interested parties.

13          THE COURT:  Excuse me for a second, Dr. Kinnison.

14          You may want to turn your head slightly so that your

15  voice goes over here as well as to the jury.  They can hear

16  you because they are a lot closer, but they (gestures to

17  defense) may not be.

18          THE WITNESS:  Okay, Your Honor.

19          THE COURT:  Continue.

20  BY MS. MCKEEL:

21  Q.   Could you please tell the jury your educational

22  background?

23  A.   I received an M.D. degree from the University of Texas,

24  Medical Branch.  I trained for five years in anatomical and

25  clinical pathology, and I did a year and a half fellowship at

1    the chief medical examiner in Richmond, Virginia.

2    Q.   Have you received any other educational training?

3    A.   As a maintenance of my license, I'm required to do

4    continuing medical education.

5    Q.   Now, have you ever testified in court as a forensic

6    pathologist?

7    A.   Yes.

8    Q.   Do you recall how many times?

9    A.   I would estimate over 3 or 400 times.

10   Q.   Okay.  Because you are in the Tidewater office, if

11   there's any gaps that you need to testify to.  Do you go

12   around to every court in the Tidewater area, including on the

13   Peninsula?

14   A.   Yes.

15   Q.   Have you been qualified as an expert to testify as a

16   forensic pathologist?

17   A.   Yes.

18   Q.   And do you remember how many times?

19   A.   In excess of 3 to 400 times.

20   Q.   And you've testified since when, what year in the

21   Tidewater area?

22   A.   What year?

23   Q.   Yeah.  What year did you begin testifying; do you recall?

24   A.   No, but I imagine it was probably 1996, 1997.

25   Q.   And have you testified in federal court and been

E. KINNISON, M.D. - DIRECT                                      244

 1    qualified as an expert in forensic pathology?

 2    A.   Yes.

 3    Q.   In fact, in front of Judge Jackson, I believe; is that

 4    correct?

 5    A.   A handful of times in federal court.

 6              MS. MCKEEL:   Judge Jackson, the government would

 7    offer this witness as an expert in the field of pathology.

 8              (No objection from defense counsel.)

 9              THE COURT:   All right, ladies and gentlemen, you may

10    accept Dr. Kinnison as an expert in the field of forensic

11    pathology.

12    BY MS. MCKEEL:

13    Q.   Dr. Kinnison, did you perform an autopsy on Louis Joseph?

14    A.   Yes, I did.

15    Q.   And did you, as a result of performing that autopsy,

16    produce a report of your findings?

17    A.   Yes, I did.

18    Q.   And what is the date of your report?

19    A.   I will look.   Can I look at the report?

20    Q.   Yes, ma'am.

21    A.   The date of the report was April 3rd, 2009.

22    Q.   And you signed that report; is that correct, ma'am?

23    A.   Yes.

24              MS. MCKEEL:   Your Honor, the government would like

25    to introduce Government's Exhibit 86.   If we could have the

E. KINNISON, M.D. - DIRECT                                    245

```
 1   book, the whole exhibit, it's multiple pages, for the
 2   witness.  And also United States Exhibits 80 and 81.
 3            THE COURT:  Any objections?
 4            (No objection from defense.)
 5            THE COURT:  All right, document will be admitted.
 6   That was Exhibit 84?
 7            MS. MCKEEL:  Ma'am, it's Exhibit Number 86.  If we
 8   could publish that, the first page, Your Honor.
 9            (The document was received in evidence as
10   Government's Exhibit No. 86.)
11   BY MS. MCKEEL:
12   Q.  I think that's in a sleeve, ma'am.  You can remove that?
13            We have multiple pages to go through, it might be
14   easier for you.
15            So the first page of the autopsy, can you explain
16   what it is?
17   A.  The first page of the Report of Autopsy has the report
18   number and the dates that I performed it.
19            Says how the body was identified, who was at the
20   autopsy, some basics about rigormortis and rigormortisage,
21   race, sex.  There's a general external examination section of
22   clothing and personal effects section, a brief summation of
23   external wounds, scars, tattoos, marks of therapy, X-rays.
24   Q.  You give a cause of death on your first page; is that
25   correct?
```

E. KINNISON, M.D. - DIRECT                                    246

1    A.  Yes.

2    Q.  And what was the cause of death that you found to

3    Mr. Joseph?

4    A.  Gunshot wounds to the torso and thighs.

5    Q.  So if you go to your next page, Page 2, I think if you

6    could show -- thank you.

7         Page 2, you go through your pathological diagnosis;

8    is that correct?

9    A.  Yes.

10   Q.  So if we can, let's go through, if you can explain the

11   gunshot wounds, how many there were to Mr. Joseph?

12   A.  In the report I've labeled them as 1 through 6 for

13   descriptive purposes.  Doesn't imply the order in which they

14   occurred.  I don't know what order they occurred in.

15        They may have been caused by as many as six separate

16   bullets or as few as five.  So the wound that I've labeled as

17   Gunshot Wound Number 1, it entered on his left upper abdomen.

18   It injured the diaphragm, the lung, fractured a rib, and it

19   exited the back, so I did not recover a bullet from inside

20   the body.

21        The direction of fire, assuming him in an upright

22   position, although I don't know what position he was in when

23   he was shot, it was from his left-to-right, front-to-back and

24   downwards.  Do you want me to continue?

25   Q.  And so you've mentioned in each of these wounds, soot or

E. KINNISON, M.D. - DIRECT                              247

1    stippling.  Could you explain what that is?

2    A.  None of the wounds showed any signs of soot or stippling,

3    so none of the six wounds did.

4            When a gun is discharged, in addition to a bullet

5    coming out, other things also come out of the gun.  If the

6    gun is touching the skin at contact, that soot and smoke may

7    be deposited in or around the wound.

8            As a distance between the gun and the skin begins to

9    open up a few inches, the smoke will dissipate and you may

10   see a heavy deposition of soot with little pinpoint breaks in

11   the skin.  And that is actually gunpowder striking and

12   breaking the skin, causing stippling.

13           As the distance increases a little bit further, then

14   soot dissipates and you will just see the little pinpoint

15   breaks in the case.  As the distance increases even further,

16   the stippling will dissipate and just see the entry.

17           Where the end point for being able to see stippling

18   on the skin can be changed by a variety of factors, including

19   an intermediate object between the gun and the skin.

20           A common intermediate object is going to be

21   clothing, but it could be really anything that gets between

22   the gun and the skin.  So that may either alter it or prevent

23   it from being seen on the skin.

24           And the gun and the bullets themselves also, how far

25   out you'll see stippling really depends on the gun and the

E. KINNISON, M.D. - DIRECT                                    248

1  bullet also.

2  Q.  So on each of these wounds, you did not see any soot or

3  stippling; is that correct?

4  A.  I didn't see any soot or stippling around any of the

5  entrance wounds.

6  Q.  Would you please go, then, and explain what the next

7  gunshot wound that you've labeled Number 2?

8  A.  Gunshot Number 2, that's just the one that -- how I

9  designated it, it entered on the front side of the left upper

10  thigh.  It's a superficial injury, so it just tracks through

11  the front of the thigh, barely exits, almost immediately

12  reenters, keeps tracking through the thigh, exits the left

13  thigh again, and then reenters and re-exits the scrotum.

14        There was a final re-exit wound, so I did not

15  recover a bullet from the body for Gunshot Wound Number 2.

16  It's a superficial injury, basically through the left thigh

17  and the scrotum.

18  Q.  Your gunshot wound that you have labeled Number 3, please

19  explain that.

20  A.  The wound that I've labeled as Gunshot Number 3, it

21  entered and exited a little bit lower on the scrotum.  And

22  then it reentered the inside of the right thigh.

23        This one actually then tracked through the thigh,

24  breaking the femur, or the thigh bone, and a bullet was

25  recovered from the back side of the right upper thigh.  So

E. KINNISON, M.D. - DIRECT                                    249

```
 1    there was no final re-exit, so I did recover a bullet from
 2    the wound that I labeled as Gunshot Wound Number 3.
 3    Q.  You did recover a bullet; is that correct?
 4    A.  Yes.
 5    Q.  So if we could, I believe it is United States Exhibit 81.
 6    But I'm also going to ask her to look at 82, please, and
 7    Number 80.
 8         Do you recognize those packages, ma'am?
 9    A.  No.  This appears to have been packaged maybe by the
10    Department of Forensic Science, Exhibit Number 81.
11    Q.  Okay.  What did you do with the bullet that you found in
12    your autopsy?
13    A.  It was turned over to Ms. Rush, or then, Ms. Rush with
14    the Newport News Police Department.
15    Q.  Is her name now Smithley, her last name Smithley?
16    A.  Yes.
17    Q.  But you recovered a bullet, and then you turned it over
18    to her; is that correct?
19    A.  Yes.
20    Q.  So with regard to the two -- between Gunshot Wound 2 and
21    3, you've talked about the scrotum.  Would you tell us what
22    part of the body that is?
23    A.  That's the sack around the penis; it's part of the
24    genitalia.
25    Q.  Ma'am, if you go then to your next Gunshot Wound Number 4
```

E. KINNISON, M.D. - DIRECT                                          250

1    and explain that, please.

2    A.  Gunshot Wound Number 4 entered on the left back side of

3    the thigh, it traveled through the thigh, and then exited and

4    then almost immediately reentered on the inner thigh.  So it

5    exited the left thigh and then almost immediately reentered

6    the right inner thigh.

7            This one also fractured the femur, or the thigh

8    bone, and it -- the -- either a fragment or the bullet itself

9    split, and so there were a pair of exit wounds on the right

10   lateral thigh.

11           So I did not recover a bullet from the body relating

12   to Gunshot Wound Number 4.

13   Q.  With regard to your Number E, Gunshot Wound Number 5,

14   please tell us about that wound.

15   A.  The wound that I've labeled as Gunshot Wound Number 5

16   entered on the back side of the left mid-thigh.

17           It traveled sort of superficially through the thigh,

18   injured no vital structures, and it exited the back inner

19   part of the left thigh.  So I did not recover a bullet from

20   that particular thigh.

21   Q.  And your last wound you labeled as Gunshot Wound Number

22   6.  Would you explain that?

23   A.  Gunshot Wound Number 6 either represents a separate

24   gunshot by a different bullet, or it could be a continuation

25   of Gunshot Wound Number 5.

E. KINNISON, M.D. - DIRECT                                    251

1          It entered on the inner part of the right thigh, it

2    traveled through soft tissues of the thigh, and it then

3    exited the back side of the right thigh.  So I did not

4    recover a bullet from the wound that I labeled as Gunshot

5    Wound Number 6.

6    Q.  Now, you have listed other injuries in your report; is

7    that correct?

8    A.  Yes.

9    Q.  Would you please explain what other injuries Mr. Joseph

10   had?

11   A.  He had blunt force injuries over his head, neck, elbow,

12   and scattered on his extremities.

13   Q.  If we can, if we go to your Page Number 3, please.

14          Would you tell, please, the ladies and gentlemen of

15   the jury what this explains, this page?

16   A.  This is a description of various structures and organs

17   within the body, and then at the bottom it talks about lab

18   procedures that were done, and then what happened to evidence

19   at the time -- that I knew of at the time of the report.

20   Q.  And you took, as it says, "other lab procedures."

21          Did you take a -- the blood card for DNA for

22   Mr. Joseph?

23   A.  Yes.

24   Q.  And you gave that blood card to, I think you've noted,

25   Kelly Wells of the Newport News Police Department?

E. KINNISON, M.D. - DIRECT                                    252

1    A.   Yes.

2    Q.   Let's go to, please, your fourth page, ma'am.

3         If you would describe what this page is, please.

4    A.   The first heading is a microscopic description of some

5    internal organs, and then there's a brief case summary, and

6    then the cause of death is listed again.

7    Q.   And would you tell us again what your cause of death is?

8    A.   Gunshot wounds to the torso and thighs.

9    Q.   If you go to your Page 5, ma'am, would you tell the jury

10   what that page explains?

11   A.   This is a diagrammatic representation of the injuries.

12   Q.   And then Page 6 of your report, the last page, what does

13   that page show?

14   A.   This just shows some general findings that are not

15   related to injuries.

16   Q.   And, ma'am, with regard to gunshot wounds of Mr. Joseph,

17   which would you consider lethal?

18   A.   The ones that would have caused the most internal

19   injuries would have been the wound that I've labeled as

20   Gunshot Wound Number 1, which bruised the stomach, injured

21   the lungs, fractured a rib.

22        And then the wounds that I've labeled as Gunshot

23   Wounds Number 3 and 4 which fractured the thigh and injured

24   vessels within the leg, the Phemerol veins specifically.

25   Q.   So that's 1, 3, and 4 were lethal?

E. KINNISON, M.D. - DIRECT                                    253

1  A.  1, 3, and 4.  Gunshot wounds that I've labeled as 2, 5,

2  and 6 were relatively superficial.

3  Q.  Dr. Kinnison, what is shoring?

4  A.  It's a term that refers to some exits when the body is

5  pressed up against something.  A bullet comes out and as it

6  hits whatever it's pressed up against, sometimes the skin

7  around the exit wound gets abraded.

8         A typical exit wound is typically sort of an

9  irregular split in the skin and it doesn't have scraped

10  margins.  But when it's shored, either by a tight band of

11  clothing or somebody's leaned up against an object or on the

12  floor, sometimes we will see some signs of abrasion around an

13  exit wound, which could suggest that something like that has

14  happened.

15  Q.  Okay.  Did any of these wounds have shoring?

16  A.  The exit wound for Gunshot Wound Number 1 has a

17  description of irregular marginal abrasion around it, so it

18  could represent a shored wound.

19         Some of the exits that are followed by reentry, some

20  of them will have atypical exit wounds.

21         Gunshot Wound Number 5 exit wound is described as

22  having an irregular abraded defect, as well as Number 6.

23         Number 5, if it's a re-entry into Number 6 could

24  have been shored just by the other thigh.

25         I'm not describing any of them definitely as shored

E. KINNISON, M.D. - DIRECT                                    254

 1  wounds, but some of them do suggest that they could have

 2  been.

 3  Q.  Ma'am, during the course of the autopsy, are photographs

 4  taken?

 5  A.  Yes.

 6  Q.  And did you provide those photographs to the United

 7  States?

 8  A.  I believe so.

 9  Q.  Okay.  Ma'am, in the book there's a series of photographs

10  labeled 86A through L.

11          MS. MCKEEL:  I can seek to introduce them all and

12  have them go through them, or if I can go through them one at

13  a time.  Whatever the Court --

14          THE COURT:  Well, I think I can make an exception to

15  the Court's ruling that you go on and introduce them, since I

16  understand there are no objections to a lot of these

17  exhibits; is that correct?

18          MR. WOODWARD:  No objection to 86A through L for

19  Mr. Benson, Your Honor.

20          THE COURT:  All right.

21          MR. SACKS:  May I have just one second?

22          THE COURT:  While he's conferring, Mr. Rasberry, do

23  you have any objection?

24          MR. RASBERRY:  Mr. Kindell does not have an

25  objection to it.

E. KINNISON, M.D. - DIRECT                                    255

1          MR. SACKS:  The only objection is it's hard to

2    discern, is it the same pictures of the same wound,

3    suggesting the duplication, or unduly cumulative?

4          I have no other testimony, sir, but I would reserve

5    that, Your Honor.

6          THE COURT:  But let's put it this way, the Court's

7    going to have her go through these subject to any objection

8    you have later, but we are going to go forward with it.

9          MS. MCKEEL:  So they can be introduced to be shown

10   to the jury?

11         THE COURT:  That's what I'm going to do.

12         MS. MCKEEL:  Thank you, Your Honor.

13   BY MS. MCKEEL:

14   Q.  Ma'am, if we could go to 86A.  Can you please explain

15   what this image shows?

16   A.  This is a photograph of the left side of his chest, and

17   it shows the entrance wound that I've labeled as Gunshot

18   Wound Number 1 above the ruler.

19   Q.  86B, what does that depict?

20   A.  This is a closeup of one of the wounds.  I'd have to look

21   to see if I could tell which one it is.

22   Q.  Okay.  Go to 86C, please.

23         Would you please describe this wound, what this

24   depicts?

25   A.  This is a photograph of his back.  On his left elbow you

E. KINNISON, M.D. - DIRECT                                    256

1    can see a bruise which is part of the blunt force injury.

2           Down his mid-back is the exit wound for the wound

3    that I've labeled as Gunshot Wound Number 1.

4           Down on his right thigh there's a pair of injuries

5    which is a larger and then a smaller.  That's the exit wound

6    for, I think it's Gunshot Wound Number 4.

7           The final exit wound for Gunshot Wound Number 4,

8    further down sort of mid-thigh is the exit wound for the

9    wound that I've labeled as Gunshot Wound Number 6.

10          Then on his inner left thigh, about what in this

11   photograph would be sort of the mid-thigh, would be the exit

12   wound for the wound that I've labeled as Gunshot Wound Number

13   5.

14   Q.  If you would go to 86D.  Can you tell us what that

15   depicts, what wounds?

16   A.  This is a photograph -- let me orient myself, take me a

17   moment.

18          So this photograph is taken of the back of the

19   left -- no, excuse me, back of the -- just give me a moment.

20   Q.  Yes, ma'am.

21   A.  This is the right thigh, and so there's a pair of

22   injuries at the very top sort of in an area that shows some

23   blood, and those are reentry wounds for Gunshot Wounds Number

24   3 and 4.

25          And then down below the ruler is sort of an

E. KINNISON, M.D. - DIRECT                                    257

1   irregular wound there, and that is the entrance wound for the

2   wound that I've labeled as Gunshot Wound Number 6.

3   Q.  If you could go to 86E.  Tell us what that shows.

4   A.  This is showing the side of his right thigh.  Immediately

5   below the ruler is a pair of wounds, one smaller and one

6   larger, and that's the pair of exits that I've associated

7   with Gunshot Wound Number 4.

8            And then down around closer to the knee where the

9   hand is is the exit wounds for the wound that I've labeled as

10  Number 6.

11  Q.  If you go to 86F, please.

12           Would you describe what these wounds are?

13  A.  This is a slightly different angle, once again showing

14  the right thigh on the right side of the photograph, and you

15  can see the exit wounds for Number 4, the Exit Wound for

16  Number 6, and then an exit wound for the wound that I've

17  labeled as Gunshot Wound Number 5 on the left thigh.

18  Q.  Would you go to Government's Exhibit 86G, please.

19           Would you tell us what this is?

20  A.  This is a photograph of an X-ray taken during the autopsy

21  of Mr. Joseph.

22  Q.  And what does this show?

23  A.  It shows a part of the pelvis, and then it shows a

24  fracture of the thigh.  And then at the left side of the

25  photograph is sort of a bright white area, and that's the

E. KINNISON, M.D. - DIRECT                                    258

1    X-ray of the bullet that I recovered from Gunshot Wound

2    Number 3.

3    Q.  Let's go next, please, to 86H, depicting some of the

4    other injuries.

5              What injury, ma'am, is this?

6    A.  These are some of the abrasions or scrapes on the right

7    elbow.

8    Q.  86I.  If you could explain that one, please?

9    A.  These are some of the scrapes or abrasions about the

10   knee.

11   Q.  Okay.  86J, would you describe that wound?

12   A.  This is a bruise, or contusion, on the -- that was near

13   the left elbow.

14   Q.  And look at Government's Exhibit 86K, please.

15             What is this injury?

16   A.  This is a laceration, which is a splitting or tearing of

17   the skin, relating to blunt force.  And it's high on his

18   right forehead.

19   Q.  And finally, 86L.  Would you tell us what injuries he

20   received to his face?

21   A.  This is an abrasion, or scrape, on his lip.

22   Q.  Now, with regard to head injuries, ma'am, do you know if

23   they bleed more than other parts of the body?

24   A.  Depends on what's being injured, I would suppose.  I

25   really don't know if I can answer that question specifically.

E. KINNISON, M.D. - CROSS                                         259

1   Q.  Okay.

2        You had some items on your first page, clothing items

3   the defendant came in -- excuse me, the victim came in to the

4   medical examiner's office.  Will you tell us how he was

5   dressed, please?

6   A.  He was wearing a sleeveless undershirt, cropped jeans,

7   belt, underwear.  There was socks and a do-rag.

8   Q.  Did you also find, during your autopsy, another bullet?

9   A.  Yes.

10  Q.  And tell us what you found, please.

11  A.  Another bullet was just found entangled in the underwear.

12  Q.  In his underwear.  And you, too, you turned that bullet

13  over, again, to crime scene tech Rush, but now named

14  Smithley; is that correct?

15  A.  Yes.

16        MS. MCKEEL:  That's all the questions I have, Judge.

17                     CROSS-EXAMINATION

18  BY MR. WOODWARD:

19  Q.  Hi, Dr. Kinnison.  Just real quickly.  I'm not going to

20  go through all of them.

21        You still have 86 -- Exhibit 86, your autopsy report

22  there with you?

23  A.  Yes.

24  Q.  Okay.  The jury will have that.  And on each of the

25  wounds you've listed a direction of fire.  For example, Wound

E. KINNISON, M.D. - CROSS                                    260

1 is left-to-right, front-to-back, and downwards.

    And just so it's clear, when you make those findings, that assumes that someone's standing up?

A.  Yes, it assumes him in an upright position to give this description, but I don't know what position he was in when he was shot.

Q.  And that same point would be true for all of the wounds, whether someone is it sitting, lying down, or, you know, on their knees.  Whatever position they're in, you just make a determination if they were upright, and it really tells the angle of the gun to the body if he had been upright?

A.  It basically just tells how it traveled through his body. It doesn't say what position he was in when he was shot.

Q.  And I think you told us that you don't know anything about the order of either the gunshot wounds or the other abrasions and contusions and lacerations that you found?

A.  I don't know what order he received the injuries.

Q.  And, of course, nothing about what you do tells us anything about the identity of the people or -- people or person that inflicted these wounds?

A.  I don't know who shot him.

Q.  Okay.  Or how many people?

A.  No, I don't know how many people --

Q.  Okay.

A.  -- were involved.

1   Q.  And with regard to distance, you found no stippling on

2   the skin.  What are you able to say, if anything, with regard

3   to the distance that these wounds were inflicted from?

4   A.  That I'm not seeing any evidence of any close range of

5   fire on the skin.

6            I can't -- he was clothed, some of the entrances

7   would have been through clothing, so clothing would have the

8   best evidence for range of fire.  I'm just not seeing any

9   evidence of close range of fire.

10  Q.  And that's neither on the skin or the clothing?

11  A.  On the skin.  The clothing is typically chemically tested

12  by forensic laboratory, if that's tested it all.

13  Q.  Okay, and so you wouldn't have been the one, if any

14  testing was done of the clothing, to see if there was gun

15  powder residue on the clothing, you wouldn't have been the

16  person to do that?

17  A.  That's correct.

18            MR. WOODWARD:  All right.

19            Thank you, Your Honor, that's all the questions I

20  have.

21            THE COURT:  Any other questions?

22                       CROSS-EXAMINATION

23  BY MR. SACKS:

24  Q.  Good morning, Doctor.  Andrew Sacks here for Mr. Mark

25  Wallace.

E. KINNISON, M.D. - CROSS                                    262

1          You testified the cause of death was gunshot wounds
2    to the thighs and the torso?
3    A.  Yes.
4    Q.  And just -- we may all know.  Technically, what is the
5    torso, what part of the body is that?
6    A.  The torso includes the chest and the abdomen, back.
7    Q.  And what was the highest -- how far up on the torso can
8    you tell us was the highest wound, if you follow what I'm
9    saying?
10   A.  What was the location of the --
11   Q.  Yes, ma'am.
12   A.  -- entrance wound?
13   Q.  Yes, ma'am, entrance, yes, ma'am.
14   A.  Gunshot Wound Number 1 is the one gunshot wound on the
15   torso.  It entered at 22 and 3 quarter inches from the top of
16   the head, and it exited at 18 and 3 quarters inches from the
17   top of the head.
18   Q.  Without being absolutely precise, can you point generally
19   on your torso where the entrance would be?  I know you're not
20   the same.
21   A.  The entrance would be sort of at the bottom of, imagine
22   your ribcage, on the left front side of the torso.
23   Q.  And that's the only one that actually entered the torso?
24   A.  Yes.
25   Q.  With respect to the stippling, the soot, the powder and

E. KINNISON, M.D. - CROSS                                      263

1    so forth, I know we talked about that.

2          Within your field, there's a generally accepted range

3    in feet, where beyond that foot range you would not expect to

4    see stippling or soot on any surface; is that correct?

5    A.   Yeah.  So depending on the gun and the bullet, assuming

6    no intermediate objects, most guns less than a couple feet, I

7    would guess no more than 3 to 4 feet away would be the

8    outside, but it's typically much less than that.

9    Q.   Understood.

10         But the outer range, 3 to 4 feet, beyond which you

11   wouldn't expect to see any of this?

12   A.   I would imagine that would be the outer limit.

13   Q.   Thank you.

14         Now, you talked about -- this gentleman, according to

15   your report -- and ladies and gentlemen of the jury will see

16   it.  But his -- you have length 72 and a half inches.  I

17   guess that's 6 and a half feet, if my math is right?

18   A.   Six-foot and 1 half inch.

19   Q.   Yeah 1 half inch.  Excuse me, six feet and 1 half inch

20   tall?

21   A.   Just a little over six feet tall.

22   Q.   Yes, ma'am.

23   A.   And this is a length which is not quite the same as a

24   height, because sometimes people's toes or their legs are

25   bent.

E. KINNISON, M.D. - CROSS                                    264

1   Q.  And then you have him at a weight of 208 pounds?

2   A.  Yes.

3   Q.  Now, you talked about some blunt force injuries.

4        You cannot tell us how they happened, can you?  You

5   can't tell us what happened, the events?

6   A.  Well --

7   Q.  They just represent blunt force to the body?

8   A.  Some impact to the body occurred.  There is no pattern

9   here for me to say what precisely caused it, but I can say

10  that, in my opinion, there is evidence of blunt force injury.

11  Q.  Yes, and I'm not questioning that.

12       But blunt force injuries can come through all kinds

13  of scenarios; can they not?

14  A.  Anything that impacts the body.  So a fall, strike, a

15  blow, being hit by a car.  There's any number of ways.

16  Scraping up against something.

17  Q.  And if somebody is fighting somebody else, that can

18  result in blunt force injuries if blows are exchanged or

19  trauma of that type?

20  A.  Sometimes, yes.

21  Q.  The finger -- you said there were no fresh chips or tears

22  in the fingernails, correct?

23  A.  That's correct.

24  Q.  Sometimes in your field, you see what you call "defense

25  wounds" on the fingers or the fingernails, suggesting the

E. KINNISON, M.D. - CROSS                                    265

```
 1   person was trying to protect themselves, correct?
 2   A.   Correct.
 3   Q.   You see no evidence of that in this case, do you?
 4   A.   I didn't see any injuries on the hands or forearms to
 5   suggest defensive injuries.
 6   Q.   Now, in the report itself, the first page talks about
 7   some general things, and then pathological diagnoses on
 8   Page 2.
 9        Sometimes you have what's called a post-mortem
10   toxicology report where blood or urine or other bodily fluids
11   are analyzed for drugs, chemicals, that sort of thing,
12   correct?
13   A.   Yes.
14   Q.   I didn't see that referenced in this report.  Is that
15   just because one was just not done?
16   A.   Under the bottom of Page 2, I made a comment "a separate
17   report will be issued."
18   Q.   Do you have that with you?
19   A.   Yes.
20        MR. SACKS:  Your Honor, may I see that, please.
21        THE COURT:  You may.
22        THE WITNESS:  May I give you a copy?
23        MR. SACKS:  Yes, ma'am, whatever the Court -- I just
24   want to look at it.
25        THE WITNESS:  Oh, you just want to look at it?
```

```
 1          MR. SACKS:  Yes.
 2          THE WITNESS:  You will look at it, you will return
 3   it to me?
 4          MR. SACKS:  Yes, ma'am, I promise.
 5          THE WITNESS:  This is an original.
 6          MR. SACKS:  That's fine, I will send it right back.
 7          THE COURT:  Does the government have a supplemental
 8   report?
 9          MS. MCKEEL:  Yes, sir, we already turned it over.
10          MR. SACKS:  I'm not complaining about that, I just
11   wanted to check it.
12   BY MR. SACKS:
13   Q.  Thank you, Doctor.
14          And that's put in as a separate document, not part of
15   your autopsy report today?
16   A.  In this case, it was listed as a separate report.
17   Q.  Just a few more.
18          The shoring that you talked about, these types of
19   abrasions and things, I think candidly you said you're not
20   really sure if they were shoring, it could be but it -- but
21   you can't really say?
22   A.  Sometimes I will actually suggest it in the report.  I
23   haven't done so here, but there is some suggestion that some
24   of these may have been shored, but I'm not sure.
25   Q.  Okay.  And, again, that can come from something,
```

E. KINNISON, M.D. - REDIRECT                                    267

```
 1   including the tightness of somebody's shirt, clothing over
 2   the body?
 3   A.  It's usually a little bit more than a shirt.  Like a
 4   brassiere band or the waistband of pants or something that --
 5   or a belt.  Something that is tight against the body.
 6            MR. SACKS:  Thank you, Dr. Kinnison.  I think that's
 7   all I have.  Thank you very much, ma'am.
 8            MR. KELLETER:  I have no additional questions.
 9            THE COURT:  Mr. Rasberry?
10            MR. RASBERRY:  No additional questions, Your Honor.
11            THE COURT:  Any redirect?
12                      REDIRECT EXAMINATION
13   BY MS. MCKEEL:
14   Q.  Dr. Kinnison, Mr. Sacks brought up the toxicology report.
15   Is that part of your report?
16   A.  It's typically collected during the autopsy report, it's
17   submitted to the Department of Forensic Science, and then the
18   Department of Forensic Science does the testing for
19   toxicology and issues the report.
20   Q.  And in this particular case, that made no difference in
21   your findings that Mr. Joseph was shot either 5 or 6 times;
22   is that correct?
23   A.  In a case like this, the toxicology report doesn't play a
24   large role in the cause of death.
25   Q.  Would it play a large part in maybe a drug overdose, does
```

J.  ESPINOZA - DIRECT                                              268

```
 1   that then help you out in an autopsy?
 2   A.  I mean, it's important to do the toxicology testing but,
 3   yes, sometimes it has more relevance to the cause of death.
 4           In this case, it doesn't have much relevance at all.
 5   Q.  Okay.  And you said that's the Department of Forensic
 6   Science.  Is that different from the Virginia Medical
 7   Examiner's Office?
 8   A.  Yes.
 9           MS. MCKEEL:  That's all I have, Your Honor.
10           THE COURT:  May the witness be permanently excused,
11   counsel?
12           (All defense respond in the affirmative.)
13           THE COURT:  All right, Doctor, you may be
14   permanently excused.
15           MS. MCKEEL:  United States would next call --
16           MR. KELLETER:  Can we take a minute?
17           (Pause.)
18           MS. MCKEEL:  Seriously, I'm okay.
19           THE COURT:  As long as you are okay.
20           JAVIER ESPINOZA, called by the Government, having
21   been first duly sworn, was examined and testified as follows:
22                        DIRECT EXAMINATION
23   BY MS. MCKEEL:
24   Q.  Would you tell us your name, please, and spell your name
25   for our reporter.
```

J.  ESPINOZA - DIRECT                                          269

1    A.  My name is Javier, which is spelled J-A-V-I-E-R, Richard
2    Espinoza, E-S-P-I-N-O-Z-A.
3    Q.  And where are you employed, sir?
4    A.  Currently I work for the Newport News Shipbuilding
5    Company, Huntington Ingalls.
6    Q.  And where were you previously employed?
7    A.  Ten months ago I retired from the Newport News Police
8    Department, and I was employed there for 25 years.
9    Q.  And were you ever in the Homicide Division?
10   A.  Yes.  My last 15 years on the police department, I was in
11   the Homicide Unit.
12   Q.  I'm going to take you back to 2009.
13        Did you become involved -- or maybe 2010 for you.
14   Did you become involved in the homicide of Louis Joseph?
15   A.  Yes, I did.
16   Q.  Were you the first detective on the case?
17   A.  No, I wasn't.  The original detective on the case had
18   retired, and then I assumed the case.
19   Q.  Okay.  When you became involved in the case, did you
20   start working on the case -- it was somewhat older for you;
21   is that correct?
22   A.  That's correct.
23   Q.  And as a result of getting some lab work back from the
24   Department of Forensic Science, did you obtain an arrest
25   warrant?

