1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    Newport News Division

 3
    - - - - - - - - - - - - - - - - - - -
 4                                      )
     UNITED STATES OF AMERICA,          )
 5                                      )
              Plaintiff,                )   CRIMINAL ACTION
 6                                      )   NO. 4:17cr45
     v.                                 )
 7                                      )
     JOSEPH JAMES CAIN BENSON, et       )
 8   al.,                               )
                                        )
 9           Defendants.                )
    - - - - - - - - - - - - - - - - - - -
10
              EXCERPTED TRANSCRIPT OF PROCEEDINGS
11               (Closing argument by Govt.)
              (Closing argument by Mr. Woodward)
12                     (Motions)
                    (PAGES 1 - 56)
13
                    Norfolk, Virginia
14                   April 16, 2018

15   BEFORE:   THE HONORABLE RAYMOND A. JACKSON
                United States District Judge
16
     APPEARANCES:
17
                OFFICE OF THE UNITED STATES ATTORNEY
18              By:  Howard J. Zlotnick, AUSA
                     Lisa R. McKeel, AUSA
19              Counsel for the Plaintiff

20              RULOFF SWAIN HADDAD MORECOCK TALBERT & WOODWARD
                By:  Lawrence H. Woodward, Jr., Esq.
21              317 30th Street
                Virginia Beach, VA  23451
22              Counsel for the Defendant Joseph James Cain Benson

23              SACKS & SACKS
                By:  Andrew M. Sacks, Esq.
24              150 Boush Street, Suite 501
                Norfolk, VA 23510-3874
25              Counsel for the Defendant Mark Xavier Wallace
```

Janet Collins, Official Court Reporter

```
 1   APPEARANCES CONT'D:

 2           KELLETER LAW, PC
             Trey R. Kelleter, Esq.
 3           409 Duke Street, Suite 100
             Norfolk, VA  23510
 4           Counsel for the Defendant Bryan Lamar Brown

 5           RASBERRY LAW, P.C.
             Jamison P. Rasberry, Esq.
 6           1023 Laskin Road, Suite 101
             Virginia Beach, VA  23451
 7           Counsel for the Defendant Rosuan Romeo Kindell

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2                             * * * * *

 3           MR. ZLOTNICK:  May it please the Court, may it

 4   please you, ladies and gentlemen of the jury.

 5           Let me start by thanking you for the close attention

 6   that you've paid throughout the course of this trial.  We

 7   started on last Tuesday.  It's been a fairly short trial, but

 8   you were alert, you could tell by your faces, and I want to

 9   thank you for that.

10           The law now affords me an opportunity to give you

11   what's called a closing argument.  It's an opportunity to

12   tell you what the government believes the evidence in this

13   case has established.

14           It's also an opportunity to superimpose, on the

15   evidence that's been presented, the jury instructions that

16   the Court is going to give you at the conclusion of all the

17   arguments.

18           In the time that I have, I want to discuss this case

19   with you fully and fairly.  I know you're going to do the

20   same with each other when you deliberate.

21           Ladies and gentlemen, juries have been with us for a

22   long time and the beauty of the jury system is it brings a

23   group of people who come into court and they bring their

24   common sense and their knowledge of the ways of the world and

25   they look at that and look at that against the facts and the
```

1    witnesses and the evidence that have been presented.

2          So the first thing I want to say to you is that in

3    this case, use your common sense.  Your common sense will

4    guide you, as will the Court's instructions when you make

5    your decision.

6          It's been my experience that criminal cases

7    generally boil down to two issues, and this case is no

8    different.  The first thing a jury has to decide is whether

9    or not the crimes that have been alleged in the indictment

10   have been committed.  In other words, under the law, as given

11   by the Court, was this crime committed?

12         Was Louis Joseph murdered with a firearm?  Was he

13   murdered with that firearm during what's called a drug

14   robbery, Interference With Commerce By Robbery?

15         Once you decide if the crimes were committed, and

16   the government would submit to you in this case there is no

17   question that this crime was committed, you then have to

18   decide whether or not a defendant, or each defendant in this

19   case, is criminally responsible for having participated in

20   that crime under the instructions that will be given to you

21   by Judge Jackson at the end.

22         In this case, ladies and gentlemen, we have proven

23   beyond a reasonable doubt that these crimes were committed

24   and we have proven beyond a reasonable doubt that each of

25   these defendants, each of them who you will consider under

1    Judge's instructions individually, they each participated in

2    these crimes.

3            Now, let me start off, as I said, the first thing is

4    was there a crime committed.

5            We know from Stacey Smithley, we know from

6    Dr. Kinnison, and we know from the trail of blood in this

7    case that Louis Joseph was murdered on March 13th, 2009 and

8    it was done with two firearms, and those two firearms have

9    been brought into court.

10           So we start off with the elements of the crime.  The

11   crime the Court's going to instruct you on is the crime of

12   Use of a Firearm in a Crime of Violence.  And you will have

13   Judge Jackson's instructions.

14           But the elements are that the defendants aided and

15   abetted my each other, committed the crime of violence, which

16   is the Interference of Commerce, during and in relation to

17   the commission of that crime aided and abetted by each other,

18   they used or carried a firearm.

19           And, last, the defendants, aided and abetted by each

20   other, with malice aforethought, used or carried the firearm

21   to cause Louis Joseph's death.

22           The crime of violence here, as I said, is that

23   Interference of Commerce by Robbery.  This was a drug

24   robbery.

25           You remember the testimony of LeKeisha Wynne early

1    on in the trial.  She testified Louis Joseph was a drug

2    dealer, selling cocaine and marijuana.  That was coming

3    through that Clipper Drive residence, often through the

4    garage.

5            And we heard testimony from Stacey Smithley that

6    actually, after the murder, they found in that Spider-Man

7    backpack marijuana.

8            Louis Joseph, ladies and gentlemen, also from the

9    testimony, there was no evidence that he had a firearm in

10   that house, none whatsoever.  Ladies and gentlemen, Louis

11   Joseph was a good target for this drug robbery.

12           We also know that there were two individuals that

13   carried firearms in this murder.  They were Benson and

14   Defendant Kindell.  We know from the evidence in this case,

15   ladies and gentlemen, they entered the residence with these

16   firearms, and we know that they murdered Louis Joseph with

17   those firearms, leaving behind the shell casings at Clipper

18   Drive and one bullet at Clipper Drive.  And then from the

19   autopsy, there were two more bullets.

20           And we know that these firearms were disposed of by

21   Defendant Brown afterwards, and they were recovered in April

22   of '09 by the police in New York.  And the shell casings from

23   the scene and the bullets from the scene, and the bullets

24   from the autopsy, were fired by these men through those

25   firearms.

1          And we also know that Benson was at the scene of

2    that murder with those firearms because we have his DNA, his

3    blood left behind on the chair, on that plastic chair.  And,

4    further, you have the statements that Kindell and Benson made

5    before they left to Willie Berry, showing their state of

6    mind.  And we know we have statements they made after they

7    returned to Boston, separately to Willie Berry, which I will

8    talk about later.  And we know this murder was committed with

9    malice aforethought.

10          And the Court will instruct you on malice

11   aforethought.  But what that really means a callous state of

12   mind.  And certainly, from the testimony from Stacey Smithley

13   and the testimony from Dr. Kinnison, you can find that

14   callous state of mind in the locations of those wounds,

15   including on his scrotum and in the number of times that he

16   was shot.  It was of malice aforethought.  They went in with

17   firearms, they murdered Louis Joseph.

18          But, ladies and gentlemen, the law has been around

19   for a long time, the law has a concept that Judge Jackson

20   will read to you called "aiding and abetting."  And what

21   aiding and abetting means is just because you -- the only

22   people that are held responsible are not only the people that

23   do the act, the two shooters, Benson and Kindell, but the law

24   also holds responsible anybody that helped them, anybody that

25   assisted them in committing that crime.  There is no need,

1    under the law, to do every act.

2         The people that are involved, in this case Wallace

3    and Brown, if they were acting in concert, if it was a joint

4    effort, if they took actions to help make this succeed, they

5    are guilty as aiders and abettors.

6         The law has been around so long, it realizes that

7    someone can do something through another person.  Someone can

8    be in the shadows while someone else does it, but they are

9    still going to be responsible for the act.

10        It's no different than in a bank robbery, ladies and

11   gentlemen.  The robber goes into the bank, holds it up and

12   does something bad in there and the getaway driver, who knows

13   in advance what the plan is and he's got a gun is responsible

14   even though he's sitting in the getaway car and never enters

15   the bank.  That's what we have in this case, ladies and

16   gentlemen.

17        So we have these defendants, these other two

18   defendants, the aiders and abettors, Wallace and Brown.  The

19   law also holds them accountable, they were acting in concert.

20        Let me talk a little bit about that just from,

21   again, superimposing the law on this for you.  I

22   anticipate -- and I'm not going to read the entire

23   instruction, the Judge will do that, but I just want to talk

24   about one part of it.

25        The Court's going to say that we have to prove,