J.  ESPINOZA - DIRECT                                        270

1    A.  Yes, I did.

2    Q.  And who did you obtain an arrest warrant for?

3    A.  That was for, I'm sorry, Mr. Benson.

4    Q.  Okay.  And where is Mr. Benson from?

5    A.  Boston, Massachusetts.

6    Q.  Okay.  And did you have to -- what did you have to do to

7    make an arrest?

8    A.  So I obtained the warrant and then I flew myself and two

9    other investigators, we flew to Boston, Massachusetts.

10          We had called previously up there and coordinated

11   with Boston PD so they were aware we were coming, who we had

12   a warrant for and so they did some legwork on their end of

13   the location to go to and so forth.

14   Q.  And do you recall what date you made the arrest?

15   A.  That was on January 12th, 2010.

16   Q.  Did Stacey Rush, now her name is Smithley, did she go

17   with you?

18   A.  Yes, she did.

19   Q.  Okay.  And did she collect some evidence while you were

20   there?

21   A.  Yes, she did.

22   Q.  At one point, did she -- did you all collect Mr. Benson's

23   phone?

24   A.  Yes, we did.

25   Q.  Eventually did you obtain, in Virginia, a search warrant

1    for Mr. Benson's phone?

2    A.  Yes, I did.

3    Q.  Now, on January 28th of 2010, did you do something with

4    Mr. Benson's phone?

5    A.  Yes, I did.

6    Q.  What did you do?

7    A.  So I had the phone but I needed to get the number off the

8    phone in order to do a warrant or a court order for that

9    phone.

10          So I took the phone to T-Mobile in the Patrick Henry

11   Mall because I didn't want to -- I figured they knew best how

12   to handle the phone, how to open it, how to get to -- I

13   didn't want to mess around too much.

14          So I went there and I explained to them I need the

15   cell phone number assigned to this phone because I'm going to

16   do a warrant and, in order to do the warrant, I need to have

17   the number.

18          So I went there to the mall and one of the persons

19   at T-Mobile assisted me in that.

20   Q.  Okay.  And what was the number for Mr. Benson's phone?

21   A.  It was area code (617) 372-2524.

22   Q.  Now, on February the 9th of 2010, did you obtain a court

23   order to get information about that phone?

24   A.  Yes, I did.

25   Q.  And what kind of information were you seeking?

1  A.  It was subscriber information, meaning I now have the

2  number, but who did that number come back to.  Name, address,

3  any other identifying characteristics.

4          Also, all calls to and from, received, missed, text

5  messages, anything in a cell phone basically I wanted.

6  Q.  And ultimately you received, then, a search warrant so we

7  could search that phone; is that correct?

8  A.  That is correct.

9  Q.  Did you give that -- did you do that yourself, are you

10  able to, or did you give it to somebody else --

11  A.  The search warrant?

12  Q.  -- to, yes, search the actual cell phone?

13  A.  I actually gave it to a detective who's in that -- we

14  have a Cell Phone Forensics area, so I gave the warrant and

15  the phone to that detective and said, do your forensics on

16  the phone.

17  Q.  And was that, at the time, Detective Smithley; is that

18  correct?

19  A.  That is correct.

20  Q.  On September 21st, 2010, did you see Mr. Benson?

21  A.  Yes, I did.

22  Q.  And was the purpose of seeing Mr. Benson to obtain buccal

23  swabs?

24  A.  Yes, it was.

25  Q.  Can you spell the word buccal for our Court Reporter?

J. ESPINOZA - CROSS                                          273

1    A.   B-U-C-C-A-L.

2    Q.   And what is that?

3    A.   So a buccal swab, basically it's like two long Q-Tips,

4    maybe 8 to 10 inches long and with a wooden handle.  And then

5    of course the cotton, like a conventional Q-Tip.

6         And it's in a pack, a sanitized pack, and you -- you

7    swab the inner cheeks, both sides of a person, to collect

8    their saliva which contains our unique DNA.

9         And then once that's collected, you put it into a

10   container and then on the outside of the container I would

11   put my name, the date and the time, and then who I collected

12   from.  And all that stuff is then packaged by myself in

13   another container, another package, and sealed.

14   Q.   Now, you didn't do that yourself; is that correct?

15   A.   I did collect it.

16   Q.   You observed it; is that correct?

17   A.   That's correct.

18   Q.   By the nurse at the -- okay.

19        And those buccal swabs then were given to whom?

20   A.   I gave those to Crime Scene Technician Smithley.

21   Q.   And I believe the buccal swabs, Exhibit 84, has already

22   been entered into evidence; is that correct?  I just want to

23   make sure they have been.

24        I want to take you to December 10th, 2010.

25        Was the charges against Mr. Benson dismissed -- or,

J. ESPINOZA - CROSS                                        274

 1   excuse me, nolle prossed, meaning a dismissal without
 2   prejudice, in the Newport News Circuit Court?
 3   A.  Yes, at the state level, that is correct.
 4            MS. MCKEEL:  That's all the questions I have, Judge.
 5            THE COURT:  Cross?
 6                       CROSS-EXAMINATION
 7   BY MR. WOODWARD:
 8   Q.  Detective Espinoza, good to see you again.
 9   A.  Yes, sir, likewise.
10   Q.  I just want to make sure I got the timeline.  The
11   offense, or the murder of Mr. Joseph, occurs on March 9th --
12   excuse me, March 13th of 2009.
13   A.  That is correct.
14   Q.  You obtain a warrant and serve the warrant and arrest
15   Mr. Benson up in Boston at January 12th of 2010?
16   A.  That is correct.
17   Q.  At that point in time, you -- Ms. McKeel asked you about
18   a report that you had back from the lab.  That was a DNA
19   report, correct?
20   A.  That is correct.
21   Q.  And I know you are not a DNA expert, but you had the
22   report?
23   A.  Yes, sir.
24   Q.  Okay.
25            Then you -- at the time of that arrest, you seized

1   Mr. Benson's cell phone?

2   A.  Yes.

3   Q.  And you got a search warrant and searched the contents of

4   the cell phone?

5   A.  That is correct.

6   Q.  You took a buccal swab from his cheek, which you also

7   sent to the DNA lab?

8   A.  That is correct.

9   Q.  That was, to your knowledge, examined and processed?

10  A.  Yes, sir.

11  Q.  As was his telephone?

12  A.  Yes.

13  Q.  And, of course, during this time, from December the

14  10th -- excuse me, January the 12th of 2010 until

15  December 10, Mr. Benson's under arrest for the murder of

16  Mr. Joseph?

17  A.  Yes, sir, that's correct.

18  Q.  And then on December 10th, you have the DNA reports, you

19  have the phone data, you have all of that and the charges are

20  nolle prossed, or dismissed, in state court?

21  A.  That is correct.

22          MR. WOODWARD:  Thank you, Your Honor, that's all I

23  have.

24          THE COURT:  Redirect?

25                      REDIRECT EXAMINATION

J. ESPINOZA - REDIRECT                                          276

1   BY MS. MCKEEL:

2   Q.  Detective Espinoza, at some point you came to the United

3   States Attorney's Office and the FBI to ask for assistance;

4   is that correct?

5   A.  That is correct.

6            MS. MCKEEL:  That's all I have.

7            THE COURT:  May the witness be permanently excused,

8   counsel?

9            MR. SACKS:  May I ask one question on that question?

10           THE COURT:  What's that question based on?

11           MR. SACKS:  The date of the indictment in this case,

12   if he knows it, the initial indictment.

13           THE COURT:  Do you know the date of the initial

14   indictment in this case?

15           MR. SACKS:  Or the month.

16           THE WITNESS:  No, Your Honor, I do not.

17           THE COURT:  So I think we can get it somewhere else.

18           The question is, may the witness be permanently

19   excused?

20           (All defense respond affirmatively.)

21           MS. MCKEEL:  Thank you, Detective Espinoza.

22           MR. ZLOTNICK:  United States calls Steve Smithley.

23           STEVEN SMITHLEY, called by the Government, having

24   been first duly sworn, was examined and testified as follows:

25                     DIRECT EXAMINATION

Janet Collins, Official Court Reporter

S. SMITHLEY - DIRECT                                              277

1    BY MR. ZLOTNICK:

2    Q.   Please state your name and spell it for the court

3    reporter.

4    A.   Sergeant Steven Smithley.   And the last name last name is

5    S-M-I-T-H-L-E-Y, first name is S-T-E-V-E-N.

6    Q.   Sergeant Smithley, where are you currently employed?

7    A.   The Newport News Police Department.

8    Q.   What is your current assignment?

9    A.   I'm the supervisor in the Organized Crime division by

10   Violent Crimes Task Force.

11   Q.   How long have you been employed by the Newport News

12   Police Department?

13   A.   17 years.

14   Q.   Bringing your attention back to the time of March of

15   2010.   What was your assignment?

16   A.   Detective in the Intelligence Division.

17   Q.   Did there come a time that you were provided a telephone?

18   A.   Yes, sir, that's correct.

19   Q.   And who provided you the telephone?

20   A.   Detective Espinoza.

21   Q.   Can you tell us whether or not the telephone had anything

22   connected in it, inside of it?

23   A.   It was a telephone that contained a SIM card.

24   Q.   Now, at that time what was your job with respect to

25   telephones?

S. SMITHLEY - DIRECT                                    278

1    A.  At the time I was conducting forensic examinations on

2    telephones utilizing a piece of equipment called a Celdek.

3    Q.  Spell that for the Court Reporter Celdek.

4    A.  C-E-L-D-E-K.

5    Q.  And do you remember what kind of telephone this was that

6    you were given?

7    A.  A BlackBerry telephone.

8    Q.  I'd like to have the witness shown what has been

9    previously put into evidence as, I believe, Exhibit 82.

10          Do you recognize what Exhibit 82 is?

11   A.  It's a BlackBerry telephone that was collected and then

12   later turned over to me.

13   Q.  And the same one you did an examination on.

14          Now, were you looking for any particular type or any

15   particular data in relation to that telephone when you

16   started your examination?

17   A.  Oh, I was requested to see if I could locate any 757 area

18   code numbers, or contacts within the device.

19   Q.  And the 757 is an area code that covers -- let me ask it

20   this way, the area of Newport News, what area code is that?

21   A.  757.

22   Q.  Did there come a time that you conducted this

23   examination?

24   A.  Yes, sir.

25   Q.  When you conducted this examination, what if anything did

S. SMITHLEY - DIRECT                                    279

1    you do with the SIM card that was in the phone?

2    A.  So the SIM card is pulled out of the phone and put into a

3    reader.  Essentially, the best way to explain it is entering

4    it into a card reader into a computer to print your pictures.

5         So the SIM card, it's a very small drive.  Put it

6    into the reader, place it into the drive and you are prompted

7    what steps to do.  And then the hardware and software will

8    read the data, what's available, and then allow you to print

9    that report.

10   Q.  So you placed the SIM card into what machine?

11   A.  The Celdek.

12   Q.  And the Celdek is a tool to analyze what?

13   A.  Analyze electronic data.  It could be -- it's not just

14   specific to a cell phone.  You could do a GPS, you know, for

15   your directions, anything that contains electronic data that

16   is capable with that machine.  It will not do all cell -- you

17   know, all telephones.  It's very specific.

18        But a SIM card reader goes into this machine and if

19   a phone has a SIM card, it has the ability to read that SIM

20   card.

21   Q.  And how can you tell if the machine is in working order?

22   A.  It will prompt you and tell you if it's not --

23   something's not compatible or not working properly.  You just

24   won't go any further with the examination.

25   Q.  And when you did the examination on March 4th, 2010,

1    could you tell if the machine was in working order?

2    A.   It was.

3    Q.   And then were you able to use the machine to extract

4    information from the SIM card?

5    A.   Yes, sir.  I was able to get the contact information.

6    Q.   I'd like to have the witness next handed what is

7    Exhibit 156.

8             Do you recognize what Exhibit 156 is?

9    A.   This is the printed version of the Celdek report.

10   Q.   On that phone?

11   A.   Yes, sir.

12   Q.   And was it prepared -- you prepared that -- that's what

13   you prepared?

14   A.   Yes, sir.

15   Q.   It shows the date?

16   A.   Yes, sir, it does.

17   Q.   And it shows the telephone number?

18   A.   Yes, sir.

19   Q.   And can you tell us what the telephone number was?

20   A.   The number that the SIM card is reading is 1

21   (617)372-2524.

22   Q.   Now, can you tell us, on that exhibit --

23             MR. ZLOTNICK:  Let me offer that exhibit into

24   evidence.

25             (No objection from defense.)

S. SMITHLEY - DIRECT                                            281

```
 1            THE COURT:  Exhibit will be admitted.
 2            (The document was received in evidence as
 3   Government's Exhibit No. 156.)
 4   BY MR. ZLOTNICK:
 5   Q.  Can you tell us, was there a number that you extracted
 6   with a 757 number in it?
 7   A.  Yes, sir, there was.
 8   Q.  And is that -- can you -- can you read us -- can you read
 9   that to the jury, what the name -- is that a contact list in
10   there?
11   A.  Yes, sir.
12   Q.  Can you tell us what the 757 number is on the contact
13   list, the name and the number?
14   A.  Listed as Number 37 on the contact list is M E Z, and
15   that's spelled, in capital letters, M-E-Z, and it's listed in
16   as (757) 696-0708.
17   Q.  The last four digits were what?
18   A.  0708.
19            MR. ZLOTNICK:  At this time, Your Honor, I would
20   like to read Stipulation Number 29.
21            THE COURT:  You may.
22            MR. ZLOTNICK:  Stipulation 29 is United States
23   Exhibit Number 155 are documents related to Mark Xavier
24   Wallace's employment at Williamsburg Plantation, Inc. The
25   records were made at or near the time of the occurrence of
```

S. SMITHLEY - DIRECT                                                  282

1   the matters set forth, by or from information transmitted by,

2   an employee with knowledge of those matters.  Such records

3   were kept in the course of regularly conducted business

4   activity of Williamsburg plantation, Inc. and such records

5   were made and kept by Williamsburg plantation, Inc. As a

6   regular practice.  And with that, I would like to offer

7   Exhibit 155.

8          THE COURT:  Any objection?

9          (No objection from defense.)

10          THE COURT:  Exhibit 155 will be admitted.

11          MR. ZLOTNICK:  I would like to ask that Exhibit 155

12   on Page 4 of it, be placed on the screen.

13          Is that published, Your Honor?

14          THE COURT:  Yes, it is.

15   BY MR. ZLOTNICK:

16   Q.  Can you tell us what number is shown on the phone number

17   there?

18   A.  Yes, sir.  (757) 696-0708.

19   Q.  Is that the same or a different number that you found in

20   the Benson phone?

21   A.  Yes, sir, that's the same number that is listed as M E Z

22   under 37 of the contact list.

23   Q.  Now, did you also find -- we can take that down.

24          Did you also find in that phone a contact under the

25   name of BRo in that phone?

1    A.  Yes, sir, two telephone numbers.

2    Q.  All right.  And can you tell -- was one of them -- well,

3    why don't you give us both of those numbers.

4    A.  Certainly.  On the contact list for Number 9, it's listed

5    as BRo, B-R-o, and the telephone number is is (617) 980-3919.

6    Q.  Is there a second one?

7    A.  Yes, listed as Number 10, and it is listed as 617 -- I'm

8    sorry, it actually has a 1 in front of it for that, but

9    1 (617) 602-6862.

10           MR. ZLOTNICK:  I would like to read Stipulation 16,

11   if I could, Your Honor?

12           THE COURT:  You may.

13           MR. ZLOTNICK:  16 says that Rosuan Romeo Kindell,

14   during all times applicable to this trial, was using cellular

15   telephone number (617) 980-3919 subscribed in the name of his

16   sister, Quenisha Kindell.

17           And that is spelled, Q-U-E-N-I-S-H-A.

18   BY MR. ZLOTNICK:

19   Q.  I next would like to show the witness what has been

20   marked Exhibit 91, if we could?

21           Do you recognize Exhibit 91 as a picture of the phone

22   itself with the M E Z in there?

23   A.  Yes, sir.  That's a screen shot of the actual contact

24   list in the actual device.

25   Q.  You had seen that before?

S. SMITHLEY - DIRECT                                             284

1    A.  Yes, sir.

2    Q.  Does it truly and accurately depict how the contact

3    looked?

4    A.  Yes, sir.

5    Q.  I would offer 91 into evidence.

6            THE COURT:  Any objection?

7            (No objection from defense.)

8            THE COURT:  It will be admitted.

9            MR. ZLOTNICK:  Could we publish that.

10           (The document was received in evidence as

11   Government's Exhibit No. 91.)

12   BY MR. ZLOTNICK:

13   Q.  And I'd next like to have the witness shown Exhibit 92.

14           Does that show -- is that also -- is that also the

15   phone?

16   A.  Yes, sir.  That's the name, and then the contact actually

17   displayed.

18   Q.  And does that truly and accurately depict how it looked?

19   A.  Yes.

20           THE COURT:  Exhibit 92 will be admitted.

21           (The document was received in evidence as

22   Government's Exhibit No. 92.)

23   BY MR. ZLOTNICK:

24   Q.  And I would next like to show the witness what has been

25   marked as Exhibit as 90A.

1         Do you recognize Exhibit 90A?

2   A.  That's the opened-up contact of BRo displaying the

3   telephone number.

4   Q.  Does it truly and accurately depict what it looked like

5   in the phone?

6   A.  Yes, sir.

7             MR. ZLOTNICK:  And I'd offer that into evidence.

8             THE COURT:  Any objection?

9             (No objection from defense.)

10            THE COURT:  98 will be admitted.

11            (The document was received in evidence as

12   Government's Exhibit No. 98.)

13   BY MR. ZLOTNICK:

14   Q.  And what number does that show, so we can publish that?

15   A.  (617) 980-3919.

16   Q.  And I'd like to finally have the witness shown

17   Exhibit 90.

18            Is that also another number for BRo that was in the

19   phone?

20   A.  That is correct, sir.

21   Q.  Does it truly and accurately depict what it looks like in

22   the phone?

23   A.  Yes.

24            MR. ZLOTNICK:  I'd offer Exhibit 90 into evidence.

25            (No objection from defense.)

S. SMITHLEY - CROSS                                              286

```
 1            THE COURT:  Hearing no objection, it will be
 2   admitted.
 3            (The document was received in evidence as
 4   Government's Exhibit No. 90.)
 5            MR. ZLOTNICK:  We can publish that and ask you to
 6   read that number for us.
 7   A.  Certainly.  1617 -- I'm sorry, I -- let me reread that
 8   for you.  1 (617) 980-0363.
 9            MR. ZLOTNICK:  Thank you.  I have no other
10   questions.
11            THE COURT:  Any questions?
12                        CROSS-EXAMINATION
13   BY MR. WOODWARD:
14   Q.  Hi, Detective.
15   A.  How are you, sir?
16   Q.  Good.
17            Can we put up what's been admitted as Exhibit 156.
18   The first page up at the top right, it says "Page 1 of 13."
19            It's not scanned in.  Never mind, I can hold on,
20   then.
21            Can you see that, Detective Smithley?
22   A.  Yes.
23   Q.  And I will slide it down so the jury can see it and the
24   Court.
25   A.  Yes, sir.
```

S. SMITHLEY - CROSS                                                287

1   Q.  That's what's just been admitted, 151?

2   A.  Yes, sir.

3   Q.  Just so the ladies and gentlemen of the jury will

4   understand, this is the front page of the report?

5   A.  That is correct, sir.

6   Q.  Okay, and right where I've got my pen here, that's the

7   date you did the extraction for March 4th of '10?

8   A.  Correct.

9   Q.  And what is the significance of the date up here,

10  10-03-04 that's on your report?

11  A.  This is the date and time of the report, so it's going to

12  be March 4th, 2010, at 17:03 and 45 seconds SIM, saying that

13  that's a SIM card.

14  Q.  But that's just they put the year first, so that's not --

15  so it's not confusing -- that's not October 3rd of 2004,

16  that's March 4th of 2010?

17  A.  Yes, sir.

18  Q.  Got you, okay.

19        And then the next page of the report is -- this is

20  the contents, correct?

21  A.  That is the summary.  Basically saying of the contents,

22  this is what we -- you know, this is what we can do with that

23  device.

24  Q.  Now your reporting, we will get to it when we get to the

25  next page.  Focused on what's there is three -- 3.1, the

S. SMITHLEY - CROSS                                              288

1   contacts?

2   A.  Yes.

3   Q.  Okay.  Because a SIM card -- correct me if I'm wrong, a

4   SIM card is really a storage device that's within a cell

5   phone?

6   A.  That is correct, sir.  It's a Subscriber Identity Module.

7   Q.  Okay.  So the SIM card doesn't contain all of the

8   information on the phone?

9   A.  No, sir, just -- the SIM card is going to be the

10  identifying factor of the phone.  It can store contacts and

11  it also can store SMS messages, depending on the amount,

12  though.

13  Q.  And SMS is text messages?

14  A.  Yes, sir, short messaging.

15  Q.  All right, and then -- we're now at Page 5.  I'm not

16  going to go through every page, but this is the beginning of

17  the -- it prints off all the entries, so the phone that you

18  examined had a total of 62 contacts?

19  A.  Yes, sir.

20  Q.  Okay.  And you've talked about --

21          MR. WOODWARD:  These were highlighted on the

22  exhibit, Your Honor, which they are not highlighted, they are

23  on the exhibit that way.

24  BY MR. WOODWARD:

25  Q.  There are two different BRos right here?

S. SMITHLEY - CROSS                                                    289

1   A.  Yes, sir.

2   Q.  What, are they Line Items 9 and 10?

3   A.  Yes, sir.

4   Q.  Now, when you do these examinations, are you able to tell

5   when the contact was placed on the phone?

6   A.  No, sir.

7   Q.  Okay.

8          So getting over to the 757 number, M E Z.  So the

9   same thing, all you know is when the phone was seized, which

10  I believe was in January of 2010, that contact was in the

11  phone?

12  A.  That is correct, sir.

13  Q.  You have no way of knowing whether or not it was there in

14  March of 2009?

15  A.  No, sir.

16  Q.  Okay.  And, likewise, sir, your analysis of this phone

17  wasn't -- you didn't do any call frequency or contact

18  frequency type analysis?

19  A.  No, sir.

20  Q.  So in terms of how many times, if any, during any time

21  frame that the phone that you were examining would have

22  contacted that 757 number, you simply didn't glean that

23  information?

24  A.  That's correct, sir.

25  Q.  And is that because you weren't asked to do that, or is

1    it because it is not on the SIM card, or both?

2    A.  That is not something I was requested to do, but that

3    data is also not on the SIM card.

4    Q.  And the Exhibit 155, Page 4, can we -- that's been

5    admitted, can we pull that back up?  I think that's -- I

6    think that 155's in the machine.

7          Can you see that now?

8    A.  Yes, sir.

9    Q.  And that indicates that this is an individual, Mark

10   Grinage, that gives that number.  It's an employment form

11   that looks like the hire date is 4-1 of '09, up there at the

12   top right?

13   A.  Yes, sir.

14   Q.  Okay.  And then if we could go to Exhibit, I think it's

15   92?  And you were shown that earlier.  That has a notation

16   out to the side, "Work."

17          Just so it's clear to the ladies and gentlemen of the

18   jury, when you are putting contacts into your phone, the

19   person who is putting them in controls, whether they call it

20   a cell phone, a work phone, a home phone, you get various

21   fields that come up when you want to create a contact?

22   A.  That is correct.

23   Q.  And I don't think we need to pull it back up, the jury

24   will see it, that said "work."

25          The ones for BRo had "mobile" beside them; is that

S. SMITHLEY - CROSS                                                    291

1    correct, or do you recall?  Let's put up 90 -- just put up 90

2    first, I guess.

3              You understand what I'm talking about, that was --

4    A.  Yes, sir.

5    Q.  -- designated as a mobile phone, the prior one that we

6    showed you, the contact said that that was a work contact.

7    A.  That's how it is displayed, yes, sir.

8    Q.  And that work contact referenced to Williamsburg -- I was

9    getting ready to say "pottery," but the Colonial Williamsburg

10   of a work location there?

11   A.  Yes.

12   Q.  All right.  And again, just so it's clear, you have no

13   knowledge of when any of the contacts were placed in the

14   phone?

15   A.  No, sir, I do not.

16   Q.  Okay.

17             MR. WOODWARD:  Thank you, Judge, that's all the

18   questions I have.

19             THE COURT:  Any question, Mr. Sacks?

20             MR. SACKS:  Just a couple.

21                       CROSS-EXAMINATION

22   BY MR. SACKS:

23   Q.  Good morning, sir.

24   A.  Good morning, sir, how are you?

25   Q.  Fine, sir, I hope you are, too.  Andrew Sacks for

S. SMITHLEY - CROSS                                                    292

```
 1   Mr. Wallace.
 2         With respect to the analysis, there were 62 different
 3   telephone numbers in the contact section, correct?
 4   A.  It displayed 62 contacts.  I didn't examine to see if
 5   everyone was the same, but it did display 62.
 6   Q.  All right, so you didn't check one way or the other to
 7   see if some of them were the same or not?
 8   A.  No.  I wouldn't have any need for that, sir.
 9   Q.  All right.
10         And there are a few of these, not many, that look --
11   like, BRo is in there twice and a couple of them are the same
12   names or initials.  You don't know if they are the same
13   people or not?
14   A.  No, sir.
15         MR. SACKS:  All right, sir, I think that's all I
16   have.  Thank you, sir.
17         THE WITNESS:  Thank you.
18         MR. SACKS:  Thank you, Your Honor.
19         MR. KELLETER:  No questions.
20         THE COURT:  Mr. Rasberry?
21         MR. RASBERRY:  No questions, Your Honor.
22         THE COURT:  No redirect?
23         MR. ZLOTNICK:  No, Your Honor.
24         THE COURT:  I know we started a little after 9:30,
25   but we are going to take the break now.
```

G. HILL - DIRECT                                                    293

1              May this witness be permanently excused?

2              (All defense respond in the affirmative.)

3              THE COURT:  All rise.

4              (Off the record, 11:01 a.m., jury out.)

5              (On the record, 11:22 a.m., jury in.)

6              THE COURT:  The record reflect that all jurors are

7    present in the courtroom.  Does counsel concur?

8              (All counsel respond in the affirmative.)

9              THE COURT:  All right, you may call your next

10   witness.

11             MS. MCKEEL:  Gloria Hill.

12             GLORIA HILL, called by the Government, having been

13   first duly sworn, was examined and testified as follows:

14                        DIRECT EXAMINATION

15   BY MS. MCKEEL:

16   Q.  Good morning, ma'am.  Would you please tell us your name

17   and spell it for our court reporter.

18   A.  Good morning, my name is Gloria D. Hill, G-L-O-R-I-A, D,

19   Hill is H-I-L-L.

20   Q.  Ma'am, could you tell us where you are employed, please?

21   A.  I work for the Virginia Department of Forensic

22   Laboratory.  I will look -- work for the Virginia Department

23   of Forensic Science, which is part of the crime laboratory

24   system for the State of Virginia.  I specifically work at the

25   Eastern Laboratory, which is located here in Norfolk,

G. HILL - DIRECT                                                    294

1    Virginia.

2    Q.  Okay.  And how long have you worked there?

3    A.  I've been employed with the Eastern Laboratory since

4    October of 2001.

5    Q.  Now, the forensic lab has many components or units to it;

6    is that correct?

7    A.  That's correct.

8    Q.  How many units does it have?

9    A.  I'm not sure of the exact number, but we specialize in

10   our certain fields, and I specialize in forensic biology.

11   Q.  And have you always been in forensic biology?

12   A.  Yes.

13   Q.  If you could, please, tell us what your background in

14   education is.