```
1   again, beyond a reasonable doubt, that each defendant who's
2   an aider and abettor knew the crime was to be committed or
3   was being committed.
4           Secondly, that each one of the aiders and abettors,
5   that is Wallace and Brown, did an act for the purpose of
6   aiding, commanding, or encouraging the commission of this
7   robbery which turned into a murder.
8           And if they acted with the intention of causing the
9   crime to be concluded, and that's the robbery, that's the
10  crime, that's the target of the robbery.
11          It says in the elements that they were doing -- they
12  were carrying this firearm to commit Interference of Commerce
13  by Robbery, the robbery.  And certainly when you walk into a
14  location to do a robbery armed with a gun, people can get
15  killed.
16          That is totally foreseeable, ladies and gentlemen,
17  and people are held responsible for the foreseeable
18  consequences of their actions.
19          So these defendants are acting in concert, Wallace
20  and Brown.  Think about this, the hub of this entire case is
21  Mark Wallace.  Wallace knows every participant in this case.
22  He knows Brown; we have that from the phone records.  He
23  knows -- and the amount of time they are in contact with each
24  other.
25          Wallace is the connection between Boston and
```

1    Virginia.  Wallace is the reason that when Stacey Smithley
2    swabbed that chair for blood, she finds evidence of a -- from
3    the buccal swabs later of a person from Boston,
4    Massachusetts, whose blood is in a home of a home invasion
5    murder in Newport News.  Why is that, ladies and gentlemen?
6    Because of Mark Wallace.
7            But for Mark Wallace, Benson wouldn't be down here.
8    And we know that his connection to the Boston Boys, Kindell
9    and Benson, is through a fellow that testified, PJ Piggot.
10           As you'll recall, PJ Piggot played on a basketball
11   team with Mr. Kindell.  Wallace went up there and met him and
12   they struck up a relationship, and that's the link.
13           And that link is further substantiated by the fact
14   that when Mr. Benson's telephone is recovered in Boston, we
15   have the M E Z number and we have also the Kindell number in
16   that telephone.
17           Ladies and gentlemen, but for Wallace, Kindell and
18   Benson would not have been in Newport News on March the 13th
19   of 2009.
20           And, but for Wallace, Louis Joseph would not have
21   been murdered by those individuals on that -- at that time
22   and place.
23           Kindell and Benson's bus trip, talk about that.
24           We know from the evidence that at the critical time,
25   Benson and Kindell come from Boston to Virginia, Greyhound

1    Bus.  Where does that Greyhound Bus end up?  Where's the trip

2    end, ladies and gentlemen?  Williamsburg, Virginia.  Who

3    lives in Williamsburg, Virginia?  Mark Wallace.  And during

4    the trip, whose telephone is calling Mark Wallace?

5    Mr. Kindell's.

6          So on the way down here, he's calling Wallace, and

7    then the next day, after they get here, we have Wallace, by

8    his own admissions to two different law enforcement officers

9    at the scene of the crime.  He's brought in this out-of-town

10   talent to do this.

11         How would -- ask yourselves another question:  How

12   would Benson and Kindell, who are coming down here, from

13   Boston and the only guy they know down here from the evidence

14   in this record, is Mark Wallace?  How would they even know

15   how to get to Clipper Drive?

16         Brown, also an aider and abettor, he has a role,

17   ladies and gentlemen.  He arms one of the suspects, at least

18   one of them, beforehand.  He also provides big blue,

19   transportation.

20         Remember, he admitted -- Brown admitted to Brandon

21   Douglas that big blue was hot, police were looking for it

22   right after this happened.  So he is providing

23   transportation, he's providing a gun.

24         Ladies and gentlemen, I'm going to get to this

25   later.  We have this call where, after the murder, some three

```
 1   hours or so after the murder, he's calling Odel to dispose of
 2   two firearms, one of them is a Smith, and we had a lot of
 3   testimony with Lennon, and Lennon says a CZ, but "Smith" is
 4   written on the slide, you will see that.  And he's getting
 5   rid of a Ruger.
 6          But he says the Smith is his weapon.  Is it a
 7   coincidence that hours after the murder he's making a call to
 8   get rid of the murder weapons?
 9          He's also -- again, you heard Brandon Douglas
10   testify, and this was testimony against Brown, with the
11   Court's limiting instruction, that he was at the scene and he
12   armed at least one of the people.  They didn't have guns.  We
13   know that when Benson came down here.
14          THE COURT:  What's your objection?
15          MR. KELLETER:  I'm sorry, if you could repeat?
16          THE COURT:  Don't -- let's avoid doing that.
17          MR. KELLETER:  Your Honor --
18          THE COURT:  Unless you have an objection.
19          MR. KELLETER:  Yes.  Was he referring to
20   inadmissible evidence?
21          MR. ZLOTNICK:  I don't think I was.
22          THE COURT:  Well, ladies and gentlemen, let me give
23   you this precaution right now.
24          These lawyers are arguing based upon their memory of
25   what was said.  You, as the judges of the facts, are
```

1    responsible for determining what facts are in evidence.  I

2    just caution you that, okay?

3            MR. ZLOTNICK:  Ladies and gentlemen, you heard

4    testimony today from Willie Berry that Benson was asking him

5    for a firearm; therefore, you can infer that he did not have

6    a firearm when he left Boston.

7            What we do know, that he had -- they had firearms

8    when they were in the Clipper Drive residence, which brings

9    me to something I'll call "circumstantial evidence."

10            You've heard Judge Jackson talk a little bit about

11    it, but circumstantial evidence is where you infer from one

12    fact, another fact.

13            The way I think of circumstantial evidence, I think

14    back to when I was a child and my father read me the story of

15    Robinson Crusoe.  This man is stranded on a desert island,

16    he's alone and then he sees, at some point, footprints in the

17    sand.  He didn't see anybody there, but he infers, from the

18    footprints in the sand, someone else was on there.

19            And this is another example of circumstantial

20    evidence, it compels a conclusion.  Just as in this case when

21    Benson tells Berry, I need a firearm, and he's coming down to

22    Virginia, you can infer that he was unarmed when he came down

23    here.  That's up to you to decide.  That's circumstantial

24    evidence.

25            Likewise, it's circumstantial evidence when we

present evidence in this case that Defendant Benson's DNA was on that chair.  No one saw him put the evidence -- his DNA on the chair, but you can infer he was in that place and that time because of the DNA evidence; circumstantial evidence, ladies and gentlemen.  And the Court will tell you about that.

          And we also have, as I said, these admissions by Brown to Brandon Douglas.  And those are admissible against Brown that they are there, they're there -- he's there with the Boston Boys.  We know who the Boston Boys are and we know that he's there with a person named AU, and they're at the door lined up.  And we know how they got in... with a crowbar.  Home invasion, ladies and gentlemen.

          And this same guy is getting rid of the guns later, one of them being his gun.  So let me talk about how this all started from the evidence.

          We have evidence that this started as a burglary, and the evidence -- and, again, I want to be -- I want to strictly adhere to the Court's instructions.

          There's evidence against Brown this was going to be -- started as a burglary, and that's coming from Brandon Douglas, you heard him testify.  And he even said that there were some individuals that did surveillance on it before, and then it was taken over by Wallace.  Now, that's not admissible against Wallace, that's admissible against Brown.

1          And it's supposed to be a burglary of a drug dealer,

2    and he said that they had done his homework and Brown

3    regretted later that they didn't stick with the original

4    plan.  You heard that testimony from Brandon Douglas.

5          We also know that Wallace made statements that this

6    was supposed to be a burglary.  He made that statement to

7    Kempf and he made the statement to Andersen.

8          And I would submit that he's making these

9    statements, he's trying to work something out for himself,

10   and he's taking things in a light most favorable to himself.

11   But he admits being at the scene of the crime.

12         But ask yourself this, ladies and gentlemen:

13         If this was supposed to be a burglary from day one

14   until the time it happened in Mark Wallace's mind, why bring

15   down Benson and Kindell from the State of Massachusetts to do

16   it.

17         And this is the same Mr. Benson who told Ms. Rivera

18   that, I don't mess with drugs, people tell on you.  I break

19   into places.  Same guy.  So that's the original plan.

20         Then, as we heard again, evidence admissible against

21   Brown, through Douglas, he told him that this was taken over.

22   And, again, we know the link between Kindell, Wallace, and we

23   know that the -- that Kindell had the link and the contacts

24   with Kindell -- with Benson.

25         It was a robbery, ladies and gentlemen, before they