15   A.  I have a bachelor's degree in Biology from Hampton

16   University in Hampton, Virginia.  After that, I received a

17   Master's of Science Degree in Human Genetics from the Medical

18   College of Virginia, which is part of the Virginia

19   Commonwealth University, or VCU, system.

20          After that, I received a Master of Science Degree in

21   Criminal Justice from VCU.

22   Q.  Now, how long have you been employed with the Virginia

23   Department of Forensic Science in the Virginia biology unit?

24   A.  Since October of 2001.

25   Q.  Can you tell us what your professional affiliations are,

G. HILL - DIRECT                                                    295

1   please?

2   A.  I'm a member of the Mid-Atlantic Association of Forensic

3   Scientists, as well as the American Academy of Forensic

4   Scientists.

5   Q.  And prior to working for the Virginia Department of

6   Forensic Science, did you work anywhere else?

7   A.  As a graduate student, I did have work with my thesis

8   project.  But outside of that, I've only really worked for

9   the Virginia Department of forensic Science.

10  Q.  And have you testified in any of the area courts, state

11  courts, and been qualified as an expert in forensic biology?

12  A.  Yes.  I've testified in this U.S. District Court as well

13  as the circuit courts of all the seven major cities in the

14  area, as well as numerous juvenile and domestic relations or

15  general district courts.

16        MS. MCKEEL:  Your Honor, the United States would

17  offer Ms. Hill as an expert in forensic biology.

18        THE COURT:  Anyone wish to voir dire her on her

19  credentials?

20        (Defense responds in the negative.)

21        THE COURT:  Okay, ladies and gentlemen, you may

22  accept Ms. Hill as an expert in forensic biologist.

23        MS. MCKEEL:  Thank you, Judge.

24  BY MS. MCKEEL:

25  Q.  Now, you are going to testify about some DNA; is that

1    right?

2    A.  Yes, that's correct.

3    Q.  Could you explain to us, please, what is DNA?

4    A.  DNA stands for deoxyribonucleic acid, is what we call the

5    blueprint of life.  It allows us all to have two arms and two

6    legs, and it allows us to be human.

7    Q.  And where is DNA found in the human body?

8    A.  Your body is made of microscopic particles called cells,

9    and your DNA is found in the nucleus, or control center of

10   the cells, and that's what I test for.

11        You get half of your DNA from your mother and half

12   from your father.

13   Q.  Now, does DNA differ from cell to cell within the body?

14   A.  No.  DNA that you test with someone's blood cells would

15   be the same DNA that you would find in their skin cells.

16   Q.  And does DNA differ from person to person?

17   A.  Except for the case of identical twins, DNA does differ.

18   Although 99 percent of our DNA is the same that allows us to

19   be human, there are certain areas that allow for differences.

20   And that's what you see sometimes in eye color and hair

21   color.

22        I'm looking at areas of DNA that do not show any

23   visual traits.

24   Q.  If you could, please describe the use of DNA in testing

25   in forensics.

G. HILL - DIRECT                                              297

1    A.   What happens is I compare DNA samples that I've obtained

2    from evidence that happens in a case, and I then compare it

3    to DNA profiles I obtain from known standards.

4           Those known standards can come in the form of a

5    blood sample from a person or swabs from an inner lining of a

6    cheek, and that's just taking a Q-Tip and rubbing the inside

7    of a cheek.  I'm able to obtain DNA profiles from that, and

8    so I will compare those that come specifically from a person

9    to those that are found in crime scene evidence.

10   Q.   And can you use blood to get DNA also?

11   A.   Yes.

12   Q.   Now, what techniques do you use to analyze DNA in the

13   forensic laboratory?

14   A.   I use the polymerase chain reaction, or PCR.

15   Q.   Is there something different to use?

16   A.   Currently that is the scientific method that we use to

17   analyze DNA.

18   Q.   And can you explain how you conduct this technique?

19   A.   PCR is, if you think of DNA as being a very large book

20   with PCR, what I'm doing is I'm taking millions and millions

21   of copies of certain pages of that book to allow it to stand

22   out, and those are the areas in which I am looking.

23   Q.   Now, is this technique used in other fields of forensic

24   science?

25   A.   Yes.  It's used in paternity testing, medical screenings,

G. HILL - DIRECT                                                  298

1    and some disease analysis as well.

2    Q.   Okay.  Now, let's go to the specifics of this case.

3          Ma'am, were you asked to analyze evidence from this

4    case with the lab number of FS lab number T09-2404?

5    A.   Yes.

6    Q.   And specifically what pieces of evidence did you analyze?

7    A.   I analyzed what was submitted as Lab Item Number 7B, a

8    stain swab from a plastic chair, as well as Item 18, which

9    were left, and right fingernail clippings from Louis Joseph,

10   Jr.

11         Also Item 24, a blood card from Louis Joseph, Jr.

12         Item 100L, a stain swab from the dining room wall.

13   Q.   This evidence that you just told us about, that was

14   submitted by Stacey Rush, now Smithley; is that correct?

15   A.   Yes, that's correct.

16   Q.   Okay.  Let's look at Government's Exhibit A.  You have a

17   screen in front of you?

18   A.   Yes.

19   Q.   Okay.

20         THE COURT:  Government said A.  What number?

21         MS. MCKEEL:  87A, I'm sorry.

22   BY MS. MCKEEL:

23   Q.   Do you see that, ma'am?

24   A.   Yes, I do.

25   Q.   Okay.  And do you recognize that?

Janet Collins, Official Court Reporter

G. HILL - DIRECT                                                    299

1   A.  I recognize it by the unique case laboratory number

2   T09-2404.

3   Q.  If we can go to Page 2 of that for her so she can see it.

4        Ma'am, is that your signature on this page?

5   A.  Yes, that is my signature.

6        MS. MCKEEL:  Your Honor, the United States would

7   introduce Government's Exhibit 87A.

8        THE COURT:  Any objection to this exhibit?

9        (No objection from defense.)

10        THE COURT:  All right, 87A will be admitted.

11        (The document was received in evidence as

12   Government's Exhibit No. 87A.)

13   BY MS. MCKEEL:

14   Q.  If we could go back to the first page, please.

15        So, ma'am, if you will tell us, because the jury has

16   what you have in front of you, what this report contains the

17   parts of the report.

18   A.  Okay.  It says, "Evidence submitted by."

19   Q.  You can start there and tell us what we're looking at?

20   A.  Yes.  This is just a summary of my analysis for this case

21   at that time.  This evidence was submitted by SE Rush, and

22   that's Stacey Rush.  And date received was May the 5th of

23   2009.

24        And then the items listed are the ones that I just

25   mentioned that were submitted at that time.

G. HILL - DIRECT                                                300

Q.  And those item numbers, are those numbers the police

departments assigned to them?

A.  Usually, yes.

Q.  Now, underneath the "Evidence Submitted," "Methods."

Tell us about that section.

A.  Like a scientific report, I'm putting in the methods that

I used to conduct this analysis.

        And, as I mentioned before, I used the method of

deoxyribonucleic acid or DNA analysis used was the polymerase

chain reaction, or PCR.  And that's what I mentioned before

as far as making those millions of copies of certain pages.

        The PCR kit that was just used was a commercially

available kit, was the PowerPlex 16 BIO System.  The

PowerPlex 16 BIO System contains 16 genetic loci.

        And what that means is 16 different areas on the DNA

that I'm able to look and then list them there, from FGA all

the way down to Amelogenin.  And Amelogenin is a

gender-determining locus which is not used for statistical

purposes.  It is what we say if you see a woman and she's an

XX and a man who's an XY, that's what Amelogenin will show

you.

Q.  Ma'am, could you spell that for our court reporter?

A.  Sure.  A-M-E-L-O-G-E-N-I-N.

Q.  Ms. Hill, if we could, let's go to what your results are.

        The first one is Item 24.  Tell us what the item is

G. HILL - DIRECT                                           301

1   and then tell us your result, please.

2   A.  Item 24 is a blood card from Louis Joseph, Jr.  That

3   would be a known standard that was taken from that

4   individual.  And I did develop a DNA profile from that item.

5   Q.  Okay.  Item 18, please.

6   A.  Item 18 are left and right fingernail clippings from

7   Louis Joseph, Jr., and the scissors that were used to create

8   those clippings.

9           Blood was indicated in stains on the fingernail

10  clippings, however, no DNA profile, foreign or different from

11  Louis Joseph, Jr. was developed --

12  Q.  Okay.

13  A.  -- from those clippings, and the scissors were not

14  examined.

15  Q.  Your next item is 100L.  Would you explain that, please?

16  A.  Item 100L was a stain swab from the dining room wall, in

17  that blood was indicated on that stained swab.  A DNA profile

18  was developed from that stained swab, and Louis Joseph, Jr.

19  cannot be eliminated as a contributor of that DNA profile.

20  Q.  So what does that mean, "cannot be eliminated?"

21  A.  That means that the -- when I develop a DNA profile, it

22  comes out as a series of numbers, and that means that the

23  series of numbers that I got from the swab from the wall were

24  the same as the series of numbers I got from the blood sample

25  from Louis Joseph, Jr.

G. HILL - DIRECT                                                          302

1   Q.   Now let's go to your second page, please.

2        It says "Item 7B."  Now, that item is the stained

3   swab from a plastic chair.  Would you tell us about that,

4   please?

5   A.   Yes.  Blood was indicated on the stained swab.  A DNA

6   profile was developed from that stained swab.  Louis Joseph,

7   Jr. is eliminated as a contributor of that DNA profile.

8   Q.   And that would complete your work for this particular

9   Certificate of Analysis dated July 21st, 2009; is that

10  correct?

11  A.   That's correct.

12  Q.   Okay.  Let's go to -- you produced another report, ma'am;

13  is that correct?

14  A.   Yes.

15  Q.   Okay.  Let's go to, if you could please put up

16  Exhibit 87B.

17       Do you see that, ma'am?

18  A.   Yes.

19  Q.   And would you tell us the date of this Certificate of

20  Analysis?

21  A.   This date is November 4th of 2009.

22  Q.   If you would go to the second page, please.  Ma'am, do

23  you see a signature?

24  A.   Yes, I recognize this certificate as one that I prepared

25  by the unique case laboratory number T09-2404, as well as my

G. HILL - DIRECT                                           303

1    signature on the second page.

2           MS. MCKEEL:  Your Honor, the United States would

3    like to introduce Government's Exhibit 87B.

4           THE COURT:  Any objection?

5           (No objection from defense.)

6           THE COURT:  87B will be admitted.

7           (The document was received in evidence as

8    Government's Exhibit No. 87B.)

9    BY MS. MCKEEL:

10   Q.  Ma'am, if you could tell us, then, just like what we did

11   with that first Certificate of Analysis, let's go over this

12   one.

13          Particularly what does this Certificate of Analysis

14   show?

15   A.  In this Certificate of Analysis, there were two things

16   that were happening in it.

17          In the first part, there was -- once that DNA

18   profile from the chair, I eliminated Louis Joseph, Jr. as

19   being a contributor, it was then searched.  And so the first

20   part of this report deals with a hit that was obtained from a

21   databank as a result of that search.

22          The second part of the report is that more evidence

23   was submitted, and that was submitted on September the 1st of

24   2009.  And that item was a strand of suspected hair and

25   suspected blood on the front living room floor.

G. HILL - DIRECT                                                    304

1    Q.   Okay.  With that -- with that Item 101, a strand of

2    suspected hair and suspected blood on the front living room

3    was Joseph Benson -- can he be eliminated as the contributor

4    to that blood?

5    A.   Joseph Benson can be eliminated as a contributor of the

6    blood from the hair.

7    Q.   Can or cannot?  I'm sorry, Louis Joseph, not Joseph

8    Benson.  I jumped ahead.

9    A.   Louis Joseph, Jr., cannot be eliminated as a contributor

10   of the DNA profile that was obtained from the stains of the

11   suspected hair.

12   Q.   Now, with regard to Item 7B, the stained swab from the

13   plastic chair, you said -- this profile was entered into a

14   national database.  And did you receive a hit of the

15   individual that potentially matched that?

16   A.   Yes.

17   Q.   And who was that?

18   A.   That was Joseph Benson.

19   Q.   Ma'am, finally, did you produce another report dated

20   November the 9th of 2010?

21   A.   Yes.

22   Q.   If we could show the witness Government's Exhibit 87C.

23        Do you see the front page of that, ma'am?

24   A.   Yes.

25   Q.   If we could show the witness, please, the second page.

1        Ma'am, is your signature on this document also?

2   A.  Yes.  I do recognize this Certificate of Analysis, again,

3   by the unique case laboratory number T09-2404, and my

4   signature on the second page.

5        MS. MCKEEL:  Your Honor, the government would like

6   to introduce the Exhibit 87C.

7        THE COURT:  Any objection?

8        (No objection from defense.)

9        THE COURT:  87C will be admitted.

10       MS. MCKEEL:  Thank you.  If we could show the first

11  page, please.

12       (The document was received in evidence as

13  Government's Exhibit No. 87C.)

14  BY MS. MCKEEL:

15  Q.  Ma'am, let's go over this report.  Would you tell us the

16  date of this report.

17  A.  It's dated November the 9th of 2010.

18  Q.  And what were you doing in this report?

19  A.  In this report, if you see again, Stacey submitted buccal

20  swabs from Joseph Benson.

21       As I stated previously, buccal swabs are swabs of

22  your inner lining of someone's cheek, and those are used as a

23  known DNA standard to compare against evidence samples in a

24  case.  And that was received on October 5th of 2010.

25       I then did the same thing I did with the other

Janet Collins, Official Court Reporter

G. HILL - DIRECT                                                    306

 1    evidence from the year before, and I was able to obtain a DNA
 2    profile from the buccal swabs.  I then compared it to the
 3    evidence that I had previously examined in this case.
 4    Q.  And what evidence was that?
 5    A.  I was comparing it to the DNA profile that was obtained
 6    from the stained swab from the chair.
 7            Item 7B, as well as the stained swab from the wall
 8    that was Item 100L.
 9    Q.  Would you tell us your results, please?
10    A.  Joseph Benson cannot be eliminated as a contributor of
11    the DNA profile previously developed on the stained swabbed
12    on the chair, 7B.  And that was reported in my previous -- my
13    previous Certificate of Analysis.  And he was eliminated as a
14    contributor of the stained swab, Item 100L, which was from
15    the wall.  That was also reported in that same certificate.
16    Q.  Okay.  So the wall stain, Mr. Benson's eliminated?
17    A.  Yes.
18    Q.  But he cannot be eliminated, then, from the stain from
19    the back of the plastic chair; is that correct?
20    A.  I just know it was from a plastic chair.
21    Q.  Okay.  Plastic chair.
22            So when you say it cannot be eliminated, would you
23    explain that, please?
24    A.  Again, I -- in order for me to obtain a DNA profile, it's
25    a series of numbers, and so the series of numbers that I

1  obtained from the swab that was taken from the plastic chair

2  was the same numbers that I obtained from the buccal swabs

3  from Joseph Benson.

4  Q.  Now, in your report, if we can look at the first page of

5  your report where you report he cannot be eliminated, that

6  next paragraph, the probability of randomly selecting.  Would

7  you read that and then explain it?

8  A.  Sure.

9       The probability of randomly selecting an unrelated

10  individual with the DNA profile matching that developed from

11  the stained swab, Item 7B, at the areas in which I looked at

12  that sample is one in greater than 6.5 billion, which is

13  approximately the world population, and the Caucasian, black,

14  and Hispanic populations.

15       And what that means, if I were able to get everyone

16  in the world in a ginormous stadium, I'm able to test their

17  DNA profiles outside of the case of an identical twin, I

18  would only expect to find that profile once.

19  Q.  Do you use the term that it "matches" Mr. Benson?  Do you

20  use that term?

21  A.  I don't use the term that -- I can say that those DNA

22  profiles match, but I can't say it's him or anything like

23  that.

24  Q.  Okay.  But as you said, it's one out of 1.6 billion

25  persons that it would match; is that correct?

G. HILL - DIRECT                                                        308

1   A.  One is 6.5 billion, yes.

2   Q.  You have a third page where you show the results of your

3   examination; is that correct?

4   A.  Yes, that is -- that would be Appendix 1.

5   Q.  If we could show -- it actually says Page 1 of 2, but

6   it's actually the third page.

7        Okay.  Ma'am, could you tell us -- explain what we

8   are looking at here.

9   A.  Sure.  This is a table of my DNA typing results.  So if

10  you go -- if you see everything has the same laboratory case

11  number, T09-2404.  The number after that would be the item

12  number that I had referenced earlier in the report, and then

13  after that, you see J. Benson.  That stands for Joseph

14  Benson.

15       L. Joseph, Jr. Is Louis Joseph, Jr.  After that is a

16  stained swab.  Then it's left fingernail clippings, right

17  fingernail clippings as well as a stained swab.

18       I said before that I look at 16 different areas of

19  DNA.  And so in the top part of the chart, you can see there

20  are eight areas, in the bottom part there are another eight

21  areas.  With the first areas being D3S1358.  And the last

22  area being FGA.

23  Q.  Explain.  Is that what you are talking about, then, when

24  you say the 16 genetic loci?

25  A.  Yes.  Each one of those boxes represents a different area

G. HILL - DIRECT                                                           309

1    in which I looked.

2    Q.  Okay.  And does Mr. Benson's -- is this a match, then, to

3    the blood swab from the plastic chair?

4    A.  Yes.  If you look through, as I said before, the DNA

5    profile is considered a series of numbers.  So if you look at

6    the D3S1358 area, you will see that Mr. Benson has a 16.  You

7    get half of your DNA from your mom and half from your dad.

8    And so because he just has a single number there, that just

9    means he inherited a 16 from one parent and a 16 from another

10   parent.

11             If you go down and look at Louis Joseph, Jr., he has

12   a 15 and a 16.  That means he inherited a 15 from one parent

13   and a 16 from another.

14             And if you go across all of the different areas, you

15   will see that those two individuals appear to be different.

16   At some places their numbers may be the same, but if we look

17   at all of them you will see that their numbers all across all

18   of them are different.

19             If you look at Item 7B, the stained swab, you will

20   see that at the D3S1358 area, there is also a 16.  And if you

21   look across all of the different areas, you will see that

22   those numbers are consistent with the numbers of Joseph

23   Benson, but are different than the numbers of Louis Joseph,

24   Jr.

25             And if you look beneath that, all of the other

G. HILL - DIRECT                                                310

1    items, all of those items, their numbers are different from

2    Joseph Benson, but the same as Louis Joseph.

3    Q.  So this report was done back in 2010; is that correct?

4    A.  That's correct.

5    Q.  Do you still, today, use the PowerPlex 16 system with 16

6    genetic loci?

7    A.  No.

8    Q.  What do you use now?

9    A.  Currently we use a different kit that is commercially

10   available that is produced by the same company but it looks

11   at additional areas.

12   Q.  Okay.  If you were to test the same blood swab and the

13   buccal swabs from Mr. Benson, would it change today?

14        MR. WOODWARD:  Objection.  Calls for speculation,

15   Your Honor.

16        THE COURT:  Sustained.

17   BY MS. MCKEEL:

18   Q.  Scientifically looking at this, is there a difference to

19   you on using what you used in 2010 and using what you used

20   today?

21        MR. WOODWARD:  Objection.  It's irrelevant.  It's

22   only what she used that matters.

23   BY MS. MCKEEL:

24   Q.  If we could go to Page 2 of Ms. Hill's report, please,

25   87C.

G. HILL - CROSS                                                    311

```
 1           So at the top of this page and then you have a
 2   signature line, over to the left there's typed initials and
 3   then there are, looks like, written initials.  Can you tell
 4   us what that is?
 5   A.  The typed initials are mine, and that just shows that I
 6   was the one that generated this report.  The initials beneath
 7   it show that someone -- another examiner in my laboratory has
 8   to review all of my work before it can be released.
 9   Q.  And so was this reviewed?
10   A.  Yes.
11   Q.  And were your findings verified by your colleague?
12   A.  Yes.
13           MS. MCKEEL:  That's all the questions I have, Your
14   Honor.
15                     CROSS-EXAMINATION
16   BY MR. WOODWARD:
17   Q.  Ms. Hill, good to see you again, how are you?
18   A.  Hi.
19   Q.  I want to first start with -- and I'm going to use the
20   document camera, because it's easier for me to point to this
21   stuff.
22           So this is what's been admitted as Page 1 of 87A,
23   correct?  You saw that?
24   A.  I believe so.  I don't remember exactly all the numbers,
25   but, yes.
```

G. HILL - CROSS                                                            312

1  Q.  It's down at the bottom.  That's your first report?

2  A.  Yes.

3  Q.  And just so it's understandable.  So you received the

4  evidence on 5-5 of 2009?

5  A.  The evidence was received in the laboratory on the 5th of

6  2009.

7  Q.  Okay.  And the date of your report is July 21st of 2009?

8  A.  Yes, that's correct.

9  Q.  Okay.  And when you do this report, you send it out to

10 the authorities, back to the detective or the agency that

11 requested it?

12 A.  Yes.  At the top of the report where it says "To," that's

13 where it gets sent to.

14 Q.  And when did they -- what's the process for doing that;

15 do you mail it to them, email it to them?

16 A.  It's mailed to them.

17 Q.  Okay.  So this would have been mailed out, just for the

18 record, on or about July 21st, within a few days of that, of

19 '09?

20 A.  Sometime around that date, yes.

21 Q.  And this number right here, when you say "your case

22 number," that's the police agency case number, that's not

23 your lab number?

24 A.  That is correct.

25 Q.  Because of the different -- this is a Newport News case.

G. HILL - CROSS                                              313

1    You get cases from Norfolk, Virginia Beach, all over, they

2    have these different police numbers.

3    A.  Yes.

4    Q.  And just so it's clear, so this report comes out on --

5    well, let me back up.

6          Do you know the date of the homicide in this case?

7    Do you know it to be March 13th of '09?  If I told you that,

8    would you dispute it?

9    A.  No, it's on the request for laboratory examination.

10   Q.  So you would agree with me it was March the 13th of

11   2009 --

12   A.  Yes.

13   Q.  -- was the date?

14   A.  Yes.

15   Q.  Okay.

16          So you send out your first report in July of '09.

17   And in terms of Item 7B, to go to that on the back page,

18   which is the swab from the chair.  All you know at this point

19   in time is there's a DNA profile on there that does not match

20   Louis Joseph?

21   A.  That's correct.

22   Q.  And you don't -- at least what the government admitted

23   didn't include the profile like you showed on the 87C, but

24   you ran that profile and determined it didn't match

25   Mr. Joseph; is that correct?

G. HILL - CROSS                                                            314

1   A.  Yes, that's correct.

2   Q.  Now, getting back to the first page of this, Item 100L,

3   right here.

4           Other than the swab from the back of the chair at

5   this time, I guess this came in in May of '09, which was just

6   about two months after the event.  Did you get any other

7   swabs to test?

8   A.  From the scene of the crime?

9   Q.  Yes.

10  A.  No.

11  Q.  And, of course, you're not there, you don't know how

12  many -- how much blood's at the scene or how many swabs are

13  taken, but you got the one that was from the chair and one

14  other swab?

15  A.  Yes.

16  Q.  So you don't know if there were swabs A through triple 0

17  or A through quadruple 0, you just know you only got one

18  other one besides the chair?

19  A.  That's correct.

20  Q.  All right.

21          Other than this swab from the crime scene, 100L, did

22  you ever get any other swabs that were indicated to you to be

23  from the crime scene, like 100A or 100AA, or anything like

24  that in this case?

25  A.  No.

G. HILL - CROSS                                                    315

1    Q.  So certainly if there were three or four areas of blood

2    in the crime scene, or swabs taken from three or four areas

3    in the crime scene, this one says "from the dining room."

4    You didn't get any that came to you that said they were from

5    the living room or the kitchen, or the front room, or

6    anything like that?

7    A.  Outside of the swab from the plastic chair, I don't know

8    where that plastic chair was found.  I didn't obtain any more

9    swabs from this case.

10   Q.  All right.  Now, the other thing I want to ask you about,

11   and I'm not going to get into the technicalities of short

12   tandem repeats and DNA here today.

13        But you consumed 7B when you tested it on this

14   occasion; is that correct?

15   A.  Yes.  The stained portion of that swab was consumed for

16   DNA analysis.

17   Q.  And it came to you and your notes indicated that it was a

18   faintly stained swab, and you consumed all the colored area

19   during the testing?

20   A.  That's correct.

21   Q.  So what that means is, so the ladies and gentlemen of the

22   jury will understand it, is that the unknown, if that's the

23   right -- the swab from the back of the chair or from the

24   chair, once you did your examination and generated the report

25   that's 87A, there was no more of that sample left available

G. HILL - CROSS                                                          316

 1   for retesting?
 2   A.  Well, in the process of my DNA analysis, when I have
 3   swabs that are consumed, those swabs are then saved and
 4   returned with the evidence, as well as any unused part of the
 5   DNA, the liquid DNA sample that I create, I then dry that
 6   down and also return that with the evidence.
 7   Q.  Okay.  But I just want to make sure, you used all the --
 8   well, let me ask it better.
 9        You get swabs, sometimes they have a lot of material
10   on them and sometimes they have a little bit?
11   A.  Yes, that's correct.
12   Q.  And oftentimes when you do a test, you don't consume the
13   entire swab?
14   A.  It depends on the swab and it depends on what I'm looking
15   for in that sample.
16   Q.  But in this case, you did consume the swab?
17   A.  I did, because it was such a light stain, I consumed the
18   swab.
19   Q.  Okay.
20        Now, let's go to what's been admitted as 87B.  Do you
21   recognize that?  This is now your report dated November
22   the 4th.
23   A.  Yes.
24   Q.  Okay.  So, again, November the 4th, 2009, you would agree
25   with me that is approximately 13 months before December of

G. HILL - CROSS                                                    317

1   2010, so about 13 months from November of '09 to

2   December 10th of '10?

3   A.  Yes.

4   Q.  And you did the same, it's the same lab number, same case

5   number from Newport News, correct?

6   A.  Yes.

7   Q.  And there's a database.  And what this report reflects is

8   that when you took the profile that you had done back in

9   May -- or the report, the previous report, it was dated in

10  May, you submitted it to that databank and you got a report

11  coming back saying that it matched Mr. Benson's DNA?

12  A.  My report was dated in July.

13  Q.  I'm sorry, the evidence was received in May.  I stand

14  corrected.

15       Your report of July of '09, when you did that report,

16  you submitted the profile you developed to the databank, and

17  then you got this -- got a notification that there was a

18  match from the databank, and you created the report that's on

19  the screen now?

20  A.  Yes, that's correct.

21  Q.  So during this -- you didn't do any further testing at

22  this point?

23  A.  Oh, I did.  I did not with that specific sample, but for

24  Item 101, which was the strand of suspected hair.

25  Q.  That's right.  Let me be precise.

G. HILL - CROSS                                                    318

 1           With regard to Mr. Benson, you didn't do any further

 2   testing; you got a communication that the sample you

 3   submitted matched the databank and you filed a report saying

 4   it matched the databank?

 5   A.  Yes, that's correct.

 6   Q.  And the databank, you don't -- whatever occurred to get

 7   Mr. Benson's sample into the databank, you didn't do that

 8   testing?

 9   A.  No.

10   Q.  That was done somewhere else?

11   A.  Yes.

12   Q.  And you didn't see the scientific work of that testing?

13   A.  That's correct.

14   Q.  And would it also be true, then, ma'am, that in or about

15   November 4th of 2009, you would have mailed this report back

16   to Detective Riley and Ms. Rush, now Ms. Smithley, just like

17   before?

18   A.  Yes.

19   Q.  Okay.  Let's now go to Page 2 of that exhibit.  And this

20   was a new item that you got, Item 101?

21   A.  Yes.

22   Q.  Which was a hair and some blood that the jury's seen a

23   picture of, and there's a picture of it in evidence.  I don't

24   have the number at my fingertips, but you understood that to

25   be something else from the crime scene?

G. HILL - CROSS                                                              319

1    A.   Yes.

2    Q.   And Mr. Benson was excluded from that?

3    A.   Well, I didn't compare his DNA profile because I didn't

4    have his DNA profile at the time, but I was not able to

5    eliminate Joseph Louis, Jr.

6    Q.   You did in fact have his DNA profile because you had

7    developed his DNA in your first report?

8    A.   I didn't.   I did a DNA report from the swab stain on the

9    chair.

10   Q.   And you had that profile, and had all the loci and all

11   the various properties for the profile?

12   A.   But I wouldn't have known it would have come from

13   Mr. Benson.

14   Q.   But you could have compared that profile to the profile

15   you developed from this, you just didn't?

16   A.   No.   What happens is -- the only times I'm comparing

17   profiles are between known samples and evidence samples.   I

18   don't compare evidence samples to each other --

19   Q.   Okay.

20   A.   -- unless they're the same profile.

21   Q.   And, again, just so it's clear now, out of all of the

22   crime scene, what you've received, the three things, if I

23   understand, you received 7B, which was from the chair, 100L

24   which was from -- make sure I don't say the wrong room -- the

25   living room, I believe.   And 101, which is the hair and the

G. HILL - CROSS                                                    320

1    blood?

2    A.  Yes, it was -- 100L was the dining room.

3    Q.  Dining room.  I misspoke.

4           And, again, you forwarded this report to the

5    authorities, and were you aware that on -- January 12th of

6    2010, Mr. Benson was arrested?

7    A.  No.

8    Q.  You were not aware of that.  Okay.

9           Let's now go to your next report, which has been

10   admitted as 87C.  And this report's dated November 9th.

11   Ms. Smithley, or Ms. Rush, has now joined the ranks of

12   married people.  That's the same person, SE Smithley is SE

13   Rush?

14   A.  Yes.

15   Q.  And you followed your same procedure and did your report

16   and mailed it out to the authorities?

17   A.  Yes.

18   Q.  Okay.  And you would have mailed it on or about

19   November 9th of 2010?

20   A.  That's correct.

21   Q.  Were you aware that approximately a month after you

22   mailed this report, the charges against Mr. Benson in Newport

23   News were nolle prossed or dismissed?

24   A.  No.

25   Q.  Okay.  But you would certainly agree with me that you

G. HILL - CROSS                                                    321

1   would -- that by December the 10th of 2010, about a month

2   after this report, that Detective Espinoza, who is now on no

3   longer, that replaced Detective Riley, the jury's heard

4   evidence about that they had all three of your DNA reports?