```
 1    left Massachusetts.  Otherwise, why is Benson asking Berry
 2    for a gun?
 3           And then before Berry -- Berry sees Benson and
 4    Kindell before they leave Boston at this fellow Finkleah's
 5    house.  And at that time, as you remember, Kindell invites
 6    Berry to join them in this trip to Virginia.
 7           And Kindell says they're going to Virginia, take a
 8    ride there, he says it's a lick.  It's a lick on a drug
 9    dealer who has weed and cocaine, and Berry declines.  That
10    shows their involvement.  That shows what they know is the
11    reason they are coming down here.  And then they travel.
12           And one of the instructions the Court's going to
13    give you is that testimony of individuals like Brandon
14    Douglas, Turner, and Mr. Berry, these are people that are
15    testifying under Plea Agreements, they're hoping to get their
16    sentences reduced.
17           And I'm going to tell you what Ronald Reagan used to
18    say, "Trust but verify."  You look for corroboration, you
19    look for corroboration.  I submit to you there is
20    corroboration.
21           One of the pieces of corroboration is that Benson's
22    talking to this guy and, somebody will wonder, like, well he
23    just wants to help himself by making something up against
24    Mr. Benson.
25           Well, ladies and gentlemen, we look at the telephone
```

1    record, you will have it, I think it's Exhibit 90 and 90A,

2    and 92 show the phones.  But also 156, which was the printout

3    that Detective Smithley testified shows the name "SKU" in

4    Benson's phone as well.

5              And of course we have the screenshots that show the

6    connections with BRo, which is Kindell, and M E Z, which is

7    Mark Wallace.  That's corroboration.  Then we have this plan

8    being executed.  We have this trip from Massachusets on the

9    Greyhound Bus to Virginia.

10              Now, Mr. Swartz testified, and Mr. Woodward is a

11   great attorney, he was having some -- he had some interest --

12   he had some fun with Mr. Swartz when he was talking about all

13   those dots and that those dots are less than cell site.

14              Well, ladies and gentlemen, you don't need cell

15   site.  All those dots are showing is the route of his travel.

16   Which one of those cells towers he hits is meaningless.  It

17   shows the route of his travel, which was mapped, and we

18   offered to show his trip down here on those particular

19   exhibits.  Both are traveling on Greyhound together.

20              And, ladies and gentlemen, ask yourself this, do

21   they end up in Norfolk?  Do they end up in Richmond?  Where

22   do they end up?  They end up in Williamsburg.  Who lives in

23   Williamsburg?  Mark Wallace, same guy Kindell's calling.

24              Then we have the execution of the plan.  This is

25   where we get into Wallace's home before the home invasion.

1    And we have Exhibit 144 and Exhibit 300, which was the

2    summary that he prepared that the defense offered during the

3    cross-examination of Mr. Swartz, and it shows who he is

4    coordinating with.

5            There are calls to Brown and there's calls to Kenny

6    Jones, AU.  There's no calls by Wallace with Kindell or

7    Benson, ladies and gentlemen.  And, again, it's

8    circumstantial evidence.  The government would submit the

9    circumstantial evidence shows that Kindell and Benson were

10   already together with Wallace.  He picked them up from the

11   airport -- I'm sorry, from the Greyhound Bus the evening

12   before.  And we also heard this testimony about the size of

13   big blue.

14           And then we have the actual home invasion.  We know

15   Wallace was at the scene, we have him telling Kempf that he,

16   Wallace -- this was offered against Mark Wallace.  He took

17   Kempf -- he took Bryan Brown's vehicle.  He said he and

18   others, "he and others," ladies and gentlemen, took Bryan

19   Brown's truck.  And he then tells later, Ms. Andersen, FBI

20   Agent Andersen, that he was there in the car, outside in the

21   car.

22           Now, we had the cell site data.  And, of course,

23   when Paul Swartz was testifying, you know there was all this

24   cross-examination about the cell site data.

25           Well, you know, you've got the cell site data.  That

1    doesn't mean he's in the exact location, he could have been

2    driving around.  We don't know what the traffic was like.  He

3    could never have stopped, he could have been moving around.

4         Ladies and gentlemen, he admits, by himself, that he

5    was there at the car outside, he admits it.  And the cell

6    site data corroborates that he was there.  And this is the

7    cell site data on Wallace's phone, Exhibit 144A.

8         And then take a look at the Exhibit 142, which is

9    the cell site data on Louis Joseph's phone.  And, at the

10   critical time, it's the same tower.  And you heard the

11   evidence of that, and we put that in to show that the time it

12   goes dark, that's when Wallace is in that vicinity.

13        That is damaging evidence against Wallace,

14   considering he says, I was there at the car outside when this

15   happened.

16        And I would submit to you he was trying to have his

17   own agenda when he spoke to those agents, Kempf and Andersen.

18   He didn't understand, not being a lawyer, the significance of

19   placing himself at the scene of the crime, considering that

20   with the other evidence of his involvement and his

21   relationship with various people.  So we have that.

22        And, of course, we have -- at the same time, we have

23   calls with Kenny Jones, and we know that, as I indicated, you

24   can infer from the phone call that you heard played that

25   Bryan Brown armed at least one of these robbers who pulled

1    the trigger.

2          And then we have the actual execution.

3          We have them at the same home tower at the critical

4    time when the phone goes dark.

5          Now, we heard a lot about these phones going dark.

6    Sure, you could all have your phones while you're in court

7    here in your car and somebody could say, Well, your phone has

8    gone dark because you're not using it.  But, ladies and

9    gentlemen, again, take this evidence and your common sense

10   into context.

11         Louis Joseph's phone went dark when Louis Joseph was

12   murdered.  These poor people are trying -- we've got him

13   making text messages, his girlfriend is frantically trying to

14   call him.  And we pinpointed the time that no one could call

15   him again, that's his phone going dark and that's at the same

16   time that Wallace is at the same home tower at that critical

17   time when the victim's phone goes dark.

18         And we know what that time frame is.  Certainly from

19   10:15 to 10:35, and then the phone moves again at about 11:18

20   into Hampton.  Wallace was not driving around in traffic, by

21   his own admission, and he knows the people, considering he

22   brought them down here.

23         And then we have what Brown told Douglas.  He makes

24   a statement that -- and this, again, only offered against

25   Brown, that he's lined up at the door with the Boston Boys,

1   we know the Boston Boys, and with AU.  And sure enough we

2   have Stacey Smithley testifying about the break-in.

3          Now, I want to have Mr. Swartz actually press a

4   button for me to show you what that doorway looked like,

5   whether or not a number of people could stand in front of

6   there, reasonably.  Look at that area around that door.  A

7   number of people can stage themselves there.  And you will

8   have that to look at for yourselves.

9          Then we have these Defendants, Benson and Kindell in

10  there.  And one of the things you need to do when you -- when

11  you consider the testimony of these accomplice -- these

12  witnesses with Plea Agreements, is to see if it corroborates,

13  as I indicated.

14         You heard, what I would submit to you, is the

15  courageous testimony of young JW who had to witness this

16  horror.  He testified he saw two shooters, men with guns.

17  They pushed Lou to the ground.  He testified he heard

18  gunshots, he heard Lou bleeding, men looking through the

19  couch.

20         In fact, Ms. McKeel, when he was up there, at some

21  point she asked the young man whether or not Lou said

22  anything.  And to show that he was still alive, it was

23  offered for that purpose, he testified that Lou said "Call

24  peoples."

25         Well, ladies and gentlemen, there was no phone at

1    that scene, remember, from Stacey Smithley.  If he could

2    call, and I don't know if a young man that age could use a

3    phone, he wouldn't be able to do it, nor would the victim who

4    was alive when they left, "Make a phone call."  Pretty cold.

5          And we have -- again, this is a statement that is --

6    again, we're talking about corroboration.  This is very

7    similar to the conversation that you heard today from Berry

8    at the studio afterwards, as to both Kindell and Benson.

9          That they went into the house, there was a tussle,

10   it got ugly, and they were both in the house, ladies and

11   gentlemen, Kindell and Benson, and there was Benson's blood

12   in the house.  That's all consistent with what the little boy

13   said and what Berry said.  They don't know each other.

14         And then we have testimony from Brandon Douglas,

15   again, offered against Mr. Brown, that they went in like

16   commandos.  I think he used some other description for some

17   game on video.  That's consistent and corroborative of the

18   unvarnished testimony of JW.

19         And finally what I think is a devastating piece of

20   evidence against Benson, besides the DNA, and that's the

21   testimony that Berry says that Benson said there was a little

22   boy in the house.  And I watched how Mr. Rasberry asked him,

23   Well, could you read media accounts.

24         Well, ladies and gentlemen, you got a chance to size

25   up Berry.  Do you think Berry is sitting there going and

1    surfing Google for the *Daily Press* and the *Virginian-Pilot* up

2    there in Boston as to what's going on down here in Virginia?

3            The only way that Mr. -- that Berry could find out

4    would be from someone who was there, namely Benson, and a

5    little boy was in that house.  No other independent way.

6            A little kid was in the residence and they had his

7    blood.  Well, we do have his blood.

8            And I've heard -- I would say to you, ladies and

9    gentlemen, when we have the defendant's blood at the scene,

10   it's all over.  He was there.  What was the percentage on

11   that?  You will see that.

12           And then we have, in addition to that against

13   Benson, you heard the testimony, the tape-recording of

14   Ms. Brenda Rivera, I think it's Exhibit 114C, and you have

15   Benson saying, "I was doing something I wasn't supposed to be

16   doing with some dudes from down here."

17           And he said that he admitted he was with a dude up

18   my way, that's Benson saying that.  I submit that's Kindell,

19   and he says he knew some dudes down here.  Kindell, I came

20   with him.  You will have that to look at.  Listen to the

21   whole thing.  And first day we was in the house, the next day

22   I made my move, then we left.  That's corroborative of

23   exactly -- it's consistent, frankly, with the statement that

24   was made to Berry.  And of course we have the guns.

25           The guns are recovered in New York, we have two

 1  shooters, two guns, and all the ammunition went through those

 2  two guns.  Those two men, Kindell and Benson, were the people

 3  that used those guns and murdered Louis Joseph.

 4       I submit to you, ladies and gentlemen, Kindell and

 5  Benson lack the moral restraint that's fundamental that most

 6  humans have that serves as a deterrent or a preventer for

 7  committing the act of murder.  And look at the way they did

 8  it.  And of course we have the forensics from the DNA.

 9       What I'll say about that is we have a Certificate of

10  Analysis, Exhibit 87A.  You have the buccal swab in evidence,

11  you have the DNA at the crime scene on the chair, and you

12  have a match with Benson.  1 in greater than 6.5 billion,

13  that's the identification of him at the scene of this crime

14  with other evidence that's been presented in this case.

15       And last, I'm going to go into this last point, is

16  we have their actions that occur after the murder, the

17  actions of Benson and Kindell, the actions of Brown, and the

18  actions of Wallace.

19       I submit to you, ladies and gentlemen, when a person

20  is guilty of a crime, they act the way you would expect a

21  guilty person to act... guilty.  We see this with these

22  defendants in the aftermath of the murder.

23       I say to you that consciousness-of-guilt evidence

24  leaves what I call a psychological mark of guilt.

25       So we have, first, the flight from Virginia.  We

 1    have -- we have conscious -- we basically have, Benson and

 2    Kindell have just been involved in a murder, and then we have

 3    them changing travel departure time within one hour of the

 4    murder.

 5            Remember to look at what their original departure

 6    time and date was.  And we have all of these -- I will use

 7    the term these "panicked calls" to Greyhound on the 800

 8    number.  They're changing their plans, changing tickets

 9    within hours of the murder.  Ladies and gentlemen, it is

10    obviously tied to the murder.

11            And then can you tell -- ask yourself, what else

12    would have caused them, from the evidence in this record, to

13    go home early, other than that murder?  They're distancing

14    themselves by going back early.

15            And then we know that Wallace, his cell site data

16    puts him at the end of the day, in the vicinity of the

17    Greyhound Bus station in Williamsburg where they started

18    from.

19            And then finally we have Brown getting rid of the

20    firearms, and we have the murder, and we know what time the

21    murderer calls, and we've got this wiretap call, which I

22    would like to play for you real quickly.

23            (Audio played.)

24            MR. ZLOTNICK:  Ladies and gentlemen, that call is

25    not a day after the murder, it's not a month after the murder

1    or a year after the murder, that call is about seven hours

2    after the murder.  Black gun, his gun, "my joint," and a

3    Ruger.  And these guns came from the crime scene, and it's

4    interesting that these guns travelled together.

5         They were purchased together in that undercover

6    transaction in New York, they're a package.  And that was

7    that connection between Brown and this fellow Odel.  And then

8    Leone's the guy that actually sold them to the undercover

9    person.

10        And then finally, Brown is getting rid of his car

11   after the murder.  He makes the statement, again, admissible

12   against Brown, that basically that big blue is hot, the

13   police are looking for it, it's the same car.  And this is

14   offered against Mr. Wallace, that Detective Kempf -- he

15   admitted to Detective Kempf he was in that car.

16        MR. SACKS:  Objection, Your Honor.  I don't think he

17   can relate to that.  One was given with a limiting

18   instruction not offered at all against this defendant.

19        THE COURT:  Objection is overruled.

20        MR. ZLOTNICK:  I'm offering what Wallace said to

21   Detective Kempf against him.

22        THE COURT:  Just restate it, please.

23        MR. ZLOTNICK:  Be happy to.

24        The Court allowed the against Kempf that Defendant

25   Brown made -- I'm sorry, that was offered against Defendant

1    Brown, not against Defendant Wallace.  I misspoke.

2            But Brown stated to Brandon Douglas that big blue

3    was hot, and Wallace admitted being at the scene.  And that's

4    offered against Wallace in big blue.

5            That's the case, ladies and gentlemen.  I've spoken

6    a while, you've been patient with me.  We've proven this case

7    beyond a reasonable doubt as to each defendant.  You've been

8    patient, I've gone over a lot of evidence with you, we ask

9    you to decide this case on the evidence, nothing more.

10   That's all we're entitled to.

11           We've proven the guilt of these defendants beyond a

12   reasonable doubt, and I thank you very much for your time and

13   attention.

14           THE COURT:  Mr. Woodward?

15           MR. KELLETER:  Your Honor, I need to put a motion on

16   the record.

17           THE COURT:  Well, you can do it -- we will do it at

18   the break.

19           MR. KELLETER:  Your Honor, I'd just like to

20   correctly reflect that I'm trying to do it now right after

21   the government.

22           THE COURT:  But we're not going to do it now, we're

23   going to do it at the break.

24           MR. KELLETER:  Yes, sir.

25           THE COURT:  Mr. Woodward?

1          MR. WOODWARD:  Thank you, Your Honor.

2          Good afternoon, ladies and gentlemen.  As you know,

3   my name is Larry Woodward and I represent Mr. Benson, and

4   this will be my one and only time that I will be able to

5   address you for a few minutes.

6          I don't have as long as the government, but I'm only

7   here to talk about Mr. Benson.

8          I, too, appreciate your time and attention.  I know

9   you've heard a lot and there's a lot to process.

10          The first thing I would like to talk about is sort

11   of how you decide the case and how you look at the evidence.

12   And the Judge will give you some instructions about

13   credibility of witnesses and burden of proof and those

14   things, which you certainly should follow.

15          I would harken that I would ask you to please

16   remember that an argument is not evidence.  Mine is not,

17   Mr. Zlotnick's is not.  He's very passionate about this case,

18   he made a lot of statements in his argument, but what you

19   need to do and what you took an oath to do is to go back and

20   look at the evidence and decide the case on that, not on his

21   statements or his beliefs about what the evidence shows.

22          So I stood up here last Tuesday -- I think it might

23   have been Wednesday, whenever -- probably was Wednesday, we

24   picked the jury Tuesday, and I told you that this was going

25   to be a case about whether or not they could prove beyond a

1    reasonable doubt that my client was involved in this crime.

2           I would submit to you, for all of the reasons that

3    I'm going to go over here in a few minutes, they've not done

4    that, they've not come close to doing that.

5           I also told you that there would be no dispute that

6    there was a crime committed, that Mr. Joseph was killed, and

7    that he was killed with a gun, and that he was, you know,

8    killed by some individuals, two or more.

9           So the first thing I think you should do with any

10   piece of evidence is, first of all, you ask yourself, can I

11   trust it?  Can I believe it to the level that I need to

12   believe it, which under this standard is beyond a reasonable

13   doubt in order to convict a fellow citizen of a serious

14   crime.

15          And I would submit to you that that -- again, y'all

16   will have to decide individually and collectively, but if you

17   decide you can't trust the evidence, then you really

18   shouldn't give it much, if any, weight.  If you decide you

19   trust it, get past that first step.

20          Then the next thing that, again, I think you should

21   do is ask yourself, Well, what does it tell me.  Even if I

22   believe that it's true, what does it really tell me.

23          And as I think I told you in opening statement,

24   equally, what does it not tell me.  Because the point here in

25   this case is, what does the evidence prove about who was

1    involved in the crime?  So there's all kinds of things that

2    have been proven in this case to one degree or another, but

3    what you have to do when you -- when Mr. Benson -- I expect

4    Judge Jackson's going to give you an instruction that says

5    you have to consider each defendant individually.

6            Again, I would submit to you that one way to do

7    that -- and it's certainly not the only way, but I would ask

8    you on behalf of Mr. Benson, or suggest, when you go back

9    there, you take each defendant and you take the evidence

10   against that defendant and you decide there's no spillover,

11   there's no -- if this person -- if I did it, this one must

12   have done it.  That's not how this works.

13           So the first thing I would ask you on your oath, and

14   Judge Jackson told you this is one of the things he told you

15   last Friday afternoon.  What Bryan Brown purportedly said to

16   Brandon Douglas, even if you believe that was said, Judge

17   Jackson gave you an instruction that said that's only

18   admissible against Mr. Brown.

19           So when you go back there, and I don't know how you

20   folks all collectively and individually make decisions.  But

21   when you write down the evidence or you have a board or

22   you've got your notes and you're writing down, okay, what do

23   we know about the case against Mr. Benson.

24           It would be as if Brandon Douglas never testified in

25   this case.  That's what that limiting instruction is.  Judge

31

1    Jackson told you, you can consider that only against

2    Mr. Brown, not against my client or anybody else.

3            So when you sit back there -- and Mr. Zlotnick made

4    his little PowerPoint and he kept saying "the Boston Boys,"

5    "the Boston Boys."

6            The only evidence, the only evidence, and I didn't

7    stand up and object, but anybody that said anything about any

8    Boston Boys was Brandon Douglas.  And if you follow your oath

9    and you consider what Mr. Brown said -- and, first of all,

10   you will have to decide you believe he said it, but that's

11   not even in the case against my client.

12           That evidence is admissible, and I've known

13   Mr. Zlotnick a long time.  I don't think he was trying to do

14   anything wrong.  But you remember that.  Those words came out

15   of Brandon Douglas's mouth, nobody else's.  And it's as if we

16   had tried this case against Mr. Benson and you never saw

17   Brandon Douglas on that witness stand.

18           You took an oath to follow the Court's instructions,

19   and I would urge you to do that.  I wanted to get that out of

20   the way first.

21           So I think the best thing to do now to sort of go

22   with the rest of this is I want to do a timeline and talk

23   about when things happened and what they have.

24           Okay, so, again, I don't think there's any dispute

25   that March 13th of 2009 was the incident.  I don't put that