5   A.  As far as I know.

6   Q.  Okay.  You certainly don't have any reason to believe

7   that they didn't get this within a month of the time you

8   prepared it and sent it to them?

9   A.  I have no reason to believe that.

10  Q.  And then this is what's called a DNA profile.  You've

11  talked to Ms. McKeel about that.

12  A.  Yes.

13  Q.  And that was under the PowerPlex 16 system?

14  A.  Yes.

15  Q.  And Ms. McKeel asked you some questions.  In order to put

16  something in the database, now you have to test for 23,

17  correct?

18  A.  You have to look at -- at additional areas of DNA than

19  what I was looking at in 2009, and 2010.

20  Q.  And that came into effect on or about January 1st of

21  2017?

22  A.  Yes, that's correct.

23  Q.  So if you -- if you received -- if you tried to submit a

24  profile with only 16 loci at this point, it wouldn't be

25  acceptable by the database?

G. HILL - CROSS                                      322

1   A.  Nationally, it would not be accepted.

2   Q.  Would not be accepted.

3        And they've added -- I'm not going to call off all

4   the numbers, but they basically added six more loci to make

5   it more precise and more definitive beginning in January 1st

6   of 2017?

7   A.  It's not to make it more precise or definitive, but they

8   did add additional areas.

9   Q.  Your testimony is that -- they added additional areas,

10  not to make it more precise and definitive?

11        THE COURT:  Now, Mr. Woodward, I think you are

12  getting close to the area where you objected to Ms. McKeel

13  trying to get into a statement by her about what it would be

14  if she submitted it.

15        MR. WOODWARD:  I understand, I will ask a different

16  question.

17  BY MR. WOODWARD:

18  Q.  What is your understanding why additional loci were added

19  in January of '17?

20  A.  It was added by the FBI.  They control what we put in

21  nationally.  And what they realized were that Europeans have

22  also been doing the same type of testing but they look at

23  different areas than Americans look at.  As well as eating

24  within America, we have certain -- like the west coast may

25  look at slightly different areas than we look at here, and so

G. HILL - CROSS                                                        323

 1    it was decided in order for us to be a little bit on the same
 2    page globally, we needed to look at some of the same areas.
 3           So they just had us add more so that we are more
 4    consistent amongst each other as well as around the globe.
 5    Q.  And "us" means the Virginia Department of Forensic
 6    Sciences?
 7    A.  Yes.
 8    Q.  Obviously that wasn't a decision you made, that was a
 9    decision that was made?
10    A.  It was made nationally by --
11    Q.  Structurally?
12    A.  Yes.  So in order for us to submit things to SCOTUS, we
13    had to have additional areas.
14    Q.  My final question, just so it's clear.  When you prepared
15    your final report of November the 9th, I want to make sure
16    it's clear, at this point you now have received the buccal
17    swabs that you know to be from Mr. Benson and you run a
18    profile and you compare it to what was your unknown profile
19    back in July of '09?
20    A.  Yes, that's correct.
21    Q.  You didn't rerun a test, you just compared the profiles?
22    A.  Yes.  I just compared the data that I obtained from both
23    analyses.
24    Q.  Okay.  And I believe the amount of DNA that was on the
25    swab 7B was approximately .9 nanograms; is that correct?

G. HILL - CROSS                                                    324

1    A.   Yes.

2    Q.   And just for the ladies and gentlemen of the jury, a

3    nanogram is one part per million, or billion.  I can never

4    keep it straight.

5    A.   Well, it's -- say a paperclip weighs about a gram.  It's

6    like taking a paperclip and dividing that paperclip into a

7    million pieces and take a piece -- like a piece of one of

8    those billion pieces, that's the amount of DNA that was

9    there.  So nothing that you could see visually with your eye.

10   Q.   So it's one in a billion.  So the amount of DNA that

11   you -- that was on the swab you tested was less than 1 in 1

12   billion, with a B?

13   A.   That's correct.

14           MR. WOODWARD:  All right.  Thank you, Judge, that's

15   all the questions I have.

16                       CROSS-EXAMINATION

17   BY MR. SACKS:

18   Q.   Good afternoon.  Andrew Sacks for Mark Wallace.

19        First of all, as I listen to your testimony, have you

20   described to the ladies and gentlemen -- or identified,

21   maybe, all of the testing that you've done in connection with

22   this particular matter?

23   A.   Yes.

24   Q.   So we have all -- a copy of all of your reports that

25   you've generated?

G. HILL - CROSS                                                    325

1    A.  Yes.

2    Q.  I take it, then, that you were never provided by the

3    police or any other authorities, at any time between 2009 and

4    today, any kind of material that was identified as coming

5    from Mark Wallace?

6    A.  No.

7    Q.  No buccal swabs from the mouth?

8    A.  No.

9    Q.  Or other such known tissue from him to compare to

10   something?

11   A.  That's correct.

12   Q.  His name doesn't -- doesn't appear in that -- in your

13   documents?

14   A.  No, I don't recognize that name.

15   Q.  All right, ma'am.

16        Now, as has been pointed out on December 10th, 2010,

17   the charge against Mr. Benson in connection with this alleged

18   matter was dismissed without prejudice in the Newport News

19   Circuit Court.

20        Between the time you did your testing in 2009 and

21   that date to December 10, 2010 -- and if you need to refer to

22   your notes to refresh your memory, please do so.

23        Do you recall ever having any conversations with the

24   police or any authorities who were investigating this matter?

25   A.  No.

G. HILL - CROSS                                                    326

1   Q.  So all of your input to the police was in writing,

2   correct?

3   A.  Yes.

4   Q.  And no verbal communication?

5   A.  I mean, there was some verbal communication during the

6   case, but not subsequent.

7   Q.  All right.  But verbal communication about the testing

8   you were doing?

9   A.  Yes.

10  Q.  But as far as the decision to nolle prosse, you were not

11  a part of that?

12  A.  No.

13  Q.  All right.  In fact, you didn't even know about it until

14  today?

15  A.  I did not.

16  Q.  All right.  In fact, you didn't even know that Mr. Benson

17  had been charged initially at that time?

18  A.  No, I'm not aware of those things.

19  Q.  All right, ma'am.  Nothing preventing the police from

20  calling you and talking to you?

21          THE COURT:  Mr. Sacks, I don't understand the

22  relevance of getting into this, so let's move on.

23          MR. SACKS:  All right, sir.

24  BY MR. SACKS:

25  Q.  The -- when -- in 2013 when the new testing protocol came

Janet Collins, Official Court Reporter

G. HILL - CROSS                                              327

```
 1   in, you were not able to retest the sample using that because

 2   the sample has been consumed, it was so tiny?

 3   A.   In 2017 when the new testing came out, we don't routinely

 4   retest samples that are conducted with the same type of

 5   technology.  The only types of samples we would retest would

 6   be something that was submitted in the '80s or '90s, before

 7   we did the type of testing we do now.

 8   Q.   I think I said 2013.

 9   A.   They added how many different loci --

10           THE COURT:  Wait a minute, asked and answered.

11           MR. SACKS:  All right.

12   BY MR. SACKS:

13   Q.   Now, finally with this, with respect to the hair in this

14   case that was submitted to you, is that part of your

15   biological responsibility, to test hair samples?

16   A.   It can be, yes.

17   Q.   Were you given any known hair samples to test against the

18   unknown hair samples?

19   A.   When I'm looking at hair samples, I'm only looking at DNA

20   that would be obtained from the root of that hair because the

21   DNA from the root of your hair would be like a skin sample

22   is, so I'm able to compare that against known DNA samples in

23   a case like any other evidence sample.

24   Q.   And so if taking a known hair from a suspect, for

25   example, to compare it to an unknown hair, that would be done
```

G. HILL -  CROSS/REDIRECT                                          328

1    by some other part of your forensic lab?

2    A.  If someone wanted hair comparisons where they wanted to

3    compare that hair to another hair, they would need to use a

4    trace examiner.  But because I'm looking at the root of the

5    hair for DNA, as well as in this specific case, blood stains

6    that were on the hair, then I'm able to perform that

7    analysis.

8    Q.  All right.  And, again, in conclusion, you didn't have

9    any known hair samples to compare to the unknown?

10   A.  I couldn't use any known hair.  I can use the same DNA

11   samples that I would have used for known standard, such as

12   buccal swabs to swab samples, compared to DNA samples that I

13   have.

14   Q.  And hair -- an unknown hair can be shown to be consistent

15   if one of my hairs is taken and compared to an unknown hair,

16   they could be consistent in characteristic, putting the DNA

17   aside?

18   A.  I can't testify to characteristics of hair because I'm

19   not that type of examiner.  It would have to be done by the

20   trace section.  But I can testify to whether I can obtain DNA

21   from a hair.

22   Q.  That's what I was trying to understand.  Thank you,

23   Ms. Hill.  That's all.

24          MR. KELLETER:  No questions from Mr. Brown.

25          MR. RASBERRY:  I have just one.

G. HILL - REDIRECT                                                    329

                         CROSS-EXAMINATION

2  BY MR. RASBERRY:

3  Q.  Good afternoon.  I'm Jameson Rasberry here for Mr.

4  Kindell.  Just one question for you.

5           At no point in any of your tests lead to any DNA hit

6  on my client?

7  A.  No.

8           MR. RASBERRY:  Okay, thank you very much.

9           Thank you, Your Honor.

10                       REDIRECT EXAMINATION

11 BY MS. MCKEEL:

12 Q.  Are area police or sheriff's departments allowed to

13 submit unlimited samples of DNA for you to examine, or are

14 there rules?

15 A.  There are rules.  We ask for police agencies to only

16 submit things that would be probative or would yield any type

17 of results to the case.

18 Q.  So if there was a bloody scene and 100, 200 samples were

19 taken, you all would not allow all of those samples to be

20 tested; is that correct?

21 A.  No, especially if it makes common sense that most of

22 those blood stains would come from a specific person that we

23 know who they are.  And there's no sense in testing all of

24 that, because it is expensive and we do work with numerous

25 cases across the state.

G. HILL - REDIRECT                                                    330

1   Q.  Now, Mr. Woodward asked you about new types of testing.

2          Do you believe, as you sit here today, that your

3   tests are valid regarding the blood on the back -- the blood

4   on the plastic chair to Mr. Benson's blood is a match,

5   according to your third page of your DNA?

6          MR. WOODWARD:  Your Honor, I'm going to object.  She

7   doesn't have any of Mr. Benson's blood.

8          MS. MCKEEL:  Excuse me, the buccal swabs.  I

9   misspoke.

10          THE COURT:  All right.

11  A.  Yes, I do believe the testing is valid.  And regardless

12  of how many areas we look at, the numbers that I created for

13  this case and the statistics generated will not change.

14          MS. MCKEEL:  I have no further questions, Your

15  Honor.

16          THE COURT:  May the witness be permanently excused,

17  counsel?

18          (All defense respond in the affirmative.)

19          THE COURT:  Step down, ma'am.

20          Next witness.

21          MR. ZLOTNICK:  Next, United States calls Detective

22  Charles Lennon to the stand.

23          CHARLES LENNON, called by the Government, having

24  been first duly sworn, was examined and testified as follows:

25                      DIRECT EXAMINATION

C. LENNON - DIRECT                                                      331

1   BY MR. ZLOTNICK:

2   Q.   Please state your name and spell it for the court

3   reporter.

4   A.   Charles, C-H-A-R-L-E-S, Lennon, L-E-N-N-O-N.

5   Q.   Mr. Lennon, are you currently employed or are you

6   retired?

7   A.   Retired.

8   Q.   Were you, at one time, employed by the New York Police

9   Department?

10  A.   Yes.

11  Q.   For how many years did you work at the New York Police

12  Department?

13  A.   25 years.

14  Q.   Can you tell us when you retired?

15  A.   July of 2017.

16  Q.   I want to bring you back in time to the year of 2009.   In

17  fact, even going back into 2008 and 2009, was there -- what

18  unit of the New York Police Department did you work in?

19  A.   Firearms Investigations Unit.

20         MR. SACKS:   Sorry, I couldn't hear that.

21         THE WITNESS:   Firearms Investigations Unit.

22  BY MR. ZLOTNICK:

23  Q.   What was the time frame that you worked in the Firearms

24  Investigations unit, sir?

25  A.   From 2006 to July of last year, 2017.

C. LENNON - DIRECT                                              332

1    Q.  Can you tell us the types of cases that the Firearms

2    Investigation unit handled while you worked there?

3    A.  We do gun trafficking cases, gun sales, gun possession.

4    Mostly trafficking.

5    Q.  When you talk about having worked on "gun trafficking"

6    cases, can you tell us if those focused upon guns coming

7    between one state and another, or just one state?

8    A.  No, one state to another.

9    Q.  And they were coming from one state into what state?

10   A.  Out of state from Virginia, North Carolina, Georgia, all

11   cases I did, into New York.

12   Q.  Bringing you back to approximately 2008.  Were you

13   involved in a case where guns were being trafficked or

14   brought to New York from another state and sold by a man

15   named Juan Leon?

16   A.  Yes.

17   Q.  Can you spell Juan Leon for the court reporter?

18   A.  Yes.  J-U-A-N, L-E-O-N.

19   Q.  Did he have a nickname?

20   A.  Yes.

21   Q.  What was his nickname?

22   A.  Junior.

23   Q.  And did you become familiar with him from your own

24   personal knowledge?

25   A.  Yes.

C. LENNON - DIRECT                                                    333

1    Q.   And did you know where, from your own personal knowledge,

2    he was from or lived?

3    A.   Yes.

4    Q.   Where was that?

5    A.   Queens, Queens, New York.

6    Q.   Did your investigation also involve an individual named

7    Bryan Brown?

8    A.   Yes.

9    Q.   Do you see him sitting here in court today?

10   A.   Yes.

11   Q.   Can you please point to him and identify him?

12   A.   Bald head, tie, beard.

13           THE COURT:  The record reflect that the witness has

14   identified the Defendant Brown.

15   BY MR. ZLOTNICK:

16   Q.   I'd like to have the witness shown what's been marked as

17   Exhibit 117, if I could.

18           Showing you Exhibit 117.  Do you recognize that

19   individual?

20   A.   Yes.

21   Q.   Can you tell us who that individual is?

22   A.   Bryan Brown.

23   Q.   Does that picture truly and accurately depict what Bryan

24   Brown looked like while you were investigating him?

25   A.   That's what he looked like back in 2009.

C. LENNON - DIRECT                                                   334

1              MR. ZLOTNICK:  I would offer Exhibit 117 into

2      evidence.

3              THE COURT:  It will be admitted.

4              (The document was received in evidence as

5      Government's Exhibit No. 117.)

6              MR. ZLOTNICK:  I'd like to publish Exhibit 117.

7      BY MR. ZLOTNICK:

8      Q.  As you sit here now, is the -- is the defendant's

9      appearance the same or different?

10     A.  Different.

11     Q.  During the investigation of Bryan Brown that you were

12     involved in in 2008 and into -- what year did it go into?

13     A.  2009.

14     Q.  During that time frame, did you have occasion to actually

15     see him physically in New York?

16     A.  No.

17     Q.  Did you have occasion to see him later when he appeared

18     in New York?

19     A.  No.

20     Q.  How about after the investigation?

21     A.  No -- oh, after, yes.

22     Q.  You saw him in New York?

23     A.  Yes.

24     Q.  When you saw him in New York, did you know what type of

25     vehicle, if any, he drove?

C. LENNON - DIRECT                                          335

```
 1    A.  No.  Bryan Brown, no, I'm sorry.  That was the other guy.

 2    Q.  All right.

 3            MR. WOODWARD:  Your Honor, can I just be clear?  Did

 4    he not see him or not notice what kind of vehicle he was

 5    driving, because it wasn't clear when he retracted.

 6            THE COURT:  All right, you can --

 7            THE WITNESS:  I didn't see him --

 8            THE COURT:  Wait a minute.

 9            THE WITNESS:  I'm sorry.

10            MR. ZLOTNICK:  Let me ask it again.

11            THE COURT:  He is going to ask the question again.

12    BY MR. ZLOTNICK:

13    Q.  You saw him in New York after your investigation?

14    A.  No.

15    Q.  You did not?

16    A.  No.  No.

17            THE COURT:  Did you ever see him in New York?

18            THE WITNESS:  No.

19            THE COURT:  Okay.

20    BY MR. ZLOTNICK:

21    Q.  Did your investigation also involve another person from

22    the City of Newport News?

23    A.  Yes.

24    Q.  What was his name?

25    A.  Cory Odle.
```

C. LENNON - DIRECT                                                    336

1    Q.   I would like to have the witness shown --

2            MR. KELLETER:   I just couldn't hear?

3            THE WITNESS:   Cory Odle.

4            MR. ZLOTNICK:   Spell his last name for us.

5            THE WITNESS:   O-D-L-E.

6    BY MR. ZLOTNICK:

7    Q.   I would like to have the witness shown Exhibit 115.

8            Do you recognize the person in Exhibit 115?

9    A.   Yes.

10   Q.   Who is that?

11   A.   Cory Odle.

12   Q.   Does that picture truly and accurately depict what he

13   looked like?

14   A.   Yes.

15   Q.   And you saw him?

16   A.   Yes.

17   Q.   Where did you see him?

18   A.   I saw him in Brooklyn.

19           MR. ZLOTNICK:   I would offer Exhibit 115 into

20   evidence.

21           THE COURT:   Any objection?

22           (No objection from defense.)

23           It will be admitted and published.

24           (The document was received in evidence as

25   Government's Exhibit No. 117.)

C. LENNON - DIRECT                                                337

1    BY MR. ZLOTNICK:

2    Q.  Now, your investigation of Brown, Odle, and Junior,

3    involved firearms coming from where to where?

4    A.  From Virginia to New York.

5            MR. ZLOTNICK:  And I'd like to now read into the

6    record Stipulation Number 9, if I could.

7            THE COURT:  You may.

8            MR. ZLOTNICK:  On March 4th, 2009, the Honorable

9    Roger N. Rosengarten, Supreme Court Justice, Queens County

10   New York, approved an application for an Order Authorizing an

11   Eavesdropping Warrant upon the application of the District

12   Attorney of Queens County New York to intercept and record

13   telephone and electronic communications over T-Mobile

14   cellular telephone bearing the number (757) 358-5838 between

15   the dates March 4th and March 21st of 2009.

16           During the Court authorized interception, calls were

17   properly monitored and minimized according to New York State

18   law.  The parties agree the interceptions of wire and

19   electronic communications were properly conducted by

20   authorized law enforcement personnel and duplicates of the

21   original recordings of incoming calls to (757) 358-5838 were

22   initiated by Bryan Lamar Brown on United States Exhibits 96

23   through 98 and the transcripts of the intercepted telephone

24   conversations are authentic and accurate duplicates of the

25   full length telephone conversations that have been agreed

C. LENNON - DIRECT                                                    338

1    upon by the parties to be played during the trial.

2    BY MR. ZLOTNICK:

3    Q.  Now, did you become familiar with -- were you involved in

4    that wiretap?

5    A.  Yes, I was.

6    Q.  And what was your role in that wiretap?

7    A.  I was the lead investigator.

8    Q.  And you heard these calls?

9    A.  Yes, I did.

10           MR. ZLOTNICK:  I'd like permission -- I would like

11   to offer into evidence Exhibits 96, 97 -- 96A, which is a

12   transcript, 97, 97A, 98, and 98A.

13           THE COURT:  In view of the stipulation, is there any

14   objection to these exhibits?

15           (No objection from defense.)

16           THE COURT:  They will be admitted.

17           (The documents and audios were received in evidence

18   as Government's Exhibit Nos. 96, 96A, 97, 97A, 98, 98A.)

19           MR. ZLOTNICK:  I will request permission to play

20   each one.  Let's start off with Exhibit 96.

21           THE COURT:  Now, did you indicate you have a

22   transcript consistent with that?

23           MR. ZLOTNICK:  I'm sorry, Your Honor?

24           THE COURT:  Do you have a transcript consistent with

25   that?

C. LENNON - DIRECT                                                    339

```
 1              MR. ZLOTNICK:  We do, we do.  It's in there.

 2         We have the Court's permission to play it?

 3         THE COURT:  Yes.

 4         (Audios played.)

 5  BY MR. ZLOTNICK:

 6  Q.  Next, let's play Exhibits 97 and transcript 97A.

 7         (Audio played.)

 8         I'd next want to play Exhibit 98 and 98A.

 9         (Audio played.)

10  BY MR. ZLOTNICK:

11  Q.  You were the individual monitoring those calls?

12  A.  Yes.

13  Q.  And that was done under the court order?

14  A.  Yes.

15  Q.  And you became familiar with both, the voice of Cory Odle

16  and the voice of Bryan Lamar Brown?

17  A.  Yes.

18  Q.  And those calls that you just heard, did they accurately

19  reflect the conversations you overheard?

20  A.  Yes.

21  Q.  Now, moving you forward in time to April 19th of 2009.

22  Do you remember being on surveillance?

23  A.  Yes.

24  Q.  Now, I'd like to read into the record -- I will come back

25  to that.
```

C. LENNON - DIRECT                                                    340

```
 1            So when you were on surveillance, was it in
 2    connection with this case?
 3    A.  Yes.
 4    Q.  Where were you on surveillance?
 5    A.  Which time?
 6    Q.  I'm sorry, were you on physical surveillance at a time on
 7    April 19th?
 8    A.  Yes.
 9    Q.  Do you remember where you were on physical surveillance?
10    A.  In Brooklyn.
11            MR. RASBERRY:  What year was that?
12            MR. ZLOTNICK:  We're talking April 19, 2009.
13    BY MR. ZLOTNICK:
14    Q.  Were you in the -- are you aware of a police precinct
15    called the 81st?
16    A.  That's where I was doing surveillance, yes.
17    Q.  And you remember street that is?
18    A.  Fulton and Ralph.
19    Q.  And was there a purpose for you being at that location?
20    A.  There was a gun buy we set up there -- it was a gun
21    purchase set up that day.
22    Q.  Were you -- what kind of an officer was going to purchase
23    the gun?
24    A.  Undercover.
25    Q.  And did there come a time that you saw an individual you
```

C. LENNON - DIRECT                                                    341

1   knew as Junior, also known as Juan Leon?

2   A.   Yes.

3   Q.   What did you see Juan Leon -- where did you see him go?

4   A.   He was in the Rite Aid parking lot on Ralph and Fulton

5   Street.

6   Q.   Did there come a time he went somewhere into a car?

7   A.   Yes, into the undercover's vehicle.

8   Q.   And what did you see?

9   A.   I seen him enter the vehicle, and they had a conversation

10  inside the vehicle.

11  Q.   Did you see someone hand something to somebody else?

12  A.   Yes.

13  Q.   Who did you see hand to who?

14  A.   Junior, Juan Leon, handed the undercover what appeared to

15  be a rag or a T-shirt.

16  Q.   Did you see the undercover do anything when he took the

17  red colored T-shirt?

18  A.   He gave him money.

19  Q.   Did there come a time that the undercover then gave you

20  some items?

21  A.   Yes.

22          MR. ZLOTNICK:  I'd like to have the witness shown

23  Exhibits 94 and 95, if I could.

24  BY MR. ZLOTNICK:

25  Q.   Before we do that, the last call we played, is that on

C. LENNON - DIRECT                                                    342

1    March 13th, 2009?

2    A.   Yes.

3    Q.   All right.

4            THE COURT:  All of those exhibits have been rendered

5    safe; is that correct?

6            MR. ZLOTNICK:  They have, Your Honor.

7            THE COURT:  Thank you.

8    BY MR. ZLOTNICK:

9    Q.   Can you take a look at Exhibits 94 and 95?

10   A.   Okay.

11   Q.   Can you tell us what Exhibit 94 is?

12   A.   94 is a black CZ .40 firearm.

13           THE COURT:  Could you hold it up on the other side

14   of the Court so we can see what you are looking at?

15           Okay, thank you.

16   BY MR. ZLOTNICK:

17   Q.   What kind of firearm is that?

18   A.   A CZ 40 caliber.

19   Q.   And can you tell us what Exhibit 95 is?  What is

20   Exhibit 95?

21   A.   And this is a Ruger P94 firearm.

22   Q.   Now, can you tell us how you know -- do you know whether

23   or not 94 or 95 were the firearms that were -- that you

24   saw -- were given to you by the undercover agent who you

25   testified you watched hand a red towel to?

C. LENNON - DIRECT                                              343

1    A.   Yes.   These are it.

2    Q.   How do you know those are it?

3    A.   My initials are on each firearm.

4    Q.   How were your initials put on there?

5    A.   A scribe -- with a scriber.

6    Q.   I inscribed it, you mean what?

7    A.   A piece of metal, they could scribe the gun.

8    Q.   And what are your initials?

9    A.   CL.

10   Q.   Now, after you took those in -- were they -- when they

11   were given to you, were they contained in the red shirt?

12   A.   Yes.

13   Q.   When you took them in, what did you do with them?

14   A.   I vouchered them.

15   Q.   And then where did you voucher them?

16   A.   In the 77 Precinct.

17   Q.   Did there come a time on 4-19 of 2009 that you took them

18   to a police crime lab?

19   A.   They were brought down to the lab, not by me, though.

20   Q.   And what's the police crime lab do?

21   A.   They test them for operability.

22            MR. ZLOTNICK:  And I'd like to read Stipulation

23   Number 8, Your Honor.

24            THE COURT:  You may.

25            MR. ZLOTNICK:  United States Exhibit Number 94 is a

C. LENNON - DIRECT                                                    344

1    CZ 40 caliber firearm, model CZ .40 serial number PN7124.

2          United States Exhibit 95 is a Ruger firearm, model

3    P94, serial number 341-21524.  Both firearms were purchased

4    on April 19th, 2009 by a New York Police Department

5    undercover officer during an operation conducted in the

6    vicinity of Ralph Avenue and Fulton Street, New York, New

7    York.  The undercover officer gave the firearms to NYPD

8    Detective Charles Lennon who properly stored and maintained

9    the firearms as evidence in the Brooklyn Firearms

10   Investigation Unit of the NYPD.  Detective and Firearms

11   Examiner Stella Ardizzone of the New York Police Department,

12   took possession of the firearms.  Detective Ardizzone tested

13   the firearms for operability.

14         She produced a report dated April 27th, 2009,

15   wherein she memorialized that both firearms were operable.

16         On November 11th, 2013, Detective Lennon transported

17   the firearms from the New York Police Department and provided

18   them to Agent Ludovico in Newport News, Virginia.  On

19   November 13th, 2013, Agent Ludovico transported the firearms

20   to the Norfolk FBI.  United States Exhibits Number 94, and

21   95, have been properly stored and maintained in the custody

22   of the New York -- I'm sorry, New York Police Department and

23   the Norfolk FBI.

24         If I could have one second here, Your Honor.

25         (Pause.)

C. LENNON - CROSS                                                  345

1          MR. ZLOTNICK:  I'd offer Exhibits 94 and 95 in

2    evidence.

3          MR. WOODWARD:  Your Honor, at this point I don't

4    think there's been any tie-ups and anything to do with the

5    crime in this case, and I would object to them coming in if

6    they haven't been linked to Mr. Benson.

7          THE COURT:  I think what we're going to have to do

8    is -- I think the objection is well taken.  The Court will

9    defer admission.

10         MR. ZLOTNICK:  Subject to connection.

11         THE COURT:  Yeah, but the Court is going to defer

12   Admission of them subject to connection at a later point.

13         MR. SACKS:  I was going to join in that objection.

14         MR. RASBERRY:  Join as well.

15         THE COURT:  Mr. Kelleter?

16         MR. SACKS:  Yes, we join as well.

17         THE COURT:  The objection is noted, it will be

18   deferred subject to being connected.

19         Any cross?

20         MR. WOODWARD:  Real briefly, on my behalf.

21                        CROSS-EXAMINATION

22   BY MR. WOODWARD:

23   Q.  How are you doing, Detective?

24   A.  Okay, how you doing?

25   Q.  Good.

C. LENNON - CROSS                                              346

1           Are either one of the weapons that are 94 or 95 a

2    Smith & Wesson?

3    A.  No.

4           MR. WOODWARD:  Okay, thank you, sir.

5                     CROSS-EXAMINATION

6    BY MR. SACKS:

7    Q.  Good afternoon, Detective, welcome to Tidewater.  Andrew

8    Sacks here for Mr. Wallace.

9           The investigation you focused on today that you

10   talked about specifically regarding these two items that

11   haven't been admitted, but the CZ .40 and the Ruger.  You

12   told us about some names of people that were suspected of

13   maybe being involved in the transaction or in somehow

14   related.  Juan Leon, Mr. Brown, Cory Odle, correct?

15   A.  Yes.

16   Q.  Those are all the names that you recall today on this

17   particular transaction that you had some contact with in

18   terms of names, correct?

19   A.  Yes.

20   Q.  You did not have the name Mark Wallace, did you?

21   A.  No.

22   Q.  All right, sir.

23          And he -- to your -- at that time, based on your

24   investigation, he was not a subject, a target, or involved in

25   any way?

1    A.   No, he wasn't.

2            MR. SACKS:   Thank you, sir, that's all I have.

3                         CROSS-EXAMINATION

4    BY MR. KELLETER:

5    Q.   Detective Lennon, this operation that y'all did that you

6    targeted people selling guns from southern states.  A lot of

7    southern states?

8    A.   Over the years or this particular case?

9    Q.   This particular operation.

10   A.   Two individuals from Virginia, yes.

11   Q.   Virginia.  And you ultimately, I think, recovered, like,

12   about 30 guns; is that about right?

13   A.   I believe so.

14   Q.   Okay.  And of those guns that you recovered, there were a

15   number of Smith & Wessons, right?

16   A.   I believe so.

17   Q.   All right.  And there were a number of Rugers, right?

18   A.   I believe so.

19   Q.   Okay.  And you monitored hundreds of phone calls --

20   A.   Yes.

21   Q.   -- right?

22           And working backwards, there was a purchase --

23   undercover purchase on April 19th of '09, right?