```
 1    there to belittle or anything.  That's the date of the crime,
 2    that's the date that Mr. Joseph was killed.
 3         The next thing that we know is that in April 2009,
 4    some individual named Leone sold some guns up in work New
 5    York.  I'm not saying that's the only thing that's happened.
 6         This is my timeline and my argument, and certainly I
 7    could have put 200 entries on there.  But in terms of -- so
 8    sit there and ask yourself, at that point in time, those guns
 9    are then in the hands of the authorities.
10         You saw Detective Lennon from New York.  He came
11    down here, they bought the guns in an undercover buy.  So, of
12    course, those guns were off the street.  And you'll see an
13    exhibit; there were no other guns.
14         Now, ask yourself, as you study this evidence, other
15    than Mr. Zlotnick in his argument, who has told you that
16    Mr. Benson ever had one of those guns?  Who said that Bryan
17    Brown gave him a gun?  Who said that anybody gave him a gun?
18         Who said that Mr. Benson used that gun and shot
19    somebody and gave it to Bryan Brown?  What evidence is there?
20    Do we even know who Mr. Leone is?  Do we know who Corey Odel
21    is.
22         Remember, we don't have to prove anything, and I
23    told you in the beginning you would also have to, when you
24    decide reasonable doubt, think about what you don't know.
25    But that's it.  That's it.
```