24   A.   Yes.

25   Q.   So that was a good month after the incident in this

C. LENNON - CROSS                                                    348

1   matter, right, March 13th, correct?

2   A.  Yes.

3   Q.  Okay.  And you listened to this phone call that they

4   indicate is between Mr. Brown and Mr. Odle.

5   A.  Yes.

6   Q.  And you recall that he said, I have a Smith and a

7   Roog[ph], right?

8   A.  Yes.

9   Q.  And a Smith, in all likelihood, would be a Smith &

10  Wesson?

11  A.  Of course.

12  Q.  And a Roog, I suppose, could be a Ruger?

13  A.  A Ruger, yes.

14  Q.  And they don't mention -- he does mention the caliber?

15  A.  No.

16  Q.  Okay.  And the make certainly isn't --

17  A.  On the phone call he says 4-5th.

18  Q.  Excuse me?

19  A.  In this phone call he says 4-5th.

20  Q.  His phone call?

21          Well it's in evidence, we will see one way or the

22  other.

23          But it's a -- a Smith is not a CZ, correct?

24  A.  No.

25  Q.  It's a CZ, is like some Czech --

C. LENNON - CROSS                                                    349

1   A.   Its own company.

2   Q.   From the Czech Republic, right?

3   A.   Right.

4   Q.   It's not some -- okay.

5           And I think it was established that Mr. Brown

6   certainly was not involved in this undercover purchase

7   because you've never even seen him up in New York, right?

8   A.   No.

9           MR. KELLETER:  I have no more questions.

10          MR. RASBERRY:  Briefly, Your Honor.

11                          CROSS-EXAMINATION

12  BY MR. RASBERRY:

13  Q.   Good afternoon, Jameson Rasberry here for Mr. Kindell.

14          I just want to make it clear, Mr. Rosuan Kindell,

15  seated next to my vacant chair, was not a subject of this

16  investigation, correct?

17  A.   No, he wasn't.

18          MR. RASBERRY:  Thank you.

19          THE COURT:  Any redirect?

20          MR. ZLOTNICK:  No, Your Honor.

21          THE COURT:  May the witness be permanently excused,

22  counsel?

23          (All counsel respond in the affirmative.)

24          THE COURT:  All right.  You may step down, you are

25  permanently excused.

Janet Collins, Official Court Reporter

J. VALENTI - DIRECT                                              350

```
 1              THE WITNESS:  Thank you.
 2              MR. ZLOTNICK:  Next witness is Detective James
 3  Valenti.
 4              JAMES VALENTI, called by the Government, having been
 5  first duly sworn, was examined and testified as follows:
 6                      DIRECT EXAMINATION
 7  BY MR. ZLOTNICK:
 8  Q.  Sir, please state your name and spell it for the court
 9  reporter.
10  A.  James, J-A-M-E-S, Valenti, V-A-L-E-N-T-I.
11  Q.  Mr. Valenti, can you tell us what your profession is?
12  A.  I am a New York Police Detective.  I work for the New
13  York City Police Department.
14  Q.  Can you tell us how long you've worked for the New York
15  City Police Department?
16  A.  Since June of 1992.
17  Q.  Can you tell us, what part of the police department do
18  you work in?
19  A.  I work at the Forensic Investigations Division, also
20  known as the police laboratory.  But specifically I work for
21  the Firearms Analysis Section.
22  Q.  And what's your title?
23  A.  Firearms Examiner.
24  Q.  Can you tell us, how long have you worked in the Firearms
25  Analysis Section of the New York Police Department?
```

J. VALENTI - DIRECT                                                351

1   A.   Since June of 2001.

2   Q.   I want to ask you, what the Firearms Analysis Section of

3   the police department does?

4   A.   The Firearms Analysis Section is responsible for all

5   firearms and firearm-related evidence that comes into the

6   possession of the New York City Police Department.  So it's

7   basically evidence from crime scenes, hospitals, or morgues,

8   or Medical Examiners offices.

9   Q.   Would this include firearms, cartridge cases, bullets or

10  other fired evidence recovered?

11  A.   Yes.

12  Q.   Now, if a firearm is submitted to the Firearm Analysis

13  Section, can you determine if a firearm is operable?

14  A.   Yes, once you test the firearm for operability.

15  Q.   When a firearm is tested for operability, what if

16  anything is produced?

17  A.   Test-fires, both bullet and cartridge casing.

18  Q.   Now, if cartridge casings and/or bullets are submitted,

19  can you determine if a submitted firearm fired that evidence?

20  A.   Yes.

21  Q.   And can you tell us where -- how are the comparisons

22  made, from what to what?

23  A.   Well, if evidence is being compared against test-fires

24  from a specific weapon, the evidence is compared to those

25  test fired, microscopically.

J. VALENTI - DIRECT                                              352

1   Q.   So you would compare the unknown samples to the
2   test-fires?
3   A.   Yes.   Test-fires being the known samples.
4   Q.   Once an operability test is done and test-fire are
5   produced, what is done with the test-fires?
6   A.   Test-fires are sealed in a test-fire envelope and they
7   are retained for future comparisons.
8   Q.   Now, have you come to court today prepared to give an
9   opinion as to whether cartridge casings and bullets were
10  fired from particular firearms and compare fired components
11  to each other?
12  A.   Yes.
13  Q.   Before we get to that opinion, I want to ask you some
14  questions about your qualifications to give such an opinion.
15       First, can you tell us how long have you been
16  involved in firearm identification?
17  A.   Since June of 2001.
18  Q.   Now that would be almost 17 years?
19  A.   Yes.
20  Q.   Can you start -- can you tell us, when you started, were
21  you under the guidance of senior firearms examiners getting
22  on-the-job training?
23  A.   Yes.
24  Q.   Have you attended schools in the field of firearm and
25  toolmark identification?

J. VALENTI - DIRECT                                                    353

1    A.   Yes.  We have in-house training.

2    Q.   Can you tell us, are you a member -- are you a member of

3    any professional organizations in this field?

4    A.   Yes.

5    Q.   And do you continue doing continuing education in this

6    field?

7    A.   Yes.

8    Q.   Approximately how many times have you examined firearms,

9    ammunition, and components of ammunition and toolmarks to

10   determine if ammunition components recovered from crime

11   scenes were fired by the same firearms, and then compared the

12   fired components to each other?

13   A.   Many thousands.

14   Q.   Have you been qualified as an expert in this field in

15   court?

16   A.   Yes.

17   Q.   Can you tell us what state courts?

18   A.   In New York State, all five boroughs; that's Brooklyn

19   which is known as Kings, Queens, Manhattan, Bronx and Staten

20   Island, both criminal and supreme court.  Also Nassau County

21   Criminal Court, and then the U.S. Federal Courts, Eastern and

22   Southern Districts.

23         MR. ZLOTNICK:  I proffer Mr. Valenti as an expert in

24   the field of firearms identification, Your Honor.

25         THE COURT:  Do you desire to voir dire?

J. VALENTI - DIRECT                                              354

```
 1              (Defense responds in the negative.)
 2              THE COURT:  Okay, ladies and gentlemen, you may
 3     accept Detective Valenti as an expert in firearms
 4     identification.
 5     BY MR. ZLOTNICK:
 6     Q.  Mr. Valenti, first, what is the difference between a
 7     semi-automatic and a revolver?
 8     A.  The main difference is with a semi-automatic pistol, it
 9     extracts and ejects expended cartridge cases from the
10     firearm.
11              With a revolver, those expended cartridge casings
12     remain in the cylinder of that weapon.  And the only way they
13     can come out of that weapon is if the cylinder is opened up
14     manually and manually ejected.  They don't automatically come
15     out like they do in a semi-automatic pistol.
16     Q.  With a semi-automatic pistol, what is loaded into the
17     firearm?
18     A.  A magazine.
19     Q.  And when you fire a semi-automatic pistol, what happens
20     to the cartridge case?
21     A.  The cartridge case is extracted and ejected from the
22     firearm, so it comes out of the firearm.
23              There's an opening on the side of the slide, which
24     is the top portion of the weapon, known as the ejection port.
25     So it comes out of that ejection port and then usually falls
```

J. VALENTI - DIRECT                                                    355

1    to the ground.

2    Q.  And you mentioned revolvers.  For those that watched old

3    westerns, what were those?

4    A.  Those were revolvers, yes.

5    Q.  Because he had a cylinder?

6    A.  Yes, rotates on an axis, contains a number of chambers

7    where live cartridges are placed in order to load the

8    firearm.

9    Q.  And would the firearm be ejected from a revolver?

10   A.  I'm sorry?

11   Q.  The revolvers eject or do they stay in the cylinder?

12   A.  Oh, the cartridge casings?  They remain inside the

13   cylinder of the weapon.

14   Q.  Mr. Valenti, I next want to ask you the types of

15   materials that are submitted for you to examine from crime

16   scenes, hospitals and autopsies.

17         What is a single component of ammunition called?

18   A.  A cartridge.

19   Q.  And can you describe for us what a cartridge consists of?

20   A.  A cartridge is a round of ammunition comprised of four

21   basic components.

22   Q.  What are the four basic components?

23   A.  You have the cartridge case, which has all the

24   components.

25         At the rear you have the primer, that is the

J. VALENTI - DIRECT                                              356

1    ignition source.

2              Inside is the gunpowder, known as the propellant.

3              And sitting on the top is the bullet, which is the

4    projectile.

5    Q.  During the firing process, can you describe what happens?

6    A.  What happens is either the striker or the firing pin

7    strikes the primer.  That creates a spark that ignites the

8    gunpowder.  Once the gunpowder is ignited, it produces

9    expanding gases which push and propel the bullet forward.  So

10   what will happen is the bullet will travel down the barrel of

11   the firearm until it exits the firearm.

12             And in a semi-automatic pistol, the expended

13   cartridge would be extracted and ejected from the firearm.

14   Q.  After the bullet separates from the cartridge case,

15   what's left?

16   A.  The expended cartridge case.  The gunpowder is burnt

17   away, the primer has a firing pin impression indented into

18   it, and if the casing remains expended or the bullets, you

19   know, shot away, fired away.

20   Q.  What kinds of markings do you find on cartridge cases

21   after a firearm is discharged?

22   A.  Okay, markings that are found are known as firing pin

23   impression and breech face impression.

24   Q.  And what are those?

25   A.  Okay, when the firing pin strikes the primer in order to

J. VALENTI - DIRECT                                              357

1    ignite the cartridge, it leaves behind a firing pin

2    impression.  This is one of the areas that I look at for

3    identification to determine whether or not one casing was

4    fired from another -- you know, the same gun as another

5    casing.

6             During the manufacturing process of firearms,

7    different tools are used to cut, grind, file, and polish

8    different surfaces of the firearm, the firing pin being one

9    of them.  Okay, tools finished off that firing pin, so when

10   that firing pin strikes that primer, it leaves a unique

11   marking, a unique firing pin impression.

12            Now, the breech face, inside the firearm, is an area

13   located around the firing pin aperture.  This is where the

14   firing pin basically protrudes in order to ignite the

15   cartridge.  That surface there is also finished off with

16   different tools that cut it, grind it, file it, polish it.

17   Those tools leave behind characteristics.

18            When a cartridge is fired, the bullet travels

19   forward.  Inside the chamber, the casing comes rearward.

20   Every action must have an equal and opposite reaction.

21            So you have the bullet going forward, casing coming

22   rearward, it does this with great force.  So what happens is

23   the head of the cartridge, which is the rear of the

24   cartridge, hits up against that breech face.  And what you

25   get then is a transfer of characteristics from that breech

J. VALENTI - DIRECT                                              358

```
 1    face to the head of the cartridge, the primer, and the head
 2    stand.  So you have a transfer of characteristics known as a
 3    breech face impression.
 4            So you have a hard metal, a hard surface impacting a
 5    soft metal, softer surface.  So it's like a negative image of
 6    the breech face.
 7            Also, we utilize this as well for cartridge case
 8    identification.  Comparing cartridge casings to one another.
 9    Q.  So you can use that to identify one to another?
10    A.  Yes.
11    Q.  You used a term head stamp.  What is that?
12    A.  Head stamp is where it says the caliber.  Like in this
13    case, that .40 S&W and a brand.  It could be any -- any of
14    the brands, it's impressed on there.
15    Q.  Can you tell us what are bullets and bullet fragments?
16    A.  Okay, the bullet is the projectile.  So when a cartridge
17    is fired, the bullet travels down the barrel and it can be
18    made up of copper, lead, brass, depending on what kind of
19    bullet it is.
20    Q.  What happens if a bullet hits something, what can happen?
21    A.  If a bullet hits a hard object, it very well can turn
22    into a bullet fragment or get fragmented into different
23    pieces, more than one piece.
24    Q.  Now, what kind of markings do you find on bullets after a
25    bullet is discharged from a firearm?
```

J. VALENTI - DIRECT                                                 359

1    A.   They are known as rifling impressions.

2    Q.   Can you describe what rifling impressions look like?

3    A.   Okay.  It's basically -- we call them lands and grooves.

4    Lands and grooves are high portions and low portions that

5    make up the rifling.

6            Now, during the manufacturing of firearms, they cut

7    rifling into a barrel, the manufacturers do, in order to give

8    the bullets stability, they want to put a spin on the bullet.

9            Think of a quarterback throwing a football that

10   wants to put a nice spiral on that football by throwing it

11   and it makes the bullet -- I'm sorry, the football fly

12   straight, be more accurate and have stability.  That's the

13   purpose of rifling, to put stability on the bullet.

14           So depending on the manufacturer, some rifling can

15   be to the right, some to the left, depending on, obviously,

16   the manufacturer.  And the number of lands and grooves vary

17   by manufacturer as well.

18           So the tools that cut that, the rifling into the

19   barrel, they start with a solid bar stock.  So they drill a

20   hole, so they burrow out the barrel.  They use a wiemer,

21   which is the second tool.  And then, depending on the rifling

22   method that they cut into, the barrel, could be a broach or a

23   button, or some other method.

24           So now you have a series of tools that leave behind

25   characteristics or imperfections inside that barrel.  That

J. VALENTI - DIRECT                                          360

 1  barrel being steel or hard metal, bullet traveling down the
 2  barrel being a softer metal; copper, brass, lead, you get a
 3  negative image of those rifling characteristics.
 4          So when I do my comparison, I'm looking for those
 5  rifling characteristics.
 6          And, for instance, let's say a barrel has six lands
 7  and six grooves.  That's the twist for that particular
 8  firearm.
 9          The bullet's going to have six high portions and low
10  portions.  That's a class characteristic.  Also the size of
11  those lands and grooves is also a class characteristic that's
12  intended by the manufacturer.
13          Those microscopic striations that are imparted on
14  the bullet from the bullet passing down the barrel, those are
15  individual characteristics.  Those are non-intended, or they
16  are not-intended characteristics.
17          That's why each and every firearm has different
18  ones, because the tools that make those -- the rifling in
19  those barrels, the tools change shape and wear, so no firearm
20  has two of the same markings.
21  Q.  So when a bullet travels down the barrel, the markings
22  are imparted on the bullet?
23  A.  Yes.
24  Q.  And are these markings unique markings or not unique?
25  A.  They are unique to a particular firearm.

J. VALENTI - DIRECT                                              361

1   Q.   Now, you mentioned an S&W.  What does S&W stand for?

2   A.   Smith & Wesson is a company that manufactures firearms.

3   Q.   How about ammunition, at one time?

4   A.   I believe at one time they did manufacture ammunition.

5           THE COURT:  Mr. Zlotnick, the Court doesn't have any

6   idea where you might be going at this time, but we are just

7   going to take a break.

8           MR. ZLOTNICK:  Very good, Your Honor.  And we will

9   continue with the detective after lunch.

10          Detective, remember you are still under oath and in

11  the middle of your examination.

12          THE WITNESS:  Yes, Your Honor.

13          THE COURT:  Court will be in recess until 2:30.

14          MR. WOODWARD:  2:30, Your Honor?

15          THE COURT:  Yes, 2:30 p.m.

16          MR. SACKS:  I'm sorry, you said 2:30 to 2 -- 2:30.

17  Thank you.

18          (Off the record, 12:59 a.m., jury out.)

19          (On the record, 2:29 p.m., jury in.)

20          THE COURT:  You may be seated.

21          Record reflect that all jurors have returned from

22  lunch break.  Counsel agree?

23          (All counsel respond in the affirmative.)

24          THE COURT:  All right, you may resume.

25          MR. ZLOTNICK:  Thank you, Your Honor.

J. VALENTI - DIRECT                                          362

BY MR. ZLOTNICK:

Q.   Detective Valenti, I'm going to now ask you, how do you
examine fired components to a specific firearm?

A.   What I use is called a comparison microscope.  And what
that is, basically, is a compound microscope, optically
bridged on one frame.

        And by looking through one set of oculars, which are
the eyepieces, it enables me to view two pieces of evidence
at the same time, side-by-side under the same magnification.

        So when I look into those oculars, I have a split
image of the right and left stage.  Each of those stages has
a piece of evidence affixed to it.  So when I do a
comparison, it's either bullet to bullet or cartridge case to
cartridge case.

Q.   Now, can you compare the known test-fires or known
standards from a firearm to unknown cartridge casings
collected at a crime scene?

A.   Yes.

Q.   And you use this comparison microscope to do that?

A.   Yes.

Q.   When you compare these two pieces of evidence
side-by-side, what's the way you do it?  Do you do it
cartridge case to cartridge case, or cartridge case to
bullet?

A.   Cartridge case to cartridge case, bullet to bullet.

J. VALENTI - DIRECT                                                    363

1    Q.   And why is that?

2    A.   You cannot compare a bullet to a cartridge case, because

3    the bullet comes in contact with the rifling that I mentioned

4    earlier, and the cartridge casings come in contact with the

5    breech face and the firing pin of the weapon; two different

6    areas of the firearm.

7    Q.   Now, in this particular case, you are aware that there's

8    a person named Stella -- let me get her last name.  Stella

9    Ardizzone of the New York Police Department, took possession

10   of the firearms.  Detective Ardizzone tested the firearms for

11   operability.  She produced a report dated April 27, 2009,

12   wherein she memorialized that both firearms were operable.

13          On November 11th, 2013, Detective Lennon transported

14   the firearms from the NYPD and provided them to Agent

15   Ludovico in Newport News, Virginia.  On November 13th, 2013,

16   Agent Ludovico transported the firearms to the Norfolk FBI.

17   United States Exhibits #94 and #85 have been properly stored

18   and maintained in the custody of the NYPD and Norfolk FBI.

19          Stella Ardizzone, do you know who she is?

20   A.   Yes.

21   Q.   Who is she?

22   A.   She's an examiner at the Firearms Analysis Section, like

23   myself.

24   Q.   And in this particular case, are you aware whether or not

25   she created test-fires?

J. VALENTI - DIRECT                                                    364

1    A.  She did.

2    Q.  And I'd like to ask you if you've seen before, several

3    exhibits.

4            MR. ZLOTNICK:  I'd like to have the witness shown

5    Exhibits 94 and 95 at this time.

6    BY MR. ZLOTNICK:

7    Q.  Let's start off -- do you know what Exhibit 94 is?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is one of the firearms where test-fires were

11   produced in this case.  This happens to be the CZ 40 caliber

12   pistol, semi-automatic pistol.

13   Q.  I would like to have the witness next shown Exhibit 94A.

14          You know what 94A is?

15   A.  94A, this is a test-fire envelope.  Inside it contains

16   test-fires, casings and the bullets from the CZ pistol.

17   Q.  Done by who?

18   A.  Detective Ardizzone.

19   Q.  And next I'd like to take a look at Exhibit 95.  And tell

20   us what that is.

21   A.  This is the other firearm in this case.  This is the

22   Ruger 40 caliber semi-automatic pistol.

23   Q.  And I'd like to show you what has been marked Exhibit 95A

24   and ask you if you can recognize that for us.

25   A.  This is the test-fire envelope from this particular

J. VALENTI - DIRECT                                              365

1    pistol.  These test-fires were produced from the Ruger

2    pistol.

3    Q.  Then by the same -- by whom?

4    A.  Detective Ardizzone, as well.

5    Q.  And these two pistols, Exhibit 94, what caliber is it?

6    A.  It's 40 Smith & Wesson caliber, both pistols.

7    Q.  Now, showing you Exhibit 94.

8         What kind of a 40 caliber is it?

9    A.  It's a 40 Smith & Wesson caliber.

10   Q.  Now, on that 40 caliber -- on that weapon, what's the

11   make of it?

12   A.  It's a CZ, it's Czechoslovakian made.

13   Q.  Now, looking at that weapon, does it use -- does it have

14   the word "Smith & Wesson" written anywhere on the firearm

15   itself?

16   A.  On the left side of the slide it's imprinted, or stamped,

17   40 S&W.

18   Q.  And what's "S&W" stand for?

19   A.  Smith & Wesson.

20   Q.  So if the jury were to look at that weapon, where would

21   they want to look to find Smith & Wesson stamped on that

22   weapon?

23   A.  The left side of the slide.  The slide being the top

24   portion.

25   Q.  And what's the serial number of that 40 caliber CZ with

J. VALENTI - DIRECT                                                    366

 1   the stamp Smith & Wesson on it?

 2   A.   Okay, that's P, as in Peter, N, as in Nancy, 7124.

 3   Q.   And you indicate Exhibit 94A are the test-fires from that

 4   CZ?

 5   A.   Yes.

 6   Q.   And can you take a look at Exhibit 95.

 7          And what type of a weapon is that?

 8   A.   95 is a Ruger, that's the make.   It's a 40 S&W caliber

 9   also.   It's a semi-automatic pistol.

10   Q.   What's the serial number on that one?

11   A.   Okay, serial number is 341-21524.

12   Q.   And is 95A the test-fires?

13   A.   95A are the test-fires, yes.

14   Q.   From the Ruger?

15   A.   Yes.

16   Q.   And you indicated these are what type of weapons, as far

17   as revolver or semi?

18   A.   Semi-automatic pistols.

19   Q.   I'd like to have the witness next shown Exhibits 52, 53,

20   54, 56, and 57.

21          THE COURT:   What's the status of 94A and 95B.

22          MR. ZLOTNICK:   I'm sorry?

23          THE COURT:   Status of 94A and 95B?

24          MR. ZLOTNICK:   What are -- what are 95 A and B?

25          THE COURT:   You had him identify them.

J. VALENTI - DIRECT                                              367

```
 1          MR. ZLOTNICK:  Yes, I'd offer them in evidence,
 2  subject to connection.
 3          THE COURT:  The Court wants to keep the record
 4  straight.
 5          Is there any objection to 94A and 95B?
 6          (No objection from defense.)
 7          THE COURT:  Hearing no objection, 94A and 95B are
 8  admitted.
 9          (The physical evidence was received in evidence as
10  Government's Exhibit Nos. 94A & 95B.)
11          MR. KELLETER:  Are those the firearms themselves?
12          THE COURT:  No, those are the test bullets.
13          MR. ZLOTNICK:  Thank you.
14          I would like to have the witness shown 52, 53, 54,
15  56 and 57.
16  BY MR. ZLOTNICK:
17  Q.  Can you tell us what those are?
18  A.  These are evidence envelopes containing either a
19  cartridge case or a bullet.
20  Q.  Do they have item numbers on them?
21  A.  Yes.
22  Q.  Is 52 Item 1?
23  A.  It is.
24  Q.  Is 53 Item 2?
25  A.  Yes.
```

J. VALENTI - DIRECT                                              368

1    Q.   Is 54 Item 3?

2    A.   Yes.

3    Q.   Is 56 Item 5?

4    A.   Yes.

5    Q.   Is 57 Item 6?

6    A.   Yes.

7    Q.   Are those all cartridge casings?

8    A.   Yes.

9    Q.   I'd next like to show you what have been marked as

10   Exhibits 55, 80, and 81.

11          Showing you Exhibits 55, 80, and 81, do you recognize

12   what those are?

13   A.   Yes.

14   Q.   What are they?

15   A.   These are discharged bullets.

16   Q.   And are they given numbers on them as well, item numbers?

17   A.   Yes.  55 is Item 4.

18          Government's Exhibit 80 is Number 16.

19          And Government's Exhibit 81 is 17.

20   Q.   Did there come a time that you were asked to determine if

21   those cartridge casings and bullets that you have before you

22   were fired from the two firearms, Exhibit 94 and Exhibit 95?

23   A.   Yes.

24   Q.   And those cartridge casings and bullets, how did you get

25   them?

J. VALENTI - DIRECT                                                    369

1   A.   They were brought to me.

2   Q.   From law enforcement here in Newport News?

3   A.   Yes.

4   Q.   Can you tell us, did you do an examination of this?

5   A.   Yes.

6   Q.   And what was the purpose of your examination?

7   A.   To determine whether or not these particular items,

8   casings, and bullets were, in fact, fired from the two

9   submitted firearms.

10  Q.   And I want to ask you, first, when we talk about the

11  results of your examination, let's talk first about cartridge

12  cases.

13        Did you take a look at whether or not Exhibits 53,

14  54, 55, which are items 2, 3, and 5, if they were fired from

15  one of those weapons?

16  A.   Yes.

17  Q.   And what was your finding?

18  A.   Your Honor, I'm going to refer to my Microscopic Analysis

19  Report.

20        MR. ZLOTNICK:   I can put that into evidence, I

21  think, at this time, as well, Your Honor.   Is that

22  Exhibit 99?   I can show the witness the Exhibit 99A.   I think

23  it's 99A we want.

24  BY MR. ZLOTNICK:

25  Q.   Do you recognize Exhibit 99A?

J. VALENTI - DIRECT                                                    370

1    A.   Yes.   That's my Microscopic Analysis Report.

2    Q.   And that has your findings; does it not?

3    A.   Yes.

4    Q.   And it's signed by you?

5    A.   Yes.

6            MR. ZLOTNICK:  I'd offer Exhibit 99A into evidence.

7            THE COURT:  Any objection?

8            (No objection from defense.)

9            THE COURT:  Hearing no objection --

10           MR. ZLOTNICK:  Sorry.

11           THE COURT:  Hearing no objection, Exhibit 99A will

12   be admitted.

13           (The document was received in evidence as

14   Government's Exhibit No. 99A.)

15   BY MR. ZLOTNICK:

16   Q.   What were your findings as a result of the microscopic

17   comparison which you performed related to 53, 54, and 56 with

18   any of those weapons?

19   A.   Okay, Items 53, 54, and 56 were fired from the Ruger

20   pistol.

21   Q.   Which is Exhibit 95?

22   A.   Yes.

23   Q.   Did you also determine -- and those were all cartridge

24   cases?

25   A.   Yes.

J. VALENTI - DIRECT                                          371

1    Q.  Did you also look at whether or not Exhibits 55 and 80

2    were bullets?  If they're -- if they were fired from any

3    particular weapon?

4    A.  Yes, 55 and 80 were also fired from the Ruger pistol and

5    those are bullets -- those are discharged bullets.

6    Q.  Next, did you look to see if Exhibits 55 and 80, were

7    those fired from any particular exhibits?

8    A.  Okay.  Exhibit 80, that being a bullet, was fired from

9    the Ruger, right?  Item 16, yep.

10          It's a little confusing, because I'm using exhibit

11   numbers, and then actual item numbers so I have to, like,

12   cross-check.

13   Q.  Take a look at your item numbers.  Take a look at Item 4.

14   A.  Okay.  Item 4 was fired from the Ruger as well.

15   Q.  And how about Item 16?

16   A.  16 was fired from the Ruger.

17   Q.  And can you take a look at Exhibit 81, Item 17?

18   A.  Item 17 was fired from the CZ pistol.

19   Q.  And would you take a look at Items 1 and 6, which are

20   Exhibits 52 and 57.

21   A.  Items 1 and 6, which are cartridge casings, were fired

22   from the CZ pistol.

23   Q.  So those were -- so your findings are that those items

24   that you've described were each fired from those two

25   firearms?

J. VALENTI - DIRECT                                          372

1    A.   Yes.

2    Q.   Are your reports reviewed by another examiner?

3    A.   Yes, in addition to -- in addition to the evidence as

4    well.  Another examiner does the exact examination I did,

5    independently of me.

6    Q.   Is that shown on your report as well?

7    A.   Not on the report, but it's on the note page.  There will

8    be a signature and a date on the bottom of the comparison

9    worksheet, which is probably Page 2 of the note pages.

10   Q.   Now, on Exhibit 99, which the jury will have.

11        Let me show you Exhibit 99B.  What is Exhibit 99B?

12   A.   So it's Page 1.

13        Yes, this is the microscopic worksheet.  This is

14   basically showing what items were compared against one

15   another.  And if you look toward the bottom where it says,

16   "verified by," there's the name there, it says, "Captain

17   Burke," initials and a date.

18        Captain Burke did an examination independently of

19   me, a microscopic examination looking at the evidence, in

20   addition to administrative review of the paperwork, making

21   sure the paperwork was correct.

22   Q.   Now, Exhibit 99B, it consists of several pages, does it

23   not, including photographs?

24   A.   Yes.

25   Q.   It also has a key at the end; does it not?

J. VALENTI - DIRECT                                          373

1  A.  Yes, it does.  For the letter designation where it says

2  "conclusion," it's got a key telling you what those letters

3  stand for.

4  Q.  And does 99B relate to your report, which has been in

5  evidence as 99A?

6  A.  Yes.

7          MR. ZLOTNICK:  Your Honor, I offer 99B into

8  evidence.

9          THE COURT:  Any objection?

10          (No objection from defense.)

11          THE COURT:  Mr. Kindell, do you have an objection?

12          MR. KELLETER:  No, Your Honor.

13          THE COURT:  Hearing no objection, 99B will be

14  admitted.

15          (The document was received in evidence as

16  Government's Exhibit No. 99B.)

17          MR. ZLOTNICK:  And with that, Your Honor, I would

18  move into evidence Exhibits 94 and 95, taking the position

19  that they were -- they are connected now because the things

20  they were compared to were fired at the scene of the crime.