```
 1              Those guns are in New York April of 2009, they're in
 2    the hands of the authorities, there's no -- we'll talk about
 3    the believability of these snitches and cooperators, but it's
 4    interesting, none of them even, and I don't think you -- you
 5    know, we'll talk about them.  None of them has said that
 6    anybody gave Mr. Benson a gun.
 7              Mr. Berry said, you know, if you believe the
 8    government's theory, here's the guy that is going to come all
 9    the way down here from Boston for the purpose of doing a lick
10    and doesn't have a gun.  Going to show up to the baseball
11    game with no glove and no bat.
12              Mr. Berry also told you that Kindell said they were
13    coming down here to sell drugs.  And your decision is not to
14    decide whether or not they were coming down here to sell
15    drugs, your decision is to decide whether or not they came
16    down here and killed anybody.
17              But, be that as it may, I would ask you -- and the
18    burden of proof and beyond a reasonable doubt means you
19    examine things critically and you ask yourself.  I don't
20    believe there's one word or document in this case other than
21    Mr. Zlotnick asking you to draw an inference that shows
22    Mr. Benson had any gun, much less the two guns that later on
23    got taken in this undercover operation up in New York.
24              So what's the next thing we have?  July 21st, 2009
25    there's a DNA report.  Now, if you will recall from Ms. Hill,
```

1    that is the DNA report where they developed a profile, she

2    talked about a paperclip and she talked about that when that

3    DNA was tested, they consumed the entire sample.

4           What that means is that, forevermore, nobody's been

5    charged at this point, nobody can check her work.  And I

6    don't stand here to impune her integrity or anything, but

7    that evidence is gone at that point.  And what do we know

8    about DNA?

9           We know -- and Ms. McKeel's a good lawyer, she stood

10   back up.  But ask yourself about common sense.  If the test

11   that they were using at that time was fine and reliable and

12   there was no problems with it, why would they start doing a

13   new test and testing more sites?

14          I'm not a scientist, I think I always have trouble

15   remembering what people's backgrounds are on the jury.  I

16   think some of you folks have backgrounds in science or

17   engineering or that.  But you just ask yourself, even if you

18   don't, from common sense, if that almost 10-year-old test was

19   fine and accurate, then why would they -- why would they

20   start doing a different test?  They have no material to test

21   under the new test because they used it all up ten years ago.

22          And I don't say that to think that Mrs. Hill was

23   trying to do anything wrong, but you do have to ask yourself

24   that.  You know, that's a technology.  Technology advances.

25          So, again, they have that profile.  There's no