21          THE COURT:  Exhibits 94 and 95 are admitted.

22          (The documents were received in evidence as

23  Government's Exhibit Nos. 94 & 95.)

24  BY MR. ZLOTNICK:

25  Q.  Now, the jury will have 99B as well as your report, 99A.

J. VALENTI - DIRECT                                                    374

1    What was the purpose of pictures, the photographs that are
2    attached to 99A?  Let's take a look at, say, 99B3.
3    A.   Okay, this is a photo depicting part of my examination;
4    it's only a small fraction of my examination.
5           The photos are more for me, the examiner, since I
6    haven't done this case in a couple of years, so I haven't
7    seen it in a couple of years.  It's sort of like for my
8    recollection to refresh my memory.  It's not exactly a
9    photograph that's trying to prove anything to you, the
10   members of the jury.
11   Q.   But it refreshes your memory as to the points of
12   comparison?
13   A.   Yes.  It's only one little point of comparison.
14   Q.   There are other photographs that are similar to that?
15   A.   Yes.
16   Q.   And I think on 9B11, let's go there.
17          What does 9B11 and how is it used?
18   A.   Yeah, that's that legend you mentioned earlier.
19          So if you look on it, the first page, that's Page 1
20   of my notes.  I basically had the cartridge casings compared
21   against one another and a conclusion was A and B.  And if you
22   look at this particular document, it says Letter A fired from
23   one gun based on sufficient agreement of class and individual
24   characteristics of the firing pin impression.
25          Then it says, B fired from one gun based on

Janet Collins, Official Court Reporter

J. VALENTI - CROSS                                              375

1    sufficient agreement of class and individual characteristics

2    of the breech face impression.

3           So basically those casings were identified on two

4    different points of identification; firing pin impression,

5    and breech face impression.

6    Q.  Now, you had talked about Smith & Wesson being printed on

7    the firearm itself.  Is Smith & Wesson -- was the caliber

8    created by a certain company?

9    A.  Yes.

10   Q.  Tell us about that.

11   A.  40 caliber cartridge was created by Smith & Wesson,

12   that's why they put their name on it.  So the caliber is

13   known as 40S&W or 40 Smith & Wesson because they invented

14   that cartridge.

15          They took a 10-millimeter cartridge, they shortened

16   the casing a little bit.  So they made it like a little bit

17   of a weaker 10-millimeter, if you will.  The 10-millimeter is

18   kind of powerful, a lot of people have trouble shooting that

19   particular firearm.  By putting less gunpowder in a shorter

20   casing, it's a little bit more manageable.  That's why they

21   invented that particular cartridge.

22          MR. ZLOTNICK:  No other questions.

23                        CROSS-EXAMINATION

24   BY MR. WOODWARD:

25   Q.  Hello, Detective, my name's Larry Woodward.  I just

J. VALENTI - CROSS                                                      376

1    wanted to clarify one thing.

2            Your examination didn't make any determination as to

3    who fired the guns?

4    A.  No.

5    Q.  It's just that they were fired and components came from

6    those guns, but it wasn't your job to -- what was your

7    Captain's name that verified, you said?

8    A.  Dennis Burke.

9    Q.  You or Captain Burke didn't make any inquiry into who

10   fired the guns?

11   A.  No.

12   Q.  All right.

13           MR. WOODWARD:  Thank you, Your Honor.

14           MR. SACKS:  No questions, Your Honor.

15           THE COURT:  Mr. Kelleter?

16                      CROSS-EXAMINATION

17   BY MR. KELLETER:

18   Q.  So you explained that Smith & Wesson, essentially,

19   invented that caliber, the 40?

20   A.  Yes.

21   Q.  But the make of the Ruger -- well, the Ruger uses -- is

22   a 40 caliber, Right?

23   A.  It's chambered for 40S&W caliber.

24   Q.  Okay.

25   A.  Both of these firearms are.

J. VALENTI - REDIRECT                                              377

1    Q.  Okay.  But the Ruger is still a Ruger, it's not made by
2    Smith & Wesson.
3    A.  It's still a Ruger.
4    Q.  Okay, and a CZ is still a CZ, it was made by some Czech
5    company?
6    A.  Yes.
7          MR. KELLETER:  Your Honor, if I may just see the two
8    firearms, 94 and 95.
9    BY MR. KELLETER:
10   Q.  Item 94 is the CZ, correct?
11   A.  Yes.
12   Q.  And if you have to take a look at it, but where it says,
13   in small print, 40S&W, what does it say in very large -- in
14   larger type right to its left?
15   A.  It says CZ40P.
16   Q.  And that's the make?
17   A.  The make, and I believe the model number.
18   Q.  Right.  And that's in significantly larger print than the
19   S&W, correct?
20   A.  It is.
21   Q.  And you're looking at the same spot on the gun when you
22   look at those two, right?
23   A.  They are on the same side of the slide, right.
24   Q.  And the point is, you're not looking at S&W of this side
25   and having to turn around or something to see the CZ, right?

J. VALENTI - REDIRECT                                          378

1  A.  They are on the same side.

2  Q.  They are right next to each other.

3  A.  They are.

4  Q.  And the make is a lot bigger than the S&W.

5  A.  It is.

6  Q.  All right.  And you have experience with firearms?

7  A.  Yes.

8  Q.  And you would never look down and go, "Oh, This is a

9  Smith & Wesson make?"

10 A.  Not with my experience, no.

11 Q.  Okay.

12         MR. KELLETER:  I have no more questions.

13         MR. RASBERRY:  No more questions.

14         THE COURT:  Any redirect?

15                  REDIRECT EXAMINATION

16 BY MR. ZLOTNICK:

17 Q.  The words "Smith S&W," are they legible or not legible?

18 A.  They're legible.

19 Q.  And you can't testify as to the experience level of any

20 other person, other than yourself, that looks at that

21 firearm, correct.

22 A.  I cannot.

23 Q.  Or you can't see what -- you can't tell at what part the

24 person is looking at when he's describing it?

25 A.  I cannot.

P. PIGGOT - DIRECT                                                379

```
1          MR. ZLOTNICK:  I got no other questions.

2          THE COURT:  May this witness be permanently excused,

3   counsel?

4          (All counsel respond in the affirmative.)

5          THE COURT:  Witness may be permanently excused.

6          MS. MCKEEL:  The next witness is Purcell Piggott.

7          MR. KELLETER:  Your Honor, before we call him, the

8   next witness, I like to look at the exhibit, the last page.

9          THE COURT:  On which exhibits?  On which, 94 and 95?

10         MR. KELLETER:  Yes, sir.

11         THE COURT:  Well, Mr. Kelleter, you have to raise

12  that issue at the break with the Court.  The Court's already

13  ruled, since any objections you make now will have to be for

14  the record.  The Court's already admitted the documents.

15         No, just hold it.  I'm saying we're going to take it

16  up at the break.  If you are talking about 94 and 95, the

17  Court has already admitted those documents and heard no

18  objection when I admitted those documents.  So now anything

19  you want to supplement the record with, we will do it at the

20  break.

21         MR. KELLETER:  Your Honor, my understanding is I

22  thought that it would be subject to cross.  If I misheard

23  that, I apologize.  I will make the motion for the record but

24  I do have motions that I wish to make.

25         THE COURT:  Well, you will have to take it up with
```

Janet Collins, Official Court Reporter

P. PIGGOTT - DIRECT                                              380

```
 1    the Court at the break.
 2              MS. MCKEEL:  Should we keep the witness, Your Honor?
 3              THE COURT:  Keep the witness in the witness room.  I
 4    don't think we will be going back.
 5              MS. MCKEEL:  Yes, sir.  Thank you.
 6              PURCELL PIGGOTT, called by the Government, having
 7    been first duly sworn, was examined and testified as follows:
 8                        DIRECT EXAMINATION
 9    BY MS. MCKEEL:
10    Q.  Would you tell us your name, sir, and please spell it for
11    our court reporter.
12    A.  Purcell Piggott.  P-U-R-C-E-L-L, P-I-G-G-O-T-T.
13    Q.  Did you go by a nickname?
14    A.  PJ.
15    Q.  Are you employed, sir?
16    A.  Yes.
17    Q.  Where are you employed?
18    A.  At the Pavilion Hospital in Williamsburg, Virginia.
19    Q.  And what do you do there?
20    A.  I'm a mental health tech.
21    Q.  Sir, did -- where are you from?
22    A.  I'm from Williamsburg, Virginia.
23    Q.  Okay.  And did you go to college at Dean College?
24    A.  Yes, ma'am.
25    Q.  And what year did you go to Dean College?
```

P. PIGGOTT - DIRECT                                                     381

1    A.  From 1999 to 2000.

2    Q.  And did you play basketball there, sir?

3    A.  Yes.

4    Q.  And was one of your teammates named Rosuan Kindell?

5    A.  Yes.

6    Q.  And did you become friends with Mr. Kindell?

7    A.  Yes.

8    Q.  Do you see him in the courtroom today?

9            Look around.

10   A.  Yes.

11   Q.  Okay, would you point him out, and tell us maybe what

12   color shirt he's wearing.

13   A.  Blue.

14   Q.  Okay.  And sitting by a gentleman, tell us what that

15   gentleman is wearing, who he's sitting beside?

16   A.  Gray suit.

17           MS. MCKEEL:  Your Honor, I would ask the record to

18   reflect that he's identified the Defendant, Mr. Kindell.

19           THE COURT:  The record will so reflect.

20   BY MS. MCKEEL:

21   Q.  Did you and Mr. Kindell become friends?

22   A.  Yes.

23   Q.  In fact, did you become friends with Mr. Kindell's family

24   while you were in college?

25   A.  Yes, uh-huh.

P. PIGGOTT - DIRECT                                                      382

1    Q.   And did you spend -- did Mr. Kindell ever come to
2    Virginia to visit you?
3    A.   Yes.
4    Q.   And when was that?
5    A.   Maybe, like, 2003, 2004.
6    Q.   And what was the occasion he came to visit you?
7    A.   We was on spring break.
8    Q.   Okay.  And were you still at Dean College at that point?
9    A.   Yes.
10   Q.   2003, 2004?
11   A.   Well, actually, no.  No, so actually no.  It was
12   basically the time when I was at Dean, which was 2000, he
13   came spring break because we went to the Kings Dominion Black
14   College Weekend during the summer.
15   Q.   Okay.  And did you end up leaving Dean College?
16   A.   Yes.
17   Q.   And you ultimately graduated from where?
18   A.   I ultimately graduated from Grambling State University.
19   Q.   During the college weekend, when you and Mr. Kindell were
20   at Dean College, did he come and visit you anymore?
21   A.   No.
22   Q.   And did you stay in touch with him?
23   A.   Yes.
24   Q.   Now, did you also -- do you have a cousin by the name of
25   Mark Wallace?

P. PIGGOTT - DIRECT                                                    383

1    A.  Yes, I do.

2    Q.  And have you known him your entire life?

3    A.  Yes.

4    Q.  Do you see him in the courtroom today?

5    A.  Yes.

6    Q.  If you'd point him out for the Judge, please, and the

7    court.

8    A.  (Indicating.)

9    Q.  And what color shirt is he wearing and tie?

10   A.  Blue.

11   Q.  And his tie color?

12   A.  I can't see it.

13   Q.  Oh, you can't see it, I'm sorry.

14          MS. MCKEEL:  Your Honor, I would like the record to

15   reflect he is identifying Mr. Wallace.

16          THE COURT:  The record will so reflect.

17   BY MS. MCKEEL:

18   Q.  Now, when you were at Dean College with Mr. Kindell, did

19   Mr. Wallace come and visit you?

20   A.  Yes.

21   Q.  And tell us about that visit.

22   A.  I want to say my second year of 2000, him and my other

23   cousin came up on the train to visit -- well, actually during

24   my cousin's spring break of high school, and they came to

25   visit for a short period.  And that's the time when his

P. PIGGOT - CROSS                                                          384

1    grandmother deceased and he actually had to leave and come

2    back.

3    Q.  And so what is your other cousin's name?

4    A.  George Piggott.

5    Q.  And during that period, did you introduce Mr. Wallace to

6    Mr. Kindell?

7    A.  Yes.

8    Q.  And do you know if Mr. Wallace and Mr. Kindell maintained

9    a friendship after you left college?

10   A.  I don't know.

11   Q.  You don't know?

12   A.  Uh-uh.

13   Q.  You don't know.

14         MS. MCKEEL:  Just one moment.

15         (Counsellors for the government confer.)

16   BY MS. MCKEEL:

17   Q.  On Friday, March the 13th of 2009, did Kindell visit you?

18   A.  Friday, when?

19   Q.  March the 13th of 2009.

20   A.  No.

21         MS. MCKEEL:  That's all we have, Judge.

22         MR. WOODWARD:  No questions, Your Honor.

23                       CROSS-EXAMINATION

24   BY MR. SACKS:

25   Q.  Good afternoon, Mr. Piggott.  Andrew Sacks here for Mark

P. PIGGOT - CROSS                                                    385

1    Wallace.

2    A.  All right.

3    Q.  Just a few questions for you.

4         First of all, with respect to Mr. Wallace, you say he

5    is a cousin of yours?

6    A.  Yes.

7    Q.  But I take it that he's a distant relative?

8    A.  Uh-huh.

9    Q.  You don't really know the exact --

10   A.  Family.

11   Q.  -- relationship?

12   A.  Uh-huh.

13   Q.  -- but you've always grown up knowing he was a cousin?

14   A.  Uh-huh.

15   Q.  All right.  Is that a "yes?"  Because she's got to --

16   A.  Yes.

17   Q.  Now, you have testified about Mr. Kindell and some

18   interaction with him.

19        You were interviewed back on September the 3rd, 2015

20   in Williamsburg at your place of employment by a Liza

21   Ludovico, a law enforcement officer.  Do you remember that?

22   A.  Yes.

23   Q.  And you were shown photographs of various people at this

24   time?

25   A.  Yes.

P. PIGGOT - CROSS                                                    386

1    Q.  Do you remember that?

2    A.  Yes.

3    Q.  And one of the photographs turned out to be of

4    Mr. Kindell; do you remember that?

5    A.  Yes.

6    Q.  When you were shown his photograph on 2015, on September

7    3rd, initially you indicated to the agent that you did not

8    know who he was, right?

9    A.  Yes.

10   Q.  Because, in fact, you didn't recall him at that point?

11   A.  Yes.

12   Q.  He was so insignificant in your overall relationships,

13   that it didn't ring any bells?

14   A.  Yes.

15   Q.  And then the investigator asked you to take another look

16   at the photograph, and you did that and said, I still don't

17   recognize this man?

18   A.  Yes.

19   Q.  All right.

20          And as you were making that statement, the

21   investigator placed a color Google Map next to the photograph

22   with a gold star in the middle of it in the State of

23   Massachusetts, highlighting Franklin, Massachusetts.  Do you

24   remember that?

25   A.  Yes.

P. PIGGOT - CROSS                                                        387

1  Q.  And once she showed you that, then you said, Oh, that's
2  Ro, R-O.
3  A.  Yes.
4  Q.  And you knew him as Ro.
5  A.  Yes.
6  Q.  Now, you knew him from the basketball team?
7  A.  Yes.
8  Q.  That was how you got to know him?
9  A.  Yes.
10 Q.  So your -- and then you said, I played basketball with
11 him my freshman year at college at Dean College?
12 A.  Yes.
13 Q.  So it was only through the basketball that you really
14 knew him?
15 A.  Yes.
16 Q.  Okay.
17       Now, you said that -- would you agree that the -- you
18 said you saw Mr. Kindell visiting in 2000 or so up in
19 Virginia, or did I misunderstand that?
20 A.  Yes.
21 Q.  And what were the circumstances again?
22 A.  Spring break for us, and also during the time every year
23 they used to have something called Black College Weekend in
24 Kings Dominion.
25 Q.  All right, so you invited him down for that, as one of

P. PIGGOT - CROSS                                                        388

1    your basketball buddies?

2    A.   Yes.

3    Q.   And would that be the last time that you recall seeing

4    Mr. Kindell in Virginia?

5    A.   Yes.

6    Q.   And you haven't had any contact with him since then, have

7    you?

8    A.   No, besides before I graduated from Grambling State

9    before I actually graduated spring 2006, I actually visited

10   him on my spring break which was the last semester, which was

11   May.  Because I graduated spring -- May 2006, and during that

12   spring break time I went out there to visit.

13   Q.   So that would have been nine years before your interview

14   in 2015 when you had even forgotten what he looked like?

15   A.   All right, sir.

16          MR. SACKS:  Your Honor, may I just check with my

17   client?  I think I'm done, but I want to confer.

18          (Pause.)

19          MR. SACKS:  That's all we have of Mr. Piggott.

20          Thank you, sir.

21          Thank you, Your Honor.

22                        CROSS-EXAMINATION

23   BY MR. RASBERRY:

24   Q.   Good afternoon, Mr. Piggott.

25   A.   Good afternoon.

P. PIGGOT - CROSS                                                389

1    Q.   And you're actually Purcell Piggott?

2    A.   Yes.

3    Q.   They call you PJ, though, right?

4    A.   Yes.

5    Q.   Is it okay if I call you PJ?

6    A.   Yes.

7    Q.   I just want to get the timeline straight.  This started

8    in about 2000.  Y'all went to college together in Dean

9    College, correct?

10   A.   Yes, correct.

11   Q.   And y'all were dorm mates?

12   A.   No.

13   Q.   No, no, okay.  Played basketball together?

14   A.   Yes.

15   Q.   And then I think it was 2000 spring break --

16   A.   Yes.

17   Q.   -- Mark Wallace and George, your cousin, came up for the

18   spring break trip?

19   A.   Uh-huh.

20   Q.   Did they hit it off, did Mr. Kindell become friends with

21   them?

22   A.   Yes.

23   Q.   Back in that 2000 spring break trip, were they supposed

24   to stay the whole week?

25   A.   Yes.

P. PIGGOTT - DIRECT                                                    390

1    Q.  Okay, but that didn't happen?

2    A.  No.

3    Q.  They had to go back early because of some kind of family

4    emergency?

5    A.  Yeah, death in the family, yup, correct.

6    Q.  And you mentioned another spring break trip.  I wasn't

7    sure if you were saying it was in 2000 or in the 2000s.

8         Do you recall the spring break trip that you came

9    down to Virginia with Mr. Kindell?

10   A.  2000 was the one when he came here.

11   Q.  You actually mean the year 2000?

12   A.  Yes.

13   Q.  And that was some sort of a college weekend, another

14   spring break trip?

15   A.  Yes.

16   Q.  And then the only other spring break trip that you and

17   Mr. Kindell were involved together, was it around 2006?

18   A.  Yes.

19   Q.  And you actually -- he actually -- sorry, you visited

20   him?

21   A.  Yes, I went to Massachusetts.

22   Q.  Up there in Massachusetts.  And that was in 2006?

23   A.  Uh-huh.

24        MR. RASBERRY:  All right.  Thank you.  No more

25   questions.

1          THE COURT:  Any redirect?

2          MS. MCKEEL:  No, sir, he can be excused.

3          THE COURT:  All right.

4          (No objection from defense.)

5          THE COURT:  All right, sir, you may be permanently

6    excused.

7          Next witness.

8          MR. ZLOTNICK:  I'm sorry, Your Honor, I was advised

9    that the witness, Mr. Valenti's, got a flight out of here at

10   4:00 and he has to be at the airport by 4:00.  I didn't want

11   him to miss his plane.

12         THE COURT:  The Court has made a determination he

13   may be excused.  He may be excused.

14         MR. ZLOTNICK:  Yes, sir.  Thank you.

15         THE COURT:  Next witness.

16         MR. ZLOTNICK:  Next witness is Paul Swartz.

17         THE COURT:  Have him sworn.

18         PAUL SWARTZ, called by the Government, having been

19   first duly sworn, was examined and testified as follows:

20                         DIRECT EXAMINATION

21   BY MR. ZLOTNICK:

22   Q.  Sir, please state your full name and spell it for the

23   court reporter.

24   A.  My name is Paul Swartz, S-W-A-R-T-Z is the spelling of my

25   last name.  First name is Paul, P-A-U-L.

P. SWARTZ - DIRECT                                                    392

1    Q.   What is your current occupation or profession?

2    A.   I'm a consultant for the United States Attorney's Office

3    here in the Eastern District of Virginia.

4    Q.   Would it be fair to say that you're a contractor as well?

5    A.   I work under a contract basis, that is correct.

6    Q.   As a consultant and contractor with the United States

7    Attorney's Office, what's the focus of your work?

8    A.   My -- excuse me, the focus of my work is conducting

9    telephone and cell site analysis and electronic surveillance.

10   Q.   How long have you been doing that type of work with the

11   United States Attorney's Office?

12   A.   Since March 15th of 2008.

13   Q.   In addition to doing that type of work with the United

14   States Attorney's Office, have you also done similar work for

15   other prosecutor's offices?

16   A.   Yes, I have.

17   Q.   And where are those?

18   A.   I've consulted with the Commonwealth Attorney's Offices

19   in the City of Hampton, the City of Newport News, the County

20   of York, and the County of Isle of Wight.

21   Q.   Before you started working as a contractor and consultant

22   with the United States Attorney's Office and with various

23   Commonwealth Attorney's Offices, what did you do before that?

24   A.   I was a police officer for the City of Newport News.   I

25   started in 1982 and retired March 1st of 2008 at the rank of

Janet Collins, Official Court Reporter

P. SWARTZ - DIRECT                                                    393

1    Sergeant.

2    Q.  How many years of service did you have when you retired

3    from the Newport News Police Department?

4    A.  25 years and 8 months.

5    Q.  What jobs in the Newport News Police Department did you

6    have that involved you in telephone analysis?

7    A.  I was assigned to the Organized Crime Division as a

8    detective, master detective, and as a sergeant.  While I was

9    assigned to the Organized Crime Division, I was detailed out

10   from the Newport News Police Department to supervise what was

11   then known as the Peninsula Narcotics Enforcement Task Force,

12   which was a regional task force comprised of agents from the

13   Newport News Police Department, the Hampton Police

14   Department, the Virginia State Police, the Poquoson Police

15   Department, and then, on a case-by-case basis, we partnered

16   with various federal agencies.

17   Q.  And in that job, you also did telephone work?

18   A.  I did.

19           Oh, and I forgot, the last three years while I was

20   with the Newport News Police Department, I supervised the

21   Intelligence Division, which had a component that focused on

22   telephone work and electronic surveillance.

23   Q.  So in all three of your jobs at the Newport News Police

24   Department, you engaged in analyzing historical telephone

25   records, as well as cell site information?

P. SWARTZ - DIRECT                                              394

1    A.  That's correct, once cell site became available on cell

2    phones, yes.

3    Q.  Is what you are doing now any different from what you did

4    as a sworn law enforcement officer?

5    A.  No.

6    Q.  When did you first start working with the analysis of

7    telephone records and electronic surveillance?

8    A.  In 1988.

9    Q.  In 1988, what kind of telephones were you looking at?

10   A.  There were only landline telephones at that time; houses

11   and businesses.

12   Q.  How's that changed?

13   A.  It's changed quite a bit with the introduction of

14   cellular telephones.  In the beginning, there were only two

15   telephone companies, and then it expanded out to many more

16   cellular phone companies.  And to what we have today with the

17   mobile devices, not only to the telephone side, they do

18   everything for an individual if you have a smart phone, which

19   includes the internet.

20   Q.  Over the past 30 years, how many telephone records have

21   you examined and analyzed?

22   A.  In excess of 40 million.

23   Q.  Are you here today to testify about the historical

24   analysis of telephone cell site location records that have

25   been offered and admitted into evidence in this case?

P. SWARTZ - DIRECT                                                    395

1    A.   Yes.

2    Q.   Have you had training in addition to your work experience

3    that qualifies you to analyze and summarize telephone cell

4    site location records?

5    A.   Yes, I have.

6    Q.   Have you had specialized training regarding the analysis

7    and summarization or interpretation in telephone and cell

8    site location records?

9    A.   Yes, I have.

10   Q.   How many hours of formalized training have you had from

11   November of '87 to the present?

12   A.   Over 800.

13   Q.   Where have you -- can you tell us some of the places

14   you've had that training?

15   A.   From all of the federal agencies, the Federal Bureau of

16   Investigation, the Drug Enforcement Administration, the

17   Department of Homeland Security.

18          And then within the Department of Justice, there are

19   several different components, including the Office of

20   Enforcement Operations, the Computer Crimes and Intellectual

21   Property section, the Bureau of Justice Assistance, the

22   National Institute of Justice, and then the United States

23   Attorney's Office.

24          Then there are some regional and national components

25   such as the Organized Crime Drug Enforcement Task Force, the

P. SWARTZ - DIRECT                                                    396

```
 1   High Intensity Drug Trafficking area out of the Washington,
 2   Baltimore section of the country.
 3          There's the National Domestic Communications
 4   Assistance Center, the National Drug Intelligence Center, the
 5   Regional Organized Crime and Information Center.  The Law
 6   Enforcement Intelligence Unit, the International Association
 7   of Law Enforcement Intelligence Analysts, the National White
 8   Collar Crime Center, the institute of Intergovernmental
 9   Research.
10          THE COURT:  I think you can stop.
11   BY MR. ZLOTNICK:
12   Q.  Let me ask you, in addition to these government entities,
13   have you also had private industry training?
14   A.  Yes, I have.
15   Q.  And would that be with a company called PenLink?
16   A.  Yes.
17   Q.  What is PenLink?
18   A.  PenLink is a company that specializes in telephone
19   analysis and electronic surveillance.  It was formed about
20   25 years ago and their software is the industry standard in
21   law enforcement for doing telephone analysis.
22          As telephone technology moved from the analogue
23   world to the digital world that we live in today, CALEA was
24   passed, which is a law that mandates that the telephone
25   companies provide a standard way of delivering electronic
```

P. SWARTZ - DIRECT                                              397

1    communications data to law enforcement for intercept

2    purposes.  And at that time, PenLink became involved in the

3    actual electronic surveillance.

4              And so we use their software not only for doing

5    historical analysis of telephone records, we now utilize

6    their software for the interception of electronic

7    communication.

8    Q.  Have you, yourself, instructed law enforcement officers

9    in telephone and cell site analysis?

10   A.  Yes, I have.

11   Q.  Have you ever been qualified as an expert in telephone

12   cell site analysis?

13   A.  Yes, I have.

14   Q.  How many times?

15   A.  12.

16   Q.  And was that in federal or state court, or both?

17   A.  Both.

18   Q.  How about -- where have you been qualified as an expert

19   in telephone and cell site analysis in the Eastern District

20   of Virginia, what divisions?

21   A.  The Newport News Division, the Norfolk Division, and the

22   Richmond Division.

23   Q.  How about in the circuit courts in the cities in

24   Virginia?

25   A.  Newport News Circuit Court and Hampton Circuit Court.

P. SWARTZ - DIRECT                                                  398

```
 1          MR. ZLOTNICK:  I'd proffer Mr. Swartz as an expert
 2   in telephone cell site analysis.
 3          THE COURT:  Do you wish to voir dire him on his
 4   credentials, gentlemen?
 5          (No objection from defense.)
 6          THE COURT:  All right, ladies and gentlemen, you may
 7   accept Mr. Swartz as an expert in telephone and cell site
 8   analysis.
 9          MR. ZLOTNICK:  I would like to read into the record
10   a number of stipulations, if I could, which are needed for
11   his testimony.
12          THE COURT:  You may.
13          MR. ZLOTNICK:  So let's start off with Stipulation
14   Number 10.  United States Exhibits 102 through 108 are
15   business records from Greyhound Lines, Inc.  The records were
16   made by an employee at or near the time of occurrence with
17   knowledge of the matters contained therein, kept in the
18   regular course of business and it was a regular practice of
19   Greyhound Lines, Inc. to make the records.  Telephone number
20   (800) 231-2222 is a toll-free access number for the Greyhound
21   Lines, Inc.
22          And at this time I would offer into evidence, 102
23   through 108.
24          THE COURT:  Any objection?
25          (No objection from defense.)
```

P. SWARTZ - DIRECT                                              399

1              THE COURT:  They are admitted.

2              (The documents were received in evidence as

3     Government's Exhibit Nos. 102-108.)

4              MR. ZLOTNICK:  I next would like to read Stipulation

5     Number 12.  United States Exhibit Number 123 is a lease

6     agreement between Jahnel Bocus and the Northampton Village

7     Apartment Homes located in Hampton, Virginia.  The records

8     were made by an employee at or near the time of occurrence

9     with knowledge of the matters contained therein, kept in the

10    regular course of business and it was the regular practice of

11    Northampton's Village Apartment Homes to make the records.

12             And I'd offer Exhibit 123 into evidence.

13             THE COURT:  Any objections?

14             (No objection from defense.)

15             THE COURT:  As a matter of fact, in view of the fact

16    that these are stipulations, I really don't need to raise the

17    inquiry about whether there's an objection.

18             MR. WOODWARD:  Your Honor, I was going to say that

19    we have no objection to what we stipulated to.