```
 1   chance to ever test it again.  There's -- she told you that,
 2   I believe her words were, you will have to remember, it was
 3   changed at the national level to bring us more into line,
 4   that's my paraphrase, with what -- with what the standards
 5   were.
 6           Again, not here to accuse the lab of being backward
 7   or Ms. Hill of being unqualified or any of that, but what you
 8   got to understand is, I didn't decide to change the
 9   standards, none of you folks decided to change the standards.
10           The people that are the, quote, experts in DNA
11   decided that the tests they were doing that the government
12   wants to rely on in this case wasn't good enough, and now
13   they've started doing it a different way.
14           They get to go again, they will probably stand back
15   up later today or tomorrow, whenever they talk to you again,
16   and say, Well, that's meaningless.  But they don't get to
17   decide whether it's meaningless or not, you guys get to
18   decide if it's meaningless.
19           So let's keep going down the timeline on the next
20   thing, as I recall, again.
21           So now we're up to November 4th of 2009.  That's the
22   DNA report where there's a hit that comes back to the
23   database where Mr. Benson, you know, they now have his
24   profile and they get a hit.  We don't know what test was used
25   when they created the database entry.
```

1          I think if you look at the exhibit, and I don't have
2    the number in front of me but it's in evidence, I think the
3    profile they were using to compare the one that Ms. Hill did
4    was created in 2004 or something like that.  They didn't
5    elicit any testimony about what standards they were using
6    then, but they had that match, as they call it.

7          So what do they do?  They go up to Boston, they
8    arrest Mr. Benson, they take his shoes, he consents -- or his
9    girlfriend consents to a search.  He gives them his telephone
10   and he gets arrested for these very same charges, the same
11   murder, the same charges in Newport News Circuit Court.

12         Now, Newport News Circuit Court's not the federal
13   court, but it's the court that all the citizens in Newport
14   News rely upon to bring cases and enforce the law and decide
15   the cases to protect those citizens against people that would
16   commit crimes and cause problems in the community.

17         So they arrest Mr. Benson, they bring him down here,
18   they put him in the Newport News City Jail.  He's pending
19   charges.

20         May 8th, 2010, he talks to Ms. Rivera.  Now, that's
21   Exhibit 114A.  They played about 12 seconds, as I read it,
22   out of about a 15-minute transcript.  The good
23   things about -- the good thing about transcripts is they're
24   not really subject to a credibility test.  You are going to
25   have that transcript.  You go look at the entire transcript.