20             THE COURT:  Absolutely.

21             MR. ZLOTNICK:  Next is Stipulation Number 13.

22    United States Exhibit Number 124 and United States

23    Exhibit 124A are subscriber and call details records from the

24    Sprint Corporation for the telephone number (757) 320-9603, a

25    cellular telephone utilized by Louis Joseph.  The records

P. SWARTZ - DIRECT                                                    400

```
 1   were made at or near the time of the occurrence of the
 2   matters set forth, by or from information transmitted by, an
 3   employee with knowledge of those matters.  Such records were
 4   kept in the course of regularly conducted business activity
 5   of Sprint Corporation and such records were made and kept by
 6   Sprint Corporation as a regular practice.
 7           And I would offer Exhibit 124 and 124A into
 8   evidence.
 9           THE COURT:  They are admitted.
10           (The documents were received in evidence as
11   Government's Exhibit Nos. 124 & 124A.)
12           MR. ZLOTNICK:  I'll next read Stipulation Number 14.
13           United States Exhibit Number 125 and United States
14   Exhibit Number 125A are subscriber and call detail records
15   from the T-Mobile, USA Inc. for telephone number
16   (617) 372-2524, a cellular telephone subscribed in the name
17   of and utilized by Joseph Benson.  The records were made at
18   or near the time of the occurrence of the matters set forth,
19   by or from information transmitted by, an employee with
20   knowledge of these matters.  Such records were kept in the
21   course of regularly conducted business activity of T-Mobile
22   USA, Inc. T-Mobile USA Inc., and such records were made and
23   kept by T-Mobile USA, Inc. as a regular practice.
24           And I'd offer 125 and 125A into evidence.
25           THE COURT:  Admitted.
```

P. SWARTZ - DIRECT                                                      401

```
 1            (The documents were received in evidence as
 2    Government's Exhibit Nos. 125 & 125A.)
 3            MR. ZLOTNICK:  Stipulation Number 15.
 4            United States Exhibit Number 126, United States
 5    Exhibit Number 126A, 126B and 126C are subscriber and call
 6    detail records from the Sprint Corporation for telephone
 7    number (617) 980-3919, a cellular telephone subscribed in the
 8    name of Quenisha Kindell.  The records were made at or near
 9    the time of the occurrence of the matters set forth, by or
10    from information transmitted by, an employee with knowledge
11    of those matters.  Such records were kept in the course of
12    regularly conducted business activity of Sprint Corporation
13    and such records were made and kept by Sprint Corporation as
14    a regular practice.
15            I would offer Exhibits 126, 126A, 126B and 126C.
16            THE COURT:  They are admitted.
17            (The documents were received in evidence as
18    Government's Exhibit Nos. 126, 126A, 126B and 126C.)
19            MR. ZLOTNICK:  United States of America 127, 127A,
20    127B, 127C are subscriber call detail records with cell site
21    location information and telephone bill reprint records from
22    nTelos for telephone number (757) 696-0708, a cellular
23    telephone subscribed in the name of Beverly Wallace.  The
24    records were made at or near the occurrence of the matters
25    set forth, by or from information transmitted by an employee
```

P. SWARTZ - DIRECT                                                    402

1    with knowledge of those matters.  Such records were kept in

2    the course of a regularly conducted business activity of

3    nTelos, and such records were made and kept by nTelos as a

4    regular practice.

5          And I'd offer into evidence Exhibits 127, 127A,

6    127B, and 127C.

7          THE COURT:  These exhibits are admitted.

8          (The documents were received in evidence as

9    Government's Exhibit Nos. 127, 127A, 127B, and 127C.)

10         MR. ZLOTNICK:  Stipulation 18.  United States

11   Exhibit 128 are telephone bill reprint records from nTelos

12   telephone number (804) 218-7725 a cellular telephone

13   subscribed in the name of Constance Brown.  The records were

14   made at or near the occurrence of matters set forth, by or

15   from information transmitted by an employee with knowledge of

16   those matters.  Such records were kept in the course of the

17   regularly conducted business activity of nTelos, and such

18   records were made and kept by nTelos as a regular practice.

19         And I would offer into evidence Exhibits 128.

20         THE COURT:  Exhibit 128 is admitted.

21         (The document was received in evidence as

22   Government's Exhibit Nos. 128.)

23         MR. ZLOTNICK:  Exhibit -- Stipulation Number 21.

24   United States of America Exhibit 135 and United States

25   Exhibit Number 135A are subscriber and call detail records

P. SWARTZ - DIRECT                                                    403

1    from the Sprint Corporation for telephone number

2    (757) 768-8891, a cellular telephone subscribed in the name

3    of Tequilla Walker.  The records were made at or near the

4    time of the occurrence of the matters set forth, by or from

5    information transmitted by, an employee with knowledge of

6    those matters.  Such records were kept in the course of

7    regularly conducted business activity of Sprint Corporation

8    and such records were made and kept by Sprint Corporation as

9    a regular practice.

10          I offer 135 and 135A into evidence.

11          THE COURT:  Exhibit 135 and 135A are admitted.

12          (The documents were received in evidence as

13   Government's Exhibit Nos. 135 & 135A.)

14          MR. ZLOTNICK:  Next, Stipulation Number 23.

15          United States Exhibit Number 138 is a listing of

16   relevant cell sites for nTelos that include the name, number,

17   street address, and latitude and longitude for each tower

18   location.

19          And I'd offer Exhibit 138 into evidence.

20          THE COURT:  Admitted.

21          (The document was received in evidence as

22   Government's Exhibit No. 138.)

23          MR. ZLOTNICK:  Next, Stipulation Number 24 states,

24   United States Exhibit Number 139 is a listing of Repoll

25   numbers and switch names for Sprint Corporation.

P. SWARTZ - DIRECT                                                404

1          And I'd offer Exhibit 139 into evidence.

2          THE COURT:  139 has been admitted.

3          (The document was received in evidence as

4  Government's Exhibit No. 139.)

5          MR. ZLOTNICK:  And next I'd offer -- I'd read Number

6  25, which is, United States Exhibit Number 140 is a listing

7  of relevant cell sites for Sprint Corporation that include

8  the name, number, street address, and latitude and longitude

9  for each tower location.

10          I would offer Exhibit 140 into evidence.

11          THE COURT:  It is admitted.

12          (The document was received in evidence Exhibit No.

13  140.)

14          MR. ZLOTNICK:  All right.  Thank you, Your Honor.

15  BY MR. ZLOTNICK:

16  Q.  Mr. Swartz, can you tell us, what are subscriber records?

17  A.  A subscriber record is a record that is maintained by the

18  telephone company for the name and address of a person who a

19  telephone number belongs to.

20          In a case of a phone out -- of a phone that is

21  billed, it would have the name, the address, and telephone

22  number associated with it, and usually some other information

23  in there about the type of services for that phone and their

24  account.  There are prepaid telephones that seem to not

25  contain any identifying information.

P. SWARTZ - DIRECT                                              405

1    Q.  I would like to have the witness shown Exhibit marked

2    124.

3              And, Mr. Swartz, is doing that from where he sits is

4    124, an example of subscriber records for the records that

5    are already received from the telephone from Louis Joseph?

6    A.  Yes, sir.

7    Q.  And what name is that in?

8    A.  It's in the name of Ervin Lee.

9    Q.  And Ervin is E-R-V-I-N?

10   A.  That's correct.

11   Q.  And it gives you the 320-9603?

12   A.  That is correct.

13   Q.  And it tells us the date it was activated was what?

14   A.  October 15th of 2008.

15   Q.  Does it tell you the date it ended or was suspended?

16   A.  Suspended on March 31st of 2009.

17   Q.  I'd next like to show you what's been marked as

18   Exhibit 124A and ask you if you could show us that.

19             What kind are records are on 124A; what would you

20   call those?

21   A.  This is what is known as a call detail record that is

22   provided by the telephone company.  This is going to look

23   different than if you received a telephone bill with itemized

24   calls on it in the mail from the phone company.

25   Q.  And these, again, relate to the telephone of Louis

P. SWARTZ - DIRECT                                              406

1    Joseph, in the name of Erwin Lee?

2    A.  Yes, sir.

3    Q.  And if you could tell us, what are call detail records?

4    A.  So these are the records that are pulled out of the

5    computer system, items at the phone company, and give the

6    detail of what's going on with each particular phone call.

7    Q.  Can you explain on here what the columns on the call

8    detail records show as far as numbers called and the duration

9    of a call?

10   A.  Yes.  The first column in a call detail record from

11   Sprint.  And, again, we're referencing on the screen right

12   now Sprint telephone records.  Each company has their own way

13   of storing the data in their own computer systems, so they

14   may vary from company to company.

15        The first column in a Sprint call detail record is

16   the calling number.  And this is the person that is actually

17   placing the telephone call.

18        The second column is the called number which, in

19   most cases, this is the telephone number that is being dialed

20   by whoever is initiating the telephone call.

21        And then the third column is the actual dialed

22   digits.

23        So to make it a little bit easier, there's the

24   fourth column.  The title on the column there is "MR."  It

25   stands for Mobile Roam number.  And this is basically showing

Janet Collins, Official Court Reporter

P. SWARTZ - DIRECT                                                    407

1    you the direction of the phone call, whether it's an incoming

2    call or an outgoing call, and whether or not the call has

3    been routed.

4    Q.   Does it show if it went to voice mail?

5    A.   It does.

6    Q.   So can -- so the data reflected on the in-coming tells

7    you if the call is inbound or if it was routed to what?

8    A.   Voice mail, which is the indication there where it's

9    saying "routed."

10   Q.   Is there a field for that, or it just says "routed?"

11   A.   It says "routed," but it's a couple of different

12   scenarios.  And this is the routed that I will explain in a

13   few more minutes.

14   Q.   Okay, can you show us the -- if the data reflects -- can

15   you show us what data reflects an outgoing call?

16   A.   Okay, that's coming up.

17   Q.   All right.  Let me ask it a different way, then.

18          Is there a column called "Repoll" on there?

19   A.   To -- if I could just finish with this.

20   Q.   Sure, go ahead.  There's two date-and-time columns.  One

21   is the -- when the call began and the second one is the

22   ending date.  And then between those two, you do the math and

23   there's a duration column.  So for the duration in Sprint

24   Telephone records, it's in seconds.

25   Q.   Now, what's the column that says "Repoll?"  What does

P. SWARTZ - DIRECT                                              408

1   that refer to?

2   A.  That is -- all right.  So the next section is to explain

3   an incoming call and outgoing call, and a routed call.

4        Do you want me to do that?

5   Q.  Why don't you do that first?

6   A.  Okay.  So an example of an incoming call is now

7   highlighted in red on the screen.  And you can see in the

8   middle column there, the "mobile roll" column, it's showing

9   inbound.  And so the person that is making this telephone

10  call is the telephone number (757) 719-3399, and it is

11  calling the number (757) 320-9603, which is what we would

12  refer to as "target telephone."  The source of the telephone

13  records is (757) 320-9603.  And so it's an incoming call that

14  occurred March 12th, 2009 at 3:32 in the afternoon, and it

15  was 27 seconds in duration.

16       And then for an incoming call that is being routed

17  to voice mail, we now have on the screen highlighted in red

18  with the second line.

19       The thing to distinguish there is that in the second

20  column that is titled "called number," you're going to see

21  1-1 preceding the telephone number.  And that is an

22  indication in the Sprint system that it's being routed to

23  voice mail.

24       And then in the mobile roll column, you will see

25  "routed call."  And then the third type of call that you

P. SWARTZ - DIRECT                                                    409

1    would typically see in Sprint call detail records is an

2    outgoing call.

3           And so you will see in the very first column of the

4    calling number, this is the person that's initiating the

5    phone call.  That telephone number is (757) 320-9603, which,

6    again, is the target telephone, the source of these records,

7    and it is making the telephone call to the number that is in

8    the second and third column, (757) 303-0692.  And you will

9    see the notation in the "MR" column, as it's an outbound call

10   on March 12th, 2009, at 4:48 p.m. and it was 103 seconds in

11   duration.

12   Q.  Now, is there also a column called "Repoll?"

13   A.  Yes, there is.

14   Q.  Tell us what that is.

15   A.  In the Sprint records at this time back in 2009, they

16   refer to this number as a Repoll number.  In the newer phone

17   records that we receive it has a different name but the same

18   meaning.

19          And what that meaning is is this is the switch that

20   a mobile telephone call is routed through, and a switch

21   represents a market, a large geographic area.  Most everybody

22   has seen a cell tower.  Well, those cell towers connect to a

23   switch, and that's what this number represents.

24   Q.  Number's 19, correct; one of them?

25   A.  In this case on this record, what you're going to see is

P. SWARTZ - DIRECT                                                    410

1    Repoll Number 19.

2    Q.  Do those represent geographic areas?

3    A.  The 19 represents the geographic area of Norfolk.

4    Q.  So the number is assigned a geographic area?

5    A.  That's correct.

6    Q.  So switches cover geographic areas?

7    A.  That's correct.

8    Q.  Do Repoll numbers show the different or the same number

9    for voice calls and text messages?

10   A.  There are different numbers for text messages, and

11   highlighted on the screen now is just a couple of those.

12          They are -- I believe it's -- no, I have this on an

13   additional slide.  I believe it's 291 through 298 would

14   indicate that the call is being routed through the home

15   office of Sprint, which is in Kansas.  And I said call, I

16   should say "text message," is being routed through the home

17   office.

18          It's also important to note at this point that with

19   text messages in these call records, because they're being

20   routed through Kansas, the time is actually in Central Time.

21   So you have to add an hour to the time that you are looking

22   at in these records.

23          So, for example, what you are looking at on the

24   screen with those three text messages, the record, if you

25   just looked at it, it says 6:09 a.m. in the morning.  That's

P. SWARTZ - DIRECT                                          411

1    actually 7:09 a.m.

2         And one of the things that we do to analyze these

3    records, when we load them into the PenLink software, we

4    actually take into account this time difference so we can

5    normalize everything so calls and text messages all show up

6    at the correct time.

7         And, again, this is just as it relates to Sprint

8    records that we're looking at right now.  There are subtle

9    differences with different companies.

10   Q.  So on text-related to Sprint historical calls, they are

11   reflected in central time?

12   A.  That is correct.

13   Q.  And the time on the text is -- what's the difference

14   between Eastern and Central time on a text; what's the

15   difference in time?

16   A.  You have to add one hour.

17   Q.  Are there other Repoll numbers that come into play with

18   other records in your analysis?

19   A.  So --

20   Q.  The answer is yes, right?

21   A.  The answer is yes.

22   Q.  And showing you 139.  What is 139?

23   A.  All right, so this is a slide that I made from

24   Exhibit 139.  139 is a master list of all the Repoll numbers

25   for Sprint.  And showing on the screen right now is the

P. SWARTZ - DIRECT                                          412

1    Repoll Number 19, which represents the Norfolk market, and

2    text messaging the Repoll Numbers 291 through 298.

3           These are the only numbers that are used in the

4    analysis for the Louis Joseph telephone.  And, as

5    Mr. Zlotnick indicated, there are additional Repoll numbers

6    that will be utilized in this presentation today, and they

7    are now displayed on the screen.

8    Q.  So looking at Repoll numbers, as a telephone makes calls,

9    as it moves it may hit different markets as it goes north or

10   south?

11   A.  That's correct.

12   Q.  And if a call -- if a phone makes no calls, would there

13   be any record of a Repoll if no calls are made on the phone?

14   A.  There is no record.

15   Q.  Now, when the jury looks at Exhibit 139, that will have a

16   list of all the Repoll numbers for Sprint company --

17   A.  That's correct.

18   Q.  -- that come into play in this case?

19   A.  Yes.

20   Q.  So can you tell us, what does a Repoll number represent?

21          And you have a diagram for that, which is 139A.  Tell

22   us what that is.

23   A.  As I stated before, when you're using your mobile device,

24   your cellular telephone, it is connecting to towers in the

25   vicinity of your -- where you're wanting to make a telephone

Janet Collins, Official Court Reporter

P. SWARTZ - DIRECT                                                413

1   call.

2   Q.  Mr. Swartz, before you go into that, is 139A, an

3   illustrative aid which describes what is on Exhibit 139?

4   A.  Yes.

5   Q.  Does it truly and accurately depict how you would

6   describe what a tower is and how MTSO information works?

7   A.  Yes.

8              MR. ZLOTNICK:  All right, I would offer that into

9   evidence.

10             THE COURT:  Isn't that just a demonstrative exhibit?

11             MR. ZLOTNICK:  It's a demonstrative aid.

12             THE COURT:  Well, then he can use it, but we don't

13  usually admit demonstrative aids.

14             MR. ZLOTNICK:  That's fine.  Your Honor, I just

15  wanted to identify what it is.

16             THE COURT:  Go ahead, then.

17  A.  So when your cellular telephone connects to a cellular

18  tower, that call then has to get into the backbone of the

19  cellular network for that particular phone company.

20             And so what it's connecting through is what is known

21  as a Mobile Telephone Switching Office.  It's the switch.

22  That Repoll Number 19 is the switch for the Norfolk market.

23  Once the call gets to that switch, it then goes through the

24  actual telephone system to connect to the other end.  And

25  this could work in reverse, where somebody is actually trying

P. SWARTZ - DIRECT                                                414

1    to reach a mobile customer.

2            But the important thing to keep in mind here when

3    you see the Repoll number, is that number represents the

4    switch that all of the cellular towers are connected to in a

5    geographic area.

6    BY MR. ZLOTNICK:

7    Q.  So to further understand this, does a Repoll switch tie

8    to a particular single tower or a group of towers in an

9    geographical area?

10   A.  A group of towers in a geographic area.

11   Q.  As shown on your illustration.

12   A.  Yes, sir.

13   Q.  And can you map the coverage are of Repoll Number 19.  I

14   think it's Exhibit 139B.

15           And, again, this is for illustrative purposes.

16   A.  Yeah.  So agents and analysts that do the kind of work

17   that I do have access to all of the locations of the towers

18   that are plotted throughout the country for each of the

19   telephone companies.

20           And what is now represented on the screen, where all

21   those towers are located in Repoll Number 19, which Sprint

22   designates as the Norfolk office, or the Norfolk switch.  So

23   it's important to know that even though it's named in

24   Norfolk, it is not actually the City of Norfolk.  It covers a

25   large geographic area which could be described as the Hampton

P. SWARTZ - DIRECT                                                    415

 1  Roads area, stretching up the Eastern Shore of Virginia as

 2  well as down into the Outer Banks of North Carolina.

 3  Q.  I now want to ask you about what is called "cell site

 4  information."

 5          Can you tell us, what is "cell site information?"

 6  A.  So with call detail records, that Repoll column

 7  represents the switch and, again, covers a large geographic

 8  area.  So your telephone, when you are making that phone

 9  call, is connecting to a tower and to a sector of that tower.

10  Q.  And we are still on the Louis Joseph, phone; are we not?

11  A.  We are looking at the Louis Joseph telephone records,

12  Exhibit 124A.  So when you begin your telephone call and when

13  you end your telephone call, the telephone company records in

14  their records the beginning location and the ending location

15  of that -- of that telephone call, which tower and which

16  sector it's connected to.

17  Q.  Is cell site information more specific than Repoll

18  information?

19  A.  Much more specific.

20  Q.  Can you tell us, does cell site information give us the

21  beginning and ending location of a cell phone, whether the

22  call is made or received, each end?

23  A.  Yes, it does.

24  Q.  If a call detail record contains cell site information,

25  are you able to visually map it?

P. SWARTZ - DIRECT                                                    416

1    A.   Yes, sir.

2    Q.   How are you able to do that?  What is the part of the

3    record you use?

4    A.   There's a couple of components here to be able to

5    actually visually display where this location is.  So in the

6    call detail records themselves, in these last two columns

7    that are highlighted on the screen, there contains four-digit

8    numbers.

9         The first digit of that number, which kind of belies

10   common sense, is actually the sector.  And the sector is the

11   antenna, the face of the direction of the sector that is --

12   the antenna that is pointing out.  The last three digits are

13   the actual tower or cell site identifying number.

14        So first you have to identify what are these numbers

15   in the call detail records.  Then we have to go to, again,

16   the master list of -- for the phone company.

17   Q.   Which is Exhibit 140 for Sprint?

18   A.   Exhibit 140 for Sprint.

19        And say you get the -- you need to have the phone

20   company, then you have to have, in this case, the Repoll

21   number, and with some phone companies it might be the switch

22   name or number.  In this case, it would be Repoll 19, so that

23   you're now focused in the correct area of the country.

24        Then you would identify what that cell number is,

25   which are the last three digits, and the sector which was

P. SWARTZ - DIRECT                                                    417

1    that first digit in the call detail records.

2           And so the combination, in the case of Sprint,

3    Repoll 19, Cell Number 341, Sector 3, you go to this list and

4    then there is an actual address, a physical address, as well

5    as the latitude and longitude location of that particular

6    tower.

7    Q.  So you need to look for the tower and the sector number

8    in the records?

9    A.  On this -- on this end, yes.

10   Q.  What is a tower?

11   A.  So most cellular device's antennas are located on a

12   master pole which is what we refer to as the "tower."  But

13   sometimes you will actually see them sitting on top or on the

14   side of buildings.  There wouldn't be a tower there but it's

15   a cell site, so it's the name "cell site" and "cell tower"

16   are sort of interchangeable.

17   Q.  Is there a physical device mounted on top of the tower?

18   A.  Yes.

19   Q.  What is that?

20   A.  That's the equipment that's used to transmit and receive

21   the cellular signals, and those are the antennas.  And in the

22   records, we refer to those as the "Sectors."

23   Q.  Do the antennas communicate with the cell phones in the

24   area?

25   A.  Yes.

P. SWARTZ - DIRECT                                                    418

1    Q.   Do they sometimes switch off?

2    A.   Yes.

3    Q.   From one to another?

4    A.   Yes, you can -- so say you're on a telephone call and

5    your beginning cell site is 3413, for example.  And you're on

6    that telephone and then things get busy with that sector or

7    antenna.  The call can get pushed to the other side of the

8    tower.  Just you moving from the front of the house to the

9    back of the house might move it to the other side of the

10   tower.

11           So we do not get the information in between, but

12   your phone is constantly reaching out and trying to find the

13   strongest signal so it can actually be recorded in the

14   records of hitting different sectors of the same tower.  Or

15   it may get -- the call may get pushed over to another tower

16   and sector altogether.

17   Q.   What's the definition of a "sector?"

18   A.   The sector.  Typically, with a -- in the cellular

19   network, once the tower -- you're at the tower, there is

20   360-degree coverage around that tower and it's, in most

21   cases, split into three different sectors.

22   Q.   Now, do you have a demonstrative aid that describes that?

23   A.   I do.

24   Q.   Could you show us that?

25           That is Exhibit 140A, which is your demonstrative

1    aid?  Can you describe what we have there?

2    A.  Yes.  So in the upper left-hand corner is what I was

3    describing that you would typically see as you're driving

4    down the road where you see a cellular tower and then at the

5    top of the tower you are going to see antennas.

6            Sometimes you will see actually antennas at the top,

7    and then you will see a couple of other strands coming down

8    the pole.  And typically what that means is that there are

9    several different phone companies using the same exact tower.

10           And then the diagram over on the right would be if

11   you were up in the sky looking down at a cellular tower, this

12   would be the coverage area that emits out from a specific

13   cellular tower with three different sectors designated on the

14   chart there.  Each of those covering about 120 degrees.

15   Q.  Now, after looking at the switch, tower, and sector

16   numbers in call detail records, what do you do next?

17   A.  Once I load the records into the PenLink software, I'm

18   then -- there's an interface between PenLink and Google

19   Earth.  And I'm able to take all of this information and then

20   be able to visually display that on a map so that I can get a

21   better view of the coverage area of a particular tower and/or

22   sector.

23   Q.  So you go to the cell site location list for the company;

24   do you not?

25   A.  Yes.

P. SWARTZ - DIRECT                                                    420

1    Q.   And you match that up with Repoll, tower, and call

2    identification numbers, and sector to determine the location

3    of a tower?

4    A.   Yes.

5    Q.   Showing you Exhibit 140.  Can you tell us, does that show

6    the Sprint cell site location list?

7    A.   That was that exhibit.

8    Q.   That's the Sprint cell -- okay.

9    A.   Yes.

10   Q.   And that would be used when you did the analysis of Louis

11   Joseph's phone?

12   A.   That's correct.

13   Q.   Now, is the tower number tied to an address, a physical

14   address?

15   A.   Yes, it is.

16   Q.   And is it shown on the record by a physical street

17   address, longitude and latitude of the tower?

18   A.   Yes, it is.

19   Q.   Let's next go to the nTelos records.

20        I'm going to show you what is marked as Exhibit 127,

21   which are subscriber records for the Wallace phone.

22   A.   Yes.

23   Q.   And that's (757) 696-0708?

24   A.   That's correct.

25   Q.   Do the nTelos records also contain call detail records?

P. SWARTZ - DIRECT                                                    421

1   A.  Yes.  In the case of nTelos, they combine that into one

2   document.  The header is the subscriber information and then

3   the call detail information is below that.

4   Q.  Now, do these particular records on Exhibit 127, do those

5   have a tower description on them?

6   A.  They do.

7   Q.  Do they also have sector as well as towers?

8   A.  They do not.  In the case of nTelos, for historical call

9   detail records, they only provide the tower or cell site

10  location.  They do not provide that sector information, which

11  enables us to be able to focus in on a smaller geographic

12  coverage area of that 360.

13          We only get the 360-degree coverage for a particular

14  tower or cell site with nTelos records.  That's from the

15  historical perspective.

16          When we're doing electronic surveillance at that

17  time when nTelos was still in business, we would be able to

18  get the sector information, but not in historical.

19  Q.  On nTelos calls, what happens with voice mail as far as

20  cell tower information?

21  A.  There is no cell site information recorded for that.

22          And if I could just add, on the Sprint records for

23  the text messages, that's the other thing that's unique in

24  those, is you do not get cell site information for text

25  messages in the Sprint records.

P. SWARTZ - DIRECT                                               422

1    Q.   And -- do you have Exhibit 138?

2    A.   We were going to go through 127.

3    Q.   All right, why don't we quickly go through 127 as far as

4    what's on there?

5    A.   Again, this is a subscriber record in the name of Beverly

6    Wallace with an address of 106 Bunch Drive in Williamsburg.

7    The telephone was activated September 5th of 2007.

8            And then for the call detail records, if we could

9    just go through each individual column.

10           The first column is the date and time that the call

11   began.

12           The second column is the billing number, which is

13   the target telephone, the source of these records.

14           The next column is the duration column.  And nTelos

15   records the duration in seconds.

16           The next column is the call type.

17           In this column, this is where you find whether the

18   call is an incoming or outgoing call.  And then there are a

19   couple of other designations, one of which is an incoming

20   call that is routed to voice mail, it says "voice mail

21   deposit."

22           And then there's also an outgoing call, voice mail

23   retrieval.  And that's where the customer of the telephone is

24   actually making a call to retrieve their voice mail.

25           The next column is the "from" number.  And this is

P. SWARTZ - DIRECT                                                423

1   the person that is making the telephone call.

2          The next column is the "to" number, and the to

3   number is the person that is receiving the phone call.

4          When you see a 1-1 preceding the 10-digit telephone

5   number, that indicates a call to voice mail.

6          And then the last column is the tower description.

7   And with the nTelos call detail records, you get most of the

8   information in the column right here, which is the column, or

9   the cell site, and the physical address of that.  You do not

10  get the latitude and longitude.  Which is in Exhibit 138.

11  Q.  So Exhibit 138, would you use the 138 to map the nTelos

12  records with the call detail records that are received?

13  A.  Yes, sir.

14  Q.  And you use longitude and latitude to do that?

15  A.  Yes, sir.

16  Q.  And you have Exhibit 138A.

17         What is 138A?  Is that a summary?

18  A.  It is.  It's a graphic way of displaying all of the

19  relevant towers that were used in this analysis of nTelos'

20  towers that were used in this analysis on a map of the

21  Virginia Peninsula.

22  Q.  So that relates to the towers that the Wallace phone used

23  in this case that you've examined?

24  A.  Yes.

25  Q.  That shows all of them?

P. SWARTZ - DIRECT                                                424

1    A.   Yes -- for this analysis.

2    Q.   And that covers Virginia Peninsula?

3    A.   That's correct.

4    Q.   Now I'd like to have you shown Exhibit 127A.

5         And are those bill reprint records, again, on the

6    Wallace phone?

7    A.   Yes, sir.

8    Q.   Have you looked at bill reprint -- these bill reprint

9    records?

10   A.   Yes, I have.

11   Q.   What is the time period of these bill reprint records?

12   A.   I don't have that in front of me.  It was in the

13   stipulation.

14   Q.   All right.  Let me ask it a different -- ask another

15   question, then.

16        Have you -- can you tell us what bill reprint records

17   are?

18   A.   So this is basically what a customer would receive in the

19   mail if they wanted an actual invoice from the nTelos phone

20   company.

21        And, again, it contains some information about the

22   customer, but it also includes information about the calls

23   that were made.

24   Q.   So it shows the customer making and getting phone calls?

25   A.   That's correct.

P. SWARTZ - DIRECT                                                    425

1    Q.  Can you show us what's described -- what's contained in

2    that record?

3    A.  Yes, sir.  So at the lower part of this first page, the

4    first column is the date, and it just has the month and the

5    day.  But you would correlate that back to the bill, the

6    billing date.  And then the time, and then there's a service

7    location.

8            For nTelos records, the service location would

9    represent the market that the telephone was in when it was

10   making phone calls.  And with nTelos being such a small

11   telephone company, their coverage area is basically Virginia

12   and West Virginia.  They have nationwide coverage, but for

13   nTelos, those calls, once you travel out of the area, are

14   going to roam onto a different network.  In most cases, it's

15   the Sprint network, and then those calls are then billed back

16   to the nTelos customer.

17           The next column is the "from" or called number.  So

18   it would be what we refer to as the number dialed.

19           And then the next column -- the header on it is

20   "location called," and it's -- so there's two things that

21   show up in this.  One is if it's an incoming call, you see

22   that on the line where it says, "Incoming Call."

23           The next would be a city and a state.  That city and

24   state is the location that the telephone number that is

25   dialed is assigned to by the national database.  So in the

P. SWARTZ - DIRECT                                                    426

```
 1   case right here, you have the first line, the telephone
 2   number begins with area code 813, and the exchange is 785.
 3   That telephone number is assigned to Tampa, Florida.  Doesn't
 4   necessarily mean that that telephone is being used there,
 5   it's just that's where the telephone number was assigned.
 6            There was a time, back in the day, that that might
 7   have meant something, but in today's world where you can port
 8   phone numbers from home to cell, cell to home and from
 9   company to company.  That does not really mean anything for
10   our purposes.
11            And then the next column is the "duration," which is
12   in minutes.
13   Q.  Now, does the record also have a separate section for
14   texts?
15   A.  It does.
16   Q.  All right.
17   A.  And so that's what's displayed on the screen now with the
18   date, the time, the direction of the text message, and then
19   the actual telephone number that is either making or
20   receiving the text message.
21   Q.  I would like to show you Exhibit 128 related to
22   subscriber records, reprint records on a Constance Brown
23   phone.
24            THE COURT:  After the break.  We're going to take a
25   15-minute break, then you can start.
```

P. SWARTZ - DIRECT                                              427

```
 1            MR. ZLOTNICK:  Yes, sir.  Thank you.
 2            (Off the record, 4:04 p.m., jury out)
 3            (On the record, 4:22 p.m., jury in.)
 4            THE COURT:  You may be seated.  The record reflect
 5   that all jurors have returned to the courtroom.  Does counsel
 6   agree?
 7            (All counsel respond in the affirmative.)
 8            THE COURT:  All right, you may continue.
 9            MR. ZLOTNICK:  Thank you, Your Honor.
10            THE COURT:  Oh, before you continue -- I tell you
11   what, we will take it up at the end of the day with respect
12   to one of the exhibits.
13            MR. ZLOTNICK:  Yes, Your Honor.  127B was our error.
14            We want to cross that out and I think all counsel
15   have initialed it.  So the stipulation has been corrected to
16   reflect that.
17            THE COURT:  And what number did you use when you
18   crossed it out?
19            MR. ZLOTNICK:  127, which is in, is my
20   understanding.
21            (The document was received in evidence as
22   Government's Exhibit No. 127.)
23            THE COURT:  All right, we want --
24            MR. WOODWARD:  And, also for the record, all of
25   the -- Mr. Benson, Mr. Brown, Mr. Wallace, and Kindell also
```

P. SWARTZ - DIRECT                                                428

1    initialed.