```
 1            Mr. Benson talks about, in that transcript, that
 2    he's not guilty, that he didn't do it.  It's on the first or
 3    second page, it's in there several times.  You'll have it,
 4    it's right -- where is it?  It's right here.  It's 22 pages
 5    long.
 6            The good thing about transcripts is when you -- just
 7    probably like you think I'm standing up here talking, it
 8    takes a lot longer to listen to something sometimes than it
 9    does to read it, but you go read this and you look at what he
10    says and what he's talking about he's doing down here that
11    was wrong.
12            He doesn't talk about killing anybody, he doesn't
13    talk about robbing anybody.  He talks about the fact that
14    he's not guilty of what he's charged with.  He made that
15    statement to Ms. Rivera.  And, again, you will have to decide
16    if you believe it or not, but the government picked what they
17    wanted to play.  We put the whole transcript in, you'll have
18    it.
19            And, again, I would always urge you, don't take a
20    snapshot, don't try to look through your fingers like that,
21    let's look at the whole picture.  When you look at the whole
22    picture about that statement, despite what they're trying to
23    argue, it's not incriminating to Mr. Benson, it's exculpatory
24    towards Mr. Benson.  But you don't have to take my word for
25    it.  Let's see what happens next on the timeline.
```

1          They take -- remember they talk about the buccal

2     swabs.  They take the buccal swabs, that's when they go swab

3     the cheek, and they now do another DNA test, DNA test number

4     three.  And I invite you to check my timeline.  If my dates

5     are off, they're off, but I think these are accurate.

6          They do that, Ms. Hill talked about it, again under

7     the old technology.  And so you would think the next thing on

8     this would be a trial, or Mr. Benson would say, wow, you got

9     my -- you got my DNA, I guess I better just say I did it and

10    cut a deal.  Or, you've got all this evidence, you've got my

11    phone, you've got the talk from Ms. Rivera, you've got my

12    DNA, you've got the guns up in New York.

13         So guess what the next thing that happens is.

14    Charges are dismissed December 10th of 2010, undisputed.

15    They dismiss this case against Mr. Benson, he goes back to

16    Boston, he goes on with his life.

17         And then on April the 12th of 2017, just a little

18    over a year ago, he gets indicted in this court and now we

19    are here in April of 2018 and he's on trial for these

20    charges.

21         Let's talk about what else happened during this

22    time.  Somewhere in here, and I had made this timeline before

23    he testified, he's in the jail cell with Mr. Turner.

24         And, look, I always think when you are judging

25    credibility, the first thing you should think of is the

1    messenger, not the message.  Because I think most of us, when

2    we make decisions, we want to know who it is that's telling

3    us something, not just what they're saying.

4            And I think common sense -- and I agree with

5    Mr. Zlotnick, you should use your common sense.  The more

6    important the decision, the more important it is to trust the

7    messenger.  And there's all kinds of decisions.  Today y'all

8    are making the decision about a fellow citizen and whether

9    the government has met its burden to prove him guilty of a

10   crime.

11           But you will have specific instructions and you will

12   talk about credibility of witnesses.  Is he a convicted

13   felon, and does he use drugs, and does he have a bias, or is

14   he trying to gain something?  But I think we all do that

15   intuitively in our day-to-day lives.  So none of y'all know

16   me, I don't know any of you, likely it is that none of us may

17   ever see each other again after today.  I don't think any of

18   us have ever seen each other before today.  So you probably

19   would trust me right now if I told you I was a lawyer because

20   the judge has told you I'm a lawyer.

21           But think about your own life.  So you have a child

22   or a loved one that needs -- needs a surgery.  You are going

23   to want to know everything you could possibly know about that

24   procedure and that doctor, and that hospital, who it is

25   that's telling you this person needs this procedure or this

1  surgery.  You go down the continuum.

2      You know, some things -- you decide to buy a house.

3  You know, buying a house is a big financial commitment but

4  most people, given the odds, would say, well, that's probably

5  not as important a decision as whether I have my child have a

6  surgery.  But you are still going to want to know a whole lot

7  about the house; who lived there, you are going to have all

8  kinds of inspections, you are going to go look at it, you are

9  going to decide whether you can trust the realtor and trust

10 the inspector, and you are going to do all those things.

11     You know, people -- some people, at least, decide to

12 get married.  You know, people put a lot of thought into that

13 decision.

14     The other end of the spectrum, as you know, somebody

15 says why don't you go see this movie or, why don't you, you

16 know, try this restaurant.  You know, if you make a mistake

17 and you trust the person, they say it's a great movie and you

18 go there and you hate the movie, nothing has really happened

19 that causes anybody, you or anybody else, any kind of

20 long-term damage.

21     My point is this, the Willie Turners of the world or

22 Wayne Turners of the world, you have to decide whether you

23 trust them or not.

24     And there was a philosopher named Aeschylus who

25 said, back, you know, thousands of years ago, he opined,

1    "Never trust a man upon his oath but upon his character,"

2    which I think is really sort of something that rings true

3    through the ages.

4            And what that means is, just because somebody raises

5    their hand and says they'll tell you the truth, that might be

6    something you want to consider.  But really, if you think

7    about it, that's a legal formality.  He promised to follow

8    the law to tell the truth.

9            He obviously doesn't have a lot of respect for the

10   law or law enforcement, he's admitted he's lied to the

11   police, he committed crimes, he wants a sentence cut.

12           So, again, I would say to you when you sit there and

13   you decide, not the -- not what Mr. Turner said, but who is

14   Mr. Turner?  Why should I trust him?  Why should I make a

15   decision about somebody's life and freedom based on Wayne

16   Turner?  And the flip side of that is, why should I not?

17           Would it cause me hesitation to make a decision in

18   an important matter in my life if Wayne Turner was the one

19   telling you this is a great house, you should buy it, there's

20   no problems?  Or this car runs like a top and it's a great

21   car?  My guess is that would cause you some hesitation.

22           So in here somewhere, I think it was in this

23   timeframe, September, October.  Mr. Benson's in the cell with

24   Mr. Turner.  And think even what Mr. Turner told you.  He

25   said, "I'm locked up for a joint someone else did."  That's

1   what he said Mr. Benson said.

2          I don't -- I'll leave it to your discretion whether

3   you believe that conversation ever occurred or not.  But even

4   if it did, does it prove that he killed anybody?  I would

5   submit to you it doesn't.

6          So now let's talk about some other things.  The

7   phones.

8          I was not having fun with Mr. Swartz, I was trying

9   to make some points.  And the point is, again, that phone

10  evidence.  Is it true those cell towers exist, is it true

11  that phones ping off of cell towers and they have

12  different -- I don't doubt any of that is true.  I don't

13  think you put Mr. Swartz in the same category in terms of the

14  messenger as the Wayne Turners of the world.  But what does

15  it prove?  I mean, what does it prove about, you know, my

16  client going into a house and shooting somebody?

17         And the other thing, and I told you this when we

18  stood up here the first time, think about all the people in

19  this case that you never heard from or don't know anything

20  about.

21         PeeWee.  That picture they showed up there, it's

22  interesting to me the government's theory is that all these

23  guys from Denbigh were going to rob Mr. Joseph and burglarize

24  Mr. Joseph, and whatever they were going to do, and all of a

25  sudden two guys from Boston who don't have a gun, don't have

1    the means to drive down, they have to buy a bus ticket, come

2    down here and, you know, they use them?

3         Where is PeeWee, where was PeeWee that day?  Where

4    was Angel Alliers?  Where was Kenny Jones?  You know, they'd

5    have you believe that Kenny Jones was there, although we

6    didn't hear from Mr. Jones in this trial.

7         Where are all the people that Ms. LeKeisha Wynne

8    told you about and UNC and PJ and all the people that come in

9    and know that Mr. Joseph has drugs and money in his house?

10   Where are all those people?

11        So, again, you know, the government, they can stand

12   back up and say, Oh, that's just Woodward, he's an old

13   lawyer, he's blowing smoke.  What I think is not important,

14   but those people are unaccounted for.  And at least three of

15   them, you know that aren't people that are sitting at that

16   table, were planning to rob this guy.

17        So, again, I would posit to you to think about that

18   and remember, this is a decision way over here on this end of

19   the spectrum.  This is not, Do I go see the comedy or the

20   drama at the movie theater.  This is down here nearly to as

21   an important a decision as you will ever make in your life.

22        And the judge is going to tell you it's not

23   suspicion, it's not do you like what you heard.  It's proof

24   beyond a reasonable doubt.

25        Let's talk about what else.  The government, they're

1    good, they seized my client's shoes.  There were three

2    different shoe prints, two in the house, neither one of them

3    matched my client.  Now, they will stand up and say, Well, he

4    had another pair of shoes.  Maybe.  We don't know.

5         They must've thought -- let me put it to you like

6    this.  You think they seized those shoes from Mr. Benson up

7    there on December -- excuse me, January the 12th of 2010

8    because they thought they weren't important?  Did they seize

9    anybody else's shoes?

10        So, again, I don't know whose footprints those were,

11   but it's not important.  More importantly, you guys don't

12   know whose footprints they were.

13        And Mr. Zlotnick and Ms. McKeel standing up here.  I

14   was doing those little -- these little things right here when

15   Mr. Zlotnick was talking, I was going like this, and you

16   can't see that, and like this.  And what I was doing is I was

17   counting off every time he said "we know."  We know this, we

18   know this, we know this, we know this.

19        No, we don't.  We don't know a lot of those things.

20   And him saying that -- what he's really saying is he believes

21   that.  But that's not what's important, what he believes is

22   not what's important.  What is important is what the evidence

23   shows and what the evidence does not show.

24        Let's talk about some of the other kinds of evidence

25   they have.  And I don't have much more to say or much more

1    time to say it because, you know, the autopsy proves nothing
2    about who committed the crime.  The crime scene proves
3    nothing about who committed the crime.  The phone records
4    prove nothing about who committed the crime.
5         So finally we get to the last thing; the government
6    puts on is Willie Berry.  Now, again, you will have to decide
7    what kind of weight you want to give to it, but remember what
8    Willie Berry told you.  He said, I heard something about this
9    from my brother.  He didn't tell you what he heard and I
10   don't know whether he, you know -- I don't know whether he
11   looks at the internet or reads the newspaper or not.
12        Then he says, I went to talk to Mr. Kindell and he
13   told me all about it.  And then years later, years later, he
14   didn't even know when, but years.  I got him to say it was
15   years later.  He says he had a conversation with Joseph
16   Benson, and Mr. Benson makes, just out of the blue, this
17   confession.
18        He's already talked to Kindell, he's already talked
19   to his brother, years have gone by, Mr. Benson has sat down
20   here in jail for -- from December -- or January the 12th to
21   December the 10th, had the charges dismissed.
22        And then I would submit to you, ladies and
23   gentlemen, that is the only thing they have that they didn't
24   have when they dismissed those charges.  That's it.
25        They have Willie Berry who, after he gets picked up

1  on a heroin charge in Boston in 2015, comes in at some point,

2  don't know exactly when, and tells his story.  Everything

3  else that they've put on in this case, they had before they

4  dismissed these charges.

5          So really what you've got to decide is, what's the

6  strength of Willie Berry.  Do you make an important decision,

7  is that something you can be comfortable with beyond a

8  reasonable doubt, saying I'm going to find a fellow citizen

9  guilty of murder on the word of Willie Berry who's down here,

10 you know, trying to get his sentence cut?

11         He wanted to quibble with me about -- maybe I don't

12 speak that clearly, I'd like to think I do, but I started off

13 with him asking him if he used marijuana every day.

14         And he said, No.

15         And I said, Well, did you tell the police you did?

16         And he goes, Yeah.

17         I said, Well, do you?

18         He goes, No.

19         I mean, you saw him.  And, look, one of the

20 instructions that the Judge is going to give you is when you

21 weigh somebody's credibility, you don't just listen to the

22 mere words they say.  You have their background, you get to

23 observe their demeanor and their way of talking on the stand.

24         So that's it.  That's what -- that's what they've

25 got in the last seven years since they dismissed the charges

1    back in December of 2010.  That's the new evidence.

2          Not the DNA, not the phone, not the crime scene, not

3    the conversation with Ms. Rivera, not any of that.  So I

4    would urge you to weigh all of that carefully.

5          And, look, I'll leave you with this.

6          "Not guilty" is a legal determination, it is not a

7    moral determination.  "Not guilty" is a legal standard.

8    Nobody's going to go back there and ask you to like the

9    culture that Mr. Davis was in -- excuse me, Mr. Joseph was

10   in, or like a lot of the stuff you heard in this case.  But

11   the only way we -- we live in interesting times in this

12   country and, you know, the only way that our standards and

13   our words in our Constitution and the law that Judge

14   Jackson's going to read you, the only way that ever has any

15   meaning is if people, like you, give it meaning.

16         So I urge you when you go back there, remember that.

17   You're making a legal determination based on the highest

18   standard in our law.

19         I would submit to you that this evidence as it

20   relates to Mr. Benson doesn't even come close, and that you

21   should find him not guilty.

22         Thank you.

23         THE COURT:  All right, ladies and gentlemen, we're

24   going to take a 15-minute break.  If you will return to the

25   jury room.