2          THE COURT:  So hearing no opposition from any

3    counsel, you are all in agreement it's 127?

4          MR. ZLOTNICK:  Yes, sir.

5          THE COURT:  And there is no 127A?

6          MR. ZLOTNICK:  No, there is no 127B.

7          THE COURT:  All right, you may continue.

8    BY MR. ZLOTNICK:

9    Q.  Mr. Swartz, Exhibit 128.  Are those records related to

10   the Constance Brown phone?

11   A.  Yes, sir.

12   Q.  And is that the (804) 218-7725?  You were present when a

13   call was played on that?

14   A.  Yes, sir.

15   Q.  And it covers a period of December 28th, '08,

16   through 3-24-09?

17   A.  Yes, sir.

18   Q.  I'd next like to have you look at Exhibit 126.

19          Is Exhibit 126 the Quenisha Kindell phone,

20   (617) 980-3919?

21   A.  Yes, sir.

22   Q.  Can you tell us the date it was activated?

23   A.  November 29th, 2008.

24   Q.  Do you also have Exhibit 126C?  What is 126C?

25   A.  126C are the Sprint call detail records for the telephone

P. SWARTZ - DIRECT                                                    429

1    number (617) 980-3919.

2    Q.  What time period do they cover?

3    A.  I don't have that in front of me.  It was in the

4    stipulation.

5    Q.  All right.  Do these records, though, contain Repoll

6    information?

7    A.  Yes, they do.

8    Q.  And that's on that -- can you show us the column the

9    Repoll information's on?

10   A.  It would be the last column.

11   Q.  Can you tell us, do they -- do they contain cell site

12   information?

13   A.  No, they do not.

14   Q.  Only Repoll?

15   A.  That's correct.

16   Q.  Now, is there a home market for this phone that you can

17   tell?

18   A.  Yes.

19   Q.  What is the home market?

20   A.  It is the Repoll Number 254, which is the Boston Woburn

21   Number 1 market.

22   Q.  Can you tell us how an incoming call on this Kindell

23   phone would be shown on these Sprint records, as contrasted

24   with the Louis Joseph phone?

25   A.  Yes, sir.

P. SWARTZ - DIRECT                                                    430

1           So highlighted at the bottom of the screen is what
2   would be representative of an incoming call on a telephone, a
3   Sprint telephone that is roaming in another area.  If there
4   was an incoming phone call and the target telephone was in
5   its home telephone market, it would look just like they did
6   on the Sprint records for the Louis Joseph phone, where there
7   would be one line of data and you would have the Repoll
8   number.

9           In this case here, highlighted at the bottom, this
10  represents -- although there's two lines of data, it
11  represents an incoming call.  And for the cellular network to
12  function, what happens is when a customer calls a cellular
13  telephone and that telephone is in a different market, the
14  call is going to be routed through the home switch as well as
15  through the switch where the phone is actually physically
16  located.

17          And in this case here, the first line represents the
18  call that is routed through the home switch, which is Repoll
19  Number 254.  And the second line represents the call, the
20  same call that is being routed to where the customer is
21  actually located.  In this case, excuse me, it's Repoll 558,
22  which is the Richmond market.

23          You'll notice that the duration is the same, and you
24  will see that the beginning time of this call, these calls
25  overlap.  And so we have to look at this and account for this

P. SWARTZ - DIRECT                                          431

1    in the records, because otherwise it would look like there

2    were two different calls.

3              But this is what's representative of when a Sprint

4    telephone receives an incoming call in a market that is

5    different than its home market.

6    Q.  So this applies when the person with the phone in a home

7    market of Boston travels to another location and makes phone

8    calls?

9    A.  Yes.

10   Q.  So it's routed through Boston and goes to the market

11   where the person holding the phone physically is located?

12   A.  Yes, sir.

13   Q.  Can you use the data on Exhibit 126, which was the

14   listing of Repoll information for Sprint, to identify if a

15   telephone is traveling out of its home market?

16   A.  Yes, sir.

17   Q.  Can that be mapped?

18   A.  Yes, it can.

19   Q.  Now I'd like to show you Exhibit 135 next.

20             Is 135 records related to Tequilla Walker?

21   A.  Yes.

22   Q.  And what number is that?

23   A.  (757) 768-8891.

24   Q.  And can you tell us if you have Exhibit 135A.

25             What's 135A?

P. SWARTZ - DIRECT                                                432

1   A.   These are call detail records from Sprint for the

2   Tequilla Walker telephone.

3   Q.   Now, I'd like to next have you take a look at

4   Exhibit 125.

5        Is Exhibit 125 a T-Mobile subscriber record for the

6   Benson phone?

7   A.   Yes, it is.

8   Q.   And what is the telephone number?

9   A.   The telephone is (617) 372-2524.

10  Q.   What kind of phone is that?

11  A.   It's a prepaid telephone.

12  Q.   What is a prepaid telephone?

13  A.   In contrast to where someone might have a cellular plan

14  and they are billed after the fact.

15       When calls are made, a prepaid phone -- the company

16  is receiving the money upfront, and then there's a certain

17  amount of time or minutes that they are allowed to use.  And

18  then they can refill that prepaid phone either on the

19  internet, sometimes using your credit card on the phone.

20  Q.   Now, you have Exhibit 125A.  What is Exhibit 125A?

21  A.   125A is a segment of a bill reprint for the telephone

22  number (617) 372-2524 that has the call information on that.

23  Q.   Does that record show what are called "call types

24  including favorites?"

25  A.   Yes, it does.

P. SWARTZ - DIRECT                                                    433

1    Q.   What does that mean, "favorites?"

2    A.   There's a designation with T-Mobile telephone company

3    that you can designate a certain amount of phone numbers that

4    are your favorites, and then you get a discount with the

5    phone company.

6    Q.   Can you tell us if one of the favorites on that is a

7    Kindell phone?

8    A.   It is.

9    Q.   How do you tell that?

10   A.   It's the (617) 980-3919, and on this call represented on

11   March 11th, 2009, it's designated under the call type "V,"

12   which is my favorites.

13   Q.   Now, you earlier saw the records showing the Benson phone

14   with the screenshots and a number associated with Kindell

15   under the name BRo?

16   A.   Yes, sir.

17   Q.   And that's Exhibit 90A?

18   A.   Yes, sir.

19   Q.   Did that number correspond with Exhibit 96?

20   A.   Exhibit 90A?

21   Q.   Yes.  What number does it correspond with?

22   A.   Exhibit 126.

23   Q.   All right.

24         MR. WOODWARD:  I'm sorry, I misunderstood.  98

25   corresponds to what?

P. SWARTZ - DIRECT                                                      434

```
 1           THE WITNESS:  Exhibit 126.
 2   BY MR. ZLOTNICK:
 3   Q.  And did the BRo phone also have a number associated with
 4   Beverly Wallace's number?
 5   A.  It did.
 6   Q.  And what exhibit is that correlated to?
 7   A.  That was Exhibit 92, which was the phone screen shot that
 8   had the Wallace telephone number.  And that equates to
 9   Exhibit 127.
10   Q.  Now, to do the analysis you did in this case and the
11   summaries that you prepared, what type of records did you
12   use?
13   A.  Used the subscriber records, used call detail records,
14   bill reprint records, and the information from the telephone
15   companies that had specific cell site location information,
16   as well as the Sprint Repoll list.
17   Q.  And, additionally, did you use cell site information?
18   A.  Yes, sir.
19   Q.  Did you use any software to do your analysis?
20   A.  Yes, I did.
21   Q.  What software did you use?
22   A.  PenLink, and then the interface with Google Earth and
23   Google Maps.
24   Q.  And was that done to map the cell site information?
25   A.  Yes, sir.
```

P. SWARTZ - DIRECT                                                    435

1    Q.  Did you review the Kindell telephone records to identify
2    if the phone travelled on or about March 11th through the
3    12th of 2009?
4    A.  I did.
5    Q.  Can you tell us, where did it travel at that time?
6    A.  It traveled from the area of Boston, Massachusetts, down
7    to the Hampton Roads area of Virginia.
8    Q.  Did you prepare a summary of the travel on that
9    telephone?
10   A.  I did.
11   Q.  And the summary is Exhibit 141?
12   A.  Yes, sir.
13   Q.  And can you tell us, in preparing Exhibit 141 on the
14   Kindell phone, you got the number up there, (617) 980-3919?
15   What exhibits did you use, and what are those exhibits?
16   A.  Exhibit 126C.
17   Q.  Are those call detail records, 126C?
18   A.  Yes.
19   Q.  On which phone?
20   A.  The Kindell phone.
21   Q.  And then is Exhibit -- what is Exhibit 139?
22   A.  139 is the Sprint Repoll list.
23   Q.  The locations?
24   A.  Yes.
25   Q.  And are Exhibits 102 through 105 Greyhound records?

P. SWARTZ - DIRECT                                                    436

1    A.   Yes, they are.

2    Q.   Now, Exhibit 141 is a summary of the travel from

3    Massachusetts to Virginia between 3-11 of 2009 to 3-12 of

4    2009?

5    A.   It's the summary of the travel, as well as some telephone

6    calls that were made, and then interspersed in there are also

7    portions of the Greyhound bus exhibit.

8    Q.   Were there telephone calls or texts between the phone

9    associated with the Kindell phone and the phone in Benson's

10   name?

11   A.   Yes, there were.

12   Q.   And that was on 3-11-09?

13   A.   There were calls on 3-11, yes.

14   Q.   Were there calls or texts between the phone associated

15   with Kindell and the phone in -- the Wallace phone?

16   A.   Yes, there were.

17   Q.   And when did they start?

18   A.   Well, I mean for the purposes of this analysis, this

19   portion of the analysis, the calls are on March 11th and 12.

20   Q.   On March 11th, when is the last call with Wallace?

21   A.   Prior to the trip starting, the last call was at

22   7:14 p.m.

23   Q.   On what date?

24   A.   On March 11.

25   Q.   Now, you also have looked at records from Greyhound; have

P. SWARTZ - DIRECT                                                    437

1    you not?

2    A.   I have.

3    Q.   Does Exhibit 102, which is in evidence, show a departure

4    date and time for two travelers that are of no interest in

5    this case?

6    A.   Yes.

7    Q.   Who were the two travelers?

8    A.   Rosuan Kindell and Joe Benson.

9    Q.   What's the date of the departure and the time of

10   departure?

11   A.   The date is March 11th.

12   Q.   And that's reflected by Exhibit 102?

13   A.   That's correct.

14   Q.   And what's the time of departure?

15   A.   7:30 p.m.

16   Q.   And how do we know that it's 7:30 p.m. from Exhibit 102?

17   A.   There are a couple of documents included in Exhibit 102.

18   One is the envelope, which is what the bus driver uses, and

19   there's the date and time that is highlighted in red.  And

20   then there are -- the bus coupons or tickets.

21          And in the upper right-hand corner, there's the date

22   of March 11th, 2009 at 7:30 p.m. on both tickets for Joe

23   Benson and Rosuan Kindell.

24   Q.   So the coupons have Mr. Benson's name and Rosuan

25   Kindell's name?

P. SWARTZ - DIRECT                                          438

1    A.  Yes, sir.

2           THE COURT:  Mr. Zlotnick, how are you using 141; is

3    this a demonstrative exhibit or what?

4           MR. ZLOTNICK:  These are actually received in

5    evidence and he's doing a summary.

6           THE COURT:  141 is not in evidence.

7           MR. ZLOTNICK:  Which one isn't?

8           THE COURT:  141.

9           MR. ZLOTNICK:  141.  Oh, 141 is the summary itself.

10   I should offer that.  I'm sorry.  You're exactly right.

11          THE COURT:  You can introduce the summary under the

12   rules, but it certainly needs to be introduced.

13          MR. ZLOTNICK:  You are absolutely correct, and I

14   will do that.  Let me ask Mr. Swartz the questions.

15   BY MR. ZLOTNICK:

16   Q.  Mr. Swartz, Exhibit 141, is that a summary of the travel?

17   A.  It's a summary of the travel, as well as telephone

18   communication among Rosuan Kindell's phone, Joe Benson's

19   telephone, and Mark Wallace's telephone.

20          THE COURT:  Any objection?

21   BY MR. ZLOTNICK:

22   Q.  On the front it has the exhibits that you used for that

23   summary?

24   A.  Yes, sir.

25          THE COURT:  Any objection?

P. SWARTZ - DIRECT                                                   439

1              (No objection from defense.)

2              THE COURT:  All right, 141 is admitted.

3              (The document was received in evidence as

4     Government's Exhibit No. 141.)

5     BY MR. ZLOTNICK:

6     Q.  So we talked about the beginning of the travel.

7              MR. WOODWARD:  Your Honor, can I ask, is what's on

8     the screen right now a part of 141?  Is that --

9              MR. ZLOTNICK:  It's part of the summary, it's pages

10    of summary.

11             MR. WOODWARD:  That's a page of 141?

12             MR. ZLOTNICK:  Yes.

13             THE COURT:  But I think it would be helpful for him

14    to tell him what page in the summary.

15    BY MR. ZLOTNICK:  Sure.

16    Q.  What page is that, Mr. Swartz?

17             THE COURT:  Next to the last page.

18    A.  All right.

19             MR. WOODWARD:  Your Honor, if I can help, I think

20    down at the bottom is 141-15.

21             THE COURT: -15.

22             MR. WOODWARD:  I see it now.  It's just not on the

23    screen.

24    BY MR. ZLOTNICK:

25    Q.  Using Exhibits 126C and Exhibit 139, which are the Sprint

P. SWARTZ - DIRECT                                                    440

1    Repoll lists, were you able to graphically show or map the

2    travel of the Kindell phones that made telephone calls on

3    March 11th and 12th, 2009?

4    A.   Yes, sir.

5    Q.   When was the last call on the Kindell phone in the Boston

6    market?

7    A.   At 9:14 p.m.

8    Q.   And what page is that, so we know?

9    A.   That is Page 5 of the exhibit.

10   Q.   And the yellow dots show what?

11   A.   Yellow dots are where the actual towers are located in

12   the Repoll 254 Boston Woburn Number 1 market.

13   Q.   And the last call was on 3-11-09 at 9:15?

14   A.   Yes, sir.

15   Q.   So that shows the coverage of the market?

16   A.   Yes.   That's just representative of the coverage area.

17   Q.   Number 254, we looked at Exhibit 139?

18   A.   Yes, sir.

19   Q.   What is the next location or activity shown on the Repoll

20   records from calls made on this phone?

21   A.   So on March 11th, 2009, between 9:51 p.m. and 10:19 p.m.,

22   the telephone was making and receiving telephone calls in the

23   Repoll Number 420, which is the Wallingford 2 Hartford

24   market.   And, as represented or depicted on the map, it's

25   basically in the Connecticut area.

P. SWARTZ - DIRECT                                          441

1    Q.   When's the last call in that particular 420 Wallingford

2    Hartford area made?

3    A.   10:19 p.m. on March 11th.

4    Q.   What's the next market that the phone goes to; is that

5    Repoll 680 New York Manhattan?

6    A.   That's correct.

7    Q.   Can you tell us, that's, again, represented by the dots

8    in your picture, in the map?

9    A.   Yes.  There were calls on the Rosuan Kindell telephone on

10   March 11th between 11:47 p.m. on March 12th at 2:17 a.m.  So

11   there's a two-and-a-half-hour time frame there.

12           Those calls were within the Repoll Number 680, which

13   is the New York Manhattan 1 switch or market.

14   Q.   And did you notice during that time it was in the New

15   York Manhattan switch or market, if there were any calls to

16   the Wallace number?

17   A.   Yes, there were three calls on March 11th between

18   11:56 p.m. and 11:58 p.m.

19   Q.   Do the Greyhound records, I think Exhibit 103, show a

20   departure time from New York City to Washington, D.C.?

21   A.   Yes, sir.

22   Q.   Can you show us that in your summary?  And that's on --

23   what page is that?

24   A.   We are now on Page 8.

25   Q.   And what does that show?

Janet Collins, Official Court Reporter

P. SWARTZ - DIRECT                                                442

1   A.  It shows in both places on the cover of the envelope, as

2   well as on the coupon tickets, that there is a departure date

3   of March 12th, 2009, at 1:45 a.m.

4   Q.  What is the next market that the phone makes calls to?

5   A.  The Repoll 110, New York Westbury.

6   Q.  Can you tell us a time there the call is made?

7   A.  March 12th at 2:17 a.m.

8   Q.  Does the phone go to another Repoll area next?

9   A.  Yes.

10  Q.  What Repoll area is that?

11  A.  Number 504, which is the New York Tetaboro area, and we

12  are now moved away from New York City itself.

13  Q.  What direction is the phone going now?

14  A.  Still heading south.

15  Q.  And are there calls between what times?

16  A.  Yes.  There were calls and text messages from the -- to

17  and from the Kindell phone with Wallace between 2:17 a.m. and

18  2:41 a.m.

19  Q.  What's the next location the phone goes to?  What's the

20  next Repoll station?

21  A.  The next one is Repoll 436, which is DC Beltsville 2.

22          And the Kindell phone was in this market on

23  March 12th, 2009, between 6:45 a.m. and 7:39 a.m.

24          And then there was another call at 7:41 a.m.

25  Q.  Does the phone continue to go south?

P. SWARTZ - DIRECT                                                    443

1    A.  It does.

2    Q.  Where does it go next?  Well, let me go back.

3          104.  And what page is that on?

4    A.  That is on Page 12.

5    Q.  That's a Greyhound ticket.  What does that show, a

6    departure from what city to what city?

7    A.  This is departure from Washington, D.C. to Richmond,

8    Virginia.

9    Q.  What's the time of the departure?

10   A.  The date is March 12th, 2009, and the departure is at

11   7:15 a.m.

12   Q.  And those are, again, tickets for both Joe Benson and

13   Rosuan Kindell?

14   A.  Yes.

15   Q.  Where does the phone go next?

16   A.  It's now in Repoll Number 107, which is the D.C.

17   Beltsville 3 market, and there were calls made between

18   7:41 a.m. and 8:31 a.m.

19   Q.  And does the phone go to another market after that, going

20   south?

21   A.  It does continue south.

22   Q.  What's the next market?

23   A.  The next market is Repoll 558, which is the Richmond

24   market.  And there were calls made on March 12th, 2009,

25   between 8:34 a.m. and 12:35 p.m.

P. SWARTZ - DIRECT                                                    444

1    Q.  So from the calls, how long was the phone in the Richmond

2    market?

3    A.  About four hours.

4    Q.  And the map shows the size of the Richmond market?

5    A.  Yes, sir.

6    Q.  Now, showing you -- is 105 in your summary?

7             Exhibit 105 is Greyhound ticket in your summary

8    showing travel from what city to what city?

9    A.  This is Page 15 of the exhibit and it shows departure

10   date of March 12th, 2009, at 12:01 p.m.

11   Q.  And where is it going to, from Richmond to where?

12   A.  Richmond to Williamsburg.

13   Q.  Williamsburg, Virginia?

14   A.  Virginia.

15   Q.  And what's the time -- and, again, who are the two

16   travelers?

17   A.  Joe Benson and Rosuan Kindell.

18   Q.  And the departure time is what time?

19   A.  12:01 p.m.

20   Q.  Of what date?

21   A.  On March 12th, 2009.

22   Q.  Now, does the Repoll information show a last leg or part?

23   A.  Yes.  The first phone call in the Norfolk market was on

24   March 12th at 12:41 p.m.

25   Q.  Who was that call to?

P. SWARTZ - DIRECT                                          445

1   A.  It was -- I'm not sure exactly who that call was to, but
2   there is a call at 12:58 to the Wallace phone.
3   Q.  And how long did that call last?
4   A.  A minute and 18 seconds.
5   Q.  Had Kindell not made telephone calls, would you be able
6   to map this trip the way you did?
7   A.  I would not have been able to map it.
8   Q.  I now want to ask you, have you prepared a summary of the
9   activity on the Louis Joseph phone between March 12th and
10  March 13th of 2009?
11  A.  Yes, sir.
12  Q.  Is that Exhibit 142?
13  A.  It is.
14  Q.  And that's a summary of Exhibits 124A and 140.  What are
15  124A and 140?
16  A.  124A are the call detail records for the Louis Joseph
17  telephone.  And Exhibit 140 is the corresponding Sprint cell
18  site location information.
19          MR. ZLOTNICK:  I'd offer Exhibit 142 into evidence.
20          THE COURT:  Any objection?
21          (No objection from defense.)
22          THE COURT:  Exhibit 142 will be admitted.
23          (The document was received in evidence as
24  Government's Exhibit No. 142.)
25  BY MR. ZLOTNICK:

P. SWARTZ - DIRECT                                                446

1  Q.  I want to ask you about the call activity on March 12th,
2  2009, the night before Louis Joseph's death.  Can you
3  determine the location of the phone?
4  A.  Yes, sir.
5  Q.  Can you tell us, what is the meaning of the word "home
6  tower?"
7  A.  So one of the things that I do is to try to figure out
8  what is the home tower and/or sector that is most frequently
9  used by a certain person that we're looking at their
10 telephone records.
11         And so the first thing that I would do would be to
12 run a frequency report and try to figure out what is the most
13 frequently used tower.  And that doesn't necessarily
14 represent where the actual home person is, where they're
15 going to bed at night.
16         Then what I do is then take a look at the time of
17 the day that calls are being made on a telephone, outgoing
18 calls in particular, because you know by the fact that it's
19 an outgoing call, the person using the telephone is actually
20 the one using the telephone, in contrast to incoming calls
21 which could be just incoming being routed to the voice mail
22 or not being answered at all.
23         So once I figure out when 's the normal period of
24 time of the day that the call activity drops off and then
25 looking at when does the call activity begin for that

P. SWARTZ - DIRECT                                                447

1    customer during a certain time frame.

2          I then take a look and rerun that frequency report

3    for the most frequently used tower to see what tower and/or

4    sector that it's related to.

5          And in the case of Louis Joseph's telephone, it is

6    the Tower 341, Sector 3.  And then the second most frequently

7    used tower and sector is Tower 341, Sector 2.  And so that is

8    not only the case of when the phone is used all the time,

9    it's also during that time frame when we're looking at the

10   end of the day and the beginning of the day when the phone is

11   actually being used.

12         So that's how I designate that as being the home

13   tower for Louis Joseph, and that's represented on the map on

14   the screen.

15   Q.  So the home tower is the most dominant sector of activity

16   on that phone?

17   A.  Yes, sir.

18   Q.  And where is that tower?  Tower -- is it Tower 341,

19   Sector 3?  Where is that located?

20   A.  The tower is physically located at 393 Denbigh Boulevard

21   in Newport News, Virginia.

22   Q.  And to determine that, you looked at Exhibit 140?

23   A.  Yes, sir.

24   Q.  And did you map that -- you have a red pin on your chart.

25   What does that red pen represent?

P. SWARTZ - DIRECT                                          448

1  A.  The red pin represents the location of 217 Clipper Drive

2  in Newport News, Virginia, the residence of Louis Joseph.

3  Q.  Now, there were -- you have some ten calls.  Can you tell

4  us about those ten calls?

5  A.  What I was looking for in this case is the phone activity

6  the evening before the murder of Louis Joseph.

7          So starting at 4:48 p.m. and going until 11:00 p.m.,

8  there were the series of calls that are represented on this

9  screen there with the times, as well as the tower and the

10 sector for where those calls were connecting at that time,

11 and all of them, except for one, are connecting to tower or

12 sect -- tower or cell site 341, 3 or 2.  Again, which is what

13 has been designated as the home tower.

14         And then there's one call at 5:16 and 54 seconds

15 that is pushed over to Tower 305, Sector 3, which is also

16 represented on the map just south of the location of 393

17 Denbigh Boulevard.

18 Q.  So the numbers 2 and 3 that we see are sectors in that

19 tower?

20 A.  That's correct.

21 Q.  At peak time, what happens with tower activity?

22 A.  What we often see at peak times of the day, peak travel

23 times.  First thing, lunchtime.  In the evening hours, people

24 are in their cars and they're on their cellular telephones.

25 And so those are the busiest times for the cellular phone

P. SWARTZ - DIRECT                                                    449

1    companies.

2           And so, for a telephone call to not drop, which is

3    what the goal of a telephone company is, is to provide good

4    customer service, they have overlapping coverage with the

5    towers and the sectors.

6           And so as I mentioned before, when you are on your

7    telephone call, even though you won't know it or see it and

8    we don't actually get to see it in the records that we

9    receive from the phone company, your phone is constantly

10   reaching out for the strongest signal, and so it can switch

11   from sector to sector.  And in this case here, there's a call

12   at 5:16 and 12 seconds, and a call at 5:16 and 54 seconds,

13   and they're at two different towers but they're in relative

14   close proximity.  But this is also drive time, so this is an

15   example of where a call has probably been pushed over to

16   another tower and sector.

17   Q.  And this shows the night before the death of Louis

18   Joseph?

19   A.  That is correct.

20   Q.  Did you also look at the telephone activity on the phone

21   for the day of his death, March 13th of -- I'm sorry, of

22   2009?

23   A.  I did.

24   Q.  And what do they show?

25   A.  So in the morning, there were only three text messages.

1        7:09 there's an incoming next message, and then at

2   7:38 there's an outgoing text message to the same number that

3   had just texted Louis Joseph.

4        And then at 7:40 a.m., there is a text message back

5   to the same telephone number.

6        So there are -- there were three text messages,

7   there were no outgoing or incoming calls in this time frame,

8   and there is no cell site information for these three text

9   messages because of the way that the Sprint network operates

10  with the historical call detail records.

11  Q.  What did you notice from the analysis of the Joseph phone

12  records beginning on -- at the time of 10:12 in the morning?

13  A.  So beginning at 10:12 a.m., the phone went to what I

14  would refer to as going dark.

15  Q.  What's it mean to "go dark?"

16  A.  This is where a telephone goes -- it receives nothing but

17  incoming calls, and in most cases the calls are being routed

18  to voice mail.

19        There's no outgoing telephone activity on the

20  telephone, and this continues on for a period of time.  There

21  are times that a phone could go dark for a couple of hours

22  and then the person starts using the phone again.

23        But in this case, the phone continues to stay dark,

24  where it's nothing but either incoming calls that are routed

25  to voice mail or incoming text messages that are not

P. SWARTZ - DIRECT                                                        451

1    responded to.

2    Q.  Now, there was a call to the Louis Joseph phone that day

3    at 4:17 p.m.  Did you analyze that?

4    A.  The last call in this series of slides is at 4:17 p.m.,

5    and it's from the telephone that is subscribed in the name of

6    Tequilla Walker.

7    Q.  Which is in evidence?

8    A.  Yes, it is.

9    Q.  And can you tell us, that last call to her, 4:17 p.m.,

10   what happened to that call, where did it go into?

11   A.  It was routed to voice mail.

12   Q.  Can you determine from any phone records when Tequilla

13   Walker called 9-1-1?

14   A.  Yes, sir.

15   Q.  And what time was that?

16   A.  On Exhibit 135A, which are the call detail records for

17   the Tequilla Walker telephone, there is a call to 9-1-1 at

18   16:39 or 4:39 p.m.  There's no duration on that call, but

19   then at 16:39:33, there is an outgoing call to 9-1-1, and

20   that's followed up with an incoming call.

21   Q.  I next want to ask you about the telephone activity and

22   location of the Wallace phone on the day of the Louis Joseph

23   death.

24          Do you have Exhibit 144 as a summary of that?

25   A.  I do.

P. SWARTZ - DIRECT                                          452

1    Q.  Showing you Exhibit 144, that represents a summary of

2    whose activity on what date?

3    A.  It's a summary of the telephone activity on the Mark

4    Wallace telephone on March 13th, 2009.

5    Q.  And can you tell us what exhibits you used to prepare

6    that summary?

7    A.  127B and 138, which are the call detail records and the

8    nTelos cell site location chart.

9    Q.  Now, having reviewed --

10           MR. ZLOTNICK:  I offer into evidence Exhibit 144.

11           THE COURT:  Any objection?

12           (No objection from defense.)

13           THE COURT:  Mr. Zlotnick?

14           MR. ZLOTNICK:  Yes, sir.

15           THE COURT:  Mr. Zlotnick?

16           MR. ZLOTNICK:  Yes, sir.

17           THE COURT:  It's clear to me you are not going to

18    finish this witness in the next 20 minutes and

19    cross-examination, too, so we're just going to stop right

20    here and we will start on this exhibit tomorrow morning at

21    9:30 a.m.

22           MR. ZLOTNICK:  Thank you, Your Honor.

23           THE COURT:  Ladies and gentlemen, remember the

24    precautions this Court has given you about not discussing

25    this case.  Turn in your notebooks, be safe, we will see you

P. SWARTZ - DIRECT                                                    453

1    at 9:20 so we are ready to go at 9:30.

2              (Jury out, 5:02 p.m.)

3              THE COURT:  Exhibit 144 is admitted, by the way.

4              (The document was received in evidence as

5    Government's Exhibit No. 144.)

6                    *****    *****    *****

7    I certify that the foregoing is a correct transcript from the
         record of proceedings in the above-entitled matter.
8
             /S/                              9/20/2018
9    -------------------------------     ------------
         Janet A. Collins, RMR, CRR, CRI        DATE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25