```
 1              (Jury out, 4:11 p.m.)
 2         THE COURT:  You may have a seat.
 3         Mr. Kelleter, you had something you wanted to raise?
 4         MR. KELLETER:  Yes, sir.
 5         Briefly, Your Honor, I do renew my motion for a
 6    mistrial.  We've gotten to a point where, despite their good
 7    faith effort, even the government can't keep straight who the
 8    evidence is admissible against.
 9         Mr. Zlotnick, within the final two minutes of his
10    first closing, took a few minutes to try to figure out who
11    exactly the evidence was admissible against.  And I would
12    submit, as Your Honor saw as Mr. Mr. Zlotnick was speaking,
13    he also had a presentation which, in all candor, I would ask
14    that a copy of that presentation be put in the record at the
15    end because the jury sees it.
16         And what the jury is seeing is a mixing together of
17    evidence, essentially trying to show a common plan, and then
18    saying, Oh, by the way, hold it only against this guy.  This
19    part of a common plan, only hold it against this guy.  And
20    again, they're all acting in good faith, but they can't even
21    keep it straight.
22         So I renew my motion.
23         MR. ZLOTNICK:  I submit that I was very careful to
24    say who the evidence was admissible against throughout the
25    closing argument.  And I haven't looked at a transcript; if I
```

1    misspoke, it was unintentional.  But I think I was careful

2    and I was clear on that.

3         THE COURT:  I think the Court has given the jury a

4    cautionary instruction on that, and a misstatement of

5    evidence by counsel is a common occurrence in cases.

6         I, similarly, had a case that counsel misstated some

7    evidence.  That's why the Court gave the instruction.  It's

8    not a ground for a mistrial.

9         Through the trial, Mr. Woodward, you have made

10   reference to the fact that these charges were dismissed in

11   Newport News, and you did it in your closing argument.  The

12   government never objected, but that is something that leaves

13   an impermissible inference in this case that Mr. Benson

14   shouldn't be here because they dismissed the charges in

15   Newport News.

16        The Court is going to give the jury a cautionary

17   instruction, the fact that these charges were dismissed is

18   nothing that can be used as an inference about the propriety

19   of what we're doing here today.

20        It's improper and the government never objected, but

21   I cannot let the jury leave here with an inference that

22   somehow, because the charges were dismissed in 2010, you

23   know, we shouldn't be here trying this case today.

24        MR. WOODWARD:  Your Honor, I would object to that.

25   I didn't say there was anything wrong.  I said he was legally

1    indicted in this court and on trial; there have been three

2    different witnesses testify about the nolle prosse.

3           I was not arguing evidence that -- I was not arguing

4    facts that were not in evidence and obviously, Your Honor, if

5    you do that, I would object.

6           I think it's very prejudicial to Mr. Benson.  They

7    can certainly stand up in their closing and say they have a

8    right to indict, and I didn't say that they didn't.

9           THE COURT:  Well, it doesn't matter whether you said

10   it or didn't say it, the simple truth is no matter how it got

11   in here, I'm not going to let the jury go with some

12   impermissible inference that a dismissal of these charges at

13   some previous point had some impact on whether we should be

14   here today.

15          Even if you hadn't said it, it still would be an

16   impermissible inference and we're not going to -- the Court

17   has no uncertainty about giving the jury the instruction.

18   They can't draw some inference about this defendant's guilt

19   or innocence based upon the fact that the charges were

20   dismissed at some other jurisdiction.  That's just the bottom

21   line.

22          MR. WOODWARD:  I understand, Your Honor.  Note my

23   objection.

24          THE COURT:  Your objection is noted.

25          MR. SACKS:  I want to inquire.  I wasn't going to

```
 1    get into the nolle prosse at all.  But in my particular
 2    defendant's case, in April of 2012, there were interviews of
 3    him, as you know, by various agents.  Certain things were
 4    done in a certain timetable, and then the defendant was not
 5    indicted until five years later.
 6            All I'm going to argue is that the weight, the
 7    importance of that evidence in 2012, must not have been but
 8    so much or something that you would have expected to be done.
 9    I'm not going to argue --
10            THE COURT:  That's an improper argument.
11            MR. SACKS:  Well, Your Honor --
12            THE COURT:  That's an absolutely improper argument.
13            And if you do that, I'm going to tell the jury.
14            MR. SACKS:  I understand.  What can I argue?
15            As far as the weight of the evidence -- how
16    significant the evidence was to the government in 2012 when
17    they do not act on it for five years, I think is --
18            THE COURT:  It doesn't make any difference.  You
19    know that you have a statute of limitations on crimes and
20    that is not a proper inference, that merely because they
21    waited five years that somehow or another the weight of the
22    evidence changed.  Maybe it did, but you argue what you want
23    to about that.
24            But I'm just telling you that's why the Court goes
25    last, to make sure that the jury is not misled by some
```

```
1     argument, whether it be the government or the defendants make
2     to the jury.
3              MR. SACKS:  And I'm not trying -- I promise you I'm
4     not trying to mislead, and never have in almost 38 years.
5     Never tried to mislead a jury in my life.
6              THE COURT:  Please don't talk when I'm talking.
7              MR. SACKS:  I'm sorry, sir.
8              THE COURT:  You've been cautioned.
9              I tell you what the other thing is we're going to
10    do.  You make your argument and we're going to take the other
11    two in the morning.  Simple as that.
12             MR. SACKS:  And, Your Honor, may I just -- if I make
13    an argument about the weight of that evidence as viewed by
14    the police at that time.  If you give an instruction later, I
15    understand you give it.
16             I don't want to be say -- that's why I'm asking you,
17    I want guidance.  I don't want to do something that you find
18    is a violation of a rule of court or procedure.  I don't
19    believe that it is, but in light of what you said to
20    Mr. Woodward, I just want to be careful, that's all.
21             THE COURT:  Well, Mr. Sacks, the Court doesn't know
22    what you intend to do.  I'm simply telling you that you
23    cannot make a legitimate argument to the jury that because
24    they waited five years they can't, per se, prosecute this
25    defendant.
```

1          MR. SACKS:  I'm not going to say that at all.

2          THE COURT:  So go ahead and wait and see what you

3    have.

4          MR. SACKS:  Thank you very much, Your Honor.

5          (Off the record, 4:18 p.m., jury out)

6          (On the record, 4:36 p.m., jury in.)

7          THE COURT:  Let the record reflect that all jurors

8    are present in the court.  Does counsel agree?

9          (All counsel respond in the affirmative.)

10          THE COURT:  In the last arguments there was a

11   reference that Mr. Benson had charges dismissed in 2010 in

12   state court.

13          The Court instructs you that the dismissal of

14   charges in the state court has no role in your decision about

15   what the verdict should be in this case; it's irrelevant in

16   terms of what you have to decide in this case.

17          Okay, Mr. Sacks.

18          (Mr. Sacks argues his case to the jury.)

19                              * * * * *

20          THE COURT:  We have two more arguments and the Court

21   anticipates that you are going to be here a long time today

22   and it's going to be some time to do that.  We are going to

23   come back tomorrow at 10:00.  Not 9:30, 10, we are going to

24   start with the last two arguments.  You are in the arguments

25   you can't decide anything, do not deliberate, do not discuss

1    the case with anyone else because you still have to hear the

2    instructions of the Court, hear the other arguments of

3    counsel, so I want you to just wait until tomorrow, hear the

4    rest of the arguments and get the appropriate instructions.

5            Leave your pads with the court security officer.

6            All rise.

7        (Jury out, 5:18 p.m.)

8            THE COURT:  You may be seated.

9            MR. WOODWARD:  Your Honor, may I put something on

10   the record?  With all -- I put it on before but I would like

11   to make it clear before Mr. Sacks started his argument.  I

12   would object to the instruction that the Court gave by argued

13   evidence that was admitted and stipulated to and did not

14   misstate that evidence.

15           I think my argument was a fair inference and I

16   believe it prejudices Mr. Benson to give that instruction

17   because it implies that I was misleading the jury.  Thank

18   you, Your Honor.

19           THE COURT:  Thank you, Mr. Woodward.  That's not the

20   inference, that you misled the jury.  I understand it.  But

21   what the Court is simply saying is it leaves that the jury

22   may draw the improper inference.  The facts are as you stated

23   them in the record but the Court has a responsibility to make

24   sure the record is such that the jury does not draw an

25   adverse inference.

1          MR. WOODWARD:  Well, Your Honor, and my point --

2          THE COURT:  We don't need to argue any further.

3    You've objected for the record and we will leave it there.

4    The Court doesn't believe of you any suspected underhanded

5    conduct.  You stated the facts as they were.

6          MR. WOODWARD:  I just wanted to be sure that was in

7    the record.

8          MR. KELLETER:  I have one quick matter to put on the

9    record, Your Honor.  I previously moved for a mistrial and

10   had noted that the government had a presentation in front of

11   the jury.  I would move that that, at the appropriate -- at

12   the end of the -- before this case is submitted, it be in the

13   record, if I'm objecting and I want a record for the Fourth

14   Circuit, if it gets to that, then obviously I would like that

15   in the record and I'm not clear from the government if it's

16   in the record.

17         THE COURT:  It does not belong in the record, it

18   does not belong in the record.  That is an unusual request.

19   That is denied.  No more than that paper Mr. Woodward was

20   using on the screen to make his argument is not put in the

21   record.

22         MR. SACKS:  Well, I wanted it clear that it was

23   presented.  All right.  Yes, Your Honor.

24         THE COURT:  The Court has ruled.

25         All right, the Court will be in recess until

1    tomorrow morning at 10:00.

2            (Whereupon, the proceedings conclude, 5:22 p.m.)

3                    *****    *****    *****

4    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

5

6

        /S/                              10/4/2018
7    --------------------------------    ------------
        Janet A. Collins, RMR, CRR, CRI         DATE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                Janet Collins, Official Court Reporter